UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:

FIRST NBC BANK HOLDING COMPANY          CASE NO. 17-11213

                                                                                                                    SECTION A

DEBTOR                                                          CHAPTER 11

**DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF FIRST-DAY MOTION**

I, Lawrence Blake Jones, Chief Restructuring Officer of First NBC Bank Holding Company ("Debtor"), a debtor and debtor-in-possession in this proceeding, do hereby make solemn oath:

1. On May 11, 2017, (the "Petition Date"), the above captioned debtor and debtor-in-possession filed a petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Louisiana.

2. I am generally familiar with the day-to-day operations, business and financial affairs and books and records of Debtor and its subsidiaries. I submit this Affidavit in support of the *Motion for Order Establishing Notice, Hearing, and Sell-Down Procedures for Trading in Equity Securities and Claims Against the Debtor's Estate* (the "Trading Motion"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the Trading Motion. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others employed by the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial

conditions and its present liquidity crisis. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Declaration.

3. The Debtor is a holding company entity whose primary asset prior to commencement of the case was its 100% ownership interest in First NBC Bank, New Orleans, LA.

4. On Friday, April 28, 2017, First NBC Bank, New Orleans, LA was closed by the Louisiana Office of Financial Institutions. Subsequently, the Federal Deposit Insurance Corporation ("FDIC") was named Receiver. **The commencement of this Chapter 11 Case is not intended in any way to interfere with or otherwise affect the receivership or the assets or liabilities of First NBC Bank in receivership.**

5. The Debtor is a publicly traded Louisiana corporation.

6. The Debtor is indebted under the following prepetition credit arrangement: Indenture, dated as of February 18, 2015 (the "Indenture") between First NBC Bank Holding Company, a Louisiana corporation ("FNBC"), and U.S. Bank, National Association, a national banking association, as trustee ("the Trustee"). Pursuant to the terms of the Indenture, FNBC issued $60.0 million in aggregate principal amount of 5.75% Subordinated Notes due 2025 (the "Notes").

7. As a result of the closure of First NBC Bank as mentioned above, the holders of over 2/3 of the Notes have requested that the Debtor be placed into Chapter 11 to protect the value of its remaining assets including certain tax attributes.

8. The Debtor has recently incurred, and is currently incurring, significant net operating losses ("NOLs"). On account of past and current operations, the Debtor and/or the Bank, or both, presently had tax attributes of approximately $359,000,000 million as of December 31, 2016 (collectively, the "Tax Attributes"). These Tax Attributes could translate into potential future federal income tax savings for the Debtor. By the Trading Motion, the Debtor seeks authorization

to protect and preserve its valuable Tax Attributes by establishing, pursuant to sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code, notice and hearing procedures regarding the trading of the Debtor's equity securities that must be complied with before such trades or transfers become effective. In addition, the Debtor seeks to establish notice and sell-down procedures regarding claims against the Debtor's estate. If no trading restrictions regarding equity securities and no sell-down procedures regarding claims are imposed by this Court, unrestricted trading or transfers of equity securities and claims could severely limit or even eliminate the Debtor's ability to use its Tax Attributes, a valuable asset of the Debtor's estate, and could have significant negative consequences for the Debtor, its estate, and the overall reorganization process.

9. The Tax Attributes are of significant value to the Debtor and its estate because the Debtor generally can carry forward its NOLs to offset its future taxable income for up to twenty (20) taxable years, thereby potentially reducing its future aggregate tax obligations and freeing up funds to meet working capital requirements and service debt. Such NOL may also be available to the Debtor to offset taxable income generated by transactions completed during the Chapter 11 Case.

10. Specifically, unrestricted trading of claims against the Debtor and the Debtor's equity securities could adversely affect the Debtor's Tax Attributes if:

(a) too many 5% or greater blocks of its equity securities are created or too many shares are added to or sold from such blocks, such that, together with previous trading by any person holding five percent or more of the Debtor's stock ("5% Shareholders") at any time during the preceding three-year or shorter period, as applicable (the "Testing Period"), an "ownership change" within the meaning of section 382 of title 26 of the United States Code, the Internal Revenue Code of 1986, as amended ("IRC"), is triggered prior to consummation and outside of the terms of a confirmed chapter 11 plan, or

(b) the beneficial ownership of claims against the Debtor that are currently held by "Qualified Creditors" (as defined below) under the applicable tax regulations is transferred, prior to consummation of a plan, and those claims (either alone or when accumulated with other claims currently held by nonqualified creditors) would be converted under a plan of reorganization into a 5% or greater block of the stock of the reorganized Debtor.

11. Section 172(b) of the IRC permits corporations to carry forward NOLs to offset future taxable income, thereby significantly improving such corporations' cash position in the future. Thus, the Debtor's Tax Attributes are an extremely valuable asset of the estate, and their availability will facilitate the Debtor's successful reorganization and serve to improve creditor recoveries. The Debtor's ability to use its Tax Attributes, however, could be severely limited under Section 382 as a result of the trading and accumulation of the Debtor's equity securities and claims against the Debtor prior to consummation of a plan of reorganization.

