## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:

**FIRST NBC BANK HOLDING COMPANY**          **CASE NO. 17-11213**

          **SECTION A**

          **DEBTOR**          **CHAPTER 11**

### MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

The Official Committee of Unsecured Creditors ("**Committee**"), by undersigned counsel, requests the entry of an order, appointing a chapter 11 trustee for the debtor First NBC Bank Holding Company ("**Debtor**"), pursuant to 11 U.S.C. §1104(a)(1) and (2), and as grounds in support therefor states as follows:

### *INTRODUCTION*

1.          11 U.S.C. §§1104(a)(1) and (2) mandate the appointment of a chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case," or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." In re New Orleans Paddlewheels, Inc., 350 B.R. 667, 691 (Bankr. E.D. La. 2006).  The Committee respectfully moves for appointment of a trustee pursuant to 11 U.S.C. §§1104(a)(1) and (2) because the Debtor is rudderless and conflicted, and cannot fulfill its fiduciary duties to the Debtor's bankruptcy estate, for at least the following two reasons:

          a.   The Debtor's management no longer is employed by the Debtor, leaving the Debtor's day-to-day operations in the hands of Mr. Blake Jones, one of its directors, who by training and experience is not suited to operating the Debtor during this complex chapter 11 case.  A trustee experienced in and familiar with

the complex and esoteric issues that arise in bank holding company bankruptcy cases is needed to do what the Debtor has not yet begun to do - commence litigation against the Debtor's officers, directors and former auditor, resolve potential regulatory and tax issues with the Federal Deposit Insurance Company ("**FDIC**"), preserve and monetize the Debtor's tax assets and attributes, and otherwise take control of the directionless and drifting Debtor and maximize recovery for creditors.  In light of the Debtor's historic failure to provide material information that is not false and misleading (as described below), a trustee also can compel the FDIC to turn over the Debtor's books and records it has seized and provide all constituencies and the Court with timely and accurate information that the Debtor historically has been unable to provide timely.

b.  The Debtor is hopelessly conflicted and cannot maximize the value of the Debtor's serious claims against its officers and directors.  Mr. Jones has serious conflicts and cannot realistically bring suit against, among others, himself.  The Debtor risks coverage disputes with its insurers if Mr. Jones tries.  By its plain terms, the Debtors' directors and officers liability insurance policies (allegedly in the amount of at least $60 million) require the Debtor's directors, including the director who is managing the Debtor, to cooperate with the insurer in defending covered claims. Each of the directors, therefore, including Mr. Jones, is hopelessly conflicted – if they cause the Debtor to pursue the Debtor's serious officer and director claims (described below), then they risk destroying all insurance coverage because by bringing the claims against themselves, they

2

may not be cooperating with the insurers in defending those claims. Indeed, not only creditors, but all other constituencies, benefit if the estate's claims are prosecuted by entities and in a manner that preserves coverage under all applicable insurance policies. The Debtor cannot fulfill its fiduciary duties to the Debtor's bankruptcy estate under these circumstances.

### *FACTS*

#### A. *The Debtor*

2.      The Debtor (NASDAQ: FNBC) is a public company, that was previously listed on NASDAQ. The Debtor describes itself as "a bank holding company that offer[ed] a broad range of financial services through First NBC Bank ("**Bank**"), a Louisiana state non-member bank, to businesses, institutions, and individuals in southeastern Louisiana and the Florida panhandle." [1] The Debtor also represented that its accounting and reporting policies conformed "to accounting principles generally accepted in the United States and to prevailing practices within the banking industry." [2]

3.      The Debtor appeared to have considerable difficulty complying with its legal obligations to report information timely to the SEC that was not false and misleading. The Debtor routinely failed to file required reports and make required disclosures to the SEC timely. [3] Even its untimely filed reports and disclosures proved unreliable, however. The Debtor was forced to restate its financial data for the years ended December 31, 2015, 2014, 2013, 2012, and 2011. The

---

[1] Debtor's quarterly 10-K report for the period ending June 30, 2016, filed by the Debtor with the United States Securities and Exchange Commission ("SEC") on October 20, 2016, ( the "**Late 10-K**") and appearing at https://www.sec.gov/Archives/edgar/data/1496631/000149663116000107/nbcb-2016630x10q.htm.

[2] Id.

[3] See, e.g., Debtor's "*FORM 12b-25 Notification of Late Filing*" filed with the SEC on March 16, 2016, and appearing at   https://www.sec.gov/Archives/edgar/data/1496631/000149663116000079/0001496631-16-000079-index.htm (delay in filing form 10-K for period ending December 31, 2015 due to restatement of earnings).

Debtor claimed its restatement corrected the use of an inappropriate amortization method in accounting for its various investments in tax credit partnerships, as opposed to proper application of the equity method of accounting.  The Debtor also claimed its restatement corrected the improper consolidation of certain investments in Federal Low-Income Housing Tax Credit entities because such entities were determined to be variable interest entities in which the Debtor was the primary beneficiary.  Finally, the Debtor claimed the restatement made various other adjustments and corrected its disclosures of the income tax effects related to these adjustments.[4]  The Debtor's auditor, Ernst & Young, declined to stand for re-appointment as the independent auditors of the Debtor's financial statements,[5] apparently for reasons related to the restatement of earnings.

4.      On December 9, 2016, Doug Smith, allegedly a public shareholder of the Debtor, filed a complaint derivatively and on behalf of the Debtor to commence an action which he alleged was "brought on behalf of [the Debtor] to remedy violations of the federal securities laws and breaches of fiduciary duty under Louisiana law committed by individual directors and officers of the [Debtor]."[6]  According to Smith:

---

[4] Id.

[5] Debtor's 8-K dated August 30, 2016, filed with the SEC on September 2, 2016.

