# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRST NBC BANK HOLDING COMPANY | ) | Case No. 17-11213 |
|  | ) |  |
| Debtor | ) |  |
|  | ) |  |

## SECOND AMENDED DISCLOSURE STATEMENT RELATING TO AMENDED JOINT CHAPTER 11 PLAN FOR FIRST NBC BANK HOLDING COMPANY

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN.  VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

Dated:  July  2, 2019

**THE STEFFES FIRM, LLC**
William E. Steffes, Esq.
bsteffes@steffeslaw.com
Barbara B. Parsons
bparsons@steffeslaw.com
13702 Coursey Blvd., Bldg. 3
Baton Rouge, Louisiana 70817
(225) 751-1751
(225) 751-1998  Facsimile
*Counsel to the Debtor*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN .................. 12

III. EXPLANATION OF CHAPTER 11 ..................................................................................... 16

    A.   Overview of Chapter 11 ................................................................................................ 16

    B.   Chapter 11 Plan ............................................................................................................ 16

    C.   Confirmation of a Chapter 11 Plan ............................................................................... 17

IV. OVERVIEW OF THE PLAN .............................................................................................. 17

V. GENERAL INFORMATION ............................................................................................... 23

    A.   Organizational Structure and Management .................................................................. 24

    B.   Employees .................................................................................................................... 24

    C.   Pre-petition Capital Structure ....................................................................................... 24

    D.   Factors That Precipitated the Debtor's Chapter 11 Filing and Purpose Thereof ............. 25

VI. THE CHAPTER 11 CASE .................................................................................................. 25

    A.   Filing of the Petitions and Debtor in Possession Status .................................................. 25

    B.   First Day Pleadings and Orders .................................................................................... 25

    C.   Employment of Professionals for the Debtor ................................................................. 25

    D.   Appointment of the Committee. ................................................................................... 25

    E.   Exclusivity .................................................................................................................... 26

    F.   Claims Bar Date ........................................................................................................... 26

    G.   Administrative Claim Bar Date .................................................................................... 26

    H.   Payment of Administrative Expense Claims ................................................................. 26

    I.   Settlement with the FDIC ............................................................................................. 27

    J.   Pending Litigation ........................................................................................................ 28

VII. THE CHAPTER 11 PLAN ................................................................................................. 28

    A.   Treatment of Claims Against and Equity Interests in the Debtor. ................................... 29

    B.   Means for Implementation of the Plan ........................................................................... 35

VIII. The Liquidation and Distribution Trust ............................................................................ 47

IX. INJUNCTION, EXCULPATION AND LIMITATION OF LIABILITY .............................. 49

X. CONFIRMATION AND CONSUMMATION PROCEDURES ............................................. 52

    A.   Overview ...................................................................................................................... 52

    B.   Confirmation of the Plan .............................................................................................. 52

    C.   Confirmation Without Acceptance of All Impaired Classes – "Cramdown" .................. 55

    D.   Effect of Confirmation ................................................................................................. 56

XI. TAX ISSUES ...................................................................................................................... 56

XII. RISK FACTORS ....................................................................................................... 57

    A.   Certain Bankruptcy Considerations ........................................................... 58

    B.   Certain Tax Considerations......................................................................... 59

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.... 59

XIV. CONCLUSION........................................................................................................... 60

## EXHIBITS

Joint Chapter 11 Plan of Reorganization ..................................................................... Exhibit "A"

Disclosure Statement Order……………………………………………………………Exhibit "B"

Litigation and Distribution Trust Agreement…………………………………………..Exhibit "C"

Demand Letter of the Committee……………………………………………………...Exhibit "D"

Estimated Administrative Expense and Priority Claims…………………………….Exhibit "E"

Litigation and Distribution Trustee Background……………………..…………………Exhibit "F"

## SCHEDULES

Chapter 7 Liquidation Analysis ......................................................................................Schedule 1

**I.**

**INTRODUCTION**

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan.** For ease of reference those definitions are repeated below. **Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.** In the event of a conflict or difference between the definitions used and provisions contained in this Disclosure Statement and the Plan, the definitions and provisions contained in the Plan shall control.

**Definitions.**

As used herein, capitalized terms shall have the respective meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

- <u>Administrative Bar Date</u> means May 13, 2019, the deadline to file proofs of claim in the Chapter 11 Cases with respect to Administrative Expense Claims other than Fee Claims.

- <u>Administrative Expense Claim</u> means a Claim (other than a Claim included in a Class under this Plan) that is entitled to priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code or Order of the Bankruptcy Court, including, without limitation, (i) Claims incurred by the Debtor (or its Estate) on or after the Petition Date and before the Effective Date for the actual, necessary costs and expenses of preserving the Estate, including, without limitation, Fee Claims.

- <u>Administrative Expense and Priority Reserve</u> means the Cash from the Estate reserved by the Debtor for the payment of all Unclassified Claims as set forth in Article II of the Plan and all Class 1 Claims as set forth in Article III of the Plan.

- <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

- <u>Allowed</u>, when used

    i) with respect to any Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim; and

ii) with respect to Equity Interests in the Debtor, means the Equity Interests in such Debtor as reflected in the stock ledger or similar register of the Debtor as of the Effective Date.

For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon any potentially applicable rights of avoidance, setoff, or subordination, and any other grounds or defenses.

For the further avoidance of doubt, any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed" under this Plan absent further Order of the Bankruptcy Court.  Unless otherwise specified in this Plan or by Order of the Bankruptcy Court, "Allowed" Claims shall not, for the purposes of computation of distributions under the Plan, include interest on such Claims from and after the Petition Date.

- Aggregate Settlement Amount means $4,250,000 in Cash reserved from the First Round Investment for Class 2 Claims and the Reorganized Debtor, as applicable.

- Avoidance Actions means all Causes of Action of the Estate that arise under chapter 5 of the Bankruptcy Code, including under section 502, 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

- Bankruptcy Code means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Case.

- Bankruptcy Court means the United States Bankruptcy Court for the Eastern District of Louisiana.

- Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

- Bar Dates means the General Bar Date, the Administrative Bar Date, and any other applicable deadline to file a proof of claim in the Chapter 11 Case.

- Bar Date Orders means the Order [Doc. 119] entered on September 1, 2017, which set the General Bar Date and the Order [Doc. 543] entered on April 2, 2019, which set the Administrative Bar Date.

- Bondholder Claims means the Claims of the Indenture Trustee on behalf of itself and holders of the Legacy Subordinated Notes.

- Bondholder Retained Interests means all of a Bondholder's rights, title and interests, on account of its Bondholder Claim, to Plan Distributions from the Litigation and Distribution Trust.

- <u>Bondholders</u> means the holders of the Legacy Subordinated Notes.

- <u>Business Day</u> means any day other than a Saturday, a Sunday, a "legal holiday" (as defined by Bankruptcy Rule 9006(a)), or any other day on which commercial banks are required or authorized to close for business in New York, New York.

- <u>Cash</u> means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

- <u>Cash Option</u> means the Class 2 Claim treatment option set forth in section 3.3.2(iii)(a) of the Plan.

- <u>Causes of Action</u> means all claims, actions, causes of action, choses in action, liabilities, obligations, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, foreseen, unforeseen, asserted, assertable directly or derivatively, arising in law, equity or otherwise, that exist and/or are or may be pending on the Effective Date, against any Person, whether asserted or unasserted as of the Effective Date that constitute "property of the Debtor's Estate" as defined in 11 U.S.C. §541, including, without limitation: (i) the right to object to Claims and Equity Interests; (ii) all Avoidance Actions; and (iii) all Tort Claims. Any and all Causes of Action are preserved under the Plan, provided, however, that nothing in this definition or within this Plan is intended to determine ownership of, or rights with respect to, claims and/or causes of action with respect to First NBC Bank or assets of First NBC Bank between the Debtor and/or the Liquidating Trustee as successor-in-interest under the Plan and the FDIC as Receiver for First NBC Bank.

- <u>Chapter 11 Case</u> means the case commenced on the Petition Date by the Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code as Case No. 17-11213.

- <u>Claim</u> shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.  For the avoidance of doubt, "Claim" includes, without limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not accrued under non-bankruptcy law that is created by one or more acts or omissions of the Debtor if: (a) the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s) may be sufficient to establish liability when injuries/damages are manifested; and (c) at the time of the Effective Date, the Debtor have received one or more demands for payment for injuries or damages arising from such acts or omissions.

- <u>Claim Objection Deadline</u> means the deadline for filing objections to Claims as set forth in Section 10.1 of this Plan.

- <u>Class</u> means a category of Claims or Equity Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

- <u>Committee</u> means the official committee of unsecured creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code.

- <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

- <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be continued from time to time.

- <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

- <u>Contested</u>, when used

    a) with respect to a Claim, means such Claim

      **1** to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been filed;

      **2** if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan;

      **3** if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been filed with the Bankruptcy Court and as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan; or

      **4** as to which an objection has been or may be filed on or before the Claim Objection Deadline; <u>provided</u>, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and

    b) with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

- <u>Debt Option</u> means the Class 2 Claim treatment option provided for in section 3.3.2(iii)(b) of the Plan.

- <u>Debt Option Threshold</u> means the aggregate amount of $30,000,000 in Class 2 Claims electing the Debt Option.

- <u>D&O Claims</u> means any and all rights and claims against the Debtor's current and/or former directors and officers for pre-petition acts of whatever nature and the proceeds of any such claims, including any D&O Policies or other Insurance Policies associated therewith.

- <u>D&O Policies</u> means any Insurance Policy insuring the Debtor's officers and/or directors, including the Financial Institutions Select Insurance Policy, Number DOP 9311203-04, issued by Zurich American Insurance Company, with a policy period of June 9, 2015 through December 31, 2016 and all excess liability insurance policies for the period of June 9, 2015 through December 31, 2016, including: (a) Continental Casualty Company, Policy No. 596594782, (b) Federal Insurance Company, Policy No. 8243-6165, (c) Great American Insurance Group, Policy No. DFX1491031, (d) Illinois National Insurance Company, Policy No. 01-415-73-85; and, the Officers and Corporate Liability Insurance Policy, Number 14-MGU-16-A39690, issued by U.S. Specialty Insurance Company, with a policy period of December 31, 2016 through December 31, 2017 and any excess liability insurance policies for the period of December 31, 2016 through December 31, 2017, including: (a) US Specialty Insurance Company, Policy No. 14-MGU-16-A39694; (b) XL Specialty Insurance Company, Policy No. ELU148261-16; (c) Illinois National Insurance Company, Policy No. 06-473-18-11; (d) Freedom Specialty Insurance Company, Policy No. XMF1602583; (e) Markel American Insurance Company, Policy No. MKLM6EL0002907; (f) Berkshire Hathaway Specialty Insurance Company, Policy No. 47-EPF-303265-01; and, (g) Illinois National Insurance Company, Policy No. 06-481-51-29.

- <u>Debtor</u> means First NBC Bank Holding Company prior to the occurrence of the Effective Date.

- <u>Debtor in Possession</u> means the Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

- <u>Disallowed</u>, when used with respect to a Claim or Equity Interest, means all or such part of a Claim or Equity Interest that has been disallowed or released by a Final Order, operation of law, written release or settlement, the provisions of this Plan, or otherwise, or withdrawn by the holder of the Claim or Equity Interest.

- <u>Disclosure Statement</u> means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

- <u>Disclosure Statement Order</u> means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

- <u>Distribution Record Date</u> means the record date for purposes of determining Bondholders eligible for Plan Distributions to Bondholders, which shall be the Confirmation Date;

only holders of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes on the Confirmation Date shall be entitled to Plan Distributions.

- **Distribution Reserve** means any reserve established by the Litigation and Distribution Trustee on account of Contested Claims of any Litigation and Distribution Trust Beneficiary which, if Allowed, would entitle such Litigation and Distribution Trust Beneficiary to a Plan Distribution.

- **Effective Date** means a date selected by the Plan Proponents jointly which shall be a Business Day that is no later than three (3) days after all of the conditions specified in Section 11.2 have been satisfied or waived in accordance with Section 11.3 of this Plan.  Except as otherwise extended by the Court on motion of the Plan Proponents, the Effective Date shall in no event occur more than sixty (60) days after the Confirmation Date.

- **Equity Interest** means (i) any outstanding ownership interest in any of the Debtor, including, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in the Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against the Debtor that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

- **Estate** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

- **Estate Cash** means all Cash of the Debtor and the Estate as of the Effective Date remaining after payment (or reserve for payment) of all Unclassified Claims as set forth in Article II of this Plan and Allowed Class 1 Claims as set forth in Article III of this Plan.

- **Exculpated Parties** means all Persons that are or were at any time on or after the Petition Date, and whether or not any such Person currently retains such capacity or position, (i) the Debtor; (ii) the Committee or a member of the Committee, solely in its capacity as a Committee member; (iii) Professional Persons, to the extent such parties are or were acting in such capacity on behalf of any of the Persons identified in (i) or (ii) above on or after the Petition Date; and (iv) the Indenture Trustee.