12. Based on the Debtor's current and projected financial condition, it is possible that a plan of reorganization will distribute a majority of the common stock of the reorganized Debtor to creditors of the Debtor in exchange for all or part of their claims. Accordingly, under any realistic plan scenario, the Debtor will likely experience an "ownership change" for purposes of Section 382 because the percentage of stock that will be owned by creditors will have increased by more than 50 points over the lowest percentage of the Debtor's stock held by such persons during the applicable Testing Period. IRC § 382(g)(1). In such an event, as described more fully below, the Debtor may avail itself of one of the special relief provisions applicable to an ownership change resulting from a confirmed chapter 11 plan. IRC §§ 382(l)(5), (6). Pursuant to these provisions, the Debtor anticipates that a Section 382 Limitation will not apply or, alternatively, that it will benefit from a favorable valuation rule that will cause the amount of its Section 382 Limitation to

reflect the expected increase in the value of the Debtor resulting from any surrender or cancellation of creditors' claims in exchange for stock pursuant to the plan. *Id.*

13. The problem facing the Debtor, and the reason for this Motion, is that (i) if too many equity holders transfer their equity interests prior to the effective date of a plan of reorganization, such transfers may trigger an ownership change that would not fall within the ambit of these special bankruptcy provisions because such an ownership change would not occur pursuant to a confirmed bankruptcy plan and (ii) the Debtor may not qualify for the special "in bankruptcy" rules of IRC § 382(l)(5) if too many claimholders transfer their claims prior to the effective date of any plan of reorganization. The Debtor needs the ability to monitor and object to changes in ownership of the Debtor's equity securities and the ability to monitor and require a sell-down of claims against the Debtor to preserve flexibility in crafting a plan of reorganization that qualifies for relief under one of the special bankruptcy provisions and, thus, maximize the Debtor's ability to reduce federal income taxes by offsetting its income earned after reorganization with Tax Attributes.

14. Although there can be no assurance that the Section 382(l)(5) Safe Harbor ultimately will be available to the Debtor, it is important that the Debtor preserves the ability to propose a plan of reorganization that would take advantage of that safe harbor. Because the determination of whether a creditor is a Qualified Creditor depends on whether such creditor has held its claim until the effective date of the plan of reorganization, transfers of claims by creditors before such date pose a threat to the Debtor's ability to satisfy the requirements of the Section 382(l)(5) Safe Harbor. Likewise, because transfers of stock by or into the hands of 5% Shareholders before the effective date of the plan of reorganization could trigger an ownership change that would impose an additional and severe Section 382 Limitation on the Debtor's use of its Tax Attributes, even if the Debtor later satisfied the requirements of Section 382(l)(5) in connection with an ownership

change resulting from the plan of reorganization, such transfers also pose a threat to the value of its Tax Attributes. The requested relief will ensure that the Debtor has maximum flexibility to structure a plan of reorganization that meets the requirements of IRC § 382(l)(5), and thus preserves its Tax Attributes to the fullest extent.

15. Even if it is ultimately determined that IRC § 382(l)(5) is unavailable to the Debtor, it is in the best interests of the Debtor and its estate to restrict equity trading which could result in an ownership change prior to consummation of a plan of reorganization for at least two additional reasons.

16. First, an ownership change must occur pursuant to the consummation of the plan in order for the Debtor to qualify for another Section 382 bankruptcy relief provision—the favorable valuation rule of IRC § 382(l)(6). Specifically, IRC § 382(l)(6) provides that if a corporation undergoes an ownership change pursuant to a plan of reorganization in chapter 11 and IRC § 382(l)(5) does not apply (either because the corporation elects out of that provision or because its requirements are not satisfied), then under IRC § 382(l)(6), the value of the Debtor's stock for purposes of calculating the Section 382 Limitation shall reflect the increase (if any) in value of the old loss corporation resulting from any surrender or cancellation of creditors' claims in the transaction. Thus, assuming the value of the Debtor's stock increases as a result of the reorganization, IRC § 382(l)(6) will provide for a higher annual limitation than would result under the general rules of Section 382 and could allow the Debtor to use a greater portion of its Tax Attributes to offset any post-change income.

17. Second, preventing an ownership change prior to the effective date of a plan of reorganization may also benefit the estate by allowing the Debtor a greater use of its Tax Attributes to offset any income arising on or prior to the effective date of the chapter 11 plan. Thus, in all

circumstances, it is in the best interests of the Debtor and its estate to grant the requested relief so as to prevent an ownership change prior to consummation of a plan of reorganization.

18. Once a Tax Attribute is limited under Section 382, its use is limited forever, and once a claim or equity interest is transferred, it cannot be undone. The relief sought herein is necessary to avoid an irrevocable loss or reduction in the availability of the Tax Attributes and the irreparable harm which could be caused by unrestricted trading in Debtor's equity securities and claims against the Debtor and the Debtor's resulting inability to offset taxable income freely with its Tax Attributes.

19. Absent granting the relief requested herein, the Debtor could be irreparably harmed by the mere filing of this Motion. If the Debtor filed this Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, the Debtor believes it is likely that a flurry of trading in claims and stock of the Debtor could immediately follow. Parties holding such claims or stock might rush to transfer their claims or stock before the restrictions on such trading are imposed by this Court. Such trading would put the Tax Attributes in jeopardy, as described above, and would therefore be counterproductive to the Debtor's objectives in seeking this relief. Accordingly, the Debtor requests that the procedures described herein be approved and that a hearing be allowed with respect to the prospective application of such procedures if any Threshold Party or Creditors' Committee appointed in this Chapter 11 Case raises a timely objection.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2017.

                        /s/ Lawrence Blake Jones
                Lawrence Blake Jones, Chief Restructuring Officer