[6] Complaint [Dkt. 1] in civil action number 2:16-cv-17001-KDE-JVM, *Smith v. Ryan, et. al*, in the United States District Court for the Eastern District of Louisiana (the "Shareholder Derivative Action").  The Shareholder Derivative Action, like all claims of harm or damage to the Debtor caused by the Debtor's officers and directors, is property of the bankruptcy estate, and the recovery on account of such claims belongs to the bankruptcy estate, regardless of whether shareholders or creditors brought the claims derivatively prior to bankruptcy.  Torch Liquidating Trust *ex rel* Bridge Assoc., LLC v. Stockstill, 561 F.3d 377, 386 (5th Cir. 2009) ("By definition then, a cause of action for breach of fiduciary duty owed to the corporation that is property of the corporation at commencement of the chapter 11 case becomes property of the debtor's estate, regardless of whether outside of bankruptcy the case was more likely to be brought by the corporation directly or by a shareholder or creditor through a derivative suit.") (citations omitted).  A bankruptcy estate "includes any right of action the debtor corporation may have to recover damages for misconduct, mismanagement or neglect of duty by a corporate officer or director."  Poth v. Russey, 99 Fed.Appx. 446, 2004 WL 614623 (4th Cir. 2004), quoting Delgado Oil Co. v. Torres, 785 F.2d 857 (10th Cir. 1986); Ford Motor Co. v. Minges, 473 F.2d 918, 921 (4th Cir. 1973); In re Amer. Capital Corp., 2011 WL 1750735 (Bankr. S.D. Fla. 2011) (slip. op.); DiStefano v. Stern (In re J.F.D. Enterprises, Inc.), 223 B.R. 610 (Bankr. D. Mass. 1998), aff'd, 236 B.R. 112 (D. Mass. 1999), aff'd, 215 F.3rd 1312 (1st Cir. 2000) (table, unpublished decision) ("[a]n action seeking damages for harm to a corporation based on the prepetition conduct of its directors or managers becomes the property of the estate upon

[The Debtor] was transformed from a relationship-centered community bank that purported to be based on sound banking principles into a mini-hedge fund that came to depend for its profitability on ever-increasing investments in risky, tax-leveraged projects. . . . The Debtor's exposure to federal and state tax-credit investments, which, while increasing the [Debtor's] short term net income after taxes, carried with it enormous risks. These risks included underlying collateral that was illiquid, had to be held for many years, conferred most of their tax benefits very early, and over which the [Debtor] had no economic, voting, or managerial control. The [Debtor's officers and directors] turned a blind eye to these risks and recklessly failed to control, or to account for, them.

The [Debtor's officers' and directors'] failures to prudently guide [the Debtor] in pursuing the tax-credit investment strategy—and to simultaneously increase the [Debtor's] exposure to oil and gas exploration projects without adequate reserves—constituted an abdication of their fiduciary responsibilities. This misconduct also had the result of misstating and withholding material information . . . causing the Debtor's stock price to trade at inflated levels, and damaging the Debtor and its shareholders when the truth was finally revealed, erasing hundreds of millions of dollars of shareholder wealth.

### B. The Debtor's Accounting and Regulatory False and Misleading Statements[7]

#### a. The Debtor's Failure to Account For its Tax Business Properly

5.      The Debtor's books and records similarly obscured the true state of affairs. As recently as the first quarter of 2016, superficially the Bank appeared to be reasonably large and moderately profitable, with few non-performing assets. The Debtor's public statements reinforced this appearance, both in formal required regulatory filings and otherwise. In point of fact, however, the Debtor's regulatory disclosures were grossly misleading and created the false impression the Debtor and the Bank were fully and adequately capitalized when, to the contrary, the Debtor was dangerously undercapitalized.

---

the filing of a bankruptcy petition."); Brandt v. Hicks, Muse & Co., Inc. (In re Healthco International, Inc.), 195 B.R. 971, 985 (Bankr. D. Mass. 1996); see also, Baillie Lumber Co., LP v. Thompson, 413 F.3d 1293 (11th Cir. 2005) (alter ego claim under Georgia law property of the estate); Morley v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427, 432 (1st Cir. 2007) (breach of fiduciary duty to creditors is derivative of a breach to the corporation).

[7] What follows is only a summary for illustration and descriptive purposes of potential claims against the Debtor's officers, directors and former auditors. The actual pleadings to be filed against the Debtor's officers, directors and former auditors may differ from and conflict with this summary, and in such event, the subsequently filed pleadings shall control. Nothing in this Motion is intended to or shall operate in any way as a limitation or otherwise to impair any claims the Debtor or the Committee may hold, and all such claims are reserved.

6.      The Debtor's false and misleading statements regarding its capitalization largely centered on its treatment of its tax credit business, which was a significant portion of the Debtor's overall business.  The Debtor, through a subsidiary, invested in or generated tax credits that either could be traded or used by the Debtor to offset otherwise taxable income.  While the underlying regulatory and accounting issues are esoteric and complex, and will be prominent in litigation against the Debtor's officers, directors and former auditors, at bottom the Debtor failed to account for its tax accumulated tax credits – referred to as "deferred tax assets" – and the effect of such deferred tax assets on the amount of capital it was required to maintain under the so-called "Basel III" convention.[8]  Under Basel III, a bank is required to maintain a minimum capital ratio of eight percent at all times which is to consist of, among other things, tier 1 capital of at least six percent, of which at least 4.5 percent must be in the form of common equity, represented by ordinary shares and bank's retained earnings.  2014-131-1 The Banking Law Journal § 1.03 (2017).  Basel III limits the amount of deferred tax assets that may be included in tier 1 capital, and requires banks to deduct the value of its deferred tax assets from its common equity tier 1 capital.  In general, deferred tax assets arising from tax credit and net operating loss carryforwards must be subtracted from common equity Tier 1 capital, although the deductibility is being phased in through 2018, starting at 40% in 2015 and increasing 20% each year through 2018.