- **Exit Facility** means that portion of the First Round Investment which is NOT used by or on behalf of the SPV for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option.

- **Fee Application** means an application for allowance and payment of a Fee Claim.

- **Fee Claim** means a Claim of a Professional.

- <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or any other court or adjudicative body of competent jurisdiction) entered on the docket of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, motion for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or any other court or adjudicative body) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

- <u>First Round Investment</u> means the $5,000,000 in Cash, held in an escrow account by the Debtor's bankruptcy counsel pursuant to the FRI Escrow Agreement, provided for purposes of Plan Distributions and future business operations of the Reorganized Debtor.

- <u>First Round Investors</u> means the Persons who will fund the First Round Investment.

- <u>FNBC</u> means First NBC Bank Holding Company

- <u>FRI Escrow Agreement</u> means that certain agreement between the Debtor, the First Round Investors and the Committee governing use and availability of the First Round Investment, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

- <u>General Bar Date</u> means October 20, 2017, the general deadline to file proofs of claim in the Chapter 11 Case (or November 7, 2017, with respect to governmental units) established by the General Bar Date Order.

- <u>General Unsecured Claim</u> means any Claim against the Debtor, including any Bondholder Claim, which is not an Administrative Expense Claim (including Fee Claims), a fee payable pursuant to section 1930 of title 28 of the United States Code, a Priority Tax Claim, an Insured Claim, an Indemnity Claim, a Secured Claim, or a Priority NQDC Claim, and shall not include Disallowed Claims.

- <u>Indemnity Claim</u> means any Claim against the Debtor for indemnification, reimbursement, or contribution filed by any current or former officer, director, employee or independent contractor of the Debtor which under this Plan are disallowed and/or subordinated to certain other Claims by Sections 502(e) and 509(c) of the Bankruptcy Code.

- <u>Indenture</u> means that certain Indenture by and between U.S. Bank National Association, as Indenture Trustee, and FNBC, as Issuer, dated as of February 18, 2015, as amended.

- <u>Indenture Trustee</u> means U.S. Bank National Association, as Indenture Trustee, under the Indenture.

- <u>Insider</u> means a Person that would fall within the definition ascribed to such term in section 101(31) of the Bankruptcy Code.

- <u>Insurance Policies</u> means, collectively, any policies of insurance coverage of any kind (including any and all amendments, endorsements, renewals, and extensions thereof) that at any time belonged or belong to or included or include the Debtor as a named insured, additional insured, or beneficiary, including, without limitation, the D&O Policies.

- <u>Insured Claim</u> means a claim for which an Insurance Policy or Policies provides or may provide coverage and payment, in whole or in part. Insured Claims are subject to the provisions of, and treatment under, Section 14.2 of this Plan.

- <u>Internal Revenue Code</u> means the Internal Revenue Code of 1986, as amended, codified at title 26 of the United States Code, together with any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements and other releases of the United States Treasury Department or the IRS.

- <u>IRS</u> means the Internal Revenue Service.

- <u>Legacy Subordinated Notes</u> means those certain subordinated notes issued by FNBC on February 18, 2015 in a private placement offering in the aggregate principal amount of $60 million, with a maturity date of February 18, 2025 and bearing interest at a rate of 5.75% per annum, some or all of which were subsequently exchanged for identical new notes, registered under the Securities Act and generally not subject to transfer restrictions, all as more fully described in FNBC's filing of Form S-4 Registration Statement under the Securities Act on August 18, 2015.

- <u>Litigation and Distribution Trust</u> means the trust established pursuant to Article VII of the Plan.

- <u>Litigation and Distribution Trust Agreement</u> means the agreement, in a form reasonably acceptable to the Debtor and the Committee, to be dated as of the Effective Date establishing the terms and conditions of the Litigation and Distribution Trust, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

- <u>Litigation and Distribution Trust Assets</u> means the Debtor's and the Estate's right, title and interest in the Estate Cash, the $300,000.00 Senior Debt instrument to be contributed as provided in Section 6.9 of this Plan, the Avoidance Actions, Tort Claims and the proceeds of any Insurance Policies applicable thereto, any objections to Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims, and, any other Cause of Action <u>not</u> related to or affecting the Tax Assets. For the avoidance of doubt, all Tort Claims shall be Litigation and Distribution Trust Assets

- <u>Litigation and Distribution Trust Beneficiaries</u> means all individuals and entities entitled to a Plan Distribution from the Litigation and Distribution Trust.

- <u>Litigation and Distribution Trust Expenses</u> means all reasonable costs and expenses incurred on or after the Effective Date by the Litigation and Distribution Trustee associated with the implementation and administration of the Litigation and Distribution Trust and the Plan.

- <u>Litigation and Distribution Trust Indemnified Parties</u> has the meaning set forth in Section 7.7 of this Plan.

- <u>Litigation and Distribution Trustee</u> means the trustee (and any successor trustee) selected to serve trustee pursuant to Article VII of this Plan and under the Litigation and Distribution Trust Agreement. The identity of the initial trustee shall be filed with the Bankruptcy Court as a Plan Document no later than three (3) Business Days after entry of the Bankruptcy Court's order approving the adequacy of the Disclosure Statement.

- <u>Oversight Committee</u> means the Oversight Committee of the Litigation and Distribution Trust established pursuant to the Litigation and Distribution Trust Agreement.

- <u>Person</u> means an individual, corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, trust, estate, unincorporated association, unincorporated organization, or any government, governmental entity, or political subdivision, department, agency, or instrumentality thereof, or any other entity.

- <u>Petition Date</u> means May 11, 2017, the date on which the Debtor commenced the Chapter 11 Case.

- <u>Plan</u> means this chapter 11 plan for the Debtor filed in the Chapter 11 Case, including all supplements, appendices and schedules hereto, either in their present form or as same may be amended, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

- <u>Plan Distribution</u> means the payment or distribution under the Plan of Cash, assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

- <u>Plan Distribution Date</u> means (i) if a Claim or Equity Interest is Allowed on the Effective Date, a date that is within five (5) business days after the Effective Date, or (ii) if such Claim or Equity Interest is not Allowed on the Effective Date, a date within five (5) business days after the date such Claim or Equity Interest becomes Allowed.

- <u>Plan Documents</u> means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.4 of the Plan including, without limitation, the Litigation and Distribution Trust Agreement. Plan Documents shall be filed

in the record of the Bankruptcy Case no later than five (5) calendar days in advance of the Confirmation hearing.

- **Plan Proponents** means the Debtor and the Committee (each, a "Plan Proponent").

- **Priority NQDC Claim** means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a)(5) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

- **Priority Tax Claim** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

- **Professional** means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Case.

- **Pro Rata Share** means the proportion that an Allowed Claim (in the full amount of such Claim) or an Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such class, including Contested Claims, but excluding Disallowed Claims, (a) as calculated by the Litigation and Distribution Trustee or Debtor, as applicable; or (b) as determined or estimated by the Bankruptcy Court.

- **Reorganized Debtor** means the Debtor after the occurrence of the Effective Date.

- **Schedules** means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtor with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtor from time to time in accordance with Bankruptcy Rule 1009.

- **Secured Claim** means a Claim: (a) secured by a lien, as defined in section 101(37) of the Bankruptcy Code, on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

- **Securities Act** means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

- **Senior Debt Instrument** means any debt instrument issued by the Reorganized Debtor pursuant to or in connection with the implementation of the Plan, which (a) ranks equally in priority only with the Exit Facility; (b) is senior in rank to all other indebtedness of the Debtor or Reorganized Debtor; (c) has a maturity date of the 5th anniversary of issuance; (d) bears interest at a rate of 5% per annum; and, (e) is payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments

may vary, but in no event shall they be in an amount less than the respective quarterly payment that would be due as calculated on a 10-year amortization schedule at 5% interest.

- **Series D Preferred** means 37,935 shares of Series D Preferred Stock issued on August 4, 2011 by FNBC to U.S. Department of the Treasury under the Small Business Lending Fund program.

- **Series E Preferred** means 1,725 shares of Series E Preferred Stock issued on April 27, 2017 by FNBC to certain members of the FNBC Board of Directors in accordance with FNBC's amendment to the articles of incorporation dated April 25, 2017.

- **SPV** means First Phoenix SPV, LLC, the Special Purpose Vehicle established by the First Round Investors to acquire the SPV Claim Rights from any Bondholder electing (or deemed to be electing) the Cash Option under Section 3.3.2(iii)(a).

- **SPV Claim Rights** means all rights, title and interests of a Bondholder in an Allowed Bondholder Claim except for any rights of the Bondholder to receive its Pro Rata Share of the Litigation and Distribution Trust Assets under Section 3.3.2(ii) and Cash under Section 3.3.2(iii)(a).

- **Subordinated 510(b) Claim** means any Claim subordinated by operation of section 510(b) of the Bankruptcy Code, including any Claim arising from the rescission of a purchase or sale of a security of the Debtor or an affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of such a Claim.

- **Subordinated Debt 1** means debt issued by the Debtor or Reorganized Debtor that is subordinate only to the Senior Debt Instruments and Exit Facility; and, is comprised exclusively of (a) Subordinated Instruments 1 issued to holders of Class 2 Claims that have elected the Debt Option; and, (b) SPV Claim Rights.

- **Subordinated Instrument 1** means any Subordinated Debt 1 instrument issued by the Reorganized Debtor pursuant to the Plan, which shall: (a) bear interest at a rate of 5% per annum, (b) have a maturity date of the 10th anniversary of issuance, and (c) be payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments may vary, but in no event shall they be in an amount less than the amount of interest accrued.

- **Tax Assets** means any tax attributes of the Debtor, including tax credit carryforwards and net operating loss carryforwards.

- **Tort Claims** means any and all claims of the Debtor based on any tort, including, but not limited to D&O Claims and all Causes of Action at law and equity (including those based on breach of contract and based on tortious conduct) against all current and former auditors and accountants.

• <u>Voting Deadline</u> means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

BY ORDER DATED _____, 2019 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF LOUISIANA (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE CHAPTER 11 PLAN FOR FIRST NBC BANK HOLDING COMPANY (THE "PLAN").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY FIRST NBC BANK HOLDING COMPANY AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "PLAN PROPONENTS"). WHILE CLASS 1, CLASS 6, CLASS 7 AND CLASS 8 ARE UNIMPAIRED AND DEEMED TO HAVE ACCEPTED THE PLAN, CLASS 2, CLASS 3A, CLASS 3B, CLASS 3C, CLASS 4 AND CLASS 5 ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN. ACCORDINGLY, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS IN CLASS 2, CLASS 3A, CLASS 3B, CLASS 3C, CLASS 4 AND CLASS 5.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY ___:___ .**M., PREVAILING CENTRAL TIME, ON _____, 2019 (THE "VOTING DEADLINE")**. FOR THE AVOIDANCE OF DOUBT, THE DEBTOR RESERVES THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE. MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING UNSECURED CLAIMS THAT DO NOT APPEAR ON THE DEBTOR'S SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH CLAIM OBJECTIONS MUST BE FILED AS REFERENCED IN THE PLAN.

## II.
## <u>NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN</u>

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE THAT DATE. THE PROPONENTS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FINANCIAL INFORMATION, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. MOREOVER, THE DEBTOR RESERVES ALL RIGHTS TO ASSERT THAT THE ALLOCATION OF VALUE MAY BE DIFFERENT.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE

DEBTOR'S FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTOR, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE STEFFES FIRM, LLC ("STEFFES") IS GENERAL BANKRUPTCY COUNSEL TO THE DEBTOR. STEFFES HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH STEFFES HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, STEFFES HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS, OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR IN THIS CHAPTER 11 CASE.

On _____, 2019, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of holders of the solicited classes of Claims against the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtor and certain of the Professional Persons the Debtor has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement

and if given or made, such information may not be relied upon as having been authorized by the Debtor.  You should not rely on any information relating to the Debtor, its business, or the Plan other than that contained in this Disclosure Statement, the exhibits hereto, and the Plan itself.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "Ballot") and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by the Debtor's counsel, The Steffes Firm, LLC, 13702 Coursey Blvd., Bldg. 3, Baton Rouge, Louisiana 70817, Attn: Barbara B. Parsons, no later than the Voting Deadline.  All votes to accept or reject the Plan must be cast by using the appropriate ballot.  Votes which are cast in any other manner will not be counted.  **All ballots must be actually received by the Debtor's counsel no later than _____, 2019 at __:__ _.m., prevailing Central Time.  For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B".**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE PLAN CONTAINS BROAD RELEASES AND INJUNCTIONS THAT WILL AFFECT YOUR RIGHTS AS DESCRIBED IN SECTION VIII (D) OF THIS DISCLOSURE STATEMENT AND ARTICLE VIII OF THE PLAN.  THESE RELEASES AND INJUNCTIONS INCLUDE, AMONG OTHERS: (I) A PERMANENT INJUNCTION OF THE COMMENCEMENT OF ACTIONS AND THE PERFECTION OR ENFORCEMENT OF JUDGMENTS AND ENCUMBRANCES AGAINST THE DEBTOR AND ITS ESTATE BY ANY ENTITY; (II) A RELEASE AND EXCULPATION OF CERTAIN "EXCULPATED PARTIES" WITH RESPECT TO, AMONG OTHER THINGS, THE CHAPTER 11 CASE AND THE PLAN; AND (III) A PERMANENT INJUNCTION OF ANY ACTION AGAINST ANY "EXCULPATED PARTY" RELATED TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") for _____, 2019 at __: _.m., prevailing Central Time, before the Honorable Elizabeth Magner, United States Bankruptcy Court for the Eastern District of Louisiana.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2019 at __:__ _.m., prevailing Central Time, in the manner described in the Disclosure Statement Order attached hereto as Exhibit "B".**

**THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN**.

## III.
## EXPLANATION OF CHAPTER 11

### A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders and other parties in interest.  The Debtor commenced this chapter 11 case, captioned In re First NBC Bank Holding Company, Case No. 17-11213 (the "Chapter 11 Case"), with the filing of voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code on May 11, 2017 (the "Petition Date").