7.      The Debtor failed to deduct its deferred tax assets from its common equity tier 1 capital properly, and failed to disclose properly the adverse effects that it would suffer if it

---

[8] Basel III is a global, voluntary regulatory framework on bank capital adequacy, stress testing, and market liquidity risk.   On July 2, 2013, various federal banking agencies adopted a final rule revising the regulatory capital framework applicable to all top tier bank holding companies with consolidated assets of $500 million or more and all banks, regardless of size. The Basel III framework became applicable beginning January 1, 2015, with certain exceptions that were phased in and that become fully effective in later years.

deducted its deferred tax assets properly, resulting in an overstatement of its tier 1 capital.  The Debtor's failure to account for its deferred tax assets properly misleadingly created the impression that the Debtor and the Bank were capitalized properly, when in point of fact the Debtor and the Bank were grossly undercapitalized.  Indeed, the Debtor's entire equity would have been wiped out by 2018, and the Debtor would have been required to raise additional capital in an amount estimated to be approximately $300 million just to adequately capitalize the Bank's operations.  The Debtor and the Bank would need more than $300 million in new capital to fund growth.  Nowhere in the Debtor's formal public filings or informal public statements prior to 2016 did the Debtor suggest, let alone properly disclose, its gross undercapitalization, its failure to account properly for its deferred tax assets.

8.      Ultimately, however, remaining silent was not an option.  As the Debtor conceded in an 8-K report filed with the SEC on April 8, 2016, (part I, "Explanatory Note"), the Debtor "in consultation with [it's] independent registered public accounting firm, Ernst & Young LLP ("**EY**"), concluded that the consolidated financial statements as of and for the years ended December 31, 2014, 2013, 2012, and 2011, as well as each of the interim periods within the years ended December 31, 2015, 2014 and 2013, need to be restated and should no longer be relied upon."  The Debtor further acknowledged that "related press releases and earnings releases, as well as management's report on the effectiveness of internal control over financial reporting as of December 31, 2013 and 2014, should no longer be relied upon."  Id.  The Debtor conceded that this restatement of its financial statements "due to an error in [the Debtor's] methodology for the recognition of impairment of its investment in tax credit entities and the [Debtor] had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities."  Id.

### b.  The Debtor's Failure to Account Properly for the Bank's Nonperforming Loans

9.      Generally, banks are required to "classify" loans that either are in default or as to which there is a prospect that the loan will not be paid.  The Debtor made false and misleading statements regarding the extent of the Bank's nonperforming and other classified loans that masked the severity of its losses from bad loans.  For example, the Debtor released an 8-K report on February 11, 2016,[9] in which it described a nonperforming ethanol receivable owed by a U.S. Subsidiary of a Spanish ethanol company.  The Debtor represented that it believed the obligors of that loan were "capable of repaying the full amount of the receivable balance over time."  The Debtor also stated its "management does not expect that [the Debtor] will incur any loss on its investment" related to this problem loan.  Although the Debtor did not identify the "U.S. Subsidiary" or the "Spanish ethanol company" it appears the Debtor knew or should have known, but did not disclose, that the Spanish parent was the subject of insolvency proceedings in Spain, and the U.S. subsidiary was a debtor in a chapter 11 case, and that neither was likely to repay the amounts owed to the Bank in full.  Subsequently, upon the Debtor's 10-K for 2015 (filed late, six months after the filing of the February 11, 2016 8-K on August 25, 2016),[10] the Debtor acknowledged (at p. 18) that it recognized a $69.9 million in impairment with respect to this matter.

10.     The Bank suffered material increases in other nonperforming loans as well, a fact that became clear only when the Debtor filed its restated financial statements.  In an 8-K the Debtor filed on September 8, 2016,[11] the Debtor attached as an exhibit a PowerPoint presentation it had made, in which it conceded (at p.12) that in 2015 the Bank had suffered a "[l]arge increase in non-

---

[9] https://www.sec.gov/Archives/edgar/data/1496631/000149663116000074/0001496631-16-000074-index.htm .

[10] https://www.sec.gov/Archives/edgar/data/1496631/000149663116000088/0001496631-16-000088-index.htm .
[11] https://www.sec.gov/Archives/edgar/data/1496631/000149663116000093/0001496631-16-000093-index.htm .

performing assets." The Debtor disclosed in 2015 its total loan loss reserve related to what appears to be three loans was $78 million, or 2.27% of gross loans. The Debtor conceded its oil and gas loan exposure, notwithstanding the collapse of oil and gas prices in 2015, was $158 million, or 4.5% of the Bank's loan portfolio, with $7 million in outstanding loan commitments, and that its loan loss allowance attributable to the Bank's oil and gas exposure was $34 million.

11.     In the Debtor's 2015 10-K filed on August 25, 2016 (supra), the Debtor conceded its risk related to nonperforming assets was amplified because of the concentration of bad loans among the Bank's biggest borrowers. The Debtor acknowledged (at 14) that "[a]s of December 31, 2015, [the Bank's] 10 largest borrowing relationships ranged from approximately $51.8 million to $96 million . . . and averaged approximately $76.4 million in total commitments."[12]

### c. *Damages*

12.     The losses incurred by the Debtor, its creditors and shareholders resulting from the Debtor's misleading statements are substantial. The Debtor had raised approximately $60 million in debt financing prior to the time it filed its restated financial statements. All of this debt remains outstanding in this bankruptcy case. Shareholders have been completely wiped out. Whether creditors' recoveries will be meaningful in this case depends in large measure whether the Court appoints an aggressive trustee who will combine appropriate litigation tactics against the Debtor's officers and directors, and the Debtor's former auditor, with sophisticated chapter 11 planning to preserve as much of the tax assets as possible for the benefit of the Debtor's creditors while addressing the panoply of regulatory and legal issues related to the FDIC's takeover of the Bank. While discovery in litigation may be required to determine exactly what the Debtor's officers did, and the extent of the relative culpability of the Debtor's officers, directors and EY for the events

---

[12] The Bank's various regulatory filings with bank regulators are not entirely consistent with the disclosures appearing in the Debtor's SEC filings. The Committee continues to investigate this matter and reserves all of its rights.

leading to the Debtor's restatement of its financial statements, it is clear what they did not do – direct the Debtor to pursue and investigate proposals that could have avoided the failure of the Bank and the large losses to creditors that have occurred.  Instead, the Bank failed and this chapter 11 case followed shortly thereafter.