The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of a debtor in property as of the date the petition is filed.  Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the Chapter 11 Case, the Debtor has remained in possession of its property and continued to operate its business as a debtor in possession.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

### B.     Chapter 11 Plan

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of impaired claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan.**

### C.   **Confirmation of a Chapter 11 Plan**

If all classes of claims and equity interests accept or are deemed to accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.   See "Confirmation and Consummation Procedures – Confirmation of the Plan," below.   **The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code**.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan.   See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.   See "Confirmation and Consummation Procedures."   Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.   Class 1 is not impaired under the Plan, and the holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.   Class 2,  Class 3A, Class 3B, Class 3C, Class 4 and Class 5 are impaired under the Plan, and the holders of Claims in Classes 2, 3A, 3B, 3C, 4 and 5 are entitled to vote to accept or reject the Plan.   Class 1, Class 6, Class 7 and Class 8 are unimpaired and the holders of equity interests in Class 6, Class 7 and Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan.   For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.   See "Confirmation and Consummation Procedures."

**IV.**
**OVERVIEW OF THE PLAN**

The following is a summary of the treatment of Claims and Equity Interests under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A".   In addition, see "The Chapter 11 Plan" section of this Disclosure Statement.   For estimates regarding potential claim amounts and amounts available for distribution under the Plan, see the Liquidation Analysis attached to this Disclosure Statement as Schedule 1.

The claim amounts set forth below are based on information contained in the Debtor's Schedules and filed proofs of claim, and reflect what the Debtor believes to be reasonable estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes treatment of unclassified and classified Claims and Equity Interests under the Plan:

### Administrative Expense and Priority Tax Claims

| Claims[1] | Treatment |
|---|---|
| Administrative Expense Claims<br><br><br><br><br><br><br><br><br>Estimated Allowed Claims:<br>Estimated Recovery Percentage: 100% | Except to the extent any Person entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, on the Plan Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction if its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim. |
| Priority Tax Claims<br><br><br><br><br><br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 100% | On the Plan Distribution Date, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such Allowed Priority Tax Claim payment (a) in Cash equal to the amount of such Allowed Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim or that is less favorable than the treatment provided to the most favored General Unsecured Claims under the Plan. |

### Claims and Equity Interests

| Classes | Treatment |
|---|---|
| Class 1 – Priority NQDC Claims | Each holder of an Allowed Priority NQDC Claim against the Debtor shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, |

---

[1] Administrative Claims and Tax Claims are treated in accordance with section 1129(a) (9) of the Bankruptcy Code. Pursuant to section 1123(a) (1) of the Bankruptcy Code, such Claims are not designated as classes of Claims for the purposes of the Plan.

| | |
|---|---|
| **Unimpaired – deemed to accept**<br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 100% | all legal, equitable and contractual rights of each holder of an Allowed Priority NQDC Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority NQDC Claim shall be paid Cash in an amount equal to its Allowed Priority NQDC Claim on the Plan Distribution Date.<br><br>While the Debtor does not intend to initiate any Avoidance Actions against holders of these Claims, it reserves the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Debtor further reserves any other offset rights that may exist with respect to the Claims.<br><br>THE DEBTOR INTENDS TO SUPPLEMENT AND AMEND ITS PENDING OBJECTIONS TO ALL CLASS 1 CLAIMS AND BELIEVES THAT NO ALLOWED CLASS 1 CLAIMS EXIST. |
| Class 2 – Allowed General Unsecured Claims<br><br>**Impaired**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Estimated Allowed Claims: $66,405,000<br>Estimated Recovery Percentage: 6% +, depending on outcome of litigation/liquidation efforts and election of Claim holders. | Each holder of an Allowed Class 2 Claim shall receive or be allocated, as applicable, on the Plan Distribution Date, on account of its Allowed Claim:<br><br>(i) Cash in an amount equal to the fees and expenses of the Indenture Trustee, which will be paid directly to the Indenture Trustee, on account of any such fees and expenses, from the Debtor's available Cash. Plan distributions for all remaining amounts due for Bondholder Claims, *i.e.*, all Bondholder Claims other than fees and expenses due to the Indenture Trustee, shall be provided directly to Bondholders[2] and not the Indenture Trustee;<br><br>(ii) such holder's Pro Rata Share of the Litigation and Distribution Trust Assets;<br><br>(iii) *In addition*, to the treatment provided in Section 3.3.2(i) and (ii) above, such holder shall be entitled to elect one of the following alternative Claim treatment options:<br><br>   (a) Cash Option - on the Plan Distribution Date, the holder shall receive payment in Cash of its Pro Rata share of the Aggregate Settlement Amount; or,<br><br>   (b) Debt Option – subject to the Debt Option Limitations set forth in section 6.6 of the Plan, on the Plan Distribution Date, the Reorganized Debtor shall issue two new instruments to the holder in exchange for and in satisfaction of its Allowed Class 2 Claim: (a) Senior Debt Instrument with a principal balance equal to the holder's Pro Rata share of the Aggregate Settlement Amount; and, (b) Subordinated Instrument 1 with a |

---

[2] The Bondholders shall be identified on the registry established by the Debtor pursuant to Plan Section 6.5.

| | |
|---|---|
| | principal amount equal to the balance of such holder's Claim. |
| | While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims. |
| **Class 3A – STA Secured Claims**<br><br>**Impaired**<br><br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral. | The holder of an Allowed Class 3A Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3A Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3A Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the STA Secured Claim, that any lien securing any STA Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.** |

| | |
|---|---|
| Class 3B – RCC Secured Claims<br><br>**Impaired**<br><br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral | The holder of an Allowed Class 3B Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3B Claim which is proven by order entered and final no later than the Effective Date such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3B Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3B Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to the Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holders of RCC Secured Claims, that any lien securing any Renewal Capital Company Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3B CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3B CLAIMS SHALL EXIST.** |
| Class 3C – NQDC Secured Claims<br><br>**Impaired** | The holder of an Allowed Class 3C Claim, if any exist, shall receive nothing under the Plan except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3C Claim which is proven by order entered and final no later than the Effective Date such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3C Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3C Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims. |

| | |
|---|---|
| Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral | While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holders of the NQDC Secured Claims, that any lien securing any Class 3C Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3C CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3C CLAIMS SHALL EXIST** |
| Class 4 – Indemnity Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: Except with respect to recoveries that Class 4 Claims may receive from Insurance Policies, 0% to 100% depending on ultimate Allowed Class 4 Claim Amounts and outcome of litigation/liquidation efforts of Liquidation and Distribution Trust. | Class 4 consists of all Indemnity Claims that are disallowed or subordinated, as applicable, pursuant to Section 502(e) and 509(c) of the Bankruptcy Code. Class 4 Claims shall be disallowed or subordinated, as applicable, to the following General Unsecured Claims, as applicable to each Class 4 Claimant, and to the extent any Class 4 Claim becomes an Allowed Claim, then it shall not be paid or satisfied until the following Claims are satisfied in full: Allowed Claims of (a) FDIC, as Receiver for First NBC Bank, (b) Bondholders, and, (c) any other Claims and/or investigative proceedings asserted against the Debtor and holders of Indemnity Claims. Once the aforesaid General Unsecured Claims have been paid in full, holders of Allowed Class 4 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO AND TO SEEK DISALLOWANCE OR SUBORDINATION OF ALL CLASS 4 CLAIMS AS FILED** |
| Class 5  Subordinated 510(b) Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $0 | Holders of Allowed Class 5 Claims shall be subordinated to all Claims or Interests that are senior to or equal the Claim or Interest represented by the security from which the Class 5 Claim arises, except that if such security is common stock, such Claim has the same priority as common stock. |

| | |
|---|---|
| Estimated Recovery Percentage: 0% to 100% depending on outcome of litigation/liquidation efforts of Liquidation and Distribution Trust. | Once all Class 1, 2 and 4 Allowed Claims have been paid in full, holders of Allowed Class 5 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims. |
| Class 6 - Series E Preferred Equity Interests<br><br>**Unimpaired - Deemed to accept** | Holders of Class 6 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest. |
| Class 7 – Equity Interests (common stock)<br><br>**Unimpaired - Deemed to accept** | Holders of Class 7 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest. |
| Class 8 - Series D Preferred Equity Interests<br><br>**Unimpaired - Deemed to accept** | Holders of Class 8 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interest. |

# V.
# GENERAL INFORMATION

The Debtor is a holding company for First NBC Bank.  Prior to its removal from the NASDAQ stock exchange on May 18, 2017, as a publicly traded company, FNBC filed certain financial, operational and legal information through public disclosures in accordance with regulations and guidance required by the Securities and Exchange Commission ("SEC"). The documents filed by FNBC with the SEC have been relied upon for purposes of providing historical information related to FNBC's pre-Petition Date operations and organizational structure.

FNBC was incorporated on May 9, 2006, and headquartered in New Orleans, Louisiana. FNBC offered a broad range of financial services through its wholly owned banking subsidiary, First NBC Bank, a Louisiana state non-member bank. FNBC's primary market was the New Orleans metropolitan area and the Florida panhandle. FNBC served its customers from its primary office located in the Central Business District of New Orleans, 38 full-service branch offices located throughout FNBC's market and a loan production office in Gulfport, Mississippi.

On April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver. At the time of the Bank's closure, FNBC's principal asset was the capital stock that it owned in the Bank; and, as a result of the Bank Closure, FNBC had no remaining material tangible assets. Specifically, after

the Bank Closure, FNBC held no operating business assets and, thus, no active business operations have been conducted since the Bank was closed in April 2017.

## A. Organizational Structure and Management

The Bank is the Debtor's sole subsidiary. The Debtor is governed by its Board of Directors, existing on the Petition Date:

| | |
|---|---|
| William D. Aaron, Jr. | Director |
| William M. Carrouche | Director |
| Leander J. Foley, III | Director |
| John F. French | Director |
| Leon L. Giorgio, Jr. | Vice Chairman |
| Shivan Govindan | Chairman |
| Lawrence Blake Jones | Director |
| Louis V. Lauricella | Director |
| Mark G. Merlo | Director |
| Dr. Charles C. Teamer | Director |
| Joseph F. Toomy | Director |

Immediately prior to the Petition Date, the Board appointed Mr. Lawrence Blake Jones as Chief Restructuring Officer to address the day-to-day affairs of the Debtor during the pendency of this Chapter 11 Case. The Board of Directors and the Chief Restructuring Officer have served without compensation since commencement of the Chapter 11 Case.

## B. Employees

The Debtor has had no employees since the Petition Date.

## C. Pre-petition Capital Structure

FNBC's capital structure consists of one class of common stock and two classes of preferred stock. The authorized capital stock of FNBC consists of 100 million shares of common stock and 39,660 shares of preferred stock. As of March 31, 2017, FNBC had 19,212,751 shares of common stock outstanding which was traded under the symbol "FNBC" on the NASDAQ Global Select Market. Additionally, FNBC had 37,925 shares of its Senior Non-Cumulative Perpetual Preferred Stock, Series D; and, 1,725 shares of its Non-Cumulative Mandatorily Convertible Perpetual Stock, Series E outstanding as of that date.

On the Petition Date, the Bankruptcy Court granted an order establishing notice, hearing and sell-down procedures for trading in equity securities and claims against FNBC's estate (the "Trading Order"). The Trading Order provides that any person or entity (as defined in Treas. Reg. § 1.382-3(a)) who currently is or becomes a Substantial Shareholder (as defined in paragraph (e) of the Trading Order) shall file with the Bankruptcy Court, and serve on counsel to FNBC, a notice of such status, on or before the later of (A) 20 calendar days after the effective date of the notice of entry of the Trading Order, or (B) 10 calendar days after becoming a Substantial Shareholder.

Any purchase, sale or other transfer of claims against FNBC or equity securities in FNBC in violation of the Trading Order is null and void *ab initio*.