### C.  The Debtor's Tax Refund

13.     United States Department of Treasury regulations provide that a parent corporation may file in its own name a consolidated income tax return for itself and its subsidiary corporations (the "**Consolidated Group**" or "**Group**"). In addition to filing the tax return in its own name, the parent corporation receives in its name any income tax refunds due the members of the Consolidated Group. IRS regulations govern the procedural mechanics for filing consolidated federal income tax returns.  The United States Internal Revenue Service (the "**IRS**") requires that there be a "sole agent" for the Group. 26 C.F.R. § 1.1502-77(a)(1). That "one entity (the agent) is the sole agent that is authorized to act in its own name regarding all matters relating to the federal income tax liability for the consolidated return year for each member of the Group." Id.  In general, the agent must be the "common parent" for the affiliated group. 26 C.F.R. § 1.1502-77(c)(1). Procedurally the IRS regulations require the use of an "agent" for filing consolidated federal income tax returns.  Superintendent of Ins. of N.Y. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), aff'd 377 F.3d 209 (2nd Cir. 2004).  Thus, the agent files claims for refunds, and *any refund is made directly to and in the name of the agent* and discharges any liability of the Government to any member with respect to such refund.  26 C.F.R. § 1.1502-77(d)(5) (emphasis added); *see also* Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262, 265 (9th Cir. 1973) ("the refund is made payable to the parent and the acceptance of the refund by the parent discharges any liability of the

10

government to the subsidiary"); United W. Bancorp, Inc. v. FDIC (In re United W. Bancorp, Inc.), 558 B.R. 409, 422-23 (Bankr. D. Colo. 2016).

14.    Here, the "agent" is the Debtor.  Upon information and belief, the Debtor has not filed a consolidated federal tax return for the Group for 2016.  Upon information and belief, the FDIC is moving on a priority basis to file a separate federal tax return for the Bank for calendar year 2016 which will provide for a tax refund for 2016 believed to be in the amount of $2,414,547 on account of financial results for the entire consolidated group carried over from prior years.

15.    Now that the Bank is in the hands of the FDIC, it is common in bank holding bankruptcy cases for the FDIC to contend that it alone is entitled to any tax refund, notwithstanding that the tax losses that generated the refund arose from tax returns filed by the Debtor on behalf of the Group.  This issue – whether a bank holding company in chapter 11 or a bank for which the FDIC is a receiver owns the refunds – has been the subject of much litigation.  The courts largely have determined ownership of the tax refunds based upon the specific language of the applicable tax sharing agreement where, as here, such an agreement exists.  Compare, e.g., Zucker v. FDIC (In re BankUnited Fin. Corp.), 727 F.3d 1100, 1102-03 (11th Cir. 2013) (bank owns the tax refunds under the applicable tax sharing agreement), and FDIC v. Siegel (In re IndyMac Bancorp, Inc.), 554 F. App'x 668, 670 (9th Cir. 2014) (holding company owns the tax refund under the applicable tax sharing agreement).[13]  Thus, each case turns on a careful analysis of the applicable tax sharing agreement and the facts and circumstances surrounding the activities that give rise to the refund.

_____

[13] Other cases determining ownership of tax refunds owed to a consolidated group taxpayer pursuant to a tax sharing agreement include Cantor v. FDIC (In re Downey Fin. Corp.), 593 F. App'x 123 (3d Cir. 2015) (bank holding company wins); FDIC v. AmFin Fin. Corp., 757 F.3d 530, 534 (6th Cir. 2014) (lower court decision in favor of holding company reversed and remanded for further fact-finding); FDIC v. Zucker (In re NetBank, Inc.), 729 F.3d 1344, 1347 (11th Cir. 2013) (FDIC wins); United W. Bancorp, Inc. v. FDIC (In re United W. Bancorp, Inc.), 558 B.R. 409, 417 (Bankr. D. Colo. 2016) (bank holding company wins); In re Imperial Capital Bancorp, Inc., 492 B.R. 25, 30 (Bankr. S.D. Cal. 2013) (holding company wins); In re First Cent. Fin. Corp., 269 B.R. 481 (Bankr. E.D.N.Y. 2001) (holding company wins).

16.     Since the holding company is the "agent" for the Group that typically receives the tax refund, and has at a minimum bare legal title to the tax refund, "the burden shifts to the FDIC to establish that it holds the beneficial interest in the Tax Refund (and the Trustee does not)." United W. Bancorp, Inc. v. FDIC (In re United W. Bancorp, Inc.), 558 B.R. at 424 (citations omitted).

17.     Upon information and belief, the Debtor and the Bank are parties to a tax sharing agreement.  The version of the agreement provided to the Committee contains contradictory provisions.  Further discovery may be required to establish the validity of the version of the agreement provided to the Committee and the full extent of any related agreements between and among the Debtor and the Bank.  Upon information and belief, the Debtor has not undertaken significant efforts either to seize any tax refund or to prepare and file a consolidated tax return. Upon information and belief, while the FDIC has represented it may be prepared to escrow any tax refund it receives on account of its separately filed tax return, such agreement is, upon information and belief, being negotiated.  However, achievement of this agreement would only be the beginning – nothing has been done yet to determine whether the FDIC or the Debtor is entitled to some or all of the refund.