**D.     Factors That Precipitated the Debtor's Chapter 11 Filing and Purpose Thereof**

The commencement of this Chapter 11 Case was precipitated by the closure of the Bank on April 17, 2017.  At the time of the closure, the Bank was the principle asset of FNBC; however, at the same time, FNBC's liabilities exceeded $60 million.  Such liability was primarily due to Bondholders, some of whom urged the Board of Directors to file this Chapter 11 Case.

**VI.**
**THE CHAPTER 11 CASE**

**A.     Filing of the Petitions and Debtor in Possession Status**

On May 11, 2017, the Debtor filed the Petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1101, 1107 and 1108 of the Bankruptcy Code, the Debtor operated remained in possession of its property as "debtor in possession", although the Debtor has not maintained active business operations since the Petition Date.

**B.     First Day Pleadings and Orders**

On the Petition Date, the Debtor filed a motion seeking entry of an order pursuant to sections 105, 362, and 541 of the Bankruptcy Code establishing notice, hearing, and sell-down procedures for trading in equity securities and claims against the Debtor's estate, which motion was granted on the same date.

**C.     Employment of Professionals for the Debtor**

Pursuant to employment applications filed with the Bankruptcy Court and subsequent orders entered by the Bankruptcy Court, the Debtor has employed the following professionals to assist it with the administration of the Chapter 11 Case: (i) The Steffes Firm, LLC, as general bankruptcy counsel; (ii) Phelps Dunbar, LLP, as special counsel; (iii) PricewaterhouseCoopers, LLP, as certified public accountant; (iv) Fenimore, Kay, Harrison & Ford, LLP, as special counsel; and, Andrew Nash, as certified public accountant (for Louisiana state income tax return purposes). All professionals retained by the Debtor have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtor pursuant to Orders entered by the Bankruptcy Court subject to final approval by the Bankruptcy Court.

**D.     Appointment of the Committee.**

On May 18, 2017, the Office of the United States Trustee appointed the Committee, which originally consisted of the following members: (i) Angel Oak Capital Advisors, LLC, (ii) Cincinnati Insurance Company, (iii) Cincinnati Life Insurance Company, (iv) Federated Life Insurance Company, (v) Federated Mutual Insurance Company, (vi) Federated Service Insurance Company, (vii) Hold Co. Opportunities Fund II, LP, and, (viii) U.S. Bank National Association, as Indenture Trustee.  On May 23, 2017, due to the addition of a member, the Office of the United States Trustee reconstituted the Committee, naming the following members: (i) Angel Oak Capital

Advisors, LLC, (ii) Cincinnati Insurance Company, (iii) Cincinnati Life Insurance Company, (iv) Federated Life Insurance Company, (v) Federated Mutual Insurance Company, (vi) Federated Service Insurance Company, (vii) Hold Co. Opportunities Fund II, LP, and, (viii) U.S. Bank National Association, as Indenture Trustee, and, (ix) Consilio, LLC.  The Committee employed the law firms of Jeffrey D. Sternklar, LLC and Stewart, Robbins & Brown, LLC to serve as its bankruptcy counsel.  These professionals have been, or will be, paid their allowed fees and expenses incurred in the provision of their services to the Committee pursuant to Orders entered by the Bankruptcy Court subject to final approval of the Bankruptcy Court.

### E.      Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtor had a certain amount of time within which (a) to file its Plan; and (b) to solicit acceptances of its timely filed Plan before other parties in interest would be permitted to file plans.  However, the time in which the Debtor maintained the exclusive right to file a chapter 11 plan has expired.

### F.      Claims Bar Date

The Bankruptcy Court established the following bar dates: (i) **October 20, 2017** as the deadline for each person or entity (other than governmental units, as defined in Section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtor; and (ii) **November 7, 2017** as the deadline for governmental units to file proofs of claim.  The bar date for the SEC was subsequently extended until January 8, 2018.

### G.      Administrative Claim Bar Date

On April 2, 2019, the Bankruptcy Court entered an Order (I) Fixing Bar Date for Filing Certain Post-Petition Administrative Expense Claims and (II) Approving the Form and Manner of Notice of the Bar Date, which established **May 13, 2019** as the deadline for each person or entity to file an Administrative Expense Claim.

### H.      Payment of Administrative Expense Claims

Section 1129(a)(9) of the Bankruptcy Code states that unless the holder of an administrative expense claim agrees to a different treatment of such claim, the plan will provide that the holder of an administrative expense claim will receive on account of such claim cash equal to the allowed amount of such claim.  11 U.S.C. § 1129(a) (9).

1. General.      Except as provided below for Professionals and to the extent that any entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim, shall be paid in full in Cash on the Plan Distribution Date; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim.  If the Debtor's records reflect that the holder of an Administrative Expense Claim received payments from the Debtor during the ninety (90) days (or in the case of insiders, one (1) year) before the Petition Date, that holder's Claim may not become an Allowed Administrative Expense Claim until the holder's potential preference liability under 11 U.S.C. §547 has been resolved.

2. Fee Claims of Professionals.    On or before the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve in the amount of the estimated unpaid Fee Claims accrued through the Effective Date (plus all other unpaid Allowed Administrative Expense Claims including those Contested by the Debtor), to be held by Debtor's counsel until such time as such Fee Claims become Allowed Administrative Expense Claims.

## I.    Settlement with the FDIC

On December 19, 2017, the Bankruptcy Court entered an *Order Granting Motion for Entry of Order Approving Settlement Pursuant to Bankruptcy Rule 9019(a)* [Doc. 297] (the "FDIC Settlement Order"). The FDIC Settlement Order authorized the Debtor to enter into a settlement agreement with the FDIC resolving all pending matters between the parties. The following briefly summarizes the Settlement Agreement:[3]

- Trust Funds:  The NQDC Trust Funds shall be split, with 75% of the Trust Funds ($445,263.63) wired to the Debtor's bank account, and 25% of the Trust Funds ($148,421.21) wired to the FDIC-R's bank account, with a corresponding split of the interest accrued since entry of the Reconsideration Order (if any);

- Zurich Reimbursement Claim:  The Reimbursement Claim shall be split, with $1.5 million payable to the Debtor, and the balance remaining in the Zurich Policy;

- Tax Refunds: The parties agreed that the Tax Refunds belong, in full, to the FDIC-R.  The Debtor waives any and all claims to the Tax Refunds on behalf of itself and any of its representatives and successors in interest and its estate, and will take all necessary steps to effectuate the Parties' agreement with respect to the Tax Refunds, including making any necessary communications with taxing authorities, wiring any Tax Refunds received by the Debtor to the FDIC-R within ten (10) days of receipt, and cooperating with the FDIC-R in any dispute arising in the Bankruptcy Case with respect to the Tax Refunds;

- FDIC-R Claim: With respect to the proof of claim filed by the FDIC-R, the Tax Benefit Reimbursement Claim shall be allowed in full for all purposes as a general unsecured claim in the principal amount of $3.45 million; and the Catch-all Claim is allowed only with respect to interest on the Tax Benefit Reimbursement Claim, and only to the extent any other general unsecured claims are entitled to interest (together, the "Allowed FDIC-R Claim").  The Allowed FDIC-R Claim shall be entitled to the treatment provided for in any eventual chapter 11 plan filed in this Chapter 11 Case for Allowed General Unsecured Claims;

---

[3]This summary is qualified in its entirety by the terms of the Settlement Agreement.  To the extent of any inconsistency between this summary and the Settlement Agreement, the terms of the Settlement Agreement will control.  All terms not otherwise defined in this paragraph shall be given the meanings ascribed to the Settlement Agreement.

- <u>Tax Attributes Usage</u>: The FDIC-R will not oppose or otherwise hinder and will cooperate, including responding to reasonable discovery requests concerning Tax Attributes, with the Debtor or any other party proposing a Chapter 11 Plan in the potential allocation to the estate and preservation of any Tax Attributes available under previously filed tax returns or future tax returns; provided that such allocation does not interfere with the FDIC-R's ability to recover the Tax Refunds, or any loss carry-back to recover additional tax refunds. The Debtor will not oppose or otherwise hinder the FDIC-R's use of the Tax Refunds, or any loss carry-back to recover additional tax refunds by using or permitting usage of any Tax Attributes;

- <u>Releases by the FDIC-R and the Debtor.</u> The FDIC-R and the Debtor each will provide a release and waiver of claims as to the above matters, as set forth in the Settlement Agreement. All other rights are reserved; and all other rights not specifically defined by the Settlement Agreement and this Order are reserved.

**J.**     **Pending Litigation**

As of the date hereof, the only known related, material actions pending are as follows:

- Securities Class Action:

   *Eric Kinzler, et al. v. First NBC Bank Holding Company, et al.*, United States Court of Appeals, Fifth Circuit, State of Louisiana, No. 17-30443; On Appeal from the United States District Court, Eastern District of Louisiana, Case No. 16-CV-4243.

- Derivative Action:

   *Doug Smith, individually and on behalf of First NBC Bank Holding Company v. Ashton J. Ryan, et al.*, United States District Court, Eastern District of Louisiana, Case No. 2:16-CV-17001.

   *Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ashton J. Ryan, Mary Beth Verdigets, William J. Burnell, Gregory St. Angelo, Officer Does 1-20, Ernst & Young, LLP, Mark Bell, and Auditor Does 1-20*, Case No. 2:19-cv-10341, U.S. District Court, Eastern District of Louisiana

**VII.**
**THE CHAPTER 11 PLAN**

As a result of the Chapter 11 Case and through the Plan, the Debtor submits that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Debtor's Assets were liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit "A" and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

## A.    <u>Treatment of Claims Against and Equity Interests in the Debtor.</u>

The classes of Claims against and Equity Interests in the Debtor shall be treated under the Plan as follows:

### 1     Class 1 – Priority NQDC Claims

Each holder of an Allowed Priority NQDC Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority NQDC Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority NQDC Claim shall be paid Cash by the Reorganized Debtor from the Estate Cash in an amount equal to its Allowed Priority NQDC Claim on the Plan Distribution Date.

**THE DEBTOR INTENDS TO SUPPLEMENT AND AMEND ITS PENDING OBJECTIONS TO ALL CLASS 1 CLAIMS AND BELIEVES THAT NO ALLOWED CLASS 1 CLAIMS SHALL EXIST.**

Holders asserting Priority NQDC Claims are identified by name and Proof of Claim number below:

| | |
|---|---|
| Fred Beebe | Claim No. 10-1 |
| Robert Bradford Calloway | Claim No. 8-1 |
| Archie N. Duplantis, Jr. | Claim No. 85-1 |
| Dean Haines | Claim No. 13-1 |
| George Jourdan | Claim No. 3-1 |
| Michael Lebeau | Claim No. 4-1 |
| Michael Lulich | Claim No. 14-1 |
| Kevin P. Reed | Claim No. 6-1 |
| William Roohi | Claim No. 7-1 |

All of the foregoing Claims are Claims to enforce obligations under the First NBC Bank Holding Company Deferred Compensation Plan. Section 1 of the First NBC Bank Holding Company Deferred Compensation Plan states as follows:

"**Section 1 – Purpose:**
      The Plan is intended to be an unfunded deferred compensation arrangement for the benefit of officers and key employees of the Company and its Affiliates (as defined below), within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As such, this Plan is not intended to constitute an employee benefit plan under ERISA and is not intended to be subject to the provisions of Parts 2, 3, and 4 of Title I of ERISA. In accordance with such intent, *any obligation of the Company or its Affiliates to pay benefits hereunder shall be deemed to be an unsecured promise, and any right of a Participant (as defined below) or Beneficiary (as defined below) to enforce such obligation shall be solely as an unsecured general creditor of the Company. The Plan is not intended to*

*constitute a qualified employee benefit plan within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the Code)."*
(Emphasis added).

Accordingly, none of the foregoing Class 1 Claims is entitled to priority under section 507(a)(5) of the Bankruptcy Code. To the extent a valid Claim of such holder is determined by the Bankruptcy Court to exist against the Debtor, such Claim shall be treated as a Class 2 General Unsecured Claim. While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

## 2        Class 2 – General Unsecured Claims

Class 2 is comprised of all General Unsecured Claims including the Bondholder Claims. The Bondholder Claims shall be deemed Allowed on the Effective Date (without the necessity of all holders of Bondholder Claims to file Proofs of Claim) in the aggregate principal amount of $60,000,000, plus accrued and unpaid interest with respect thereon in the amount of $_____, plus any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, under the Indenture, including, but not limited to, the fees and expenses of the Indenture Trustee. **Notwithstanding the filing of a Proof of Claim by the Indenture Trustee in the Chapter 11 Case, the Bondholders - not the Indenture Trustee – shall vote to accept or reject the Plan on behalf of their respective Bondholder Claims.**

Each holder of an Allowed Class 2 Claim shall receive or be allocated, as applicable, on the Plan Distribution Date, on account of its Allowed Claim:

(i)     Cash in an amount equal to the outstanding fees and expenses of the Indenture Trustee, including fees and expenses of its counsel, which will be paid on the Effective Date directly to the Indenture Trustee, on account of any such outstanding fees and expenses, from the Debtor's available Cash. Plan Distributions for all remaining amounts due on account of Bondholder Claims, *i.e.*, Bondholder Claims other than fees and expenses due to the Indenture Trustee, shall be made directly to holders of Legacy Subordinated Notes of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes as of the Distribution Record Date.