### D.  The Debtor's Directors and Officers Insurance

18.     The Debtor is the owner of a "tower" of insurance policies that provides coverage on a "claims made" basis[14] for certain "Wrongful Acts" of the Debtor's officers and directors for claims made and reported to the insurer in the policy year beginning December 31, 2016 and

---

14 A "claims made" insurance policy only covers claims made and reported to the insurer.  Director and officer liability policies commonly are "claims made" policies.  Claims made policies generally are enforceable in Louisiana against insurers.  See, Gorman v. City of Opelousas, 148 So. 3d 888, 892 (La. 2014) ("Where a policy unambiguously and clearly limits coverage to claims made and reported during the policy period, such limitation of liability is not per se impermissible.").

concluding on December 31, 2017.[15]  The foundation of this insurance tower is a $10,000,000

*"Directors, Officers and Corporate Liability Insurance Policy"* (Policy Number 14-MGU-16-

A39690) (the "Underlying Policy").  The Debtor owns a number of excess liability policies that,

with the Underlying Policy, provides certain coverage for "Wrongful Acts" of the Debtor's officers

and directors in the aggregate amount of at least $60,000,000.[16]  It appears from the Committee's

preliminary review of the policies that the excess policies "follow form" with the Underlying

Policy.  In other words, with exceptions not relevant here, generally the excess policies provide

coverage on the same terms and conditions as the Underlying Policy, but the coverage of each

excess policy is triggered only when coverages under all "junior" policies, including the

Underlying Policy, have been exhausted.  Thus, the boundaries of the extent, scope, terms and

conditions of coverage under all of the policies are governed and defined by the terms and

conditions of the Underlying Policy.

19.    "Wrongful Acts" covered by the Underlying Policy generally are defined as any

"actual or alleged act, error, misstatement, misleading statement, omission or breach of duty" by,

*inter alia*, the Debtor's current and former officers and directors.  The insurer generally covers the

officers and directors (and, to the extent the Debtor has indemnity obligations to the officers and

directors, the Debtor's indemnity obligations) for losses for which they are liable for "Wrongful

Acts."

---

15 It appears the Debtor had other policies in place prior to December 31, 2016 (the beginning of the "Policy Year" under the Underlying Policy).  Moreover, if claims were made on the policies in prior years, and additional claims are made under the policies in the existing policy year, then it is conceivable coverage may be substantially higher in the aggregate.  The Committee has not been provided with copies of all policies, and its investigation into the Debtor's insurance coverage continues.  The Committee, of course, reserves all of its rights and remedies.

16 On July 14, 2017, Ashton Ryan, a former officer and director of the Debtor, filed his *"Motion for an Order for Relief from Stay, etc."* [Dkt. 62] ("**Ryan Motion**"), in which Mr. Ryan avers (at ¶15) that the insurance is in the amount of $60 million.  The Committee continues to investigate the insurance and reserves it rights with respect to all insurance.

20.     The Underlying Policy contain numerous obligations on the part of directors and officers when a claim is made.  Particularly relevant here is the "cooperation obligation" that appears in Condition H(1), and provides that "the **Insureds** [i.e., the Debtor and its officers and directors] will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect [to claims for which coverage is sought]." (emphasis in original). Under Louisiana law, "failure of an insured to cooperate with the insurer has been held to be a material breach of the contract and a defense to suit on the policy."  Hamilton v. State Farm Fire & Cas. Ins. Co., 477 F. App'x 162, 165 (5th Cir. 2012) (quoting, Mosadegh v. State Farm Fire & Cas. Co., 2008 WL 4544361, 2008 U.S. Dist. LEXIS 79124 at *3 (E.D. La. Oct. 8, 2008)); see, Doe v. OneBeacon Am. Ins. Co., 639 F. App'x 627, 628 (11th Cir. 2016) ("As a matter of [Florida] law, the insured -- at the time it settled the case in advance of trial -- breached its duty to cooperate with its insurer in the investigation and defense of the underlying tort claim. So, the insurer has no duty to indemnify the insured in this case."); Hsu v. Safeco Ins. Co. of Ind., 654 F. App'x 979, 980 (11th Cir. 2016) ("Under Georgia law, an insurer may require its insured to abide by the terms of his policy and cooperate with the insurer's investigation as a precondition to recovery.") (citation omitted); Durden v. State Farm Fire & Cas. Co., No. 1:15-cv-3971-WSD, 2017 U.S. Dist. LEXIS 26567, at *19 (N.D. Ga. 2017) (same).

### E.  The Motions for Relief From Stay

21.     As noted above, Mr. Ryan, a former officer and director of the Debtor, has filed the Ryan Motion seeking relief from the automatic stay to permit the insurers to pay "Defense Costs" to his counsel for defense of certain pending civil actions.  Similarly, Mary Beth Vertigets, allegedly a former officer of the Debtor, also has filed a motion for relief from stay to obtain "Defense Costs" from the Debtors' insurers (with the Ryan Motion, the "**Relief from Stay**

14

**Motions**"). The Committee intends to file its response to the Relief from Stay Motions in due course.

22.     The Relief from Stay Motions frame a critical aspect of the irreconcilable conflict the Debtor confronts that justifies the appointment of a Chapter 11 trustee, as the interests of creditors and the interests of Mr. Jones are in conflict. Generally, the insurance policies are "wasting" policies, in that defense costs properly paid by the insurers will reduce the amount available to compensate parties for the harm caused by the wrongdoing of the Debtor and its insiders. Creditors have an interest in preventing, or at least minimizing, the amount of "waste" that occurs, since creditors are the likely beneficiaries of the insurance coverage available under the policies.

23.     The interests of Mr. Jones, like Mr. Ashton and Ms. Vertigets, are very different. They seek access to the insurance policies now to provide them with the funds for aggressive defenses of the various existing and future civil actions. Although two of the existing civil actions identified in the Ryan Motion are stayed by court orders in those matters, one of those matters – certain litigation in Georgia in which Mr. Ryan is a named defendant – no longer is stayed. Moreover, the SEC has commenced an investigation related to the Debtor. While the exact contours and scope of that investigation are not clear, the investigation seems to be focused on the prepetition conduct of Mr. Ryan and Ms. Vertigets as officers of the Debtor.