(ii)    such holder's Pro Rata Share of the Litigation and Distribution Trust Assets;

(iii)   In addition to the treatment provided in Section 3.3.2(i) and (ii) above, such holder shall be entitled to elect one of the following alternative Claim treatment options:

(a)    Cash Option - on the Plan Distribution Date, the holder shall receive payment in Cash of its Pro Rata share of the Aggregate Settlement Amount

(b)    Debt Option – subject to the Debt Option Limitations set forth in section 6.6 of the Plan, on the Plan Distribution Date, the Reorganized Debtor shall issue two new instruments to the holder in exchange for and in satisfaction of its Allowed Class 2 Claim: (1) Senior Debt Instrument with a principal balance equal to the holder's Pro Rata share of the Aggregate Settlement Amount; and, (2) Subordinated Instrument 1 with a principal amount equal to the balance of such holder's Claim.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

### 3    Class 3A – STA Claims

Class 3A is comprised of all allegedly Secured Claims of Gregory T. St. Angelo, namely Proof of Claim nos. 56 and 57 filed in the Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3A Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3A Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3A Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the STA Secured Claims, that any lien securing any STA Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.**

### 4 Class 3B – RCC Secured Claims

Class 3B is comprised of all allegedly Secured Claims of Renewal Capital Company ("RCC") namely Proof of Claim no. 52 filed in this Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3B CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3B CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3B Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3B Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3B Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3B Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the RCC Secured Claim, that any lien securing any Renewal Capital Company Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.

### 5 Class 3C – NQDC Secured Claims

Class 3C is comprised of the following allegedly Secured Claims filed in the Chapter 11 Case: (a) Proof of Claim No. 13 filed by Dean Haines; (b) Proof of Claim No. 14 filed by Michael Lulich; and, (c) Proof of Claim No. 46 filed by Ashton Ryan, Jr.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3C CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3C CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3C Claim, if any exist, shall receive nothing under the Plan except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3C Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3C Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3C Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and

conclusive adjudication and determination, binding on the holders of the NQDC Secured Claims, that any lien securing any Class 3C Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.

All of the Class 3C Claims identified above are Claims to enforce obligations under the First NBC Bank Holding Company Deferred Compensation Plan. Section 1 of the First NBC Bank Holding Company Deferred Compensation Plan states as follows:

> **"Section 1 – Purpose:**
>
> The Plan is intended to be an unfunded deferred compensation arrangement for the benefit of officers and key employees of the Company and its Affiliates (as defined below), within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As such, this Plan is not intended to constitute an employee benefit plan under ERISA and is not intended to be subject to the provisions of Parts 2, 3, and 4 of Title I of ERISA. In accordance with such intent, ***any obligation of the Company or its Affiliates to pay benefits hereunder shall be deemed to be an unsecured promise, and any right of a Participant (as defined below) or Beneficiary (as defined below) to enforce such obligation shall be solely as an unsecured general creditor of the Company. The Plan is not intended to constitute a qualified employee benefit plan within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the Code)."***
> (Emphasis added).

Accordingly, none of the foregoing Class 3C Claims are entitled to treatment as an Allowed Secured Claim. To the extent a valid Claim of such holder is determined by the Bankruptcy Court to exist against the Debtor, such Claim shall be treated as a Class 2 General Unsecured Claim. While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.

## 6        Class 4 – Indemnity Claims

Class 4 consists of all Indemnity Claims that are disallowed or subordinated, as applicable, pursuant to Section 502(e) and 509(c) of the Bankruptcy Code. Class 4 Claims shall be disallowed or subordinated, as applicable, to the following General Unsecured Claims, as applicable to each Class 4 Claimant, and to the extent any Class 4 Claim becomes an Allowed Claim, then it shall not be paid or satisfied until the following Claims are satisfied in full: Allowed Claims of (a) FDIC, as Receiver for First NBC Bank, (b) Bondholders, and, (c) any other Claims and/or investigative proceedings asserted against the Debtor and holders of Indemnity Claims. Once the aforesaid General Unsecured Claims have been paid in full, holders of Allowed Class 4 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

**THE PLAN PROPONENTS INTEND TO OBJECT TO AND TO SEEK DISALLOWANCE OR SUBORDINATION OF ALL CLASS 4 CLAIMS AS FILED.**

Below is a listing of all known Indemnity Claims, identified by Proof of Claim number and associated Claimant name.

| Claim No. | Claimant |
|---|---|
| 20 | Ashton J. Ryan, Jr. |
| 37 | Ashton J. Ryan, Jr. |
| 20 | Ashton J. Ryan, Jr. |
| 38 | Ashton J. Ryan, Jr. |
| 39 | Ashton J. Ryan, Jr. |
| 40 | Ashton J. Ryan, Jr. |
| 41 | Ashton J. Ryan, Jr. |
| 54 | Gregory St. Angelo |
| 55 | Stephen P. Petagana |
| 59 | William D. Aaron, Jr. |
| 60 | Herbert W. Anderson |
| 61 | Dale Atkins |
| 62 | John C. Calhoun |
| 63 | William Carrouche |
| 64 | Jimmy Fitzmorris |
| 65 | Leander Foley |
| 66 | John F. French |
| 67 | Leon L. Giorgio, Jr. |
| 68 | Shivan Govindan |
| 69 | Lawrence Blake Jones |
| 70 | Louis Lauricella |
| 71 | Mark G. Merlo |
| 72 | Hermann Moyse, III |
| 73 | Grish Roy Pandit |
| 74 | James C. Roddy |
| 75 | Dr. Charles C. Teamer, Sr. |
| 76 | Joseph F. Toomy |
| 77 | R. Michael Wilkinson |
| 79 | William Burnell |
| 80 | Mary Beth Verdigets |
| 81 | Marsha Crowle |
| 83 | David W. Anderson |

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

### 7      Class 5 - Subordinated 510(b) Claims

The holders of Class 5 Claims shall be subordinated to all Claims or Interests that are senior to or equal the Claim or Interest represented by the security from which the Class 5 Claim arises, except that if such security is common stock, such Claim has the same priority as common stock. Once all Class 1, 2 and 4 Allowed Claims have been paid in full, holders of Allowed Class 5 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

The Debtor believes that Class 5 Claim holders are limited to the plaintiffs asserting claims in the litigation styled, *Eric R. Kinzler, Individually and on Behalf of All Others Similarly Situated, v. First NBC Bank Holding Company, Ashton J. Ryan, Jr. and Mary Beth Verdigets*, *Case No. 16-04243, U.S. District Court, Eastern District of Louisiana* Kinzler; the U.S. Department of Treasury, David and Tiffany Oestreicher (Proof of Claim no. 43), and any party who purchased or sold Equity Interests in the Debtor.

### 8      Class 6 – Series E Preferred Equity Interests

Holders of Class 6 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest.

### 9      Class 7 - Equity Interests (Common Stock)

Holders of Class 7 Equity Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interests. Upon the Effective Date, pursuant to 11 U.S.C. §1145, all Class 7 Equity Interests shall be canceled and reissued to the exact holders of Class 7 Equity Interests in exchange for such interests.

### 10      Class 8 – Series D Preferred Equity Interests

Holders of Class 8 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interests.

### B.      <u>Means for Implementation of the Plan.</u>

### 1      First Round Investment and Exit Facility

Prior to the Effective Date, the identities of the First Round Investors and the principal amounts advanced from each First Round Investor shall be provided to the Committee.

The First Round Investment shall be disbursed from escrow to, or on behalf of, the Reorganized Debtor under the Exit Facility; and, as applicable, to, or on behalf of, the SPV pursuant to the FRI Escrow Agreement. The First Round Investment shall be utilized and shall be disbursed for uses contemplated, solely as set forth in Plan Section 6.1. Upon the Effective Date, the First Round Investment shall be disbursed by Debtor's counsel from escrow:

(a)     to or on behalf of the SPV: disbursement shall be specifically for SPV's payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option under Plan Section 3.3.2(iii)(a). The Reorganized Debtor or Debtor's counsel shall act as disbursing agent for the SPV in making the foregoing Plan Distributions to Bondholders.

(b)     to or on behalf of the Reorganized Debtor: disbursement shall be made under the Exit Facility, specifically for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any holder of other Allowed Class 2 Claims (non-Bondholder Claims) that has elected or is deemed to have elected the Cash Option.

(c)     to the Reorganized Debtor: disbursement shall be made under the Exit Facility and shall consist of all funds from the First Round Investment remaining after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Section 3.3.2(iii)(a) of the Plan; such disbursement shall be provided to the Reorganized Debtor specifically for its future business operation expenses.

The Exit Facility shall thus provide to the Reorganized Debtor: (i) all Cash required for its Plan Distributions made on the Plan Distribution Date; and, (ii) all Cash remaining from the First Round Investment after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Plan Section 3.3.2(iii)(a). The Exit Facility shall rank equally in priority with the indebtedness evidenced by the Senior Debt Instruments. The Litigation and Distribution Trust and its assets shall have no liability for the Exit Facility, such liability being the sole responsibility of the Reorganized Debtor.

## 2     Senior Debt and Subordinated Debt of the Reorganized Debtor

Senior Debt Instruments shall be issued exclusively to the Litigation and Distribution Trust and holders of Class 2 Claims that have elected the Debt Option. The Senior Debt shall be senior to any and all other indebtedness of the Debtor from and after the Effective Date except for the First Round Investment (which shall be *pari passu* with the Senior Debt). The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new debt senior to or *pari passu* with Senior Debt unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash.

The Subordinated Instruments 1 shall be senior to any preferred or common stock or any subordinated instruments that do not make up the Subordinated Debt 1. The Subordinated Debt 1 shall be exclusively comprised of (a) Subordinated Instruments 1 issued pursuant to Section 3.3.2(iii) to holders of Class 2 Claims that have elected the Debt Option in exchange for, and in satisfaction of, such holders' Legacy Subordinated Note (in addition to the Senior Debt Instrument

issued as provided in Section 3.3.2(iii) and its Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2(ii)); and (b) SPV Claim Rights and associated Legacy Subordinated Notes acquired by the SPV in exchange for, and in full satisfaction of, the Legacy Subordinated Notes deemed to have been assigned to the SPV as a result of the election of the Cash Option by holders of Allowed Class 2 Claims.   The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new debt senior to or *pari passu* with Subordinated Debt 1 or to make any distributions or dividend payments of any kind or character to any Claims or Equity Interests junior or *pari passu* in priority to Subordinated Debt 1 unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash.  The Reorganized Debtor may, however, issue, at any time, additional debt that is subordinate to the Subordinated Debt 1.

### 3      Establishment of the Administrative Expense and Priority Reserve

Prior to the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve from its available Cash; and, all distributions to holders of Allowed Unclassified Claims as set forth in Article II of the Plan and Allowed Class 1 Claims as set forth in Article III of the Plan shall be made therefrom. The Administrative Expense and Priority Reserve shall also include a Cash reserve for payment of (a) Contested Unclassified Claims, described in Article II of the Plan, and (b) Contested Class 1 Claims, if and as such Contested Claims become Allowed Claims. Any funds remaining, after all such Claims have been fully disposed of through payment or disallowance, shall be transferred and conveyed to the Litigation and Distribution Trust.  A schedule of estimated Allowed Unclassified Claims as set forth in Article II of the Plan and Allowed Class 1 Claims as set forth in Article III is attached to this Disclosure Statement as **Exhibit E.**

### 4      Establishment of the Special Purpose Vehicles

Prior to the Effective Date, the SPV shall be established by the First Round Investors to acquire the Legacy Subordinated Notes and corresponding SPV Claim Rights from the Bondholders electing or deemed to be electing the Cash Option.  Any Bondholder that has elected or is deemed to have elected the Cash Option shall be deemed to have assigned its Legacy Subordinated Notes and all of such Bondholder's SPV Claim Rights to First Phoenix, LLC as of the Plan Distribution Date. Thereafter, the SPV shall be deemed to be the holder of record of any such acquired Legacy Subordinated Notes and a result thereof, shall be entitled to enforce all legal, equitable and contractual rights attributable to such Legacy Subordinated Notes included in any SPV Claim Rights it acquires.   For the avoidance of doubt, any Legacy Subordinated Notes deemed to have been assigned to the SPV shall not be cancelled upon the Effective Date, but shall instead remain enforceable against the Reorganized Debtor exclusively by the SPV and its successors **through the Plan Distribution Date and shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as the acquired SPV Claim Rights and Legacy Subordinated Notes in full satisfaction of the Legacy Subordinated Notes so acquired**.  The Reorganized Debtor, as agent for the SPV, shall make all Plan Distributions to holders of any Bondholder Claims electing the Cash Option pursuant to Plan Section 3.3.2(iii)(a).