24.     Mr. Jones, like Mr. Ryan and Ms. Vertigets, has an interest in having the Court allow the Relief from Stay Motions and commence the payment of attorneys fees for their individual benefits , notwithstanding the "waste" that inures to the detriment of creditors. As noted above, creditors, in contrast, have an interest in preventing, or at least minimizing, the potential "waste." A trustee can evaluate the Relief from Stay Motions and indeed, all issues relating to the

existing insurance, free of this conflict.  Unlike Mr. Jones, a trustee could act for the benefit of creditors and this bankruptcy estate unaffected by the personal interests of Mr. Jones.

### F.  This Bankruptcy Case and the Committee

25.     On or about April 28, 2017, the Commissioner of Financial Institutions of the State of Louisiana filed suit in Louisiana state court seeking court approval of a conservator for the Bank.  The Federal Deposit Insurance Corporation ("<u>FDIC</u>") became the receiver for the Bank. The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 11, 2017 (the "<u>Petition Date</u>"), thereby commencing this bankruptcy case.  The Debtor remains in possession of its assets and in control of its affairs as debtor-in-possession.

26.     On May 18, 2017, the United States Trustee filed its "*Notice of Appointment of Unsecured Creditors Committee]*" [Dkt. 25], thereby forming the Committee.

## ARGUMENT AND AUTHORITIES

### A.  A Chapter 11 Trustee Should Be Appointed for the Debtor Pursuant to 11 U.S.C. §1104(a)(1)

27.     11 U.S.C. §1104(a)(1) requires the Court to order the appointment of a chapter 11 trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause.  <u>In re New Towne Dev., LLC</u>, 404 B.R. 140, 149 (Bankr. M.D. La. 2009); <u>In re SunCruz Casinos, LLC</u>, 298 B.R. 821, 828–29 (Bankr SD Fla 2003), citing <u>In re Oklahoma Refining Company</u>, 838 F.2d 1133, 1136 (10th Cir.1988) (other citations omitted).  "[C]ause can consist of other factors, including an actual conflict of interest."  <u>In re Cajun Electric Power Co-op., Inc.</u>, 191 B.R. 659, 661 (M.D.La.1995), <u>aff'd</u>, <u>Matter of Cajun Electric Power Co-op., Inc.</u>, 74 F.3d 599 (5th Cir.1996); <u>see</u>, <u>In re New Towne Dev., LLC</u>, 404 B.R. at 149 (cause under section 1104(a)(1) can include an actual conflict of interest).

28.     Here, the Debtor and its management have precisely such a disabling conflict of interest.  The Debtor's management has resigned.  Mr. Jones owes a duty of cooperation to the Debtor's insurers with respect to claims against him for which coverage exists under the Debtor's insurance tower.  Mr. Jones may be violating his duty of cooperation if he purports to direct the Debtor's efforts in litigation against the Debtor's officers and directors.  At bottom, Mr. Jones has a disabling conflict of interest if he purports to cause the Debtor to sue himself.  As noted above, Mr. Jones has an irreconcilable conflict with the Debtor's estate and its creditors with respect to the Ryan Motion.

29.     The Debtor appears to be paralyzed by its potential conflicts.  The Debtor has taken only small steps to maximize recovery for creditors and administer this case, such as retaining special counsel to terminate the Debtor's 401k and retirement plans and recovering liquidated debts owed to the Debtor (including from certain of its insurers for costs and fees in excess of the retentions under the applicable insurance policies).  However, the Debtor has neither commenced litigation against EY and its officers and directors nor sought authority to conduct Rule 2004 examinations to evaluate these claims.  Upon information and belief, the Debtor has not taken any action to investigate whether the FDIC will have any claims in this case, or whether such claims will be adversely affected by the manner in which the FDIC is liquidating the Bank's assets.[17]  The Debtor has taken only limited steps to preserve and protect the estate's rights to potential tax refunds, and has not commenced litigation with the FDIC to determine ownership of the tax refunds.

---

[17] The Debtor has an interest in assuring the FDIC's liquidation of the Bank's assets occurs in a manner to maximize the value of those assets if the FDIC has a right to assert a claim against the Debtor for the difference, if any, in its losses resulting from the Bank's failure and the amounts realized from the disposition of the Bank's assets.

30.     Moreover, the Debtor's historical wrongful conduct, which Mr. Jones, as a director, was unable to prevent, also constitutes cause under 11 U.S.C. §1104(a)(1) for appointment of a trustee.  While Mr. Jones, unlike Mr. Ryan, was not an officer in charge of the day-to-day affairs of the Debtor prior to the Petition Date, nevertheless, Mr. Jones had a duty of care and a duty of loyalty that required, at a minimum, that Mr. Jones act as a director in the best interests of the Debtor to prevent the Debtor from engaging in the wrongdoing that caused such grievous harm to creditors.  Whatever else is true, Mr. Jones was unsuccessful in preventing this wrongdoing.  A chapter 11 trustee will be free to evaluate the extent of culpability of all directors and officers of the Debtor for this wrongdoing, and seek to recover from the culpable officers and directors accordingly, without concern for consequences of such an evaluation on him or her personally.

31.     Cause also exists to appoint a trustee pursuant to 11 U.S.C. §1104(a)(1) because the Debtor has historically been unable to publish and disclose material information timely disclosures.  A trustee could investigate and disclose all of the Debtor's prepetition operations, acts, and financial affairs with impartiality and without the Debtor's impaired credibility regarding its ability and willingness to provide timely information that is neither false nor misleading.  "Most importantly, all interests in the case, and the Court, can be reassured [by appointment of a trustee] that full and open disclosure of the debtor's assets will be achieved."  In re New Orleans Paddlewheels, Inc., 350 B.R. at 693.  Among other things, in addition to the various issues described above requiring further investigation, a trustee can investigate whether the Debtor's prepetition sale of deposits to Whitney Bank occurred in accordance with applicable law and consistently with the fiduciary obligation of the Debtor's officers and directors to maximize the value of those deposits.  A trustee can investigate the curious references on certain of the Debtor's regulatory disclosures that the Bank held an inordinate amount of uninsured deposits.  The source

of these deposits, the uses to which the Debtor put these deposits and indeed, in light of the Bank's

failure, the reasons why any deposits were uninsured all are issues worthy of further investigation

by an independent trustee.