**5      Disposition of Legacy Subordinated Notes**

On the Confirmation Date, the Debtor shall cause there to be established a register for the recordation of Bondholders as of that date. On the Plan Distribution Date, the Reorganized Debtor or the SPV, as applicable, shall make the Plan distributions described in Plan section 3.3.2, to such Bondholders, or their transferees, as recorded on such register of the Debtor in accordance with such transfer procedures as the Debtor may establish.

Legacy Subordinated Notes of Bondholders Electing Debt Option:

If a Bondholder elects the Debt Option, pursuant to Plan section 3.3.2(iii)(b), then, on the Plan Distribution Date, in addition to the Senior Debt Instrument issued pursuant to that Section and Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2 (ii), the Debtor shall issue the Senior Debt Instrument and Subordinated Instrument 1 to such Bondholder in exchange for and in satisfaction of the Bondholder's Legacy Subordinated Note.

Legacy Subordinated Notes of Bondholders Electing Cash Option:

If a Bondholder elects the Cash Option, pursuant to Plan section 3.3.2(iii)(a), then, on the Plan Distribution Date, in exchange for the Cash payment provided by the SPV to the Bondholder, the Bondholder shall be deemed to have assigned its Legacy Subordinated Note to the SPV, and the SPV shall thereafter be deemed to be the record holder of such Bondholder's Legacy Subordinated Note and SPV Claim Rights which shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as, and in full satisfaction of, the acquired SPV Claim Rights and Legacy Subordinated Notes.

**6      Debt Option Limitations**

Notwithstanding the Class 2 Treatment provided for in section 3.3.2(iii)(b), the Debt Option treatment shall be limited to the Debt Option Threshold.  Should the aggregate dollar amount of Allowed Class 2 Claims electing the Debt Option exceed the Debt Option Threshold, then the treatment of such claims shall be modified as follows: the Debt Option shall be applied to the amount of each holder's Pro Rata share of the Debt Option Threshold and the Cash Option shall be applied to the balance of the holder's Claim.   *For illustration purposes only*, the Plan Proponents have provided an ***example*** of the modified treatment that may be required for a Class 2 Claim, electing the Debt Option, if the Debt Option Threshold is exceeded.

EXAMPLE OF MODIFIED TREATMENT FOR HOLDERS, ELECTING DEBT OPTION, IN A SCENARIO IN WHICH DEBT OPTION THRESHOLD IS EXCEEDED:

Assumptions:

    1.  The total amount of Class 2 Claims eligible to vote is $67,000,000.

    2.  The total amount of Class 2 Claims electing the Debt Option is $40,000,000

(aggregate Claim amount exceeds Debt Option Threshold by $10,000,000).

3. The total amount of Class 2 Claims electing (or deemed to be electing) the Cash Option is $27,000,000.

4. The Class 2 Claims electing the Debt Option are comprised of the following Claims:

   a) Class 2 Claim of $20,000,000
   b) Class 2 Claim of $10,000,000
   c) Class 2 Claim of $8,000,000, and
   d) Class 2 Claim of $2,000,000.

Under this scenario, treatment of the Class 2 Claims electing the Debt Option would be modified as follows:

   a) Class 2 Claim of $20,000,000 would receive:
      Debt Option Treatment for $15,000,000 of its Class 2 Claim; and,
      Cash Option Treatment for $5,000,000 of its Class 2 Claim.
   b) Class 2 Claim of $10,000,000 would receive:
      Debt Option Treatment for $7,500,000 of its Class 2 Claim; and,
      Cash Option Treatment for $2,500,000 of its Class 2 Claim
   c) Class 2 Claim of $8,000,000 would receive:
      Debt Option Treatment for $6,000,000 of its Class 2 Claim; and,
      Cash Option Treatment for $2,000,000 of its Class 2 Claim
   d) Class 2 Claim of $2,000,000 would receive:
      Debt Option Treatment for $1,500,000 of its Class 2 Claim; and,

Cash Option Treatment for $500,000 of its Class 2.

## 7    Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Debtor and the Litigation and Distribution Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, (a) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (b) the implementation of all settlements and compromises as set forth in or contemplated by the Plan (c) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents); and, (d) the execution of any such documentation necessary for the Debtor to enter into the Exit Facility in order to the full release and availability of the First Round Investment.

On or before the Effective Date, the Debtor's Board of Directors shall take all necessary action, in accordance with its corporate governance documents, to elect Navid Abghari of Angel Oak Capital Advisors, the designee of the Committee, to serve as a member of the FNBC Board of Directors, alongside its existing members

## 8    Preservation of Causes of Action

Except as otherwise provided in the Plan, each Tort Claim of the Debtor shall be preserved and, along with the exclusive right to commence, pursue, and enforce such Tort Claim in any appropriate court or tribunal, shall be deemed transferred to the Liquidation and Distribution Trust/ Litigation and Distribution Trustee as of the Effective Date, and shall vest exclusively in the Litigation and Distribution Trust /Litigation and Distribution Trustee (as applicable) as of the Effective Date.  In addition, each Tort Claim to which the Committee, pursuant to Bankruptcy Court Orders [Doc.261 and Doc. 563] was granted standing to assert, commence, prosecute, and, if appropriate, settle (with Court approval), on behalf of and for the benefit of the Debtor's estate, shall vest exclusively in the Litigation and Distribution Trust /Litigation and Distribution Trustee (as applicable) as of the Effective Date.

Except as otherwise provided for below with respect to Causes of Action retained by the Debtor or Reorganized Debtor, unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised, settled or transferred in the Plan or any other Final Order, the Debtor, Committee and the Litigation and Distribution Trustee, as applicable, expressly reserve such claim or Cause of Action for later pursuit by the Litigation and Distribution Trustee and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon, after, or as a result of the Confirmation Date or Effective Date of the Plan, the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Debtor and the Litigation and Distribution Trustee, as applicable, expressly reserve the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtor, as trustees or representatives for or on behalf of the creditors, not so specifically and expressly waived, relinquished, released, compromised, settled or transferred that are alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person, including, without limitation, the plaintiffs or codefendants in such lawsuits.

Any Person to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor should assume that such obligation, transfer, or transaction may be reviewed by the Litigation and Distribution Trustee subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised, settled or transferred, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Person has filed a proof of claim against the Debtor in the Chapter 11 Case, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtor's Schedules, or (d) such Person's scheduled Claim has been objected to by the Debtor, the Litigation and Distribution Trustee or has been identified by the Debtor as disputed, contingent, or unliquidated.

**No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Litigation and Distribution Trustee will not pursue any and all available Causes of Action against them. The Debtor and the Litigation and Distribution Trustee, and the Estate expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise explicitly provided in the Plan**.

The retained claims and Causes of Action, include, without limitation:

- Causes of Action, including Avoidance Actions, (the Plan Proponents and their successors do not intend to initiate any direct Avoidance Actions against Claim holders, but reserve the right to assert Avoidance Actions as a defense to any Claims) and Tort Claims, as defined in the Plan;
- Objections to Claims under the Plan;
- Any and all litigation, claims, or Causes of Action of the Debtor and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, claims, or Causes of Action listed or described in the Plan, Disclosure Statement, or the Confirmation Order;
- Actions against insurance carriers relating to coverage, indemnity or other matters;
- Counterclaims and defenses relating to notes or other obligations;
- Contract, tort, or equitable claims which may exist or subsequently arise;
- Any claims of the Debtor arising under Section 362 of the Bankruptcy Code;
- Equitable subordination claims arising under Section 510 of the Bankruptcy Code or other applicable law;
- Any and all claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under Section 547 of the Bankruptcy Code, turnover Claims arising under Sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under Section 548 of the Bankruptcy Code, including, but not limited, to any transfers listed the Debtor's Statements of Financial Affairs;
- Any derivative Causes of Action, of the Debtor pursuant to the Bankruptcy Code or any other statute or legal theory or theory under equity, including all claims included within the lawsuit styled, *Doug Smith, Individually and on Behalf of First NBC Bank Holding Company v. Ashton J. Ryan, et al. and First NBC Bank Holding Company*, *Case No. 16-17001, U.S. District Court, Eastern District of Louisiana;*
- Any claims asserted in the litigation styled, *Eric R. Kinzler, Individually and on Behalf of All Others Similarly Situated, v. First NBC Bank Holding Company, Ashton J. Ryan, Jr. and Mary Beth Verdigets, Case No. 16-04243, U.S. District Court, Eastern District of Louisiana.* However, notwithstanding any other provision of the Plan that may be to the contrary, nothing in the Plan shall be deemed to be a finding or determination by the Bankruptcy Court that

such claims or Causes of Action are property of the Estate. Additionally, the Plaintiffs in that litigation specifically assert that those claims are direct claims asserted on behalf of a class of purchasers of First NBC common stock and that only purchasers of First NBC stock have legal standing to assert those claims. As a result, the Plaintiffs in that litigation assert that the claims alleged in the securities class action litigation are not property of the Estate, cannot be transferred to the Litigation and Distribution Trust, and cannot thereby become Litigation and Distribution Trust Assets. Plaintiffs' assertions, however, are not dispositive and the rights of all parties are unimpaired by those assertions. All parties reserve all rights with respect to ownership of these claims.

- Any and all alter ego, veil piercing and/or single business enterprise Claims against the Debtor.
- Any and all claims against Ernst & Young, LLP, its insurer(s), and against any other entities which provided professional services to the Debtor prior to the Petition Date[4].
- Any Cause of Action included within the suit styled *Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ashton J. Ryan, Mary Beth Verdigets, William J. Burnell, Gregory St. Angelo, Officer Does 1-20, Ernst & Young, LLP, Mark Bell, and Auditor Does 1-20*, Case No. 2:19-cv-10341, U.S. District Court, Eastern District of Louisiana.

Without limiting, and in addition to, the foregoing reservations of claims and Causes of Actions, the Liquidating Trust/Liquidating Trustee expressly reserves and retains any and all past, present and future legal and equitable claims and Causes of Action (including any derivative Causes of Action) against any former or current director or officer of the Debtor, as well as direct action or other claims against its liability insurers, arising under state or other non-bankruptcy law or arising under the Bankruptcy Code, in this Chapter 11 Case, or in any way related to this Chapter 11 Case, or under and/or pursuant to any statute or legal or equitable theory that is in any manner arising from, connected with or related to any act or omission of such director or officer that occurred prior to the Petition Date, including, but not limited to, claims and Causes of Action for breach of fiduciary duty, violations of applicable federal or state securities law, negligence, gross negligence, willful misconduct, misrepresentation, omission, mismanagement, waste, fraud, bad faith, tortious interference with contract, detrimental reliance, including, but not limited to, any damages allowed by law or equity, including compensatory, punitive and anticipated future damages, plus all costs including attorney's fees, court costs, and expert witness fees. Such claims and Causes of Action include those arising in connection with or relating in any way to the Committee's letters to the Debtor's insurers attached hereto as **Exhibit D**.

*Notwithstanding the foregoing reservations of claims and Causes of Action for the benefit of the Litigation and Distribution Trust and its beneficiaries, the following are specifically preserved and shall re-vest in the Debtor: (a) any objections to Claims other than Claims in*

---

[4] A request for review of the Debtor's claims against Ernst & Young, LLP was filed by the Debtor on or about August 24, 2017, and such matter currently remains pending before the Louisiana Society of Certified Public Accountants as RP 17-007.

*Classes 2, 3A, 3B, 3C, 4 and 5; and, (b) any claims or Causes of Action, whether legal, equitable or statutory in nature, that may affect the Reorganized Debtor's ability to utilize or have recognized with any taxing authority any the Tax Assets that may exist, whether known or unknown to the Debtor prior to the Effective Date.*

Due to the size and scope of the Debtor's business operations, there may be numerous other claims and Causes of Action that currently exist or may subsequently arise, in addition to the claims and Causes of Action identified above. The Debtor and Committee are also continuing to investigate and assess which claims and Causes of Action may be pursued. The Debtor and the Litigation and Distribution Trustee do not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued or do not fall within the list above, that any such claims or Causes of Action have been waived.

**THE PLAN SHALL BE INTERPRETED SO AS TO AFFORD, FOR THE BENEFIT OF ALL HOLDERS OF ALLOWED CLAIMS, THE GREATEST OPPORTUNITY FOR MAXIMUM RECOVERY BY THE LIQUIDATION AND DISTRIBUTION TRUSTEE ON THE ASSETS, TORT CLAIMS, AND RIGHTS IN AND PROCEEDS OF ANY INSURANCE POLICIES.**

**9      Establishment of the Litigation and Distribution Trust and Appointment of the Litigation and Distribution Trustee.**

The Litigation and Distribution Trust shall be established and the Litigation and Distribution Trustee shall be appointed as set forth in Article VII of the Plan.