32.     Thus, cause exists under 11 U.S.C. §1104(a)(1) for the appointment of a Trustee.

Although there is a strong presumption that a debtor in possession should remain in control, "[t]he

willingness of Congress to leave a debtor in possession is premised on the expectation that current

management can be depended upon to carry out the fiduciary responsibilities of a trustee." In re

SunCruz Casinos, LLC, 298 B.R. at 830 , quoting In re Marvel, 140 F.3d 463, 474 (3d Cir. 1998)

(internal quotation omitted).   Where, as here, cause for appointment of a trustee exists, "the

appointment of a trustee is a power which is critical for the Court to exercise in order to preserve

the integrity of the bankruptcy process and to ensure that the interests of creditors are served."  In

re SunCruz Casinos, LLC, 298 B.R. at 830, quoting In re Matter of Intercat, Inc., 247 B.R. 911,

920 (Bankr. S.D. Ga. 2000).   The "integrity of the bankruptcy process" and the interests of

creditors would be seriously challenged absent appointment of a chapter 11 trustee for the Debtor

where, as here, management will have conflicts that preclude it from fulfilling its fiduciary duties

to creditors and to maximize creditor recoveries from the Debtor's insurance policies.

B. **Appointment of a Chapter 11 Trustee for the Debtor is in the Interest of Creditors and Other Interests of the Estate and Should be Ordered Pursuant to 11 U.S.C. §1104(a)(2)**

33.     11 U.S.C. §1104(a)(2) provides for the appointment of a chapter 11 trustee, inter

alia, "if such appointment is in the interest of creditors . . . and other interests of the estate."  Unlike

the "cause" standard of section 1104(a)(1), the Court has discretion under section 1104(a)(2) to

consider a variety of factors even if no cause for appointment of a trustee exists under section

1104(a)(1).  Determination of whether appointment of a chapter 11 trustee is in the best interests

of creditors "entails exercise of a spectrum of discretionary powers and equitable considerations.

It must therefore be determined on a case by case basis and will rely heavily on the facts." In re New Orleans Paddlewheels, Inc., 350 B.R. at 692; see, In re Sundale, Ltd., 400 B.R. at 901. The Court should consider the cumulative totality of the circumstances. See, id. at 912. Among the factors Courts have considered is the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. In re New Orleans Paddlewheels, Inc., supra, In re Sundale, Ltd., supra.

34.     Here the benefits of appointment clearly outweigh the costs in light of the totality of the circumstances. The Debtor will be unable to fulfill its fiduciary duties and will be unable to monetize claims against officers and directors as easily and as inexpensively as a trustee could pursue those claims. Current management cannot be expected to pursue the Debtor's claims against themselves, and if they try, they risk collateral litigation and coverage disputes with their insurers. These risks and costs disappear with the appointment of a trustee.

35.     The Debtor may contend that these conflicts can be managed simply by the expedient of conferring the Committee with derivative standing to pursue litigation in which the Debtor is conflicted. However, this is an imperfect solution. The Debtors remain the owners of the causes of action, even if the Committee derivatively is litigating those claims, and the Debtor, rather than the Committee, arguably reserves the ultimate decision whether to settle or litigate claims. See, e.g., Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC), 423 F.3d 166 (2nd Cir. 2005) (Committee cannot compromise claims it brings derivatively over objection of debtor in possession). Conferring the Committee with derivative standing does nothing to cure the Debtor's lack of experience in dealing with the FDIC and other constituencies in complex chapter 11 cases such as this bank holding company case.

36.     Moreover, the Debtor is rudderless.  The Debtor is not operating any ongoing business.  From Mr. Jones's testimony at the meeting of creditors held pursuant to section 341 of the Bankruptcy Code, it is obvious that Mr. Jones has little, if any, personal knowledge of the Debtor's financial affairs.  Indeed, Mr. Jones made clear at that meeting that his knowledge largely is secondary hearsay from information provided to him by third parties.[18]  In short, by experience and training, Mr. Jones is not the most qualified individual to run a bank holding company in chapter 11.  Appointment of a trustee is the mechanism Congress enacted as the means to divest a debtor in possession of control of the estate and its assets where, as here, the Debtor's management is conflicted and not the most suitable persons to operate in the highly specialized world of bank holding company chapter 11 cases.  A person experienced in the myriad regulatory, tax and legal matters should be appointed trustee to assume control of this case instead and, as has occurred in other bank holding bankruptcy cases, act to maximize the recovery for creditors.

37.     Section 1104(a)(2) requires consideration of the best interests of "other interests" and not just those of creditors.  All constituencies benefit if the Debtor's assets are maximized, by preserving the insurance tower and otherwise as described above.  The directors benefit

---

[18] Transcript of June 9, 2017 Meeting of Creditors ("**Transcript**"), at page 36 -37, excerpts attached as **Exhibit A**.  As set forth in Exhibit A, Mr. Jones testified that he reviewed the schedules and statement of affairs after counsel prepared them (page 36, lines 16 – 19).  Mr. Jones's testimony emphasized his lack of personal knowledge by explaining his reliance on third parties for information needed to complete the schedules and statement of financial affairs.  In further explaining the limited information available to him to prepare the schedules and statement of financial affairs, Mr. Jones testified (Transcript, page 37, lines 9 – 17) as to the limited availability of personnel to provide him with necessary information that he lacked:

> There is no one in the company to ask a question because nobody was ever there to begin with.  They were all at the bank.  They're all fired as of the 28th.  To the degree that we could get information, we've done our best job for people volunteering issues.  Some of them are now employees of the FDIC.  Some of them are employees of Hancock Whitney. What we're giving you is the absolute best that we can give you at this point.