**10      Vesting of the Tort Claims and Insurance Policies**

On the Effective Date, the Estate's interest in any Tort Claims and rights in and proceeds of any Insurance Policies necessary for the prosecution of all such Claims shall be transferred to and vest in the Litigation and Distribution Trust. The Litigation and Distribution Trustee shall have standing and be authorized to institute and prosecute through final judgment or settle the Tort Claims. Upon entry of a final judgment or settlement, the relevant proceeds of the Tort Claims and relevant Insurance Policies shall be property of the Litigation and Distribution Trust for the benefit of holders of Allowed Class 2, Class 3A, Class 3B, Class 3C, Class 4, and Class 5 Claims in accordance with the provisions of the Plan. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise affect or alter obligations of the Insurance Policies such that the full benefits of all such policies can be realized for Creditors therein.

**11      Sources of Cash for Plan Distributions**

All Cash necessary for the Debtor or Reorganized Debtor to make payments and Plan Distributions under the Plan by the Debtor shall be made (or reserved) from its available Cash prior to the transfer of the remaining Estate Cash to the Litigation and Distribution Trust; and, from the First Round Investment. All Plan Distributions to be made by the Litigation and Distribution Trustee shall be obtained from the liquidation of Litigation and Distribution Trust Assets (including the proceeds of any Tort Claims and related Insurance Policies).

## 12    Cancellation of Instruments

On the Effective Date, except as otherwise specifically provided for in the Plan, including as provided for in Article VI of the Plan: (1) the obligations of the Debtor under the Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, existing management incentive plan or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically left unaltered pursuant to the Plan, including, but not limited to, the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be), shall be cancelled, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically left unaltered pursuant to the Plan, including, but not limited to, the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be) shall be released and discharged; provided, however, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (1) allowing holders to receive Plan Distributions as provided in the Plan and (2) allowing the Indenture Trustee to exercise its charging liens for the payment of their fees and expenses and for indemnification as provided in the applicable Indenture; provided, further, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Indenture shall continue in effect solely for the purposes of allowing the Bondholder Claims under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtor or Bondholders. Notwithstanding anything in the Plan to the contrary, no instruments or rights shall be deemed cancelled to the extent the preservation or non-cancellation of such instruments is necessary to preserve unimpaired any and all Causes of Action and to permit the Litigation and Distribution Trustee to assert any and all Causes of Action pursuant to the Plan.

## 13    Amendment of Indenture and Preservation of Trustee Rights

On the Effective Date, and without further order of the Court, i) the Indenture shall be, automatically and without further act, amended to delete Section 107 and Section 510 thereof to remove references to the Trust Indenture Act and effectuate automatic resignation of the Indenture Trustee and appointment of a successor trustee; (ii) the Indenture shall be, automatically and without further act, amended to revise sections 509 thereof to permit and effectuate the resignation of the Indenture Trustee, including in its role as Registrar and Paying Agent, and the appointment of a successor trustee, as set forth herein; (iii) the Indenture Trustee will be deemed to have

resigned as Trustee, Registrar and Paying Agent and any other role it may have under the Indenture in accordance with Section 509(2) of the Indenture; (iv) Shivan Govindan will be automatically and without further act appointed as successor trustee, registrar and paying agent (the "Successor Trustee") under the Indenture and will be deemed to have accepted such appointment under the Indenture; (v) except as otherwise expressly set forth herein, all rights, duties and obligations of the Indenture Trustee under the Notes, the Indenture and such other agreements, instruments and other documents related thereto, including those related to the Indenture Trustee's resignation, will be deemed fully and finally satisfied, released and discharged. The Indenture Trustee will be relieved of and have no further responsibility for the exercise of rights and powers or for the performance of the duties and obligations vested in the Trustee under the Indenture and the Successor Trustee will become vested with all the rights, powers, trusts and duties of the retiring Indenture Trustee. Notwithstanding anything herein to the contrary, the amendment of the Indenture will not impair in any way (i) the rights of the Indenture Trustee to the Indenture Trustee's claims under the Plan, or (ii) the indemnification rights of the Trustee or the indemnification obligations of the Debtor under the Indenture, as the same existed immediately prior to the Effective Date.

## 14    Continued Corporate Existence and Vesting of Assets of the Debtor

On and after the Effective Date, the Reorganized Debtor will continue to exist as a corporation and shall retain all of the powers of corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be deemed amended to conform to the requirements of Section 1123(a)(6) of the Bankruptcy Code. Furthermore, as of the Effective Date, the Debtor shall have taken such steps as may be necessary to delist and deregister its common stock under the Securities Exchange Act of 1934; and, thereafter, shall take appropriate action to assure compliance with applicable securities laws.

Except as otherwise provided in the Plan, on and after the Effective Date, assets and property of the Debtor and its Estate, including any Tax Assets and any other assets of the Debtor but excluding the Litigation and Distribution Trust Assets, will re-vest in the Reorganized Debtor free and clear of all Claims, Liens, charges and other encumbrances. Of the Tax Assets, the Debtor estimates that, as of the Effective Date, its net operating losses will total $365 million in net operating losses. The Debtor would be entitled under the Plan to use its existing net operating loss carryforwards in future years to eliminate taxes on a corresponding amount of its income, subject to any applicable limitations resulting from change in ownership and/or other limitations imposed under applicable tax laws. The present value of the tax savings that could be generated by the existing net operating loss carryforwards cannot be determined with any certainty, as use of the carryforwards may be subject to the limitations described above and is dependent on the Reorganized Debtor having sufficient future income.

In addition, the Debtor has tax credits approximating $147 million in the aggregate through 2017, which amount may increase through the filing of subsequent or amended tax returns. The Debtor is not aware of any additional Tax Assets. Under the Plan, the Reorganized Debtor will retain any available tax credits to the extent allowed by applicable tax law or as otherwise set forth herein.

On and after the Effective Date, the Reorganized Debtor shall be permitted to conduct its business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Reorganized Debtor shall be authorized, without limitation, to use and dispose of Assets of the Debtor other than the Litigation and Distribution Trust Assets, as the representative of Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs. In addition to the First Round Investment, it is anticipated that the holders of Equity Interests and other investors will contribute capital to the Reorganized Debtor to enable the Reorganized Debtor to acquire assets after the Effective Date and that the Reorganized Debtor will have future business operations.  The Debtor has not yet identified particular assets for acquisition.

The initial directors of the Reorganized Debtor will be:

| | |
|---|---|
| William D. Aaron, Jr. | Director |
| William M. Carrouche | Director |
| Leander J. Foley, III | Director |
| John F. French | Director |
| Leon L. Giorgio, Jr. | Vice Chairman |
| Shivan Govindan | Chairman |
| Lawrence Blake Jones | Director |
| Louis V. Lauricella | Director |
| Mark G. Merlo | Director |
| Dr. Charles C. Teamer | Director |
| Joseph F. Toomy | Director |
| Designee of the Committee | Director |

The initial officers[5] of the Reorganized Debtor will be:

| | |
|---|---|
| Andrew Nash | Chief Financial Officer |
| Mark Haden | Business Development Officer |

## 15   Dissolution of the Committee

Upon the Effective Date, the Committee shall be deemed to have transferred and conveyed to the Litigation and Distribution Trust/Litigation and Distribution Trustee all of its rights, interests, and standing to assert the D&O Claims; and, shall thereafter dissolve automatically, whereupon its members, professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

---

[5] Compensation to be determined and supplied through amendment or supplement.

**16    Delisting of Stock**

Promptly upon the occurrence of the Effective Date, the Reorganized Debtor shall take all actions necessary to delist the Debtor's pre-confirmation common stock by having the Financial Industry Regulatory Authority ("FINRA") remove the Debtor's trading symbol from FINRA's quotation system.

## VIII.    THE LIQUIDATION AND DISTRIBUTION TRUST

The Litigation and Distribution Trust shall be established and the Litigation and Distribution Trustee shall be appointed as set forth in Article VII of the Plan.   *The role of the Litigation and Distribution Trustee and disclosures regarding administration of the Litigation and Distribution Trust is set forth more fully in Article VII of the Plan and the Litigation and Distribution Trust Agreement.*

**1    Establishment of Liquidation and Distribution Trust**

On the Effective Date, the Litigation and Distribution Trust shall be established pursuant to the Litigation and Distribution Trust Agreement for the purposes of administering the Litigation and Distribution Trust Assets and making all distributions to Litigation and Distribution Trust Beneficiaries as provided for under the Plan. The Litigation and Distribution Trust Agreement shall be substantially in the form in **Exhibit C** hereto.

The beneficial interests in the Litigation and Distribution Trust shall not be certificated, unless otherwise provided in the Litigation and Distribution Trust Agreement.  The issuance of any beneficial interests of the Litigation and Distribution Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

**2    Execution of the Liquidation Trust Agreement**

The Litigation and Distribution Trust Agreement, in a form reasonably acceptable to the Debtor and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Litigation and Distribution Trust and the beneficial interests therein, which shall be for the benefit of holders of Allowed Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims as set forth in the Plan.  Article VII of the Plan sets forth certain of the rights, duties and obligations of the Litigation and Distribution Trustee.  In the event of any conflict between the terms of Article VII of the Plan and the terms of the Litigation and Distribution Trust Agreement, the terms of the Plan shall govern.

**3    Governance of the Litigation and Distribution Trust**

The Litigation and Distribution Trust shall be governed and administered by the Litigation and Distribution Trustee and the Oversight Committee, as provided under the Litigation and Distribution Trust Agreement.  The Litigation and Distribution Trustee and the Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Litigation and Distribution Trust and shall act in the best interests of the Litigation and Distribution Trust

Beneficiaries. The initial three members of the Oversight Committee shall be Vik Ghei, Misha Zaitzeff, and Donna Ennis, each of whom currently represent members of the Committee.

Vik Ghei is a member of the general partner of each fund managed by HoldCo Asset Management. Prior to co-founding HoldCo in 2011, Mr. Ghei was a Managing Director and Associate Portfolio Manager at Tricadia Capital Management. Misha Zaitzeff is a member of the general partner of each fund managed by HoldCo Asset Management. Prior to co-founding HoldCo in 2011, Mr. Zaitzeff was an investment professional at Tricadia Capital Management where he invested in corporate loans and bonds, public and private equity, distressed debt across all sectors, and structured credit. Donna Ennis is the Portfolio Manager at Federated Insurance. Prior to her experience with Federated Insurance, which began in 2014, she was Vice President of PNC Capital Advisors.

### 4     Litigation and Distribution Trust Trustee

In accordance with the Litigation and Distribution Trust Agreement, and subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall be authorized to exercise and perform the rights, powers, and duties held by the Debtor and the Estate with respect to the Litigation and Distribution Trust Assets upon their transfer to the Litigation and Distribution Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, manage, and to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Litigation and Distribution Trust Assets.

Stephen Darr shall serve as the Litigation and Distribution Trustee. A summary of Mr. Darr's background and experience is attached as **Exhibit F** to this Disclosure Statement. Mr. Darr will bill for his services as Litigation and Distribution Trustee at an hourly rate of $660.00/hr. If the Litigation and Distribution Trust requires financial advisory assistance and retains Mr. Darr's firm, it is expected that his firm will bill for services at an hourly rate which will not exceed $660.00/hr. As set forth more fully in the Plan and in the Litigation and Distribution Trust Agreement, compensation for the Litigation and Distribution Trustee shall be subject to agreement with the Oversight Committee.

The Liquidation and Distribution Trustee shall provide an annual reporting to Litigation and Distribution Trust Beneficiaries which shall include: the current status of any pending litigation of the Litigation and Distribution Trust; the Litigation and Distribution Trust's income and expenses for the prior fiscal year, and the number of Litigation and Distribution Trust Beneficiaries and outstanding Claim amounts.

### 5     Litigation and Distribution Trust Assets

Except as otherwise provided in the Plan, on the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all of the Litigation and Distribution Trust Assets, as well as the rights, privileges (including, but not limited to, the attorney-client privilege), and powers of the Debtor and its Estate applicable to the Litigation and Distribution Trust Assets, shall automatically vest in the Litigation and Distribution Trust, free and clear of all Claims and Equity Interests for

the benefit of the Litigation and Distribution Trust Beneficiaries.  For the avoidance of doubt, (i) in no event shall the term "Litigation and Distribution Trust Assets" be deemed to include any released claims against any Exculpated Parties, and (ii) the Litigation and Distribution Trust shall not have the right to assert any released claims against any Exculpated Parties.  Upon the transfer of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust, the Litigation and Distribution Trust shall succeed to all of the Debtor's and Estate's rights, title and interest in such Litigation and Distribution Trust Assets, and the Debtor shall have no further interest in or with respect to such Litigation and Distribution Trust Assets.  **The Litigation and Distribution Trust Assets are properties dealt with by this Plan and the transfer of each of such properties to the Litigation and Distribution Trust shall be free and clear of all claims and interests of creditors, equity security holders, and of general partners, if any, of the Debtor, as provided in 11 U.S.C. § 1141(c).**

The Confirmation Order shall constitute a determination that the transfers of Assets to the Litigation and Distribution Trust are legal and valid and consistent with the laws of the State of Louisiana.