The Debtor's counsel then stressed (Transcript, page 27, lines 19-20) that Mr. Jones and counsel "had extremely limited information as [Mr. Jones] mentioned."

individually if the insurance is unimpaired, since they, as insureds, obtain maximum protection for their personal assets if the insurers indemnify them for creditors' claims of wrongdoing, as the insurers are required to do under the policies.  All constituencies also benefit since appointment of a trustee enables the estate to benefit from the asset maximizing activities a trustee can perform but which the Debtor is unable or unwilling to perform.

38.    The final factor - the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, also weighs in favor of appointing a trustee.  As noted, the benefits of appointment of a trustee are substantial.  Leaving the Debtor in possession of its affairs will not reduce the costs since the Debtor's management – the parties who arguably have institutional knowledge that theoretically might limit costs of maximizing estate assets – no longer are employed by the Debtor.  A trustee experienced in bank holding company cases could expeditiously identify the relevant issues and arguably could perform the necessary tasks more economically than could Mr. Jones.  Nothing prevents Mr. Jones from assisting a chapter 11 trustee to minimize costs if such assistance proves helpful.[19]

39.    The costs of appointing a trustee in these cases also can minimized by the rapid appointment of a trustee.  Louisiana has a "first come, first served" rule with regard to proceeds from liability insurance policies.  La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.), 832 F.2d 1391, 1393 n.2 (5th Cir. 1987), citing, Holtzclaw v. Falco, Inc., 355 So. 2d 1279, 1286-87 (La. 1978); Carter v. Safeco Ins. Co., 435 So. 2d 1076, 1080 (La.Ct.App. - 1st Cir. 1983).  The insurance may cover claims (such as those asserted against Mr. Ryan in the Georgia litigation described in the Ryan Motion) in addition to the estate's claims against directors and officers.  Moreover, as noted, the insurance policies are "wasting" policies, in that the amounts

---

[19] Mr. Jones testified at the creditors meeting that he is not receiving any salary from the Debtor for his current work and that he is receiving "zero" from the Debtor.  Transcript, page 15, lines 4 – 9, attached as **Exhibit A**.

available to satisfy claims may be reduced by payments to insureds for defense costs. Prompt appointment of a trustee will increase the prospects for the estate's recovery from the Debtor's insurance tower ahead of any competing claimants. A trustee could act to stay or control the litigation referenced in the Relief from Stay Motions for which those movants seek defense costs that "waste" the insurance policies. A trustee could bring and accelerate litigation to obtain judgment against the officers and directors that would be paid from proceeds of these insurance policies.

40.     Although circumstances differ, this Court's observations in In re New Orleans Paddlewheels, Inc., 350 B.R. at 693, echo here. This Court determined the costs of appointing a trustee were outweighed for many reasons, including the fact that the trustee would "be in a position to pursue claims debtor's management shows no inclination to pursue" and therefore, "the recovery to the estate may well be increased." Id. In a similar vein here, the recovery to the estate may well be increased here because the trustee can bring claims without the risks that the insurer successfully will deny coverage if the Debtor brings those claims, and without the costs associated with coverage litigation with the insurer. A trustee also could bring claims against EY that to date Mr. Jones "shows no inclination to pursue."

41.     The Committee recognizes that the Debtor's estate currently has little if any cash available to fund a trustee's efforts. Nevertheless, the estate has substantial illiquid assets that should result in substantial cash availability for the estate to pay administrative expenses incurred by a chapter 11 trustee. Indeed, the Debtor already has filed its *"Ex Parte Motion for Turnover of Proceeds"* [Dkt. 91] to obtain possession of $593,686.84 of cash. The Committee has identified a candidate to serve as trustee who is knowledgeable about bank holding company bankruptcy cases, and has served in fiduciary capacities in other bank holding company chapter 11 cases. This

individual has advised the Committee and, when interviewed by the United States Trustee's office,

that he is ready, willing, and able to serve as a chapter 11 trustee in this case notwithstanding the

limited immediate liquidity to fund his efforts.  Thus, the Court can be assured that an experienced

trustee, knowledgeable in the specialized issues that arise with respect to bank holding company

bankruptcies, will assume control of the Debtor's estate if the Court orders appointment of a trustee

and the United States Trustee appoints the Committee's candidate.

### *CONCLUSION*

42.     Appointment of a chapter 11 trustee for the Debtor is mandated by 11 U.S.C.

§1104(a)(1) for cause and under 11 U.S.C. §1104(a)(2), as the interests of this estate will benefit

by realizing maximum value for the Debtors' assets if management is replaced by an independent,

disinterested and unconflicted fiduciary.  The Court should allow this motion and appoint a chapter

11 trustee for the Debtors as soon as possible.

**WHEREFORE,** the Committee respectfully requests that the Court grant this Motion and

order the appointment of a Chapter 11 trustee in the Debtor's chapter 11 case, and for such other

and further relief as the Court deems just and proper.

**Signatures on following page**

Dated:  August 22, 2017                              Respectfully Submitted By:

   **/s/Jeffrey D. Sternklar**.
Jeffrey D. Sternklar (MA BBO No. 549561)
JEFFREY D. STERNKLAR LLC
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel.: (617) 396-4515
Fax: (617) 507-6530
Jeffrey@sternklarlaw.com


**STEWART ROBBINS & BROWN, LLC**

**/s/ Paul Douglas Stewart, Jr.**
P. Douglas Stewart, Jr. (La. Bar No. 24661)
Brooke W. Altazan (La. Bar No. 32796)
620 Florida Street, Suite 100
Baton Rouge, LA 70801
Tel.: (225) 231-9998
Fax: (225) 709-9467
dstewart@stewartrobbins.com
baltazan@stewartrobbins.com

*Counsel for Official Committee of Unsecured Creditor*