All parties shall execute any documents or other instruments necessary to cause title to the Litigation and Distribution Trust Assets to be transferred to the Litigation and Distribution Trust. The Litigation and Distribution Trust Assets will be held in trust for the benefit of all holders of Allowed Claims in Classes 2, 3A, 3B, 3C, 4 and 5 pursuant to the terms of the Plan and Litigation and Distribution Trust Agreement.

As more fully set forth in Section 7.9 of the Plan and Litigation and Distribution Trust Agreement, the transfer of each of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust shall be treated for U.S. federal income tax purposes as a transfer of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust Beneficiaries, who will immediately thereafter be deemed to have automatically transferred all such Assets to the Litigation and Distribution Trust.

## IX.    INJUNCTION, EXCULPATION AND LIMITATION OF LIABILITY

### 1    Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate Order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against in the Debtor or the Estate, **except for** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, are, with respect to any such Claims, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without

49

limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Estate, the Reorganized Debtor, or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the Estate, the Reorganized Debtor or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor, the Estate or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, satisfied, or otherwise addressed pursuant to the Plan or the Confirmation Order, including, but not limited to, through the releases and exculpations provided under the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained therein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.  Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth in the Plan.

The foregoing injunctions shall extend for the benefit of the Litigation and Distribution Trustee, and any successors of the Debtor or the Reorganized Debtor, and to any property and interest in property subject to the Plan.

## 2     Discharge

Except as otherwise provided in the Plan **with respect to** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, except as to the Litigation and Distribution Trust Assets. Upon the Effective Date, except as otherwise provided for in the Plan or Confirmation Order, FNBC shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan.

3       Injunction

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATIONS GRANTED IN THE PLAN, THE DEBTOR AND ALL PARTIES IN INTEREST SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

4       Exculpation

No Exculpated Party shall have or incur, and each Exculpated Party will be released and exculpated from any claim, obligation, Cause of Action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Case, entry into the Litigation and Distribution Trust Agreement, the negotiation and pursuit of the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and the issuance of securities under or in connection with the Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as determined by Final Order of the Bankruptcy Court, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of any securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

5       Limitation on Liability on Liquidation and Distribution
        Trustee

The Litigation and Distribution Trustee will not be liable for any act he may do or omit to do as Litigation and Distribution Trustee under the Plan and the Litigation and Distribution Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Litigation and Distribution Trustee be liable in any event, except for willful misconduct, gross negligence, or intentional fraud. The foregoing limitation on liability will also apply to any Person (including any professional) employed by the Litigation and Distribution Trustee and acting on behalf of the Litigation and Distribution in the fulfillment of their respective duties hereunder or under the Litigation and Distribution Trust Agreement.

6       D&O Claims and D&O Policies

For the avoidance of doubt, and notwithstanding anything to the contrary set forth in the Plan or this Disclosure Statement, including Article VIII thereof, no release, exculpation,

injunction, or waiver set forth in the Plan shall apply to any D&O Claims (or claims relating to any D&O Policies) belonging to or pursuable by the Committee or the Litigation and Distribution Trust or Litigation and Distribution Trustee, and all such claims and related Causes of Action are expressly reserved and preserved as set forth in Section 6.3 of the Plan.

### 7    SEC rights preserved

Notwithstanding any provision herein to the contrary, no provision of the Plan or any order confirming the Plan: (i) releases or exculpates any non-debtor person or entity from any claim or cause of action of the U.S. Securities and Exchange Commission ("SEC"); or (ii) enjoins, limits, impairs or delays the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

### 8    Binding Effect of Plan

The Plan shall be binding upon the Debtor, the holders of all Claims and Equity Interests, parties in interest, Persons and their respective successors and assigns.  Except as specifically provided in the Plan, to the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

Nothing in this Plan affects, modifies or otherwise alters the rights, claims, interests or defenses of the FDIC as Receiver for First NBC (the "FDIC-R") as receiver for First NBC Bank, a) under the terms of the Settlement Agreement, as approved by order entered on December 19, 2017 [Doc. 297] b) against any non-Debtor person or entity or c) against any insurance policy under which First NBC Bank or the Debtor is named insured or any insurance policy that may cover any claim that is asserted by the FDIC-R or First NBC Bank or that is property of the Debtor's bankruptcy estate; additionally, for the avoidance of doubt, nothing in this Plan shall be deemed to preclude the FDIC-R from or otherwise affect the FDIC-R's right, if any, to pursue or defend a claim to ownership of claims or causes of action, including any claims or causes of action brought or otherwise prosecuted by the Debtor or the Liquidating Trustee; provided further, that this sentence does not alter or affect an exculpation granted to an Exculpated Party hereunder for work conducted from the Petition Date to the Effective Date.

### X.
### CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    Overview

**Please see Discussion at Section III.A.**

### B.    Confirmation of the Plan

### 1    Elements of Section 1129 of the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

a.      The Plan complies with the applicable provisions of the Bankruptcy Code.

b.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

c.      The Plan has been proposed in good faith and not by any means proscribed by law.

d.      Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e.      The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or a successor to the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

f.      With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.

g.      In the event that the Debtor does not seek to confirm the Plan non-consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the Effective Date and Priority Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims.

i.      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.      All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtor believes that the Plan will satisfy all the statutory provisions of Chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

### 2      Acceptance

An impaired class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims actually voting. Each impaired class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests actually voting.

### 3      Best Interests of Creditors Test

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of impaired Claims against and Equity Interests in the Debtor would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtor and the cash held by the Debtor at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay impaired Claims arising on or in addition to the foregoing. It is expected that the liquidation of remaining assets, under chapter 7 of the Bankruptcy Code, would yield less value due to the expeditious liquidation as required by chapter 7 than they are expected to yield under the Plan. In addition, under a chapter 7 liquidation, the Debtor's Estate would not receive the Aggregate Settlement Amount provided for under the Plan.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including (i) the additional costs associated with the appointment of the chapter 7 trustee; (ii) the erosion in value of assets in chapter 7 cases, in the context of the expeditious liquidation required under chapter 7; and, (iii) no Aggregate Settlement Amount to the Estate, the Debtor has determined that confirmation of the Plan will provide each holder of an impaired Claim with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis attached to this Disclosure Statement as Schedule 1, the Debtor believes that the Plan provides to each holder of a Claim a value greater than the value of the distribution that each holder would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

### 4        Feasibility

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtor has analyzed the Liquidation and Distribution Trust's capacity to service its obligations under the Plan. Based upon its analysis, the Debtor submits that the Litigation and Distribution Trustee will be able to make all payments required to be made under the Plan because the Exit Facility and Estate Cash will provide the Debtor and Liquidation and Distribution Trustee with sufficient funds to satisfy Plan payments.

### C.      Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

In the event that any impaired class does not accept the Plan, the Debtor may nevertheless move for confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and it reserves the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other

classes of Claims that vote to reject the Plan. The Debtor may seek confirmation of the Plan under Section 1129(b) as to certain Claims.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

## D.  **Effect of Confirmation**

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan. Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

**XI.**
**TAX ISSUES**

For federal income tax purposes, (i) all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, and the Litigation and Distribution Trust Beneficiaries) shall treat the Litigation and Distribution Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 684, (ii) the transfer of Assets of the Debtor to the Litigation and Distribution Trust under the Plan shall be treated as a deemed transfer to the Litigation and Distribution Trust Beneficiaries in satisfaction of their Claims followed by a deemed transfer of the Litigation and Distribution Assets by the Litigation and Distribution Trust Beneficiaries to the Litigation and Distribution Trust, (iii) the Litigation and Distribution Trust Beneficiaries will be deemed to be the grantors and owners of the Litigation and Distribution Trust and its assets, and (iv) the Litigation and Distribution Trust will be taxed as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code owned by the Litigation and Distribution Trust Beneficiaries. The Litigation and Distribution Trust will file federal income tax returns as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 and report, but not pay tax on, the Litigation and Distribution Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The Litigation and Distribution Trust Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Litigation and Distribution Trust Assets transferred to the Litigation and Distribution Trust for all federal income tax purposes. The Litigation and Distribution Trust Assets shall be valued based on the Litigation and Distribution Trustee's good faith determination of their fair market value.

The Litigation and Distribution Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Litigation and Distribution Trust Beneficiaries shall be bound by such election, if made by the Litigation and Distribution Trustee, in consultation with the Oversight Committee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, and the Litigation and Distribution Trust Beneficiaries) shall treat the transfers of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust in accordance with the terms of the Plan as a sale by the Debtor and/or its Estate of such Litigation and Distribution Trust Assets to the Litigation and Distribution Trust at a selling price equal to the fair market value of such Litigation and Distribution Trust Assets on the date of transfer. The Litigation and Distribution Trust shall be treated as the owner of all Litigation and Distribution Trust Assets that it holds.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest and other fees, premiums and charges, as applicable.

**THE FOREGOING HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

## XII.
## RISK FACTORS

There are many risks and uncertainties in respect of the Plan and its implementation. The holders of Claims against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. The risk factors identified below they should not be regarded as the only risks present in connection with the Debtor's business or the Plan and its implementation.

## A.     Certain Bankruptcy Considerations

### 1     Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims against and Equity Interests in the Debtor under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. **The Bankruptcy Court has established June 28, 2019 as the deadline within which a party in interest may object to the Plan's classification of Claims and Equity Interests for Classes 1, 2, 5, 6, 7 and 8.  With respect to Classes 3A, 3B, 3C and 4, the Bankruptcy Court has established _____, 2019 as the deadline within which a party in interest may object to the Plan's classification of Claims and Equity Interests; and, any such objections shall be set for hearing before the Bankruptcy Court on the Confirmation Date.**

### 2     Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Equity Interests as those proposed in the Plan.

### 3     The Debtor May Not Be Able Secure Confirmation or Consummation of the Plan

The Plan requires the acceptance of a requisite number of holders of Claims that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section of this Disclosure Statement entitled "Confirmation and Consummation Procedures – Overview."  There can be no assurance that such acceptances and approvals will be obtained and therefore, that the Plan will be confirmed.  In addition, confirmation of the Plan and the occurrence of the Effective Date of the Plan are subject to the satisfaction of certain conditions precedent.  Although the Debtor believes that the conditions precedent to the confirmation of the Plan and to the occurrence of the Effective Date of the Plan will be met, there can be no assurance that all such conditions precedent will be satisfied. If any condition precedent is not satisfied or waived pursuant to the Plan, the Plan may not be confirmed or the Effective Date may not occur.

Furthermore, although the Debtor believes that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur.  The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events, including the establishment of the

aggregate of the Subordinated Instruments 1 within the provided limitations. There can be no assurance that all of these events will occur or that those that do not occur will be waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims and Equity Interests would receive less than they would receive under the Plan. A liquidation analysis prepared by the Debtor with the assistance of its Professionals is attached hereto as Schedule 1.

If the Plan is not confirmed and does not go effective for any reason and the Debtor or some other party in interest decides to prosecute a different plan, recoveries to holders of Claims against or Equity Interests in the Debtor may be negatively impacted. If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims and Equity Interests. There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and Equity Interests as the treatment provided under the Plan. If any modifications to the Plan are materially adverse to any holders of Claims or Equity Interests, it would be necessary to resolicit votes from holders of such Claims or Equity Interests, which would, at the very least, further delay confirmation and consummation of the Plan, and could jeopardize the consummation of the Plan.

## 4 Actual Plan Distributions May Be Less than Estimated for the Purposes of this Disclosure Statement

The Debtor projects that the Claims and Equity Interests asserted against the Debtor may be resolved in and reduced to an amount that approximates the estimates set forth in the Liquidation Analysis attached hereto as Schedule 1. However, there can be no assurance that such estimates will prove accurate. In the event the allowed amounts of such Claims and/or Equity Interests are materially higher than the projected estimates, actual distributions to holders of Allowed Claims could be materially less than estimated herein.

## B. Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Holders of Claims and Equity Interests, and other interested parties, should read carefully the discussion set forth in the article of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences" for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## XIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has concluded that the Plan will maximize recoveries to holders of Claims and Equity Interests. If no plan of reorganization can be confirmed, the Chapter 11 Case of the Debtor

may be converted to s case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.   The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because (i) the chapter 7 trustee's unfamiliarity with the Debtor and its industry would lead to additional costs for the Estate and (ii) in a liquidation of the Debtor under chapter 11, the Causes of Action retained by the Estate likely will be pursued in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, potentially resulting in greater recoveries.   Accordingly, the Debtor has determined that confirmation of the Plan will likely provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7.

## XIV.
## <u>CONCLUSION</u>

The Debtor believes that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims in the Debtor to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.


Dated:  July 2, 2019                              Respectfully submitted,

                                                  First NBC Bank Holding Company, Debtor

                                                  By: /s/ Lawrence Blake Jones
                                                  Name:   Lawrence Blake Jones
                                                  Title:    Chief Restructuring Officer