UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:

FIRST NBC BANK HOLDING COMPANY                CASE NO. 17-11213

                                              SECTION A

DEBTOR                                        CHAPTER 11

### AFFIDAVIT OF SERVICE
### (CLASS 2 CLAIMS)

**First NBC Bank Holding Company**
**5.75% Subordinated Notes due February 2025**
**CUSIPs:  32115DAA4 and 32115DAB2**

The undersigned, Robert Stevens, President of Globic Advisors, Inc., ("Globic"), the Voting Agent, having personal knowledge of the facts set forth herein and being competent to testify, states as follows:

1.      On July 8, 2019, Globic caused a Solicitation Package, as defined hereinbelow, to be transmitted by USPS Priority Mail to the registered holders of the Notes as of the voting record date of July 3, 2019, (the "Voting Record Date").

2.      The Solicitation Package consisted of the following documents, attached as Exhibit 1:

   a. Second Amended Disclosure Statement Relating to Amended Joint Chapter 11 Plan for First NBC Bank Holding Company
   b. Class 2 – Registered Holder Ballot
   c. Return Envelope (postage pre-paid)

3.      The Indenture Trustee for the Notes, US Bank, N.A., provided a list of all holders, who held their notes in registered form as of the Voting Record Date, see attached as Exhibit 2.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Dated: July 9, 2019                          _____
                                             Robert Stevens
                                             President, Globic Advisors, Inc.

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FIRST NBC BANK HOLDING COMPANY | ) | Case No. 17-11213 |
| | ) | |
| Debtor | ) | |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO AMENDED JOINT CHAPTER 11 PLAN FOR FIRST NBC BANK HOLDING COMPANY**

> **THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN.  VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT.   THIS  DISCLOSURE  STATEMENT  IS  BEING  SUBMITTED  FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

Dated:  July  2, 2019

**THE STEFFES FIRM, LLC**
William E. Steffes, Esq.
bsteffes@steffeslaw.com
Barbara B. Parsons
bparsons@steffeslaw.com
13702 Coursey Blvd., Bldg. 3
Baton Rouge, Louisiana 70817
(225) 751-1751
(225) 751-1998  Facsimile
*Counsel to the Debtor*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1
II. NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ................. 12
III. EXPLANATION OF CHAPTER 11 ............................................................................. 16
   A.   Overview of Chapter 11 ...................................................................................... 16
   B.   Chapter 11 Plan .................................................................................................. 16
   C.   Confirmation of a Chapter 11 Plan ..................................................................... 17
IV. OVERVIEW OF THE PLAN ...................................................................................... 17
V. GENERAL INFORMATION ....................................................................................... 23
   A.   Organizational Structure and Management ........................................................ 24
   B.   Employees .......................................................................................................... 24
   C.   Pre-petition Capital Structure ............................................................................. 24
   D.   Factors That Precipitated the Debtor's Chapter 11 Filing and Purpose Thereof ............. 25
VI. THE CHAPTER 11 CASE ......................................................................................... 25
   A.   Filing of the Petitions and Debtor in Possession Status ...................................... 25
   B.   First Day Pleadings and Orders ......................................................................... 25
   C.   Employment of Professionals for the Debtor ....................................................... 25
   D.   Appointment of the Committee. .......................................................................... 25
   E.   Exclusivity .......................................................................................................... 26
   F.   Claims Bar Date ................................................................................................. 26
   G.   Administrative Claim Bar Date .......................................................................... 26
   H.   Payment of Administrative Expense Claims ........................................................ 26
   I.   Settlement with the FDIC ................................................................................... 27
   J.   Pending Litigation .............................................................................................. 28
VII. THE CHAPTER 11 PLAN ........................................................................................ 28
   A.   Treatment of Claims Against and Equity Interests in the Debtor. ........................ 29
   B.   Means for Implementation of the Plan. ............................................................... 35
VIII. The Liquidation and Distribution Trust .................................................................... 47
IX. INJUNCTION, EXCULPATION AND LIMITATION OF LIABILITY ............................. 49
X. CONFIRMATION AND CONSUMMATION PROCEDURES ......................................... 52
   A.   Overview ............................................................................................................ 52
   B.   Confirmation of the Plan .................................................................................... 52
   C.   Confirmation Without Acceptance of All Impaired Classes – "Cramdown" ......... 55
   D.   Effect of Confirmation ....................................................................................... 56
XI. TAX ISSUES ........................................................................................................... 56

XII. RISK FACTORS ................................................................................................................ 57

   A.   Certain Bankruptcy Considerations ............................................................................ 58

   B.   Certain Tax Considerations......................................................................................... 59

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.... 59

XIV. CONCLUSION.................................................................................................................. 60

## EXHIBITS

Joint Chapter 11 Plan of Reorganization ...................................................................... Exhibit "A"

Disclosure Statement Order……………………………………………………………Exhibit "B"

Litigation and Distribution Trust Agreement………………………………………..Exhibit "C"

Demand Letter of the Committee……………………………………………………...Exhibit "D"

Estimated Administrative Expense and Priority Claims……………………………Exhibit "E"

Litigation and Distribution Trustee Background………………..…………………Exhibit "F"

## SCHEDULES

Chapter 7 Liquidation Analysis ......................................................................................Schedule 1

# I.
## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan.** For ease of reference those definitions are repeated below.   **Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**  In the event of a conflict or difference between the definitions used and provisions contained in this Disclosure Statement and the Plan, the definitions and provisions contained in the Plan shall control.

**Definitions.**

As used herein, capitalized terms shall have the respective meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

- <u>Administrative Bar Date</u> means May 13, 2019, the deadline to file proofs of claim in the Chapter 11 Cases with respect to Administrative Expense Claims other than Fee Claims.

- <u>Administrative Expense Claim</u> means a Claim (other than a Claim included in a Class under this Plan) that is entitled to priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code or Order of the Bankruptcy Court, including, without limitation, (i) Claims incurred by the Debtor (or its Estate) on or after the Petition Date and before the Effective Date for the actual, necessary costs and expenses of preserving the Estate, including, without limitation, Fee Claims.

- <u>Administrative Expense and Priority Reserve</u> means the Cash from the Estate reserved by the Debtor for the payment of all Unclassified Claims as set forth in Article II of the Plan and all Class 1 Claims as set forth in Article III of the Plan.

- <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

- <u>Allowed</u>, when used

    i) with respect to any Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim; and

ii) with respect to Equity Interests in the Debtor, means the Equity Interests in such Debtor as reflected in the stock ledger or similar register of the Debtor as of the Effective Date.

For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon any potentially applicable rights of avoidance, setoff, or subordination, and any other grounds or defenses.

For the further avoidance of doubt, any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed" under this Plan absent further Order of the Bankruptcy Court.  Unless otherwise specified in this Plan or by Order of the Bankruptcy Court, "Allowed" Claims shall not, for the purposes of computation of distributions under the Plan, include interest on such Claims from and after the Petition Date.

- <u>Aggregate Settlement Amount</u> means $4,250,000 in Cash reserved from the First Round Investment for Class 2 Claims and the Reorganized Debtor, as applicable.

- <u>Avoidance Actions</u> means all Causes of Action of the Estate that arise under chapter 5 of the Bankruptcy Code, including under section 502, 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

- <u>Bankruptcy Code</u> means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Case.

- <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Eastern District of Louisiana.

- <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

- <u>Bar Dates</u> means the General Bar Date, the Administrative Bar Date, and any other applicable deadline to file a proof of claim in the Chapter 11 Case.

- <u>Bar Date Orders</u> means the Order [Doc. 119] entered on September 1, 2017, which set the General Bar Date and the Order [Doc. 543] entered on April 2, 2019, which set the Administrative Bar Date.

- <u>Bondholder Claims</u> means the Claims of the Indenture Trustee on behalf of itself and holders of the Legacy Subordinated Notes.

- <u>Bondholder Retained Interests</u> means all of a Bondholder's rights, title and interests, on account of its Bondholder Claim, to Plan Distributions from the Litigation and Distribution Trust.

- <u>Bondholders</u> means the holders of the Legacy Subordinated Notes.

- <u>Business Day</u> means any day other than a Saturday, a Sunday, a "legal holiday" (as defined by Bankruptcy Rule 9006(a)), or any other day on which commercial banks are required or authorized to close for business in New York, New York.

- <u>Cash</u> means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

- <u>Cash Option</u> means the Class 2 Claim treatment option set forth in section 3.3.2(iii)(a) of the Plan.

- <u>Causes of Action</u> means all claims, actions, causes of action, choses in action, liabilities, obligations, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, foreseen, unforeseen, asserted, assertable directly or derivatively, arising in law, equity or otherwise, that exist and/or are or may be pending on the Effective Date, against any Person, whether asserted or unasserted as of the Effective Date that constitute "property of the Debtor's Estate" as defined in 11 U.S.C. §541, including, without limitation: (i) the right to object to Claims and Equity Interests; (ii) all Avoidance Actions; and (iii) all Tort Claims. Any and all Causes of Action are preserved under the Plan, provided, however, that nothing in this definition or within this Plan is intended to determine ownership of, or rights with respect to, claims and/or causes of action with respect to First NBC Bank or assets of First NBC Bank between the Debtor and/or the Liquidating Trustee as successor-in-interest under the Plan and the FDIC as Receiver for First NBC Bank.

- <u>Chapter 11 Case</u> means the case commenced on the Petition Date by the Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code as Case No. 17-11213.

- <u>Claim</u> shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.  For the avoidance of doubt, "Claim" includes, without limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not accrued under non-bankruptcy law that is created by one or more acts or omissions of the Debtor if: (a) the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s) may be sufficient to establish liability when injuries/damages are manifested; and (c) at the time of the Effective Date, the Debtor have received one or more demands for payment for injuries or damages arising from such acts or omissions.

- <u>Claim Objection Deadline</u> means the deadline for filing objections to Claims as set forth in Section 10.1 of this Plan.

3

- <u>Class</u> means a category of Claims or Equity Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

- <u>Committee</u> means the official committee of unsecured creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code.

- <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

- <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be continued from time to time.

- <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

- <u>Contested</u>, when used

   a) with respect to a Claim, means such Claim

   **1**   to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been filed;

   **2**   if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan;

   **3**   if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been filed with the Bankruptcy Court and as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan; or

   **4**   as to which an objection has been or may be filed on or before the Claim Objection Deadline; <u>provided</u>, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and

   b) with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

- <u>Debt Option</u> means the Class 2 Claim treatment option provided for in section 3.3.2(iii)(b) of the Plan.

- <u>Debt Option Threshold</u> means the aggregate amount of $30,000,000 in Class 2 Claims electing the Debt Option.

- <u>D&O Claims</u> means any and all rights and claims against the Debtor's current and/or former directors and officers for pre-petition acts of whatever nature and the proceeds of any such claims, including any D&O Policies or other Insurance Policies associated therewith.

- <u>D&O Policies</u> means any Insurance Policy insuring the Debtor's officers and/or directors, including the Financial Institutions Select Insurance Policy, Number DOP 9311203-04, issued by Zurich American Insurance Company, with a policy period of June 9, 2015 through December 31, 2016 and all excess liability insurance policies for the period of June 9, 2015 through December 31, 2016, including: (a) Continental Casualty Company, Policy No. 596594782, (b) Federal Insurance Company, Policy No. 8243-6165, (c) Great American Insurance Group, Policy No. DFX1491031, (d) Illinois National Insurance Company, Policy No. 01-415-73-85; and, the Officers and Corporate Liability Insurance Policy, Number 14-MGU-16-A39690, issued by U.S. Specialty Insurance Company, with a policy period of December 31, 2016 through December 31, 2017 and any excess liability insurance policies for the period of December 31, 2016 through December 31, 2017, including: (a) US Specialty Insurance Company, Policy No. 14-MGU-16-A39694; (b) XL Specialty Insurance Company, Policy No. ELU148261-16; (c) Illinois National Insurance Company, Policy No. 06-473-18-11; (d) Freedom Specialty Insurance Company, Policy No. XMF1602583; (e) Markel American Insurance Company, Policy No. MKLM6EL0002907; (f) Berkshire Hathaway Specialty Insurance Company, Policy No. 47-EPF-303265-01; and, (g) Illinois National Insurance Company, Policy No. 06-481-51-29.

- <u>Debtor</u> means First NBC Bank Holding Company prior to the occurrence of the Effective Date.

- <u>Debtor in Possession</u> means the Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

- <u>Disallowed</u>, when used with respect to a Claim or Equity Interest, means all or such part of a Claim or Equity Interest that has been disallowed or released by a Final Order, operation of law, written release or settlement, the provisions of this Plan, or otherwise, or withdrawn by the holder of the Claim or Equity Interest.

- <u>Disclosure Statement</u> means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

- <u>Disclosure Statement Order</u> means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

- <u>Distribution Record Date</u> means the record date for purposes of determining Bondholders eligible for Plan Distributions to Bondholders, which shall be the Confirmation Date;

only holders of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes on the Confirmation Date shall be entitled to Plan Distributions.

- **Distribution Reserve** means any reserve established by the Litigation and Distribution Trustee on account of Contested Claims of any Litigation and Distribution Trust Beneficiary which, if Allowed, would entitle such Litigation and Distribution Trust Beneficiary to a Plan Distribution.

- **Effective Date** means a date selected by the Plan Proponents jointly which shall be a Business Day that is no later than three (3) days after all of the conditions specified in Section 11.2 have been satisfied or waived in accordance with Section 11.3 of this Plan. Except as otherwise extended by the Court on motion of the Plan Proponents, the Effective Date shall in no event occur more than sixty (60) days after the Confirmation Date.

- **Equity Interest** means (i) any outstanding ownership interest in any of the Debtor, including, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in the Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against the Debtor that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

- **Estate** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

- **Estate Cash** means all Cash of the Debtor and the Estate as of the Effective Date remaining after payment (or reserve for payment) of all Unclassified Claims as set forth in Article II of this Plan and Allowed Class 1 Claims as set forth in Article III of this Plan.

- **Exculpated Parties** means all Persons that are or were at any time on or after the Petition Date, and whether or not any such Person currently retains such capacity or position, (i) the Debtor; (ii) the Committee or a member of the Committee, solely in its capacity as a Committee member; (iii) Professional Persons, to the extent such parties are or were acting in such capacity on behalf of any of the Persons identified in (i) or (ii) above on or after the Petition Date; and (iv) the Indenture Trustee.

- **Exit Facility** means that portion of the First Round Investment which is NOT used by or on behalf of the SPV for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option.

- **Fee Application** means an application for allowance and payment of a Fee Claim.

- **Fee Claim** means a Claim of a Professional.

- <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or any other court or adjudicative body of competent jurisdiction) entered on the docket of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, motion for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or any other court or adjudicative body) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

- <u>First Round Investment</u> means the $5,000,000 in Cash, held in an escrow account by the Debtor's bankruptcy counsel pursuant to the FRI Escrow Agreement, provided for purposes of Plan Distributions and future business operations of the Reorganized Debtor.

- <u>First Round Investors</u> means the Persons who will fund the First Round Investment.

- <u>FNBC</u> means First NBC Bank Holding Company

- <u>FRI Escrow Agreement</u> means that certain agreement between the Debtor, the First Round Investors and the Committee governing use and availability of the First Round Investment, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

- <u>General Bar Date</u> means October 20, 2017, the general deadline to file proofs of claim in the Chapter 11 Case (or November 7, 2017, with respect to governmental units) established by the General Bar Date Order.

- <u>General Unsecured Claim</u> means any Claim against the Debtor, including any Bondholder Claim, which is not an Administrative Expense Claim (including Fee Claims), a fee payable pursuant to section 1930 of title 28 of the United States Code, a Priority Tax Claim, an Insured Claim, an Indemnity Claim, a Secured Claim, or a Priority NQDC Claim, and shall not include Disallowed Claims.

- <u>Indemnity Claim</u> means any Claim against the Debtor for indemnification, reimbursement, or contribution filed by any current or former officer, director, employee or independent contractor of the Debtor which under this Plan are disallowed and/or subordinated to certain other Claims by Sections 502(e) and 509(c) of the Bankruptcy Code.

- <u>Indenture</u> means that certain Indenture by and between U.S. Bank National Association, as Indenture Trustee, and FNBC, as Issuer, dated as of February 18, 2015, as amended.

- <u>Indenture Trustee</u> means U.S. Bank National Association, as Indenture Trustee, under the Indenture.

- <u>Insider</u> means a Person that would fall within the definition ascribed to such term in section 101(31) of the Bankruptcy Code.

- <u>Insurance Policies</u> means, collectively, any policies of insurance coverage of any kind (including any and all amendments, endorsements, renewals, and extensions thereof) that at any time belonged or belong to or included or include the Debtor as a named insured, additional insured, or beneficiary, including, without limitation, the D&O Policies.

- <u>Insured Claim</u> means a claim for which an Insurance Policy or Policies provides or may provide coverage and payment, in whole or in part. Insured Claims are subject to the provisions of, and treatment under, Section 14.2 of this Plan.

- <u>Internal Revenue Code</u> means the Internal Revenue Code of 1986, as amended, codified at title 26 of the United States Code, together with any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements and other releases of the United States Treasury Department or the IRS.

- <u>IRS</u> means the Internal Revenue Service.

- <u>Legacy Subordinated Notes</u> means those certain subordinated notes issued by FNBC on February 18, 2015 in a private placement offering in the aggregate principal amount of $60 million, with a maturity date of February 18, 2025 and bearing interest at a rate of 5.75% per annum, some or all of which were subsequently exchanged for identical new notes, registered under the Securities Act and generally not subject to transfer restrictions, all as more fully described in FNBC's filing of Form S-4 Registration Statement under the Securities Act on August 18, 2015.

- <u>Litigation and Distribution Trust</u> means the trust established pursuant to Article VII of the Plan.

- <u>Litigation and Distribution Trust Agreement</u> means the agreement, in a form reasonably acceptable to the Debtor and the Committee, to be dated as of the Effective Date establishing the terms and conditions of the Litigation and Distribution Trust, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

- <u>Litigation and Distribution Trust Assets</u> means the Debtor's and the Estate's right, title and interest in the Estate Cash, the $300,000.00 Senior Debt instrument to be contributed as provided in Section 6.9 of this Plan, the Avoidance Actions, Tort Claims and the proceeds of any Insurance Policies applicable thereto, any objections to Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims, and, any other Cause of Action <u>not</u> related to or affecting the Tax Assets. For the avoidance of doubt, all Tort Claims shall be Litigation and Distribution Trust Assets

- <u>Litigation and Distribution Trust Beneficiaries</u> means all individuals and entities entitled to a Plan Distribution from the Litigation and Distribution Trust.

- <u>Litigation and Distribution Trust Expenses</u> means all reasonable costs and expenses incurred on or after the Effective Date by the Litigation and Distribution Trustee associated with the implementation and administration of the Litigation and Distribution Trust and the Plan.

- <u>Litigation and Distribution Trust Indemnified Parties</u> has the meaning set forth in Section 7.7 of this Plan.

- <u>Litigation and Distribution Trustee</u> means the trustee (and any successor trustee) selected to serve trustee pursuant to Article VII of this Plan and under the Litigation and Distribution Trust Agreement. The identity of the initial trustee shall be filed with the Bankruptcy Court as a Plan Document no later than three (3) Business Days after entry of the Bankruptcy Court's order approving the adequacy of the Disclosure Statement.

- <u>Oversight Committee</u> means the Oversight Committee of the Litigation and Distribution Trust established pursuant to the Litigation and Distribution Trust Agreement.

- <u>Person</u> means an individual, corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, trust, estate, unincorporated association, unincorporated organization, or any government, governmental entity, or political subdivision, department, agency, or instrumentality thereof, or any other entity.

- <u>Petition Date</u> means May 11, 2017, the date on which the Debtor commenced the Chapter 11 Case.

- <u>Plan</u> means this chapter 11 plan for the Debtor filed in the Chapter 11 Case, including all supplements, appendices and schedules hereto, either in their present form or as same may be amended, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

- <u>Plan Distribution</u> means the payment or distribution under the Plan of Cash, assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

- <u>Plan Distribution Date</u> means (i) if a Claim or Equity Interest is Allowed on the Effective Date, a date that is within five (5) business days after the Effective Date, or (ii) if such Claim or Equity Interest is not Allowed on the Effective Date, a date within five (5) business days after the date such Claim or Equity Interest becomes Allowed.

- <u>Plan Documents</u> means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.4 of the Plan including, without limitation, the Litigation and Distribution Trust Agreement. Plan Documents shall be filed

in the record of the Bankruptcy Case no later than five (5) calendar days in advance of the Confirmation hearing.

- **Plan Proponents** means the Debtor and the Committee (each, a "Plan Proponent").

- **Priority NQDC Claim** means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a)(5) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

- **Priority Tax Claim** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

- **Professional** means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Case.

- **Pro Rata Share** means the proportion that an Allowed Claim (in the full amount of such Claim) or an Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such class, including Contested Claims, but excluding Disallowed Claims, (a) as calculated by the Litigation and Distribution Trustee or Debtor, as applicable; or (b) as determined or estimated by the Bankruptcy Court.

- **Reorganized Debtor** means the Debtor after the occurrence of the Effective Date.

- **Schedules** means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtor with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtor from time to time in accordance with Bankruptcy Rule 1009.

- **Secured Claim** means a Claim: (a) secured by a lien, as defined in section 101(37) of the Bankruptcy Code, on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

- **Securities Act** means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

- **Senior Debt Instrument** means any debt instrument issued by the Reorganized Debtor pursuant to or in connection with the implementation of the Plan, which (a) ranks equally in priority only with the Exit Facility; (b) is senior in rank to all other indebtedness of the Debtor or Reorganized Debtor; (c) has a maturity date of the 5th anniversary of issuance; (d) bears interest at a rate of 5% per annum; and, (e) is payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments

may vary, but in no event shall they be in an amount less than the respective quarterly payment that would be due as calculated on a 10-year amortization schedule at 5% interest.

- **Series D Preferred** means 37,935 shares of Series D Preferred Stock issued on August 4, 2011 by FNBC to U.S. Department of the Treasury under the Small Business Lending Fund program.

- **Series E Preferred** means 1,725 shares of Series E Preferred Stock issued on April 27, 2017 by FNBC to certain members of the FNBC Board of Directors in accordance with FNBC's amendment to the articles of incorporation dated April 25, 2017.

- **SPV** means First Phoenix SPV, LLC, the Special Purpose Vehicle established by the First Round Investors to acquire the SPV Claim Rights from any Bondholder electing (or deemed to be electing) the Cash Option under Section 3.3.2(iii)(a).

- **SPV Claim Rights** means all rights, title and interests of a Bondholder in an Allowed Bondholder Claim except for any rights of the Bondholder to receive its Pro Rata Share of the Litigation and Distribution Trust Assets under Section 3.3.2(ii) and Cash under Section 3.3.2(iii)(a).

- **Subordinated 510(b) Claim** means any Claim subordinated by operation of section 510(b) of the Bankruptcy Code, including any Claim arising from the rescission of a purchase or sale of a security of the Debtor or an affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of such a Claim.

- **Subordinated Debt 1** means debt issued by the Debtor or Reorganized Debtor that is subordinate only to the Senior Debt Instruments and Exit Facility; and, is comprised exclusively of (a) Subordinated Instruments 1 issued to holders of Class 2 Claims that have elected the Debt Option; and, (b) SPV Claim Rights.

- **Subordinated Instrument 1** means any Subordinated Debt 1 instrument issued by the Reorganized Debtor pursuant to the Plan, which shall: (a) bear interest at a rate of 5% per annum, (b) have a maturity date of the 10th anniversary of issuance, and (c) be payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments may vary, but in no event shall they be in an amount less than the amount of interest accrued.

- **Tax Assets** means any tax attributes of the Debtor, including tax credit carryforwards and net operating loss carryforwards.

- **Tort Claims** means any and all claims of the Debtor based on any tort, including, but not limited to D&O Claims and all Causes of Action at law and equity (including those based on breach of contract and based on tortious conduct) against all current and former auditors and accountants.

- <u>Voting Deadline</u> means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

BY ORDER DATED JULY 3, 2019 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF LOUISIANA (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE CHAPTER 11 PLAN FOR FIRST NBC BANK HOLDING COMPANY (THE "PLAN").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY FIRST NBC BANK HOLDING COMPANY AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "PLAN PROPONENTS"). WHILE  CLASS 1, CLASS 6, CLASS 7 AND CLASS 8 ARE UNIMPAIRED AND DEEMED TO HAVE ACCEPTED THE PLAN, CLASS 2, CLASS 3A, CLASS 3B, CLASS 3C, CLASS 4 AND CLASS 5 ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN. ACCORDINGLY, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS IN CLASS 2, CLASS 3A, CLASS 3B, CLASS 3C, CLASS 4 AND CLASS 5.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **5:00 P.M., PREVAILING CENTRAL TIME, ON JULY 31, 2019 (THE "VOTING DEADLINE")**.  FOR THE AVOIDANCE OF DOUBT, THE DEBTOR RESERVES THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE.  MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING UNSECURED CLAIMS THAT DO NOT APPEAR ON THE DEBTOR'S SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH CLAIM OBJECTIONS MUST BE FILED AS REFERENCED IN THE PLAN.

## II.
## <u>NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN</u>

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE THAT DATE. THE PROPONENTS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FINANCIAL INFORMATION, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. MOREOVER, THE DEBTOR RESERVES ALL RIGHTS TO ASSERT THAT THE ALLOCATION OF VALUE MAY BE DIFFERENT.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE

**DEBTOR'S FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTOR, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.**

**THE STEFFES FIRM, LLC ("STEFFES") IS GENERAL BANKRUPTCY COUNSEL TO THE DEBTOR. STEFFES HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH STEFFES HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, STEFFES HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.**

**THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.**

**AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS, OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR IN THIS CHAPTER 11 CASE.**

On July 3, 2019, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of holders of the solicited classes of Claims against the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtor and certain of the Professional Persons the Debtor has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement

and if given or made, such information may not be relied upon as having been authorized by the Debtor. You should not rely on any information relating to the Debtor, its business, or the Plan other than that contained in this Disclosure Statement, the exhibits hereto, and the Plan itself.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "Ballot") and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by the Debtor's counsel, The Steffes Firm, LLC, 13702 Coursey Blvd., Bldg. 3, Baton Rouge, Louisiana 70817, Attn: Barbara B. Parsons, no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. **All ballots must be actually received by the Debtor's counsel no later than July 31, 2019 at 5:00 p.m., prevailing Central Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B".**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE PLAN CONTAINS BROAD RELEASES AND INJUNCTIONS THAT WILL AFFECT YOUR RIGHTS AS DESCRIBED IN SECTION VIII (D) OF THIS DISCLOSURE STATEMENT AND ARTICLE VIII OF THE PLAN. THESE RELEASES AND INJUNCTIONS INCLUDE, AMONG OTHERS: (I) A PERMANENT INJUNCTION OF THE COMMENCEMENT OF ACTIONS AND THE PERFECTION OR ENFORCEMENT OF JUDGMENTS AND ENCUMBRANCES AGAINST THE DEBTOR AND ITS ESTATE BY ANY ENTITY; (II) A RELEASE AND EXCULPATION OF CERTAIN "EXCULPATED PARTIES" WITH RESPECT TO, AMONG OTHER THINGS, THE CHAPTER 11 CASE AND THE PLAN; AND (III) A PERMANENT INJUNCTION OF ANY ACTION AGAINST ANY "EXCULPATED PARTY" RELATED TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") for August 7, 2019 at 10:00 a.m., prevailing Central Time, before the Honorable Elizabeth Magner, United States Bankruptcy Court for the Eastern District of Louisiana. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before July 31, 2019 at 5:00 p.m., prevailing Central Time, in the manner described in the Disclosure Statement Order attached hereto as Exhibit "B".**

**THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN**.

## III.
## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders and other parties in interest. The Debtor commenced this chapter 11 case, captioned In re First NBC Bank Holding Company, Case No. 17-11213 (the "Chapter 11 Case"), with the filing of voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code on May 11, 2017 (the "Petition Date").

The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of a debtor in property as of the date the petition is filed. Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Case, the Debtor has remained in possession of its property and continued to operate its business as a debtor in possession.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

### B.    Chapter 11 Plan

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of impaired claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan.**

### C.     **Confirmation of a Chapter 11 Plan**

If all classes of claims and equity interests accept or are deemed to accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "Confirmation and Consummation Procedures – Confirmation of the Plan," below. **The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code**.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan. See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. See "Confirmation and Consummation Procedures." Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. Class 1 is not impaired under the Plan, and the holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan. Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 are impaired under the Plan, and the holders of Claims in Classes 2, 3A, 3B, 3C, 4 and 5 are entitled to vote to accept or reject the Plan. Class 1, Class 6, Class 7 and Class 8 are unimpaired and the holders of equity interests in Class 6, Class 7 and Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "Confirmation and Consummation Procedures."

### IV.
### OVERVIEW OF THE PLAN

The following is a summary of the treatment of Claims and Equity Interests under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A". In addition, see "The Chapter 11 Plan" section of this Disclosure Statement. For estimates regarding potential claim amounts and amounts available for distribution under the Plan, see the Liquidation Analysis attached to this Disclosure Statement as Schedule 1.

The claim amounts set forth below are based on information contained in the Debtor's Schedules and filed proofs of claim, and reflect what the Debtor believes to be reasonable estimates of the likely resolution of outstanding disputed Claims. The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes treatment of unclassified and classified Claims and Equity Interests under the Plan:

### Administrative Expense and Priority Tax Claims

| Claims[1] | Treatment |
|---|---|
| Administrative Expense Claims<br><br><br><br><br>Estimated Allowed Claims:<br>Estimated Recovery Percentage: 100% | Except to the extent any Person entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, on the Plan Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction if its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim. |
| Priority Tax Claims<br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 100% | On the Plan Distribution Date, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such Allowed Priority Tax Claim payment (a) in Cash equal to the amount of such Allowed Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim or that is less favorable than the treatment provided to the most favored General Unsecured Claims under the Plan. |

### Claims and Equity Interests

| Classes | Treatment |
|---|---|
| Class 1 – Priority NQDC Claims | Each holder of an Allowed Priority NQDC Claim against the Debtor shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, |

---

[1] Administrative Claims and Tax Claims are treated in accordance with section 1129(a) (9) of the Bankruptcy Code. Pursuant to section 1123(a) (1) of the Bankruptcy Code, such Claims are not designated as classes of Claims for the purposes of the Plan.

| | |
|---|---|
| **Unimpaired – deemed to accept**<br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 100% | all legal, equitable and contractual rights of each holder of an Allowed Priority NQDC Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority NQDC Claim shall be paid Cash in an amount equal to its Allowed Priority NQDC Claim on the Plan Distribution Date.<br><br>While the Debtor does not intend to initiate any Avoidance Actions against holders of these Claims, it reserves the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Debtor further reserves any other offset rights that may exist with respect to the Claims.<br><br>THE DEBTOR INTENDS TO SUPPLEMENT AND AMEND ITS PENDING OBJECTIONS TO ALL CLASS 1 CLAIMS AND BELIEVES THAT NO ALLOWED CLASS 1 CLAIMS EXIST. |
| Class 2 – Allowed General Unsecured Claims<br><br>**Impaired**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Estimated Allowed Claims: $66,405,000<br>Estimated Recovery Percentage: 6% +, depending on outcome of litigation/liquidation efforts and election of Claim holders. | Each holder of an Allowed Class 2 Claim shall receive or be allocated, as applicable, on the Plan Distribution Date, on account of its Allowed Claim:<br><br>(i) Cash in an amount equal to the fees and expenses of the Indenture Trustee, which will be paid directly to the Indenture Trustee, on account of any such fees and expenses, from the Debtor's available Cash. Plan distributions for all remaining amounts due for Bondholder Claims, *i.e.*, all Bondholder Claims other than fees and expenses due to the Indenture Trustee, shall be provided directly to Bondholders[2] and not the Indenture Trustee;<br><br>(ii) such holder's Pro Rata Share of the Litigation and Distribution Trust Assets;<br><br>(iii) *In addition*, to the treatment provided in Section 3.3.2(i) and (ii) above, such holder shall be entitled to elect one of the following alternative Claim treatment options:<br><br>(a) Cash Option - on the Plan Distribution Date, the holder shall receive payment in Cash of its Pro Rata share of the Aggregate Settlement Amount; or,<br><br>(b) Debt Option – subject to the Debt Option Limitations set forth in section 6.6 of the Plan, on the Plan Distribution Date, the Reorganized Debtor shall issue two new instruments to the holder in exchange for and in satisfaction of its Allowed Class 2 Claim: (a) Senior Debt Instrument with a principal balance equal to the holder's Pro Rata share of the Aggregate Settlement Amount; and, (b) Subordinated Instrument 1 with a |

---

[2] The Bondholders shall be identified on the registry established by the Debtor pursuant to Plan Section 6.5.

| | |
|---|---|
| | principal amount equal to the balance of such holder's Claim. |
| | While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims. |
| **Class 3A – STA Secured Claims**<br><br>**Impaired**<br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral. | The holder of an Allowed Class 3A Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3A Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3A Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the STA Secured Claim, that any lien securing any STA Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.** |

| | |
|---|---|
| Class 3B – RCC Secured Claims<br><br>**Impaired**<br><br><br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral | The holder of an Allowed Class 3B Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3B Claim which is proven by order entered and final no later than the Effective Date such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3B Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3B Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to the Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holders of RCC Secured Claims, that any lien securing any Renewal Capital Company Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3B CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3B CLAIMS SHALL EXIST.** |
| Class 3C – NQDC Secured Claims<br><br>**Impaired** | The holder of an Allowed Class 3C Claim, if any exist, shall receive nothing under the Plan except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3C Claim which is proven by order entered and final no later than the Effective Date such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3C Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3C Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims. |

| | |
|---|---|
| Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 0% to 100% depending on value of collateral | While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.<br><br>**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holders of the NQDC Secured Claims, that any lien securing any Class 3C Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3C CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3C CLAIMS SHALL EXIST** |
| Class 4 – Indemnity Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: Except with respect to recoveries that Class 4 Claims may receive from Insurance Policies, 0% to 100% depending on ultimate Allowed Class 4 Claim Amounts and outcome of litigation/liquidation efforts of Liquidation and Distribution Trust. | Class 4 consists of all Indemnity Claims that are disallowed or subordinated, as applicable, pursuant to Section 502(e) and 509(c) of the Bankruptcy Code. Class 4 Claims shall be disallowed or subordinated, as applicable, to the following General Unsecured Claims, as applicable to each Class 4 Claimant, and to the extent any Class 4 Claim becomes an Allowed Claim, then it shall not be paid or satisfied until the following Claims are satisfied in full: Allowed Claims of (a) FDIC, as Receiver for First NBC Bank, (b) Bondholders, and, (c) any other Claims and/or investigative proceedings asserted against the Debtor and holders of Indemnity Claims. Once the aforesaid General Unsecured Claims have been paid in full, holders of Allowed Class 4 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.<br><br>**THE PLAN PROPONENTS INTEND TO OBJECT TO AND TO SEEK DISALLOWANCE OR SUBORDINATION OF ALL CLASS 4 CLAIMS AS FILED** |
| Class 5  Subordinated 510(b) Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $0 | Holders of Allowed Class 5 Claims shall be subordinated to all Claims or Interests that are senior to or equal the Claim or Interest represented by the security from which the Class 5 Claim arises, except that if such security is common stock, such Claim has the same priority as common stock. |

| | |
|---|---|
| Estimated Recovery Percentage: 0% to 100% depending on outcome of litigation/liquidation efforts of Liquidation and Distribution Trust. | Once all Class 1, 2 and 4 Allowed Claims have been paid in full, holders of Allowed Class 5 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.<br><br>While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims. |
| Class 6 - Series E Preferred Equity Interests<br><br>**Unimpaired - Deemed to accept** | Holders of Class 6 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights  to which each such Holder is entitled on account of such Interest. |
| Class 7 – Equity Interests (common stock)<br><br>**Unimpaired - Deemed to accept** | Holders of Class 7 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest. |
| Class 8 - Series D Preferred Equity Interests<br><br>**Unimpaired - Deemed to accept** | Holders of Class 8 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interest. |

## V.
## <u>GENERAL INFORMATION</u>

The Debtor is a holding company for First NBC Bank.  Prior to its removal from the NASDAQ stock exchange on May 18, 2017, as a publicly traded company, FNBC filed certain financial, operational and legal information through public disclosures in accordance with regulations and guidance required by the Securities and Exchange Commission ("SEC"). The documents filed by FNBC with the SEC have been relied upon for purposes of providing historical information related to FNBC's pre-Petition Date operations and organizational structure.

FNBC was incorporated on May 9, 2006, and headquartered in New Orleans, Louisiana. FNBC offered a broad range of financial services through its wholly owned banking subsidiary, First NBC Bank, a Louisiana state non-member bank. FNBC's primary market was the New Orleans metropolitan area and the Florida panhandle. FNBC served its customers from its primary office located in the Central Business District of New Orleans, 38 full-service branch offices located throughout FNBC's market and a loan production office in Gulfport, Mississippi.

On April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver. At the time of the Bank's closure, FNBC's principal asset was the capital stock that it owned in the Bank; and, as a result of the Bank Closure, FNBC had no remaining material tangible assets. Specifically, after

the Bank Closure, FNBC held no operating business assets and, thus, no active business operations have been conducted since the Bank was closed in April 2017.

## A. Organizational Structure and Management

The Bank is the Debtor's sole subsidiary. The Debtor is governed by its Board of Directors, existing on the Petition Date:

| | |
|---|---|
| William D. Aaron, Jr. | Director |
| William M. Carrouche | Director |
| Leander J. Foley, III | Director |
| John F. French | Director |
| Leon L. Giorgio, Jr. | Vice Chairman |
| Shivan Govindan | Chairman |
| Lawrence Blake Jones | Director |
| Louis V. Lauricella | Director |
| Mark G. Merlo | Director |
| Dr. Charles C. Teamer | Director |
| Joseph F. Toomy | Director |

Immediately prior to the Petition Date, the Board appointed Mr. Lawrence Blake Jones as Chief Restructuring Officer to address the day-to-day affairs of the Debtor during the pendency of this Chapter 11 Case. The Board of Directors and the Chief Restructuring Officer have served without compensation since commencement of the Chapter 11 Case.

## B. Employees

The Debtor has had no employees since the Petition Date.

## C. Pre-petition Capital Structure

FNBC's capital structure consists of one class of common stock and two classes of preferred stock. The authorized capital stock of FNBC consists of 100 million shares of common stock and 39,660 shares of preferred stock. As of March 31, 2017, FNBC had 19,212,751 shares of common stock outstanding which was traded under the symbol "FNBC" on the NASDAQ Global Select Market. Additionally, FNBC had 37,925 shares of its Senior Non-Cumulative Perpetual Preferred Stock, Series D; and, 1,725 shares of its Non-Cumulative Mandatorily Convertible Perpetual Stock, Series E outstanding as of that date.

On the Petition Date, the Bankruptcy Court granted an order establishing notice, hearing and sell-down procedures for trading in equity securities and claims against FNBC's estate (the "Trading Order"). The Trading Order provides that any person or entity (as defined in Treas. Reg. § 1.382-3(a)) who currently is or becomes a Substantial Shareholder (as defined in paragraph (e) of the Trading Order) shall file with the Bankruptcy Court, and serve on counsel to FNBC, a notice of such status, on or before the later of (A) 20 calendar days after the effective date of the notice of entry of the Trading Order, or (B) 10 calendar days after becoming a Substantial Shareholder.

Any purchase, sale or other transfer of claims against FNBC or equity securities in FNBC in violation of the Trading Order is null and void *ab initio*.

**D.      Factors That Precipitated the Debtor's Chapter 11 Filing and Purpose Thereof**

The commencement of this Chapter 11 Case was precipitated by the closure of the Bank on April 17, 2017.  At the time of the closure, the Bank was the principle asset of FNBC; however, at the same time, FNBC's liabilities exceeded $60 million.  Such liability was primarily due to Bondholders, some of whom urged the Board of Directors to file this Chapter 11 Case.

**VI.**
**THE CHAPTER 11 CASE**

**A.      Filing of the Petitions and Debtor in Possession Status**

On May 11, 2017, the Debtor filed the Petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1101, 1107 and 1108 of the Bankruptcy Code, the Debtor operated remained in possession of its property as "debtor in possession", although the Debtor has not maintained active business operations since the Petition Date.

**B.      First Day Pleadings and Orders**

On the Petition Date, the Debtor filed a motion seeking entry of an order pursuant to sections 105, 362, and 541 of the Bankruptcy Code establishing notice, hearing, and sell-down procedures for trading in equity securities and claims against the Debtor's estate, which motion was granted on the same date.

**C.      Employment of Professionals for the Debtor**

Pursuant to employment applications filed with the Bankruptcy Court and subsequent orders entered by the Bankruptcy Court, the Debtor has employed the following professionals to assist it with the administration of the Chapter 11 Case: (i) The Steffes Firm, LLC, as general bankruptcy counsel; (ii) Phelps Dunbar, LLP, as special counsel; (iii) PricewaterhouseCoopers, LLP, as certified public accountant; (iv) Fenimore, Kay, Harrison & Ford, LLP, as special counsel; and, Andrew Nash, as certified public accountant (for Louisiana state income tax return purposes). All professionals retained by the Debtor have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtor pursuant to Orders entered by the Bankruptcy Court subject to final approval by the Bankruptcy Court.

**D.      Appointment of the Committee.**

On May 18, 2017, the Office of the United States Trustee appointed the Committee, which originally consisted of the following members: (i) Angel Oak Capital Advisors, LLC, (ii) Cincinnati Insurance Company, (iii) Cincinnati Life Insurance Company, (iv) Federated Life Insurance Company, (v) Federated Mutual Insurance Company, (vi) Federated Service Insurance Company, (vii) Hold Co. Opportunities Fund II, LP, and, (viii) U.S. Bank National Association, as Indenture Trustee.  On May 23, 2017, due to the addition of a member, the Office of the United States Trustee reconstituted the Committee, naming the following members: (i) Angel Oak Capital

Advisors, LLC, (ii) Cincinnati Insurance Company, (iii) Cincinnati Life Insurance Company, (iv) Federated Life Insurance Company, (v) Federated Mutual Insurance Company, (vi) Federated Service Insurance Company, (vii) Hold Co. Opportunities Fund II, LP, and, (viii) U.S. Bank National Association, as Indenture Trustee, and, (ix) Consilio, LLC. The Committee employed the law firms of Jeffrey D. Sternklar, LLC and Stewart, Robbins & Brown, LLC to serve as its bankruptcy counsel. These professionals have been, or will be, paid their allowed fees and expenses incurred in the provision of their services to the Committee pursuant to Orders entered by the Bankruptcy Court subject to final approval of the Bankruptcy Court.

### E.      Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtor had a certain amount of time within which (a) to file its Plan; and (b) to solicit acceptances of its timely filed Plan before other parties in interest would be permitted to file plans. However, the time in which the Debtor maintained the exclusive right to file a chapter 11 plan has expired.

### F.      Claims Bar Date

The Bankruptcy Court established the following bar dates: (i) **October 20, 2017** as the deadline for each person or entity (other than governmental units, as defined in Section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtor; and (ii) **November 7, 2017** as the deadline for governmental units to file proofs of claim. The bar date for the SEC was subsequently extended until January 8, 2018.

### G.      Administrative Claim Bar Date

On April 2, 2019, the Bankruptcy Court entered an Order (I) Fixing Bar Date for Filing Certain Post-Petition Administrative Expense Claims and (II) Approving the Form and Manner of Notice of the Bar Date, which established **May 13, 2019** as the deadline for each person or entity to file an Administrative Expense Claim.

### H.      Payment of Administrative Expense Claims

Section 1129(a)(9) of the Bankruptcy Code states that unless the holder of an administrative expense claim agrees to a different treatment of such claim, the plan will provide that the holder of an administrative expense claim will receive on account of such claim cash equal to the allowed amount of such claim. 11 U.S.C. § 1129(a) (9).

1. General.      Except as provided below for Professionals and to the extent that any entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim, shall be paid in full in Cash on the Plan Distribution Date; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim. If the Debtor's records reflect that the holder of an Administrative Expense Claim received payments from the Debtor during the ninety (90) days (or in the case of insiders, one (1) year) before the Petition Date, that holder's Claim may not become an Allowed Administrative Expense Claim until the holder's potential preference liability under 11 U.S.C. §547 has been resolved.

2. Fee Claims of Professionals.      On or before the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve in the amount of the estimated unpaid Fee Claims accrued through the Effective Date (plus all other unpaid Allowed Administrative Expense Claims including those Contested by the Debtor), to be held by Debtor's counsel until such time as such Fee Claims become Allowed Administrative Expense Claims.

## I.      Settlement with the FDIC

On December 19, 2017, the Bankruptcy Court entered an *Order Granting Motion for Entry of Order Approving Settlement Pursuant to Bankruptcy Rule 9019(a)* [Doc. 297] (the "FDIC Settlement Order").  The FDIC Settlement Order authorized the Debtor to enter into a settlement agreement with the FDIC resolving all pending matters between the parties. The following briefly summarizes the Settlement Agreement:[3]

- Trust Funds:  The NQDC Trust Funds shall be split, with 75% of the Trust Funds ($445,263.63) wired to the Debtor's bank account, and 25% of the Trust Funds ($148,421.21) wired to the FDIC-R's bank account, with a corresponding split of the interest accrued since entry of the Reconsideration Order (if any);

- Zurich Reimbursement Claim:  The Reimbursement Claim shall be split, with $1.5 million payable to the Debtor, and the balance remaining in the Zurich Policy;

- Tax Refunds:  The parties agreed that the Tax Refunds belong, in full, to the FDIC-R.  The Debtor waives any and all claims to the Tax Refunds on behalf of itself and any of its representatives and successors in interest and its estate, and will take all necessary steps to effectuate the Parties' agreement with respect to the Tax Refunds, including making any necessary communications with taxing authorities, wiring any Tax Refunds received by the Debtor to the FDIC-R within ten (10) days of receipt, and cooperating with the FDIC-R in any dispute arising in the Bankruptcy Case with respect to the Tax Refunds;

- FDIC-R Claim: With respect to the proof of claim filed by the FDIC-R, the Tax Benefit Reimbursement Claim shall be allowed in full for all purposes as a general unsecured claim in the principal amount of $3.45 million; and the Catch-all Claim is allowed only with respect to interest on the Tax Benefit Reimbursement Claim, and only to the extent any other general unsecured claims are entitled to interest (together, the "Allowed FDIC-R Claim").  The Allowed FDIC-R Claim shall be entitled to the treatment provided for in any eventual chapter 11 plan filed in this Chapter 11 Case for Allowed General Unsecured Claims;

---

[3]This summary is qualified in its entirety by the terms of the Settlement Agreement.  To the extent of any inconsistency between this summary and the Settlement Agreement, the terms of the Settlement Agreement will control.  All terms not otherwise defined in this paragraph shall be given the meanings ascribed to the Settlement Agreement.

- <u>Tax Attributes Usage</u>: The FDIC-R will not oppose or otherwise hinder and will cooperate, including responding to reasonable discovery requests concerning Tax Attributes, with the Debtor or any other party proposing a Chapter 11 Plan in the potential allocation to the estate and preservation of any Tax Attributes available under previously filed tax returns or future tax returns; provided that such allocation does not interfere with the FDIC-R's ability to recover the Tax Refunds, or any loss carry-back to recover additional tax refunds. The Debtor will not oppose or otherwise hinder the FDIC-R's use of the Tax Refunds, or any loss carry-back to recover additional tax refunds by using or permitting usage of any Tax Attributes;

- <u>Releases by the FDIC-R and the Debtor.</u> The FDIC-R and the Debtor each will provide a release and waiver of claims as to the above matters, as set forth in the Settlement Agreement. All other rights are reserved; and all other rights not specifically defined by the Settlement Agreement and this Order are reserved.

**J.      Pending Litigation**

As of the date hereof, the only known related, material actions pending are as follows:

- Securities Class Action:

  *Eric Kinzler, et al. v. First NBC Bank Holding Company, et al.*, United States Court of Appeals, Fifth Circuit, State of Louisiana, No. 17-30443; On Appeal from the United States District Court, Eastern District of Louisiana, Case No. 16-CV-4243.

- Derivative Action:

  *Doug Smith, individually and on behalf of First NBC Bank Holding Company v. Ashton J. Ryan, et al.*, United States District Court, Eastern District of Louisiana, Case No. 2:16-CV-17001.

  *Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ashton J. Ryan, Mary Beth Verdigets, William J. Burnell, Gregory St. Angelo, Officer Does 1-20, Ernst & Young, LLP, Mark Bell, and Auditor Does 1-20*, Case No. 2:19-cv-10341, U.S. District Court, Eastern District of Louisiana

**VII.**
**THE CHAPTER 11 PLAN**

As a result of the Chapter 11 Case and through the Plan, the Debtor submits that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Debtor's Assets were liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit "A" and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

A. **Treatment of Claims Against and Equity Interests in the Debtor.**

The classes of Claims against and Equity Interests in the Debtor shall be treated under the Plan as follows:

1    **Class 1 – Priority NQDC Claims**

Each holder of an Allowed Priority NQDC Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority NQDC Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority NQDC Claim shall be paid Cash by the Reorganized Debtor from the Estate Cash in an amount equal to its Allowed Priority NQDC Claim on the Plan Distribution Date.

**THE DEBTOR INTENDS TO SUPPLEMENT AND AMEND ITS PENDING OBJECTIONS TO ALL CLASS 1 CLAIMS AND BELIEVES THAT NO ALLOWED CLASS 1 CLAIMS SHALL EXIST.**

Holders asserting Priority NQDC Claims are identified by name and Proof of Claim number below:

| | |
|---|---|
| Fred Beebe | Claim No. 10-1 |
| Robert Bradford Calloway | Claim No. 8-1 |
| Archie N. Duplantis, Jr. | Claim No. 85-1 |
| Dean Haines | Claim No. 13-1 |
| George Jourdan | Claim No. 3-1 |
| Michael Lebeau | Claim No. 4-1 |
| Michael Lulich | Claim No. 14-1 |
| Kevin P. Reed | Claim No. 6-1 |
| William Roohi | Claim No. 7-1 |

All of the foregoing Claims are Claims to enforce obligations under the First NBC Bank Holding Company Deferred Compensation Plan. Section 1 of the First NBC Bank Holding Company Deferred Compensation Plan states as follows:

"**Section 1 – Purpose:**
    The Plan is intended to be an unfunded deferred compensation arrangement for the benefit of officers and key employees of the Company and its Affiliates (as defined below), within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As such, this Plan is not intended to constitute an employee benefit plan under ERISA and is not intended to be subject to the provisions of Parts 2, 3, and 4 of Title I of ERISA. In accordance with such intent, *any obligation of the Company or its Affiliates to pay benefits hereunder shall be deemed to be an unsecured promise, and any right of a Participant (as defined below) or Beneficiary (as defined below) to enforce such obligation shall be solely as an unsecured general creditor of the Company. The Plan is not intended to*

*constitute a qualified employee benefit plan within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the Code")."*
(Emphasis added).

Accordingly, none of the foregoing Class 1 Claims is entitled to priority under section 507(a)(5) of the Bankruptcy Code. To the extent a valid Claim of such holder is determined by the Bankruptcy Court to exist against the Debtor, such Claim shall be treated as a Class 2 General Unsecured Claim. While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

## 2       Class 2 – General Unsecured Claims

Class 2 is comprised of all General Unsecured Claims including the Bondholder Claims. The Bondholder Claims shall be deemed Allowed on the Effective Date (without the necessity of all holders of Bondholder Claims to file Proofs of Claim) in the aggregate principal amount of $60,000,000, plus accrued and unpaid interest with respect thereon in the amount of $805,000, plus any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, under the Indenture, including, but not limited to, the fees and expenses of the Indenture Trustee. **Notwithstanding the filing of a Proof of Claim by the Indenture Trustee in the Chapter 11 Case, the Bondholders - not the Indenture Trustee – shall vote to accept or reject the Plan on behalf of their respective Bondholder Claims.**

Each holder of an Allowed Class 2 Claim shall receive or be allocated, as applicable, on the Plan Distribution Date, on account of its Allowed Claim:

(i)      Cash in an amount equal to the outstanding fees and expenses of the Indenture Trustee, including fees and expenses of its counsel, which will be paid on the Effective Date directly to the Indenture Trustee, on account of any such outstanding fees and expenses, from the Debtor's available Cash. Plan Distributions for all remaining amounts due on account of Bondholder Claims, *i.e.*, Bondholder Claims other than fees and expenses due to the Indenture Trustee, shall be made directly to holders of Legacy Subordinated Notes of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes as of the Distribution Record Date.

(ii)     such holder's Pro Rata Share of the Litigation and Distribution Trust Assets;

(iii)    In addition to the treatment provided in Section 3.3.2(i) and (ii) above, such holder shall be entitled to elect one of the following alternative Claim treatment options:

(a)     Cash Option - on the Plan Distribution Date, the holder shall receive payment in Cash of its Pro Rata share of the Aggregate Settlement Amount

(b)     Debt Option – subject to the Debt Option Limitations set forth in section 6.6 of the Plan, on the Plan Distribution Date, the Reorganized Debtor shall issue two new instruments to the holder in exchange for and in satisfaction of its Allowed Class 2 Claim: (1) Senior Debt Instrument with a principal balance equal to the holder's Pro Rata share of the Aggregate Settlement Amount; and, (2) Subordinated Instrument 1 with a principal amount equal to the balance of such holder's Claim.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

**3      Class 3A – STA Claims**

Class 3A is comprised of all allegedly Secured Claims of Gregory T. St. Angelo, namely Proof of Claim nos. 56 and 57 filed in the Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3A Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3A Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3A Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the STA Secured Claims, that any lien securing any STA Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.**

4       **Class 3B – RCC Secured Claims**

Class 3B is comprised of all allegedly Secured Claims of Renewal Capital Company ("RCC") namely Proof of Claim no. 52 filed in this Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3B CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3B CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3B Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3B Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3B Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3B Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the RCC Secured Claim, that any lien securing any Renewal Capital Company Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien.

5       **Class 3C – NQDC Secured Claims**

Class 3C is comprised of the following allegedly Secured Claims filed in the Chapter 11 Case: (a) Proof of Claim No. 13 filed by Dean Haines; (b) Proof of Claim No. 14 filed by Michael Lulich; and, (c) Proof of Claim No. 46 filed by Ashton Ryan, Jr.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3C CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3C CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3C Claim, if any exist, shall receive nothing under the Plan except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3C Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3C Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3C Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and

conclusive adjudication and determination, binding on the holders of the NQDC Secured Claims, that any lien securing any Class 3C Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under the Plan free and clear of any such alleged lien**.**

All of the Class 3C Claims identified above are Claims to enforce obligations under the First NBC Bank Holding Company Deferred Compensation Plan. Section 1 of the First NBC Bank Holding Company Deferred Compensation Plan states as follows:

> **"Section 1 – Purpose:**
>
> The Plan is intended to be an unfunded deferred compensation arrangement for the benefit of officers and key employees of the Company and its Affiliates (as defined below), within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As such, this Plan is not intended to constitute an employee benefit plan under ERISA and is not intended to be subject to the provisions of Parts 2, 3, and 4 of Title I of ERISA. In accordance with such intent, ***any obligation of the Company or its Affiliates to pay benefits hereunder shall be deemed to be an unsecured promise, and any right of a Participant (as defined below) or Beneficiary (as defined below) to enforce such obligation shall be solely as an unsecured general creditor of the Company. The Plan is not intended to constitute a qualified employee benefit plan within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the Code)."*** (Emphasis added).

Accordingly, none of the foregoing Class 3C Claims are entitled to treatment as an Allowed Secured Claim.  To the extent a valid Claim of such holder is determined by the Bankruptcy Court to exist against the Debtor, such Claim shall be treated as a Class 2 General Unsecured Claim. While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to the Claims.

### 6        Class 4 – Indemnity Claims

Class 4 consists of all Indemnity Claims that are disallowed or subordinated, as applicable, pursuant to Section 502(e) and 509(c) of the Bankruptcy Code.  Class 4 Claims shall be disallowed or subordinated, as applicable, to the following General Unsecured Claims, as applicable to each Class 4 Claimant,  and to the extent any Class 4 Claim becomes an Allowed Claim, then it shall not be paid or satisfied until the following Claims are satisfied in full: Allowed Claims of (a) FDIC, as Receiver for First NBC Bank, (b) Bondholders, and, (c) any other Claims and/or investigative proceedings asserted against the Debtor and holders of Indemnity Claims.  Once the aforesaid General Unsecured Claims have been paid in full, holders of Allowed Class 4 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

**THE PLAN PROPONENTS INTEND TO OBJECT TO AND TO SEEK DISALLOWANCE OR SUBORDINATION OF ALL CLASS 4 CLAIMS AS FILED.**

Below is a listing of all known Indemnity Claims, identified by Proof of Claim number and associated Claimant name.

| Claim No. | Claimant |
|---|---|
| 20 | Ashton J. Ryan, Jr. |
| 37 | Ashton J. Ryan, Jr. |
| 20 | Ashton J. Ryan, Jr. |
| 38 | Ashton J. Ryan, Jr. |
| 39 | Ashton J. Ryan, Jr. |
| 40 | Ashton J. Ryan, Jr. |
| 41 | Ashton J. Ryan, Jr. |
| 54 | Gregory St. Angelo |
| 55 | Stephen P. Petagana |
| 59 | William D. Aaron, Jr. |
| 60 | Herbert W. Anderson |
| 61 | Dale Atkins |
| 62 | John C. Calhoun |
| 63 | William Carrouche |
| 64 | Jimmy Fitzmorris |
| 65 | Leander Foley |
| 66 | John F. French |
| 67 | Leon L. Giorgio, Jr. |
| 68 | Shivan Govindan |
| 69 | Lawrence Blake Jones |
| 70 | Louis Lauricella |
| 71 | Mark G. Merlo |
| 72 | Hermann Moyse, III |
| 73 | Grish Roy Pandit |
| 74 | James C. Roddy |
| 75 | Dr. Charles C. Teamer, Sr. |
| 76 | Joseph F. Toomy |
| 77 | R. Michael Wilkinson |
| 79 | William Burnell |
| 80 | Mary Beth Verdigets |
| 81 | Marsha Crowle |
| 83 | David W. Anderson |

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

### 7      Class 5 - Subordinated 510(b) Claims

The holders of Class 5 Claims shall be subordinated to all Claims or Interests that are senior to or equal the Claim or Interest represented by the security from which the Class 5 Claim arises, except that if such security is common stock, such Claim has the same priority as common stock. Once all Class 1, 2 and 4 Allowed Claims have been paid in full, holders of Allowed Class 5 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

The Debtor believes that Class 5 Claim holders are limited to the plaintiffs asserting claims in the litigation styled, *Eric R. Kinzler, Individually and on Behalf of All Others Similarly Situated, v. First NBC Bank Holding Company, Ashton J. Ryan, Jr. and Mary Beth Verdigets*, *Case No. 16-04243, U.S. District Court, Eastern District of Louisiana* Kinzler; the U.S. Department of Treasury, David and Tiffany Oestreicher (Proof of Claim no. 43), and any party who purchased or sold Equity Interests in the Debtor.

### 8      Class 6 – Series E Preferred Equity Interests

Holders of Class 6 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest.

### 9      Class 7 - Equity Interests (Common Stock)

Holders of Class 7 Equity Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interests. Upon the Effective Date, pursuant to 11 U.S.C. §1145, all Class 7 Equity Interests shall be canceled and reissued to the exact holders of Class 7 Equity Interests in exchange for such interests.

### 10      Class 8 – Series D Preferred Equity Interests

Holders of Class 8 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interests.

## B.      <u>Means for Implementation of the Plan.</u>

### 1      First Round Investment and Exit Facility

Prior to the Effective Date, the identities of the First Round Investors and the principal amounts advanced from each First Round Investor shall be provided to the Committee.

The First Round Investment shall be disbursed from escrow to, or on behalf of, the Reorganized Debtor under the Exit Facility; and, as applicable, to, or on behalf of, the SPV pursuant to the FRI Escrow Agreement. The First Round Investment shall be utilized and shall be disbursed for uses contemplated, solely as set forth in Plan Section 6.1. Upon the Effective Date, the First Round Investment shall be disbursed by Debtor's counsel from escrow:

(a)     to or on behalf of the SPV: disbursement shall be specifically for SPV's payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option under Plan Section 3.3.2(iii)(a). The Reorganized Debtor or Debtor's counsel shall act as disbursing agent for the SPV in making the foregoing Plan Distributions to Bondholders.

(b)     to or on behalf of the Reorganized Debtor: disbursement shall be made under the Exit Facility, specifically for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any holder of other Allowed Class 2 Claims (non-Bondholder Claims) that has elected or is deemed to have elected the Cash Option.

(c)     to the Reorganized Debtor: disbursement shall be made under the Exit Facility and shall consist of all funds from the First Round Investment remaining after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Section 3.3.2(iii)(a) of the Plan; such disbursement shall be provided to the Reorganized Debtor specifically for its future business operation expenses.

The Exit Facility shall thus provide to the Reorganized Debtor: (i) all Cash required for its Plan Distributions made on the Plan Distribution Date; and, (ii) all Cash remaining from the First Round Investment after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Plan Section 3.3.2(iii)(a). The Exit Facility shall rank equally in priority with the indebtedness evidenced by the Senior Debt Instruments. The Litigation and Distribution Trust and its assets shall have no liability for the Exit Facility, such liability being the sole responsibility of the Reorganized Debtor.

## 2     Senior Debt and Subordinated Debt of the Reorganized Debtor

Senior Debt Instruments shall be issued exclusively to the Litigation and Distribution Trust and holders of Class 2 Claims that have elected the Debt Option. The Senior Debt shall be senior to any and all other indebtedness of the Debtor from and after the Effective Date except for the First Round Investment (which shall be *pari passu* with the Senior Debt). The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new debt senior to or *pari passu* with Senior Debt unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash.

The Subordinated Instruments 1 shall be senior to any preferred or common stock or any subordinated instruments that do not make up the Subordinated Debt 1. The Subordinated Debt 1 shall be exclusively comprised of (a) Subordinated Instruments 1 issued pursuant to Section 3.3.2(iii) to holders of Class 2 Claims that have elected the Debt Option in exchange for, and in satisfaction of, such holders' Legacy Subordinated Note (in addition to the Senior Debt Instrument

issued as provided in Section 3.3.2(iii) and its Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2(ii)); and (b) SPV Claim Rights and associated Legacy Subordinated Notes acquired by the SPV in exchange for, and in full satisfaction of, the Legacy Subordinated Notes deemed to have been assigned to the SPV as a result of the election of the Cash Option by holders of Allowed Class 2 Claims.   The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new debt senior to or *pari passu* with Subordinated Debt 1 or to make any distributions or dividend payments of any kind or character to any Claims or Equity Interests junior or *pari passu* in priority to Subordinated Debt 1 unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash.  The Reorganized Debtor may, however, issue, at any time, additional debt that is subordinate to the Subordinated Debt 1.

### 3      Establishment of the Administrative Expense and Priority Reserve

Prior to the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve from its available Cash; and, all distributions to holders of Allowed Unclassified Claims as set forth in Article II of the Plan and Allowed Class 1 Claims as set forth in Article III of the Plan shall be made therefrom. The Administrative Expense and Priority Reserve shall also include a Cash reserve for payment of (a) Contested Unclassified Claims, described in Article II of the Plan, and (b) Contested Class 1 Claims, if and as such Contested Claims become Allowed Claims. Any funds remaining, after all such Claims have been fully disposed of through payment or disallowance, shall be transferred and conveyed to the Litigation and Distribution Trust.  A schedule of estimated Allowed Unclassified Claims as set forth in Article II of the Plan and Allowed Class 1 Claims as set forth in Article III is attached to this Disclosure Statement as **Exhibit E.**

### 4      Establishment of the Special Purpose Vehicles

Prior to the Effective Date, the SPV shall be established by the First Round Investors to acquire the Legacy Subordinated Notes and corresponding SPV Claim Rights from the Bondholders electing or deemed to be electing the Cash Option.  Any Bondholder that has elected or is deemed to have elected the Cash Option shall be deemed to have assigned its Legacy Subordinated Notes and all of such Bondholder's SPV Claim Rights to First Phoenix, LLC as of the Plan Distribution Date. Thereafter, the SPV shall be deemed to be the holder of record of any such acquired Legacy Subordinated Notes and a result thereof, shall be entitled to enforce all legal, equitable and contractual rights attributable to such Legacy Subordinated Notes included in any SPV Claim Rights it acquires.   For the avoidance of doubt, any Legacy Subordinated Notes deemed to have been assigned to the SPV shall not be cancelled upon the Effective Date, but shall instead remain enforceable against the Reorganized Debtor exclusively by the SPV and its successors **through the Plan Distribution Date and shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as the acquired SPV Claim Rights and Legacy Subordinated Notes in full satisfaction of the Legacy Subordinated Notes so acquired**.  The Reorganized Debtor, as agent for the SPV, shall make all Plan Distributions to holders of any Bondholder Claims electing the Cash Option pursuant to Plan Section 3.3.2(iii)(a).

### 5    Disposition of Legacy Subordinated Notes

On the Confirmation Date, the Debtor shall cause there to be established a register for the recordation of Bondholders as of that date. On the Plan Distribution Date, the Reorganized Debtor or the SPV, as applicable, shall make the Plan distributions described in Plan section 3.3.2, to such Bondholders, or their transferees, as recorded on such register of the Debtor in accordance with such transfer procedures as the Debtor may establish.

Legacy Subordinated Notes of Bondholders Electing Debt Option:

If a Bondholder elects the Debt Option, pursuant to Plan section 3.3.2(iii)(b), then, on the Plan Distribution Date, in addition to the Senior Debt Instrument issued pursuant to that Section and Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2 (ii), the Debtor shall issue the Senior Debt Instrument and Subordinated Instrument 1 to such Bondholder in exchange for and in satisfaction of the Bondholder's Legacy Subordinated Note.

Legacy Subordinated Notes of Bondholders Electing Cash Option:

If a Bondholder elects the Cash Option, pursuant to Plan section 3.3.2(iii)(a), then, on the Plan Distribution Date, in exchange for the Cash payment provided by the SPV to the Bondholder, the Bondholder shall be deemed to have assigned its Legacy Subordinated Note to the SPV, and the SPV shall thereafter be deemed to be the record holder of such Bondholder's Legacy Subordinated Note and SPV Claim Rights which shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as, and in full satisfaction of, the acquired SPV Claim Rights and Legacy Subordinated Notes.

### 6    Debt Option Limitations

Notwithstanding the Class 2 Treatment provided for in section 3.3.2(iii)(b), the Debt Option treatment shall be limited to the Debt Option Threshold.  Should the aggregate dollar amount of Allowed Class 2 Claims electing the Debt Option exceed the Debt Option Threshold, then the treatment of such claims shall be modified as follows: the Debt Option shall be applied to the amount of each holder's Pro Rata share of the Debt Option Threshold and the Cash Option shall be applied to the balance of the holder's Claim.  *For illustration purposes only*, the Plan Proponents have provided an ***example*** of the modified treatment that may be required for a Class 2 Claim, electing the Debt Option, if the Debt Option Threshold is exceeded.

EXAMPLE OF MODIFIED TREATMENT FOR HOLDERS, ELECTING DEBT OPTION, IN A SCENARIO IN WHICH DEBT OPTION THRESHOLD IS EXCEEDED:

Assumptions:

1.   The total amount of Class 2 Claims eligible to vote is $67,000,000.

2.   The total amount of Class 2 Claims electing the Debt Option is $40,000,000

(aggregate Claim amount exceeds Debt Option Threshold by $10,000,000).

3. The total amount of Class 2 Claims electing (or deemed to be electing) the Cash Option is $27,000,000.

4. The Class 2 Claims electing the Debt Option are comprised of the following Claims:

    a) Class 2 Claim of $20,000,000
    b) Class 2 Claim of $10,000,000
    c) Class 2 Claim of $8,000,000, and
    d) Class 2 Claim of $2,000,000.

Under this scenario, treatment of the Class 2 Claims electing the Debt Option would be modified as follows:

    a) Class 2 Claim of $20,000,000 would receive:
        Debt Option Treatment for $15,000,000 of its Class 2 Claim; and,
        Cash Option Treatment for $5,000,000 of its Class 2 Claim.
    b) Class 2 Claim of $10,000,000 would receive:
        Debt Option Treatment for $7,500,000 of its Class 2 Claim; and,
        Cash Option Treatment for $2,500,000 of its Class 2 Claim
    c) Class 2 Claim of $8,000,000 would receive:
        Debt Option Treatment for $6,000,000 of its Class 2 Claim; and,
        Cash Option Treatment for $2,000,000 of its Class 2 Claim
    d) Class 2 Claim of $2,000,000 would receive:
        Debt Option Treatment for $1,500,000 of its Class 2 Claim; and,

Cash Option Treatment for $500,000 of its Class 2.

### 7    <u>Corporate Action</u>

The entry of the Confirmation Order shall constitute authorization for the Debtor and the Litigation and Distribution Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, (a) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (b) the implementation of all settlements and compromises as set forth in or contemplated by the Plan (c) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents); and, (d) the execution of any such documentation necessary for the Debtor to enter into the Exit Facility in order to the full release and availability of the First Round Investment.

On or before the Effective Date, the Debtor's Board of Directors shall take all necessary action, in accordance with its corporate governance documents, to elect Navid Abghari of Angel Oak Capital Advisors, the designee of the Committee, to serve as a member of the FNBC Board of Directors, alongside its existing members

## 8    Preservation of Causes of Action

Except as otherwise provided in the Plan, each Tort Claim of the Debtor shall be preserved and, along with the exclusive right to commence, pursue, and enforce such Tort Claim in any appropriate court or tribunal, shall be deemed transferred to the Liquidation and Distribution Trust/ Litigation and Distribution Trustee as of the Effective Date, and shall vest exclusively in the Litigation and Distribution Trust /Litigation and Distribution Trustee (as applicable) as of the Effective Date.  In addition, each Tort Claim to which the Committee, pursuant to Bankruptcy Court Orders [Doc.261 and Doc. 563] was granted standing to assert, commence, prosecute, and, if appropriate, settle (with Court approval), on behalf of and for the benefit of the Debtor's estate, shall vest exclusively in the Litigation and Distribution Trust /Litigation and Distribution Trustee (as applicable) as of the Effective Date.

Except as otherwise provided for below with respect to Causes of Action retained by the Debtor or Reorganized Debtor, unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised, settled or transferred in the Plan or any other Final Order, the Debtor, Committee and the Litigation and Distribution Trustee, as applicable, expressly reserve such claim or Cause of Action for later pursuit by the Litigation and Distribution Trustee and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon, after, or as a result of the Confirmation Date or Effective Date of the Plan, the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Debtor and the Litigation and Distribution Trustee, as applicable, expressly reserve the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtor, as trustees or representatives for or on behalf of the creditors, not so specifically and expressly waived, relinquished, released, compromised, settled or transferred that are alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person, including, without limitation, the plaintiffs or codefendants in such lawsuits.

Any Person to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor should assume that such obligation, transfer, or transaction may be reviewed by the Litigation and Distribution Trustee subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised, settled or transferred, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Person has filed a proof of claim against the Debtor in the Chapter 11 Case, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtor's Schedules, or (d) such Person's scheduled Claim has been objected to by the Debtor, the Litigation and Distribution Trustee or has been identified by the Debtor as disputed, contingent, or unliquidated.

**No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Litigation and Distribution Trustee will not pursue any and all available Causes of Action against them. The Debtor and the Litigation and Distribution Trustee, and the Estate expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise explicitly provided in the Plan**.

The retained claims and Causes of Action, include, without limitation:

- Causes of Action, including Avoidance Actions, (the Plan Proponents and their successors do not intend to initiate any direct Avoidance Actions against Claim holders, but reserve the right to assert Avoidance Actions as a defense to any Claims) and Tort Claims, as defined in the Plan;

- Objections to Claims under the Plan;

- Any and all litigation, claims, or Causes of Action of the Debtor and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, claims, or Causes of Action listed or described in the Plan, Disclosure Statement, or the Confirmation Order;

- Actions against insurance carriers relating to coverage, indemnity or other matters;

- Counterclaims and defenses relating to notes or other obligations;

- Contract, tort, or equitable claims which may exist or subsequently arise;

- Any claims of the Debtor arising under Section 362 of the Bankruptcy Code;

- Equitable subordination claims arising under Section 510 of the Bankruptcy Code or other applicable law;

- Any and all claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under Section 547 of the Bankruptcy Code, turnover Claims arising under Sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under Section 548 of the Bankruptcy Code, including, but not limited, to any transfers listed the Debtor's Statements of Financial Affairs;

- Any derivative Causes of Action, of the Debtor pursuant to the Bankruptcy Code or any other statute or legal theory or theory under equity, including all claims included within the lawsuit styled, *Doug Smith, Individually and on Behalf of First NBC Bank Holding Company v. Ashton J. Ryan, et al. and First NBC Bank Holding Company*, *Case No. 16-17001, U.S. District Court, Eastern District of Louisiana;*

- Any claims asserted in the litigation styled, *Eric R. Kinzler, Individually and on Behalf of All Others Similarly Situated, v. First NBC Bank Holding Company, Ashton J. Ryan, Jr. and Mary Beth Verdigets*, *Case No. 16-04243, U.S. District Court, Eastern District of Louisiana.* However, notwithstanding any other provision of the Plan that may be to the contrary, nothing in the Plan shall be deemed to be a finding or determination by the Bankruptcy Court that

41

such claims or Causes of Action are property of the Estate. Additionally, the Plaintiffs in that litigation specifically assert that those claims are direct claims asserted on behalf of a class of purchasers of First NBC common stock and that only purchasers of First NBC stock have legal standing to assert those claims. As a result, the Plaintiffs in that litigation assert that the claims alleged in the securities class action litigation are not property of the Estate, cannot be transferred to the Litigation and Distribution Trust, and cannot thereby become Litigation and Distribution Trust Assets. Plaintiffs' assertions, however, are not dispositive and the rights of all parties are unimpaired by those assertions. All parties reserve all rights with respect to ownership of these claims.

- Any and all alter ego, veil piercing and/or single business enterprise Claims against the Debtor.
- Any and all claims against Ernst & Young, LLP, its insurer(s), and against any other entities which provided professional services to the Debtor prior to the Petition Date[4].
- Any Cause of Action included within the suit styled *Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ashton J. Ryan, Mary Beth Verdigets, William J. Burnell, Gregory St. Angelo, Officer Does 1-20, Ernst & Young, LLP, Mark Bell, and Auditor Does 1-20*, Case No. 2:19-cv-10341, U.S. District Court, Eastern District of Louisiana.

Without limiting, and in addition to, the foregoing reservations of claims and Causes of Actions, the Liquidating Trust/Liquidating Trustee expressly reserves and retains any and all past, present and future legal and equitable claims and Causes of Action (including any derivative Causes of Action) against any former or current director or officer of the Debtor, as well as direct action or other claims against its liability insurers, arising under state or other non-bankruptcy law or arising under the Bankruptcy Code, in this Chapter 11 Case, or in any way related to this Chapter 11 Case, or under and/or pursuant to any statute or legal or equitable theory that is in any manner arising from, connected with or related to any act or omission of such director or officer that occurred prior to the Petition Date, including, but not limited to, claims and Causes of Action for breach of fiduciary duty, violations of applicable federal or state securities law, negligence, gross negligence, willful misconduct, misrepresentation, omission, mismanagement, waste, fraud, bad faith, tortious interference with contract, detrimental reliance, including, but not limited to, any damages allowed by law or equity, including compensatory, punitive and anticipated future damages, plus all costs including attorney's fees, court costs, and expert witness fees. Such claims and Causes of Action include those arising in connection with or relating in any way to the Committee's letters to the Debtor's insurers attached hereto as **Exhibit D**.

*Notwithstanding the foregoing reservations of claims and Causes of Action for the benefit of the Litigation and Distribution Trust and its beneficiaries, the following are specifically preserved and shall re-vest in the Debtor: (a) any objections to Claims other than Claims in*

---

[4] A request for review of the Debtor's claims against Ernst & Young, LLP was filed by the Debtor on or about August 24, 2017, and such matter currently remains pending before the Louisiana Society of Certified Public Accountants as RP 17-007.

*Classes 2, 3A, 3B, 3C, 4 and 5; and, (b) any claims or Causes of Action, whether legal, equitable or statutory in nature, that may affect the Reorganized Debtor's ability to utilize or have recognized with any taxing authority any the Tax Assets that may exist, whether known or unknown to the Debtor prior to the Effective Date.*

Due to the size and scope of the Debtor's business operations, there may be numerous other claims and Causes of Action that currently exist or may subsequently arise, in addition to the claims and Causes of Action identified above. The Debtor and Committee are also continuing to investigate and assess which claims and Causes of Action may be pursued. The Debtor and the Litigation and Distribution Trustee do not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued or do not fall within the list above, that any such claims or Causes of Action have been waived.

**THE PLAN SHALL BE INTERPRETED SO AS TO AFFORD, FOR THE BENEFIT OF ALL HOLDERS OF ALLOWED CLAIMS, THE GREATEST OPPORTUNITY FOR MAXIMUM RECOVERY BY THE LIQUIDATION AND DISTRIBUTION TRUSTEE ON THE ASSETS, TORT CLAIMS, AND RIGHTS IN AND PROCEEDS OF ANY INSURANCE POLICIES.**

### 9 Establishment of the Litigation and Distribution Trust and Appointment of the Litigation and Distribution Trustee.

The Litigation and Distribution Trust shall be established and the Litigation and Distribution Trustee shall be appointed as set forth in Article VII of the Plan.

### 10 Vesting of the Tort Claims and Insurance Policies

On the Effective Date, the Estate's interest in any Tort Claims and rights in and proceeds of any Insurance Policies necessary for the prosecution of all such Claims shall be transferred to and vest in the Litigation and Distribution Trust. The Litigation and Distribution Trustee shall have standing and be authorized to institute and prosecute through final judgment or settle the Tort Claims. Upon entry of a final judgment or settlement, the relevant proceeds of the Tort Claims and relevant Insurance Policies shall be property of the Litigation and Distribution Trust for the benefit of holders of Allowed Class 2, Class 3A, Class 3B, Class 3C, Class 4, and Class 5 Claims in accordance with the provisions of the Plan. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise affect or alter obligations of the Insurance Policies such that the full benefits of all such policies can be realized for Creditors therein.

### 11 Sources of Cash for Plan Distributions

All Cash necessary for the Debtor or Reorganized Debtor to make payments and Plan Distributions under the Plan by the Debtor shall be made (or reserved) from its available Cash prior to the transfer of the remaining Estate Cash to the Litigation and Distribution Trust; and, from the First Round Investment. All Plan Distributions to be made by the Litigation and Distribution Trustee shall be obtained from the liquidation of Litigation and Distribution Trust Assets (including the proceeds of any Tort Claims and related Insurance Policies).

**12      Cancellation of Instruments**

On the Effective Date, except as otherwise specifically provided for in the Plan, including as provided for in Article VI of the Plan: (1) the obligations of the Debtor under the Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, existing management incentive plan or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically left unaltered pursuant to the Plan, including, but not limited to, the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be), shall be cancelled, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically left unaltered pursuant to the Plan, including, but not limited to, the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be) shall be released and discharged; provided, however, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (1) allowing holders to receive Plan Distributions as provided in the Plan and (2) allowing the Indenture Trustee to exercise its charging liens for the payment of their fees and expenses and for indemnification as provided in the applicable Indenture; provided, further, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Indenture shall continue in effect solely for the purposes of allowing the Bondholder Claims under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtor or Bondholders. Notwithstanding anything in the Plan to the contrary, no instruments or rights shall be deemed cancelled to the extent the preservation or non-cancellation of such instruments is necessary to preserve unimpaired any and all Causes of Action and to permit the Litigation and Distribution Trustee to assert any and all Causes of Action pursuant to the Plan.

**13      Amendment of Indenture and Preservation of Trustee Rights**

On the Effective Date, and without further order of the Court, i) the Indenture shall be, automatically and without further act, amended to delete Section 107 and Section 510 thereof to remove references to the Trust Indenture Act and effectuate automatic resignation of the Indenture Trustee and appointment of a successor trustee; (ii) the Indenture shall be, automatically and without further act, amended to revise sections 509 thereof to permit and effectuate the resignation of the Indenture Trustee, including in its role as Registrar and Paying Agent, and the appointment of a successor trustee, as set forth herein; (iii) the Indenture Trustee will be deemed to have

resigned as Trustee, Registrar and Paying Agent and any other role it may have under the Indenture in accordance with Section 509(2) of the Indenture; (iv) Shivan Govindan will be automatically and without further act appointed as successor trustee, registrar and paying agent (the "Successor Trustee") under the Indenture and will be deemed to have accepted such appointment under the Indenture; (v) except as otherwise expressly set forth herein, all rights, duties and obligations of the Indenture Trustee under the Notes, the Indenture and such other agreements, instruments and other documents related thereto, including those related to the Indenture Trustee's resignation, will be deemed fully and finally satisfied, released and discharged. The Indenture Trustee will be relieved of and have no further responsibility for the exercise of rights and powers or for the performance of the duties and obligations vested in the Trustee under the Indenture and the Successor Trustee will become vested with all the rights, powers, trusts and duties of the retiring Indenture Trustee. Notwithstanding anything herein to the contrary, the amendment of the Indenture will not impair in any way (i) the rights of the Indenture Trustee to the Indenture Trustee's claims under the Plan, or (ii) the indemnification rights of the Trustee or the indemnification obligations of the Debtor under the Indenture, as the same existed immediately prior to the Effective Date.

## 14     Continued Corporate Existence and Vesting of Assets of the Debtor

On and after the Effective Date, the Reorganized Debtor will continue to exist as a corporation and shall retain all of the powers of corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be deemed amended to conform to the requirements of Section 1123(a)(6) of the Bankruptcy Code. Furthermore, as of the Effective Date, the Debtor shall have taken such steps as may be necessary to delist and deregister its common stock under the Securities Exchange Act of 1934; and, thereafter, shall take appropriate action to assure compliance with applicable securities laws.

Except as otherwise provided in the Plan, on and after the Effective Date, assets and property of the Debtor and its Estate, including any Tax Assets and any other assets of the Debtor but excluding the Litigation and Distribution Trust Assets, will re-vest in the Reorganized Debtor free and clear of all Claims, Liens, charges and other encumbrances. Of the Tax Assets, the Debtor estimates that, as of the Effective Date, its net operating losses will total $365 million in net operating losses. The Debtor would be entitled under the Plan to use its existing net operating loss carryforwards in future years to eliminate taxes on a corresponding amount of its income, subject to any applicable limitations resulting from change in ownership and/or other limitations imposed under applicable tax laws. The present value of the tax savings that could be generated by the existing net operating loss carryforwards cannot be determined with any certainty, as use of the carryforwards may be subject to the limitations described above and is dependent on the Reorganized Debtor having sufficient future income.

In addition, the Debtor has tax credits approximating $147 million in the aggregate through 2017, which amount may increase through the filing of subsequent or amended tax returns. The Debtor is not aware of any additional Tax Assets. Under the Plan, the Reorganized Debtor will retain any available tax credits to the extent allowed by applicable tax law or as otherwise set forth herein.

On and after the Effective Date, the Reorganized Debtor shall be permitted to conduct its business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Reorganized Debtor shall be authorized, without limitation, to use and dispose of Assets of the Debtor other than the Litigation and Distribution Trust Assets, as the representative of Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs. In addition to the First Round Investment, it is anticipated that the holders of Equity Interests and other investors will contribute capital to the Reorganized Debtor to enable the Reorganized Debtor to acquire assets after the Effective Date and that the Reorganized Debtor will have future business operations.  The Debtor has not yet identified particular assets for acquisition.

The initial directors of the Reorganized Debtor will be:

| | |
|---|---|
| William D. Aaron, Jr. | Director |
| William M. Carrouche | Director |
| Leander J. Foley, III | Director |
| John F. French | Director |
| Leon L. Giorgio, Jr. | Vice Chairman |
| Shivan Govindan | Chairman |
| Lawrence Blake Jones | Director |
| Louis V. Lauricella | Director |
| Mark G. Merlo | Director |
| Dr. Charles C. Teamer | Director |
| Joseph F. Toomy | Director |
| Designee of the Committee | Director |

The initial officers[5] of the Reorganized Debtor will be:

| | |
|---|---|
| Andrew Nash | Chief Financial Officer |
| Mark Haden | Business Development Officer |

## 15    Dissolution of the Committee

Upon the Effective Date, the Committee shall be deemed to have transferred and conveyed to the Litigation and Distribution Trust/Litigation and Distribution Trustee all of its rights, interests, and standing to assert the D&O Claims; and, shall thereafter dissolve automatically, whereupon its members, professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

---

[5] Compensation to be determined and supplied through amendment or supplement.

**16     Delisting of Stock**

Promptly upon the occurrence of the Effective Date, the Reorganized Debtor shall take all actions necessary to delist the Debtor's pre-confirmation common stock by having the Financial Industry Regulatory Authority ("FINRA") remove the Debtor's trading symbol from FINRA's quotation system.

## VIII.     THE LIQUIDATION AND DISTRIBUTION TRUST

The Litigation and Distribution Trust shall be established and the Litigation and Distribution Trustee shall be appointed as set forth in Article VII of the Plan.   *The role of the Litigation and Distribution Trustee and disclosures regarding administration of the Litigation and Distribution Trust is set forth more fully in Article VII of the Plan and the Litigation and Distribution Trust Agreement.*

### 1     Establishment of Liquidation and Distribution Trust

On the Effective Date, the Litigation and Distribution Trust shall be established pursuant to the Litigation and Distribution Trust Agreement for the purposes of administering the Litigation and Distribution Trust Assets and making all distributions to Litigation and Distribution Trust Beneficiaries as provided for under the Plan. The Litigation and Distribution Trust Agreement shall be substantially in the form in **Exhibit C** hereto.

The beneficial interests in the Litigation and Distribution Trust shall not be certificated, unless otherwise provided in the Litigation and Distribution Trust Agreement.  The issuance of any beneficial interests of the Litigation and Distribution Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

### 2     Execution of the Liquidation Trust Agreement

The Litigation and Distribution Trust Agreement, in a form reasonably acceptable to the Debtor and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Litigation and Distribution Trust and the beneficial interests therein, which shall be for the benefit of holders of Allowed Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims as set forth in the Plan.  Article VII of the Plan sets forth certain of the rights, duties and obligations of the Litigation and Distribution Trustee.  In the event of any conflict between the terms of Article VII of the Plan and the terms of the Litigation and Distribution Trust Agreement, the terms of the Plan shall govern.

### 3     Governance of the Litigation and Distribution Trust

The Litigation and Distribution Trust shall be governed and administered by the Litigation and Distribution Trustee and the Oversight Committee, as provided under the Litigation and Distribution Trust Agreement.   The Litigation and Distribution Trustee and the Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Litigation and Distribution Trust and shall act in the best interests of the Litigation and Distribution Trust

Beneficiaries. The initial three members of the Oversight Committee shall be Vik Ghei, Misha Zaitzeff, and Donna Ennis, each of whom currently represent members of the Committee.

Vik Ghei is a member of the general partner of each fund managed by HoldCo Asset Management. Prior to co-founding HoldCo in 2011, Mr. Ghei was a Managing Director and Associate Portfolio Manager at Tricadia Capital Management. Misha Zaitzeff is a member of the general partner of each fund managed by HoldCo Asset Management. Prior to co-founding HoldCo in 2011, Mr. Zaitzeff was an investment professional at Tricadia Capital Management where he invested in corporate loans and bonds, public and private equity, distressed debt across all sectors, and structured credit. Donna Ennis is the Portfolio Manager at Federated Insurance. Prior to her experience with Federated Insurance, which began in 2014, she was Vice President of PNC Capital Advisors.

### 4    Litigation and Distribution Trust Trustee

In accordance with the Litigation and Distribution Trust Agreement, and subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall be authorized to exercise and perform the rights, powers, and duties held by the Debtor and the Estate with respect to the Litigation and Distribution Trust Assets upon their transfer to the Litigation and Distribution Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, manage, and to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Litigation and Distribution Trust Assets.

Stephen Darr shall serve as the Litigation and Distribution Trustee. A summary of Mr. Darr's background and experience is attached as **Exhibit F** to this Disclosure Statement. Mr. Darr will bill for his services as Litigation and Distribution Trustee at an hourly rate of $660.00/hr. If the Litigation and Distribution Trust requires financial advisory assistance and retains Mr. Darr's firm, it is expected that his firm will bill for services at an hourly rate which will not exceed $660.00/hr. As set forth more fully in the Plan and in the Litigation and Distribution Trust Agreement, compensation for the Litigation and Distribution Trustee shall be subject to agreement with the Oversight Committee.

The Liquidation and Distribution Trustee shall provide an annual reporting to Litigation and Distribution Trust Beneficiaries which shall include: the current status of any pending litigation of the Litigation and Distribution Trust; the Litigation and Distribution Trust's income and expenses for the prior fiscal year, and the number of Litigation and Distribution Trust Beneficiaries and outstanding Claim amounts.

### 5    Litigation and Distribution Trust Assets

Except as otherwise provided in the Plan, on the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all of the Litigation and Distribution Trust Assets, as well as the rights, privileges (including, but not limited to, the attorney-client privilege), and powers of the Debtor and its Estate applicable to the Litigation and Distribution Trust Assets, shall automatically vest in the Litigation and Distribution Trust, free and clear of all Claims and Equity Interests for

the benefit of the Litigation and Distribution Trust Beneficiaries. For the avoidance of doubt, (i) in no event shall the term "Litigation and Distribution Trust Assets" be deemed to include any released claims against any Exculpated Parties, and (ii) the Litigation and Distribution Trust shall not have the right to assert any released claims against any Exculpated Parties. Upon the transfer of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust, the Litigation and Distribution Trust shall succeed to all of the Debtor's and Estate's rights, title and interest in such Litigation and Distribution Trust Assets, and the Debtor shall have no further interest in or with respect to such Litigation and Distribution Trust Assets. **The Litigation and Distribution Trust Assets are properties dealt with by this Plan and the transfer of each of such properties to the Litigation and Distribution Trust shall be free and clear of all claims and interests of creditors, equity security holders, and of general partners, if any, of the Debtor, as provided in 11 U.S.C. § 1141(c).**

The Confirmation Order shall constitute a determination that the transfers of Assets to the Litigation and Distribution Trust are legal and valid and consistent with the laws of the State of Louisiana.

All parties shall execute any documents or other instruments necessary to cause title to the Litigation and Distribution Trust Assets to be transferred to the Litigation and Distribution Trust. The Litigation and Distribution Trust Assets will be held in trust for the benefit of all holders of Allowed Claims in Classes 2, 3A, 3B, 3C, 4 and 5 pursuant to the terms of the Plan and Litigation and Distribution Trust Agreement.

As more fully set forth in Section 7.9 of the Plan and Litigation and Distribution Trust Agreement, the transfer of each of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust shall be treated for U.S. federal income tax purposes as a transfer of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust Beneficiaries, who will immediately thereafter be deemed to have automatically transferred all such Assets to the Litigation and Distribution Trust.

## IX.   INJUNCTION, EXCULPATION AND LIMITATION OF LIABILITY

### 1   Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate Order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against in the Debtor or the Estate, **except for** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, are, with respect to any such Claims, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without

limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Estate, the Reorganized Debtor, or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the Estate, the Reorganized Debtor or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor, the Estate or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, satisfied, or otherwise addressed pursuant to the Plan or the Confirmation Order, including, but not limited to, through the releases and exculpations provided under the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained therein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan. Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth in the Plan.

The foregoing injunctions shall extend for the benefit of the Litigation and Distribution Trustee, and any successors of the Debtor or the Reorganized Debtor, and to any property and interest in property subject to the Plan.

**2      Discharge**

Except as otherwise provided in the Plan **with respect to** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, except as to the Litigation and Distribution Trust Assets. Upon the Effective Date, except as otherwise provided for in the Plan or Confirmation Order, FNBC shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan.

### 3 Injunction

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATIONS GRANTED IN THE PLAN, THE DEBTOR AND ALL PARTIES IN INTEREST SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

### 4 Exculpation

No Exculpated Party shall have or incur, and each Exculpated Party will be released and exculpated from any claim, obligation, Cause of Action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Case, entry into the Litigation and Distribution Trust Agreement, the negotiation and pursuit of the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and the issuance of securities under or in connection with the Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as determined by Final Order of the Bankruptcy Court, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of any securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

### 5 Limitation on Liability on Liquidation and Distribution Trustee

The Litigation and Distribution Trustee will not be liable for any act he may do or omit to do as Litigation and Distribution Trustee under the Plan and the Litigation and Distribution Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Litigation and Distribution Trustee be liable in any event, except for willful misconduct, gross negligence, or intentional fraud. The foregoing limitation on liability will also apply to any Person (including any professional) employed by the Litigation and Distribution Trustee and acting on behalf of the Litigation and Distribution in the fulfillment of their respective duties hereunder or under the Litigation and Distribution Trust Agreement.

### 6 D&O Claims and D&O Policies

For the avoidance of doubt, and notwithstanding anything to the contrary set forth in the Plan or this Disclosure Statement, including Article VIII thereof, no release, exculpation,

injunction, or waiver set forth in the Plan shall apply to any D&O Claims (or claims relating to any D&O Policies) belonging to or pursuable by the Committee or the Litigation and Distribution Trust or Litigation and Distribution Trustee, and all such claims and related Causes of Action are expressly reserved and preserved as set forth in Section 6.3 of the Plan.

### 7 SEC rights preserved

Notwithstanding any provision herein to the contrary, no provision of the Plan or any order confirming the Plan: (i) releases or exculpates any non-debtor person or entity from any claim or cause of action of the U.S. Securities and Exchange Commission ("SEC"); or (ii) enjoins, limits, impairs or delays the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

### 8 Binding Effect of Plan

The Plan shall be binding upon the Debtor, the holders of all Claims and Equity Interests, parties in interest, Persons and their respective successors and assigns. Except as specifically provided in the Plan, to the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

Nothing in this Plan affects, modifies or otherwise alters the rights, claims, interests or defenses of the FDIC as Receiver for First NBC (the "FDIC-R") as receiver for First NBC Bank, a) under the terms of the Settlement Agreement, as approved by order entered on December 19, 2017 [Doc. 297] b) against any non-Debtor person or entity or c) against any insurance policy under which First NBC Bank or the Debtor is named insured or any insurance policy that may cover any claim that is asserted by the FDIC-R or First NBC Bank or that is property of the Debtor's bankruptcy estate; additionally, for the avoidance of doubt, nothing in this Plan shall be deemed to preclude the FDIC-R from or otherwise affect the FDIC-R's right, if any, to pursue or defend a claim to ownership of claims or causes of action, including any claims or causes of action brought or otherwise prosecuted by the Debtor or the Liquidating Trustee; provided further, that this sentence does not alter or affect an exculpation granted to an Exculpated Party hereunder for work conducted from the Petition Date to the Effective Date.

## X.
## CONFIRMATION AND CONSUMMATION PROCEDURES

### A. Overview

**Please see Discussion at Section III.A.**

### B. Confirmation of the Plan

### 1 Elements of Section 1129 of the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

a.      The Plan complies with the applicable provisions of the Bankruptcy Code.

b.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

c.      The Plan has been proposed in good faith and not by any means proscribed by law.

d.      Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e.      The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or a successor to the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

f.      With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.

g.      In the event that the Debtor does not seek to confirm the Plan non-consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the Effective Date and Priority Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims.

i.      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.       Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.       All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtor believes that the Plan will satisfy all the statutory provisions of Chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

### 2       Acceptance

An impaired class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims actually voting. Each impaired class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests actually voting.

### 3       Best Interests of Creditors Test

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of impaired Claims against and Equity Interests in the Debtor would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtor and the cash held by the Debtor at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay impaired Claims arising on or in addition to the foregoing. It is expected that the liquidation of remaining assets, under chapter 7 of the Bankruptcy Code, would yield less value due to the expeditious liquidation as required by chapter 7 than they are expected to yield under the Plan. In addition, under a chapter 7 liquidation, the Debtor's Estate would not receive the Aggregate Settlement Amount provided for under the Plan.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including (i) the additional costs associated with the appointment of the chapter 7 trustee; (ii) the erosion in value of assets in chapter 7 cases, in the context of the expeditious liquidation required under chapter 7; and, (iii) no Aggregate Settlement Amount to the Estate, the Debtor has determined that confirmation of the Plan will provide each holder of an impaired Claim with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis attached to this Disclosure Statement as Schedule 1, the Debtor believes that the Plan provides to each holder of a Claim a value greater than the value of the distribution that each holder would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

### 4    Feasibility

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtor has analyzed the Liquidation and Distribution Trust's capacity to service its obligations under the Plan. Based upon its analysis, the Debtor submits that the Litigation and Distribution Trustee will be able to make all payments required to be made under the Plan because the Exit Facility and Estate Cash will provide the Debtor and Liquidation and Distribution Trustee with sufficient funds to satisfy Plan payments.

## C.    <u>Confirmation Without Acceptance of All Impaired Classes – "Cramdown"</u>

In the event that any impaired class does not accept the Plan, the Debtor may nevertheless move for confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and it reserves the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other

classes of Claims that vote to reject the Plan. The Debtor may seek confirmation of the Plan under Section 1129(b) as to certain Claims.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

## D.    Effect of Confirmation

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan. Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

## XI.
## TAX ISSUES

For federal income tax purposes, (i) all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, and the Litigation and Distribution Trust Beneficiaries) shall treat the Litigation and Distribution Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 684, (ii) the transfer of Assets of the Debtor to the Litigation and Distribution Trust under the Plan shall be treated as a deemed transfer to the Litigation and Distribution Trust Beneficiaries in satisfaction of their Claims followed by a deemed transfer of the Litigation and Distribution Assets by the Litigation and Distribution Trust Beneficiaries to the Litigation and Distribution Trust, (iii) the Litigation and Distribution Trust Beneficiaries will be deemed to be the grantors and owners of the Litigation and Distribution Trust and its assets, and (iv) the Litigation and Distribution Trust will be taxed as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code owned by the Litigation and Distribution Trust Beneficiaries. The Litigation and Distribution Trust will file federal income tax returns as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 and report, but not pay tax on, the Litigation and Distribution Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The Litigation and Distribution Trust Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Litigation and Distribution Trust Assets transferred to the Litigation and Distribution Trust for all federal income tax purposes. The Litigation and Distribution Trust Assets shall be valued based on the Litigation and Distribution Trustee's good faith determination of their fair market value.

The Litigation and Distribution Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Litigation and Distribution Trust Beneficiaries shall be bound by such election, if made by the Litigation and Distribution Trustee, in consultation with the Oversight Committee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, and the Litigation and Distribution Trust Beneficiaries) shall treat the transfers of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust in accordance with the terms of the Plan as a sale by the Debtor and/or its Estate of such Litigation and Distribution Trust Assets to the Litigation and Distribution Trust at a selling price equal to the fair market value of such Litigation and Distribution Trust Assets on the date of transfer. The Litigation and Distribution Trust shall be treated as the owner of all Litigation and Distribution Trust Assets that it holds.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest and other fees, premiums and charges, as applicable.

**THE FOREGOING HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

## XII.
## RISK FACTORS

There are many risks and uncertainties in respect of the Plan and its implementation. The holders of Claims against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. The risk factors identified below they should not be regarded as the only risks present in connection with the Debtor's business or the Plan and its implementation.

A.    **Certain Bankruptcy Considerations**

1    **Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims against and Equity Interests in the Debtor under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. **The Bankruptcy Court has established June 28, 2019 as the deadline within which a party in interest may object to the Plan's classification of Claims and Equity Interests for Classes 1, 2, 5, 6, 7 and 8. With respect to Classes 3A, 3B, 3C and 4, the Bankruptcy Court has established July 9, 2019 as the deadline within which a party in interest may object to the Plan's classification of Claims and Equity Interests; and, any such objections shall be set for hearing before the Bankruptcy Court on the Confirmation Date.**

2    **Failure to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Equity Interests as those proposed in the Plan.

3    **The Debtor May Not Be Able Secure Confirmation or Consummation of the Plan**

The Plan requires the acceptance of a requisite number of holders of Claims that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section of this Disclosure Statement entitled "Confirmation and Consummation Procedures – Overview." There can be no assurance that such acceptances and approvals will be obtained and therefore, that the Plan will be confirmed. In addition, confirmation of the Plan and the occurrence of the Effective Date of the Plan are subject to the satisfaction of certain conditions precedent. Although the Debtor believes that the conditions precedent to the confirmation of the Plan and to the occurrence of the Effective Date of the Plan will be met, there can be no assurance that all such conditions precedent will be satisfied. If any condition precedent is not satisfied or waived pursuant to the Plan, the Plan may not be confirmed or the Effective Date may not occur.

Furthermore, although the Debtor believes that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur. The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events, including the establishment of the aggregate of the Subordinated Instruments 1 within the provided limitations. There can be no

assurance that all of these events will occur or that those that do not occur will be waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims and Equity Interests would receive less than they would receive under the Plan. A liquidation analysis prepared by the Debtor with the assistance of its Professionals is attached hereto as Schedule 1.

If the Plan is not confirmed and does not go effective for any reason and the Debtor or some other party in interest decides to prosecute a different plan, recoveries to holders of Claims against or Equity Interests in the Debtor may be negatively impacted. If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims and Equity Interests. There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and Equity Interests as the treatment provided under the Plan. If any modifications to the Plan are materially adverse to any holders of Claims or Equity Interests, it would be necessary to resolicit votes from holders of such Claims or Equity Interests, which would, at the very least, further delay confirmation and consummation of the Plan, and could jeopardize the consummation of the Plan.

### 4 Actual Plan Distributions May Be Less than Estimated for the Purposes of this Disclosure Statement

The Debtor projects that the Claims and Equity Interests asserted against the Debtor may be resolved in and reduced to an amount that approximates the estimates set forth in the Liquidation Analysis attached hereto as Schedule 1. However, there can be no assurance that such estimates will prove accurate. In the event the allowed amounts of such Claims and/or Equity Interests are materially higher than the projected estimates, actual distributions to holders of Allowed Claims could be materially less than estimated herein.

### B. Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Holders of Claims and Equity Interests, and other interested parties, should read carefully the discussion set forth in the article of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences" for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

### XIII.
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has concluded that the Plan will maximize recoveries to holders of Claims and Equity Interests. If no plan of reorganization can be confirmed, the Chapter 11 Case of the Debtor may be converted to s case under chapter 7, in which event a trustee would be elected or appointed

to liquidate the properties and interests in property of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because (i) the chapter 7 trustee's unfamiliarity with the Debtor and its industry would lead to additional costs for the Estate and (ii) in a liquidation of the Debtor under chapter 11, the Causes of Action retained by the Estate likely will be pursued in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, potentially resulting in greater recoveries.  Accordingly, the Debtor has determined that confirmation of the Plan will likely provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7.

## XIV.
## CONCLUSION

The Debtor believes that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims in the Debtor to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.


Dated:  July 2, 2019                        Respectfully submitted,

                                            First NBC Bank Holding Company, Debtor

                                            By: /s/ Lawrence Blake Jones
                                            Name:   Lawrence Blake Jones
                                            Title:    Chief Restructuring Officer

# EXHIBIT A

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRST NBC BANK HOLDING COMPANY | ) | Case No. 17-11213 |
|  | ) |  |
| Debtor | ) | Section A |
|  | ) |  |

---

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**FOR FIRST NBC BANK HOLDING COMPANY**

---

Dated: July 2, 2019

**THE STEFFES FIRM, LLC**
William E. Steffes, Esq.
bsteffes@steffeslaw.com
Barbara B. Parsons
bparsons@steffeslaw.com
13702 Coursey Blvd., Bldg. 3
Baton Rouge, Louisiana 70817
(225) 751-1751
(225) 751-1998 Facsimile
*Counsel to the Debtor*

**JEFFREY D. STERNKLAR, LLC**
Jeffrey D. Sternklar
26th Floor
225 Franklin Street
Boston, MA 02110

and

**STEWART, ROBBINS & BROWN, LLC**
Paul Douglas Stewart, Jr.
dstewart@stewartrobbins.com
Brandon Brown
bbrown@stewartrobbins.com
301 Main Street, Suite 1640
P. O. Box 2348
Baton Rouge, LA 70821-2348

*Co-Counsel to the Official Committee of
Unsecured Creditors*

# TABLE OF CONTENTS

**Page**

INTRODUCTION…………………………………………………………………………1
ARTICLE I. <u>DEFINITIONS; RULES FOR INTERPRETATION</u>……………………… 3
  1.1  Definitions……………………………………………………………………… 3
  1.2  Rules for Interpretation. ……………………………………………………… 13
  1.3  Computation of Time.………………………………………………………… 14
  1.4  Appendices and Plan Documents……………………………………………… 14
ARTICLE II. <u>TREATMENT OF ADMINISTRATIVE, PRIORITY TAX, AND UNCLASSIFIED CLAIMS</u>……………………………………………………………… 14
  2.1  Treatment of Administrative Expense Claims.………………………………… 14
  2.2  Treatment of Quarterly Fees. ………………………………………………… 16
  2.3  Treatment of Priority Tax Claims. …………………………………………… 16
ARTICLE III. <u>CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS</u>……………… 16
  3.1  General. ………………………………………………………………………… 16
  3.2  Classification of Claims and Equity Interests………………………………… 17
  3.3  Treatment of Claims Against and Equity Interests in the Debtor.……………… 17
ARTICLE IV. <u>IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS</u>……………………………………………………………………… 21
  4.1  Unimpaired Classes of Claims and Equity Interests.………………………… 21
  4.2  Impaired Classes of Claims and Equity Interests. …………………………… 22
  4.3  Impairment Controversies……………………………………………………… 22
ARTICLE V. <u>ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS</u>. 22
  5.1  Classes Entitled to Vote and Default Options.………………………………… 22
  5.2  Acceptance by an Impaired Class of Claims and Equity Interests. …………… 22
  5.3  Confirmability and Severability of this Plan. ………………………………… 23
ARTICLE VI. <u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>……………………… 23
  6.1  First Round Investment and Exit Facility. …………………………………… 23
  6.2  Senior Debt and Subordinated Debt of the Reorganized Debtor.……………… 24
  6.3  Establishment of the Administrative Expense and Priority Reserve …………… 25
  6.4  Establishment of the Special Purpose Vehicle………………………………… 25
  6.5  Dispostion of Legacy Subordinated Notes …………………………………… 25
  6.6  Debt Option Limitations for Class 2 Claim Treatment.………………………… 26

6.7     Corporate Action..............................................................................................27

6.8     Preservation of Causes of Action……………….…...............................................27

6.9     Establishment of the Litigation and Distribution Trust and Appointment of the Litigation and Distribution Trustee.....................................................................31

6.10    Vesting of the Tort Claims and Insurance Policies……………….……………...31

6.11    Sources of Cash for Plan Distributions…...……………………………….....…..31

6.12    Continued Corporate Existence and Vesting of Assets in the Debtor...…………31

6.13    Cancellation of Instruments……….………………………………………….…32

6.14    Amendment of Indenture and Preservation of Trustee Rights.……………………33

6.15    Dissolution of the Committee………………………………………………….…33

6.16    Delisting of Stock……….………………………………………………….....…33

**ARTICLE VII. <u>THE LITIGATION AND DISTRIBUTION TRUST</u>**...............................34

7.1     Establishment of Litigation and Distribution Trust. .........................................34

7.2     Execution of the Litigation and Distribution Trust Agreement. ...................34

7.3     Litigation and Distribution Trust Assets..........................................................34

7.4     Governance of Litigation and Distribution Trust..............................................35

7.5     Litigation and Distribution Trustee.................................................................35

7.6     Oversight Committee. .....................................................................................38

7.7     Special Governance Provisions Regarding Prosecution and Settlement of Causes of Action………………………………………………………………………….41

7.8     Indemnification. .............................................................................................42

7.9     LT Reserves .....................................................................................................42

7.10    Discharge of Litigation and Distribution Trustee and Dissolution……………..…43

7.11    Taxes………………………………………………………………………….…43

**ARTICLE VIII. <u>INJUNCTIONS, EXCULPATION AND LIMITATION ON LIABILITY</u>** ................................................................................................44

8.1     Term of Bankruptcy Injunction or Stays. .....................................................44

8.2     Discharge……………………………………………………………..…………45

8.3     Injunction. .......................................................................................................46

8.4     Exculpation. .....................................................................................................46

8.5     Limitation on Liability of Litigation and Distribution Trustee...................46

8.6     D&O Claims and D&O Policies...……………………………………….………47

8.7     SEC Rights Preserved……………………………………………………………47

**ARTICLE IX. <u>PLAN DISTRIBUTION PROVISIONS</u>**...........................................47

9.1     Plan Distributions............................................................................................47

9.2 Timing of Plan Distributions. ................................................................... 47

9.3 Delivery of Plan Distributions and Undeliverable or Unclaimed Distributions. .......... 48

9.4 Plan Distributions Subject to Withholding and Reporting Requirements. ................... 49

9.5 Manner of Payment Under the Plan. ............................................................ 49

9.6 Rounding. ......................................................................................... 49

9.7 Settlement of Claims and Controversies. ...................................................... 49

9.8 Setoffs and Recoupments……………….……………………………………………50

**ARTICLE X. PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS** ............................................................................................... 50

10.1 Claim Objection Deadline. ..................................................................... 50

10.2 Prosecution of Contested Claims. ............................................................. 50

10.3 Claims Settlement. ............................................................................... 50

10.4 Entitlement to Plan Distributions upon Allowance. ........................................ 51

**ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE** .................................. 51

11.1 Conditions Precedent to Confirmation. ....................................................... 51

11.2 Conditions Precedent to the Occurrence of the Effective Date. .......................... 51

11.3 Waiver of Conditions. ........................................................................... 52

11.4 Effect of Non-Occurrence of the Effective Date. ........................................... 52

**ARTICLE XII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................................................. 53

12.1 Assumption and Rejection of Executory Contracts and Unexpired Leases. .............. 53

12.2 Claims Arising from Rejection, Expiration or Termination. ............................... 53

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................................ 54

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ................................................ 55

14.1 Satisfaction of Claims. ......................................................................... 55

14.2 Special Provisions Regarding Insurance Policies and Insured Claims. ................... 56

14.3 Third Party Agreements; Subordination. ..................................................... 57

14.4 Service of Documents. .......................................................................... 57

14.5 Headings. ......................................................................................... 58

14.6 Governing Law. .................................................................................. 58

14.7 Exemption from Transfer Taxes. .............................................................. 58

14.8 Notice of Entry of Confirmation Order and Relevant Dates. .............................. 58

14.9 Interest and Attorneys' Fees. .................................................................. 58

14.10 Modification of the Plan. ....................................................................... 59

14.11    Revocation of Plan. ................................................................................................. 59

14.12    Compliance with Tax Requirements. ....................................................................... 59

14.13    Binding Effect. ........................................................................................................ 59

14.14    Rates. ....................................................................................................................... 60

14.15    Extensions of Time. ................................................................................................. 60

14.16    No Admissions. ........................................................................................................ 60

## INTRODUCTION

First NBC Bank Holding Company and the Committee (collectively, the "Plan Proponents") hereby propose the following chapter 11 plan of reorganization for the resolution of all outstanding Claims against and Equity Interests in the Debtor in this Chapter 11 Case.

Reference is made to the Disclosure Statement for a discussion of the Debtor's history, business, properties and operations, risk factors, a summary and analysis of this Plan, and certain related matters. Subject to certain restrictions and requirements set forth herein, including, without limitation, Sections 14.10 and 14.11 of this Plan, and in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation in accordance with the terms hereof, the Confirmation Order, and the Bankruptcy Code.

**TRANSMITTED WITH THIS PLAN IS A COPY OF THE DISCLOSURE STATEMENT REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE (TOGETHER WITH ITS EXHIBITS, AND AS AMENDED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT"). THE PLAN PROPONENTS URGE ALL CLAIMANTS AND OTHER PARTIES IN INTEREST TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY. NO SOLICITATION MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND ANY DOCUMENTS, SCHEDULES, EXHIBITS OR LETTERS ATTACHED THERETO OR REFERENCED THEREIN HAVE BEEN AUTHORIZED BY THE PLAN PROPONENTS OR THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THIS PLAN IS 5:00 P.M., CENTRAL TIME, JULY 31, 2019 UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF LOUISIANA.**

**THE PLAN PROPONENTS BELIEVE THAT THIS PLAN WILL ENABLE THE LITIGATION AND DISTRIBUTION TRUST TO RECEIVE AND EFFICIENTLY LIQUIDATE CERTAIN ASSETS OF THE DEBTOR AS WELL AS THE GUARANTEED CASH PAYMENT AMOUNT FOR THE BENEFIT OF ITS CREDITORS WHILE PRESERVING ITS EQUITY INTERESTS AND THE DEBTOR ITSELF AS AN ONGOING VIABLE BUSINESS ENTITY AS THE REORGANIZED DEBTOR, THEREBY ACCOMPLISHING THE OBJECTIVES OF CHAPTER 11. ADDITIONALLY, THE PLAN PROPONENTS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTOR'S CREDITORS AND EQUITY INTERESTS AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATE. THE PLAN PROPONENTS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

**BY ORDER DATED JULY 3, 2019, THE BANKRUPTCY COURT APPROVED THE DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THE DISCLOSURE STATEMENT BY THE**

1

BANKRUPTCY COURT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THIS PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR THIS PLAN EXCEPT AS EXPRESSLY INDICATED THEREIN.  THE DISCLOSURE STATEMENT AND PLAN WERE COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES AND ARE BELIEVED TO BE ACCURATE TO THE BEST OF THEIR KNOWLEDGE, INFORMATION AND BELIEF.  HOLDERS OF CLAIMS AND EQUITY INTERESTS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THIS PLAN, INCLUDING WITH RESPECT TO THE MERITS AND RISKS INVOLVED.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THIS PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THIS PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THIS PLAN. NOTHING STATED IN THE DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THIS PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

SUMMARIES OF PROVISIONS OF AGREEMENTS REFERRED TO IN THIS PLAN AND THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE, AND ARE SUBJECT TO AND QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS PLAN OR THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THIS PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER THIRD PARTIES SHOULD BE AWARE THAT THIS PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY MATERIALLY AFFECT THEIR RIGHTS.

# ARTICLE I.

# DEFINITIONS; RULES FOR INTERPRETATION

## 1.1   Definitions.

As used herein, capitalized terms shall have the respective meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.1     Administrative Bar Date means May 13, 2019, the deadline to file proofs of claim in the Chapter 11 Cases with respect to Administrative Expense Claims other than Fee Claims.

1.1.2     Administrative Expense Claim means a Claim (other than a Claim included in a Class under this Plan) that is entitled to priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code or Order of the Bankruptcy Court, including, without limitation, (i) Claims incurred by the Debtor (or its Estate) on or after the Petition Date and before the Effective Date for the actual, necessary costs and expenses of preserving the Estate, including, without limitation, Fee Claims.

1.1.3     Administrative Expense and Priority Reserve means the Cash from the Estate reserved by the Debtor for the payment of all Unclassified Claims as set forth in Article II of the Plan and all Class 1 Claims as set forth in Article III of the Plan.

1.1.4     Affiliate shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.1.5     Allowed, when used

i) with respect to any Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim; and

ii) with respect to Equity Interests in the Debtor, means the Equity Interests in such Debtor as reflected in the stock ledger or similar register of the Debtor as of the Effective Date.

For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon any potentially applicable rights of avoidance, setoff, or subordination, and any other grounds or defenses.

For the further avoidance of doubt, any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed" under this Plan absent further Order of the Bankruptcy Court.  Unless otherwise specified in this Plan or by Order of the Bankruptcy Court, "Allowed" Claims shall not, for the purposes of computation of distributions under the Plan, include interest on such Claims from and after the Petition Date.

3

1.1.6     Aggregate Settlement Amount means $4,250,000 in Cash reserved from the First Round Investment for Class 2 Claims and the Reorganized Debtor, as applicable.

1.1.7     Avoidance Actions means all Causes of Action of the Estate that arise under chapter 5 of the Bankruptcy Code, including under section 502, 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

1.1.8     Bankruptcy Code means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Case.

1.1.9     Bankruptcy Court means the United States Bankruptcy Court for the Eastern District of Louisiana.

1.1.10    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

1.1.11    Bar Dates means the General Bar Date, the Administrative Bar Date, and any other applicable deadline to file a proof of claim in the Chapter 11 Case.

1.1.12    Bar Date Orders means the Order [Doc. 119] entered on September 1, 2017, which set the General Bar Date and the Order [Doc. 543] entered on April 2, 2019, which set the Administrative Bar Date.

1.1.13    Bondholder Claims means the Claims of the Indenture Trustee on behalf of itself and holders of the Legacy Subordinated Notes.

1.1.14    Bondholder Retained Interests means all of a Bondholder's rights, title and interests, on account of its Bondholder Claim, to Plan Distributions from the Litigation and Distribution Trust.

1.1.15    Bondholders means the holders of the Legacy Subordinated Notes.

1.1.16    Business Day means any day other than a Saturday, a Sunday, a "legal holiday" (as defined by Bankruptcy Rule 9006(a)), or any other day on which commercial banks are required or authorized to close for business in New York, New York.

1.1.17    Cash means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

1.1.18    Cash Option means the Class 2 Claim treatment option set forth in section 3.3.2(iii)(a) of the Plan.

1.1.19    Causes of Action means all claims, actions, causes of action, choses in action, liabilities, obligations, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills,

specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, foreseen, unforeseen, asserted, assertable directly or derivatively, arising in law, equity or otherwise, that exist and/or are or may be pending on the Effective Date, against any Person, whether asserted or unasserted as of the Effective Date that constitute "property of the Debtor's Estate" as defined in 11 U.S.C. §541, including, without limitation: (i) the right to object to Claims and Equity Interests; (ii) all Avoidance Actions; and (iii) all Tort Claims. Any and all Causes of Action are preserved under the Plan, provided, however, that nothing in this definition or within this Plan is intended to determine ownership of, or rights with respect to, claims and/or causes of action with respect to First NBC Bank or assets of First NBC Bank between the Debtor and/or the Liquidating Trustee as successor-in-interest under the Plan and the FDIC as Receiver for First NBC Bank.

1.1.20    Chapter 11 Case means the case commenced on the Petition Date by the Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code as Case No. 17-11213.

1.1.21    Claim shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code. For the avoidance of doubt, "Claim" includes, without limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not accrued under non-bankruptcy law that is created by one or more acts or omissions of the Debtor if: (a) the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s) may be sufficient to establish liability when injuries/damages are manifested; and (c) at the time of the Effective Date, the Debtor have received one or more demands for payment for injuries or damages arising from such acts or omissions.

1.1.22    Claim Objection Deadline means the deadline for filing objections to Claims as set forth in Section 10.1 of this Plan.

1.1.23    Class means a category of Claims or Equity Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

1.1.24    Committee means the official committee of unsecured creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code.

1.1.25    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.1.26    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.1.27    Confirmation Order means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.28    <u>Contested</u>, when used

a) with respect to a Claim, means such Claim

i.    to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been filed;

ii.    if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan;

iii.    if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been filed with the Bankruptcy Court and as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan; or

iv.    as to which an objection has been or may be filed on or before the Claim Objection Deadline; <u>provided</u>, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and

b) with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

1.1.29    <u>Debt Option</u> means the Class 2 Claim treatment option provided for in section 3.3.2(iii)(b) of the Plan.

1.1.30    <u>Debt Option Threshold</u> means the aggregate amount of $30,000,000 in Class 2 Claims electing the Debt Option.

1.1.31    <u>D&O Claims</u> means any and all rights and claims against the Debtor's current and/or former directors and officers for pre-petition acts of whatever nature and the proceeds of any such claims, including any D&O Policies or other Insurance Policies associated therewith.

1.1.32    <u>D&O Policies</u> means any Insurance Policy insuring the Debtor's officers and/or directors, including the Financial Institutions Select Insurance Policy, Number DOP 9311203-04, issued by Zurich American Insurance Company, with a policy period of June 9, 2015 through December 31, 2016 and all excess liability insurance policies for the period of June 9, 2015 through December 31, 2016, including: (a) Continental Casualty Company, Policy No. 596594782, (b) Federal Insurance Company, Policy No. 8243-6165, (c) Great American Insurance Group, Policy No. DFX1491031, (d) Illinois National Insurance Company, Policy No. 01-415-73-85; and, the Officers and Corporate Liability Insurance Policy, Number 14-MGU-16-A39690, issued by U.S.

Specialty Insurance Company, with a policy period of December 31, 2016 through December 31, 2017 and any excess liability insurance policies for the period of December 31, 2016 through December 31, 2017, including: (a) US Specialty Insurance Company, Policy No. 14-MGU-16-A39694; (b) XL Specialty Insurance Company, Policy No. ELU148261-16; (c) Illinois National Insurance Company, Policy No. 06-473-18-11; (d) Freedom Specialty Insurance Company, Policy No. XMF1602583; (e) Markel American Insurance Company, Policy No. MKLM6EL0002907; (f) Berkshire Hathaway Specialty Insurance Company, Policy No. 47-EPF-303265-01; and, (g) Illinois National Insurance Company, Policy No. 06-481-51-29.

1.1.33    Debtor means First NBC Bank Holding Company prior to the occurrence of the Effective Date.

1.1.34    Debtor in Possession means the Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.1.35    Disallowed, when used with respect to a Claim or Equity Interest, means all or such part of a Claim or Equity Interest that has been disallowed or released by a Final Order, operation of law, written release or settlement, the provisions of this Plan, or otherwise, or withdrawn by the holder of the Claim or Equity Interest.

1.1.36    Disclosure Statement means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

1.1.37    Disclosure Statement Order means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

1.1.38    Distribution Record Date means the record date for purposes of determining Bondholders eligible for Plan Distributions to Bondholders, which shall be the Confirmation Date; only holders of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes on the Confirmation Date shall be entitled to Plan Distributions.

1.1.39    Distribution Reserve means any reserve established by the Litigation and Distribution Trustee on account of Contested Claims of any Litigation and Distribution Trust Beneficiary which, if Allowed, would entitle such Litigation and Distribution Trust Beneficiary to a Plan Distribution.

1.1.40    Effective Date means a date selected by the Plan Proponents jointly which shall be a Business Day that is no later than three (3) days after all of the conditions specified in Section 11.2 have been satisfied or waived in accordance with Section 11.3 of this Plan.  Except as otherwise extended by the Court on motion of the Plan Proponents, the Effective Date shall in no event occur more than sixty (60) days after the Confirmation Date.

1.1.41    Equity Interest means (i) any outstanding ownership interest in any of the Debtor, including, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or

their equivalents, or other rights to purchase or otherwise receive any ownership interest in the Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against the Debtor that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

1.1.42    Estate means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.1.43    Estate Cash means all Cash of the Debtor and the Estate as of the Effective Date remaining after payment (or reserve for payment) of all Unclassified Claims as set forth in Article II of this Plan and Allowed Class 1 Claims as set forth in Article III of this Plan.

1.1.44    Exit Facility means that portion of the First Round Investment which is NOT used by or on behalf of the SPV for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option.

1.1.45    Exculpated Parties means all Persons that are or were at any time on or after the Petition Date, and whether or not any such Person currently retains such capacity or position, (i) the Debtor; (ii) the Committee or a member of the Committee, solely in its capacity as a Committee member; (iii) Professional Persons, to the extent such parties are or were acting in such capacity on behalf of any of the Persons identified in (i) or (ii) above on or after the Petition Date; and (iv) the Indenture Trustee.

1.1.46    Fee Application means an application for allowance and payment of a Fee Claim.

1.1.47    Fee Claim means a Claim of a Professional.

1.1.48    Final Order means an order or judgment of the Bankruptcy Court (or any other court or adjudicative body of competent jurisdiction) entered on the docket of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, motion for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or any other court or adjudicative body) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

1.1.49    First Round Investment means the $5,000,000 in Cash, held in an escrow account by the Debtor's bankruptcy counsel pursuant to the FRI Escrow Agreement, provided for purposes of Plan Distributions and future business operations of the Reorganized Debtor.

1.1.50    First Round Investors means the Persons who will fund the First Round Investment.

1.1.51    FNBC means First NBC Bank Holding Company

1.1.52    FRI Escrow Agreement means that certain agreement between the Debtor, the First Round Investors and the Committee governing use and availability of the First Round Investment, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

1.1.53    General Bar Date means October 20, 2017, the general deadline to file proofs of claim in the Chapter 11 Case (or November 7, 2017, with respect to governmental units) established by the General Bar Date Order.

1.1.54    General Unsecured Claim means any Claim against the Debtor, including any Bondholder Claim, which is not an Administrative Expense Claim (including Fee Claims), a fee payable pursuant to section 1930 of title 28 of the United States Code, a Priority Tax Claim, an Insured Claim, an Indemnity Claim, a Secured Claim, or a Priority NQDC Claim, and shall not include Disallowed Claims.

1.1.55    Indemnity Claim means any Claim against the Debtor for indemnification, reimbursement, or contribution filed by any current or former officer, director, employee or independent contractor of the Debtor which under this Plan are disallowed and/or subordinated to certain other Claims by Sections 502(e) and 509(c) of the Bankruptcy Code.

1.1.56    Indenture means that certain Indenture by and between U.S. Bank National Association, as Indenture Trustee, and FNBC, as Issuer, dated as of February 18, 2015, as amended.

1.1.57    Indenture Trustee means U.S. Bank National Association, as Indenture Trustee, under the Indenture.

1.1.58    Insider means a Person that would fall within the definition ascribed to such term in section 101(31) of the Bankruptcy Code.

1.1.59    Insurance Policies means, collectively, any policies of insurance coverage of any kind (including any and all amendments, endorsements, renewals, and extensions thereof) that at any time belonged or belong to or included or include the Debtor as a named insured, additional insured, or beneficiary, including, without limitation, the D&O Policies.

1.1.60    Insured Claim means a claim for which an Insurance Policy or Policies provides or may provide coverage and payment, in whole or in part.  Insured Claims are subject to the provisions of, and treatment under, Section 14.2 of this Plan.

1.1.61    Internal Revenue Code means the Internal Revenue Code of 1986, as amended, codified at title 26 of the United States Code, together with any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements and other releases of the United States Treasury Department or the IRS.

1.1.62    IRS means the Internal Revenue Service.

1.1.63    Legacy Subordinated Notes means those certain subordinated notes issued by FNBC on February 18, 2015 in a private placement offering in the aggregate principal amount of $60 million, with a maturity date of February 18, 2025 and bearing interest at a rate of 5.75% per annum, some or all of which were subsequently exchanged for identical new notes, registered under the Securities Act and generally not subject to transfer restrictions, all as more fully described in FNBC's filing of Form S-4 Registration Statement under the Securities Act on August 18, 2015.

1.1.64    Litigation and Distribution Trust means the trust established pursuant to Article VII of the Plan.

1.1.65    Litigation and Distribution Trust Agreement means the agreement, in a form reasonably acceptable to the Debtor and the Committee, to be dated as of the Effective Date establishing the terms and conditions of the Litigation and Distribution Trust, which shall be substantially in the form filed with the Bankruptcy Court as a Plan Document.

1.1.66    Litigation and Distribution Trust Assets means the Debtor's and the Estate's right, title and interest in the Estate Cash, the $300,000.00 Senior Debt instrument to be contributed as provided in Section 6.9 of this Plan, the Avoidance Actions, Tort Claims and the proceeds of any Insurance Policies applicable thereto, any objections to Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims, and, any other Cause of Action not related to or affecting the Tax Assets. For the avoidance of doubt, all Tort Claims shall be Litigation and Distribution Trust Assets.

1.1.67    Litigation and Distribution Trust Beneficiaries means all individuals and entities entitled to a Plan Distribution from the Litigation and Distribution Trust.

1.1.68    Litigation and Distribution Trust Expenses means all reasonable costs and expenses incurred on or after the Effective Date by the Litigation and Distribution Trustee associated with the implementation and administration of the Litigation and Distribution Trust and the Plan.

1.1.69    Litigation and Distribution Trust Indemnified Parties has the meaning set forth in Section 7.7 of this Plan.

1.1.70    Litigation and Distribution Trustee means the trustee (and any successor trustee) selected to serve trustee pursuant to Article VII of this Plan and under the Litigation and Distribution Trust Agreement. The identity of the initial trustee shall be filed with the Bankruptcy Court as a Plan Document no later than three (3) Business Days after entry of the Bankruptcy Court's order approving the adequacy of the Disclosure Statement.

1.1.71    Oversight Committee means the Oversight Committee of the Litigation and Distribution Trust established pursuant to the Litigation and Distribution Trust Agreement.

1.1.72    Person means an individual, corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, trust, estate, unincorporated

association, unincorporated organization, or any government, governmental entity, or political subdivision, department, agency, or instrumentality thereof, or any other entity.

1.1.73    Petition Date means May 11, 2017, the date on which the Debtor commenced the Chapter 11 Case.

1.1.74    Plan means this chapter 11 plan for the Debtor filed in the Chapter 11 Case, including all supplements, appendices and schedules hereto, either in their present form or as same may be amended, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

1.1.75    Plan Distribution means the payment or distribution under the Plan of Cash, assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

1.1.76    Plan Distribution Date means (i) if a Claim or Equity Interest is Allowed on the Effective Date, a date that is within five (5) business days after the Effective Date, or (ii) if such Claim or Equity Interest is not Allowed on the Effective Date, a date within five (5) business days after the date such Claim or Equity Interest becomes Allowed.

1.1.77    Plan Documents means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.4 of the Plan including, without limitation, the Litigation and Distribution Trust Agreement.  Plan Documents shall be filed in the record of the Bankruptcy Case no later than five (5) calendar days in advance of the Confirmation hearing.

1.1.78    Plan Proponents means the Debtor and the Committee (each, a "Plan Proponent").

1.1.79    Priority NQDC Claim means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a)(5) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

1.1.80    Priority Tax Claim means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.81    Professional means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Case.

1.1.82    Pro Rata Share means the proportion that an Allowed Claim (in the full amount of such Claim) or an Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such class, including Contested Claims, but excluding Disallowed Claims, (a) as calculated by the Litigation and Distribution Trustee or Debtor, as applicable; or (b) as determined or estimated by the Bankruptcy Court.

1.1.83     Reorganized Debtor means the Debtor after the occurrence of the Effective Date.

1.1.84     Schedules means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtor with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtor from time to time in accordance with Bankruptcy Rule 1009.

1.1.85     Secured Claim means a Claim: (a) secured by a lien, as defined in section 101(37) of the Bankruptcy Code, on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.1.86     Securities Act means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

1.1.87     Senior Debt Instrument means any debt instrument issued by the Reorganized Debtor pursuant to or in connection with the implementation of the Plan, which (a) ranks equally in priority only with the Exit Facility; (b) is senior in rank to all other indebtedness of the Debtor or Reorganized Debtor; (c) has a maturity date of the 5th anniversary of issuance; (d) bears interest at a rate of 5% per annum; and, (e) is payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments may vary, but in no event shall they be in an amount less than the respective quarterly payment that would be due as calculated on a 10-year amortization schedule at 5% interest.

1.1.88     Series D Preferred means 37,935 shares of Series D Preferred Stock issued on August 4, 2011 by FNBC to U.S. Department of the Treasury under the Small Business Lending Fund program.

1.1.89     Series E Preferred means 1,725 shares of Series E Preferred Stock issued on April 27, 2017 by FNBC to certain members of the FNBC Board of Directors in accordance with FNBC's amendment to the articles of incorporation dated April 25, 2017.

1.1.90     SPV means First Phoenix SPV, LLC, the Special Purpose Vehicle established by the First Round Investors to acquire the SPV Claim Rights from any Bondholder electing (or deemed to be electing) the Cash Option under Section 3.3.2(iii)(a).

1.1.91     SPV Claim Rights means all rights, title and interests of a Bondholder in an Allowed Bondholder Claim except for any rights of the Bondholder to receive its Pro Rata Share of the Litigation and Distribution Trust Assets under Section 3.3.2(ii) and Cash under Section 3.3.2(iii)(a).

1.1.92     Subordinated 510(b) Claim means any Claim subordinated by operation of section 510(b) of the Bankruptcy Code, including any Claim arising from the rescission of a purchase or sale of a security of the Debtor or an affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of such a Claim.

1.1.93    Subordinated Debt 1 means debt issued by the Debtor or Reorganized Debtor that is subordinate only to the Senior Debt Instruments and Exit Facility; and, is comprised exclusively of (a) Subordinated Instruments 1 issued to holders of Class 2 Claims that have elected the Debt Option;  and, (b) SPV Claim Rights.

1.1.94    Subordinated Instrument 1 means any Subordinated Debt 1 instrument issued by the Reorganized Debtor pursuant to the Plan, which shall: (a) bear interest at a rate of 5% per annum, (b) have a maturity date of the 10th anniversary of issuance, and (c) be payable in quarterly installments commencing on the first business day of the fourth quarter following the Plan Distribution Date, which quarterly payments may vary, but in no event shall they be in an amount less than the amount of interest accrued.

1.1.95    Tax Assets means any tax attributes of the Debtor, including tax credit carryforwards and net operating loss carryforwards.

1.1.96    Tort Claims means any and all claims of the Debtor based on any tort, including, but not limited to, D&O Claims and all Causes of Action at law and equity (including those based on breach of contract and based on tortious conduct) against all current and former auditors and accountants.

1.1.97    Voting Deadline means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

**1.2    Rules for Interpretation.**

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural and terms denoting one gender shall include the other gender; (b) the Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous; (c) any reference in this Plan to a contract, instrument, release, or other agreement or document attached as an Exhibit to this Plan or included in the Plan Documents being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (d) any reference in this Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (e) any reference to a Person as a holder of a Claim or Equity Interest includes that Person's successors and assigns; (f) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan or the Plan Documents, as the same may be amended, waived or modified from time to time; (g) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Louisiana, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments,

13

agreements or documents; (j) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (k) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

**1.3     Computation of Time.**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, and if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

**1.4     Appendices and Plan Documents.**

All appendices to this Plan and the Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Except as otherwise provided herein, all Plan Documents shall be filed with the Bankruptcy Court not less than five (5) days prior to the Voting Deadline. Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to:

> **THE STEFFES FIRM, LLC**
> 13702 Coursey Blvd., Bldg. 3
> Baton Rouge, Louisiana 70817
> Attn: Barbara B. Parsons
> (225) 751-1998  Facsimile
> **bparsons@steffeslaw.com**

## ARTICLE II.

## TREATMENT OF ADMINISTRATIVE, PRIORITY TAX, AND UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified for purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code, respectively. All Administrative Expense Claims and Priority Tax Claims shall instead be treated separately as unclassified Claims along with certain other unclassified Claims under the terms set forth in this Article II.

**2.1     Treatment of Administrative Expense Claims.**

2.1.1    General Provisions.

Except as provided below for Professionals and non-tax liabilities incurred in the ordinary course of business by the Debtor in Possession, requests for payment of Administrative Expense Claims must have been filed and properly noticed for hearing no later than the Administrative Bar

Date. **Holders of Administrative Expense Claims (including, without limitation, any governmental units asserting claims for federal, state, or local taxes) that are required to file a request for payment of such claims and that do not file and properly notice for hearing such requests by such Administrative Bar Date shall be forever barred from asserting such claims against the Debtor, Reorganized Debtor, any other Person, or any of their respective property.**

Except to the extent any Person entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim on the Plan Distribution Date; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim.

For the avoidance of doubt, no Administrative Expense Claim that remains subject to objection on or before the Claim Objection Deadline (*i.e.*, such Administrative Expense Claim is Contested) shall receive a distribution under this Plan unless and until the Reorganized Debtor, in consultation with the Litigation and Distribution Trustee, determines that no objection will be filed with respect to such Claim. Upon such a determination or agreement between the Reorganized Debtor, the Litigation and Distribution Trustee and the holder of any Administrative Expense Claim, any such Administrative Expense Claim shall become Allowed and paid by the Reorganized Debtor from the Administrative Expense and Priority Reserve established by the Debtor for that purpose.

Holders of Allowed Administrative Expense Claims shall not be entitled to interest on their Administrative Expense Claims.

2.1.2    Fee Claims of Professionals.

All Fee Claims of Professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Chapter 11 Case) shall file and serve on the Reorganized Debtor a Fee Application and associated notice of hearing for final allowance of the Fee Claim no later than sixty (60) days after the Effective Date; **provided, however, that no later than two (2) Business Days prior to the Confirmation Hearing all Professionals shall file with the Bankruptcy Court and provide to the Debtor an estimate of their accrued and unpaid Fee Claims through the Confirmation Hearing.** On or before the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve in the amount of the estimated unpaid Fee Claims accrued through the Effective Date (plus all other unpaid Allowed Administrative Expense Claims including those Contested by the Debtor), to be held by Debtor's counsel until such time as such Fee Claims become Allowed Administrative Expense Claims.

2.1.3    Ordinary Course Liabilities.

Holders of Administrative Expense Claims, **known to the Debtor,** *i.e.***, (a) Computershare (b) Globic Advisors, LLC, and (c) Broadridge Investor Communication Solutions**, which are based on liabilities incurred in the ordinary course of business of the Debtor prior to the Effective Date (other than professionals or other entities described in Section 2.1.2 above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) shall not be required to file any request for payment of such claims; however, **all such claims must be submitted to the Debtor's bankruptcy counsel within 45 days of the Effective Date** *via* **mail, facsimile or e-mail transmission at counsel's address listed herein; and, failure to timely submit such claims in the foregoing manner shall result in such Claims being forever barred from assertion against the Debtor, Reorganized Debtor, any other Person, or any of their respective property.**

Holders of any Administrative Expense Claims **OTHER THAN (a) Computershare, (b) Globic Advisors, LLC, and (c) Broadridge Investor Communication Solutions**, which are based on liabilities incurred in the ordinary course of business of the Debtor prior to the Effective Date (other than professionals or other entities described in Section 2.1.2 above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) must comply with the filing and Administrative Bar Date requirements set forth above in Section 2.1 "General Provisions" and the Bar Date Order.

## 2.2    **Treatment of Quarterly Fees.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtor on or before the Effective Date. All such fees arising after the Effective Date shall be an administrative expense of the Litigation and Distribution Trust and shall be paid by the Litigation and Distribution Trustee from the Litigation and Distribution Trust Assets.

## 2.3    **Treatment of Priority Tax Claims.**

Prior to the Effective Date, the Debtor shall have established the Administrative Expense and Priority Reserve from its available Cash. On the Distribution Date, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of such Allowed Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim. The Debtor does not believe that there are any Allowed Priority Tax Claims due as of this date.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**3.1    General.**    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, all Claims and Equity Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to this Plan, as set forth herein. A Claim or Equity Interest shall be deemed classified in a particular class only to the extent that the Claim or Equity Interest qualifies within the description of that class, and shall be deemed classified in a different

class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different class.  A Claim or Equity Interest is in a particular class only to the extent that such Claim or Equity Interest is Allowed in that class and has not been paid or otherwise satisfied prior to the Effective Date.

**3.2** **Classification of Claims and Equity Interests.**

The following chart assigns a number and name to each class against the Debtor for purposes of identifying each separate class:

| Class | Claim or Equity Interest |
|-------|--------------------------|
| 1 | Priority NQDC Claims |
| 2 | General Unsecured Claims |
| 3A | STA Secured Claims |
| 3B | RCC Secured Claims |
| 3C | NQDC Secured Claims |
| 4 | Indemnity Claims |
| 5 | Subordinated 510(b) Claims |
| 6 | Series E Preferred Equity Interests |
| 7 | Equity Interests (Common Stock) |
| 8 | Series D Preferred Equity Interests |

**3.3** **Treatment of Claims Against and Equity Interests in the Debtor.**

The classes of Claims against and Equity Interests in the Debtor shall be treated under the Plan as follows:

3.3.1    Class 1 – Priority NQDC Claims.

Each holder of an Allowed Priority NQDC Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority NQDC Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority NQDC Claim shall be paid Cash from the Administrative Expense and Priority Reserve by the Reorganized Debtor in an amount equal to its Allowed Priority NQDC Claim on the Plan Distribution Date.

**THE DEBTOR INTENDS TO SUPPLEMENT AND AMEND ITS PENDING OBJECTIONS TO ALL CLASS 1 CLAIMS AND BELIEVES THAT NO ALLOWED CLASS 1 CLAIMS EXIST**.

3.3.2    Class 2 – General Unsecured Claim.

Class 2 is comprised of all General Unsecured Claims including the Bondholder Claims. The Bondholder Claims shall be deemed Allowed on the Effective Date (without the necessity of all holders of Bondholder Claims to file Proofs of Claim) in the aggregate principal amount of $60,000,000, plus accrued and unpaid interest with respect thereon in the amount of $805,000, plus any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, under the Indenture, including, but not limited to, the fees and expenses of the Indenture Trustee. **Notwithstanding the filing of a Proof of Claim by the Indenture Trustee in the Chapter 11 Case, the Bondholders - not the Indenture Trustee – shall vote to accept or reject the Plan on behalf of their respective Bondholder Claims.**

Each holder of an Allowed Class 2 Claim shall receive or be allocated, as applicable, on the Plan Distribution Date, on account of its Allowed Claim:

(i)    Cash in an amount equal to the outstanding fees and expenses of the Indenture Trustee, including fees and expenses of its counsel, which will be paid on the Effective Date directly to the Indenture Trustee, on account of any such outstanding fees and expenses, from the Debtor's available Cash. Plan Distributions for all remaining amounts due on account of Bondholder Claims, *i.e.*, Bondholder Claims other than fees and expenses due to the Indenture Trustee, shall be made directly to holders of Legacy Subordinated Notes of record as reflected on the registry maintained by the Registrar for the Legacy Subordinated Notes as of the Distribution Record Date;

(ii)    such holder's Pro Rata Share of the Litigation and Distribution Trust Assets;

(iii)    *In addition to the treatment provided in Section 3.3.2(i) and (ii) above*, such holder shall be entitled to elect one of the following alternative Claim treatment options:

a)    Cash Option  -  on the Plan Distribution Date, the holder shall receive payment in Cash of its Pro Rata share of the Aggregate Settlement Amount; or,

b)    Debt Option – subject to the Debt Option limitations set forth in section 6.6 of the Plan, on the Plan Distribution Date, the Reorganized Debtor shall issue two new instruments to the holder in exchange for and in satisfaction of its Allowed Class 2 Claim: (a) Senior Debt Instrument with a principal balance equal to the holder's Pro Rata share of the Aggregate Settlement Amount; and, (b) Subordinated Instrument 1 with a principal amount equal to the balance of such holder's Claim.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

### 3.3.3      Class 3A STA Secured Claims

Class 3A is comprised of all allegedly Secured Claims of Gregory T. St. Angelo ("STA"), namely Proof of Claim nos. 56 and 57 filed in this Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3A CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3A CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3A Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3A Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3A Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the STA Secured Claims, that any lien securing any STA Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under this Plan free and clear of any such alleged lien.

### 3.3.4      Class 3B – RCC Secured Claims

Class 3B is comprised of all allegedly Secured Claims of Renewal Capital Company ("RCC"), namely Proof of Claim no. 52 filed in this Chapter 11 Case.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3B CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3B CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3B Claim, if any exist, shall receive nothing under the Plan, except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3B Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3B Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3B Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holder of the RCC Secured Claim, that any lien securing any Renewal Capital Company Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under this Plan free and clear of any such alleged lien.

3.3.5     <u>Class 3C – NQDC Secured Claims</u>

Class 3C is comprised of the following allegedly Secured Claims filed in the Chapter 11 Case: (a) Proof of Claim No. 13 filed by Dean Haines; (b) Proof of Claim No. 14 filed by Michael Lulich; and, (c) Proof of Claim No. 46 filed by Ashton Ryan, Jr.

**THE PLAN PROPONENTS INTEND TO OBJECT TO ALL CLASS 3C CLAIMS AND BELIEVE THAT NO ALLOWED CLASS 3C CLAIMS SHALL EXIST.**

The holder of an Allowed Class 3C Claim, if any exist, shall receive nothing under the Plan except the surrender of any collateral subject to a perfected, valid, non-voidable security interest securing such Class 3C Claim which is proven by order entered and final no later than the Effective Date by such holder to be property of the Debtor's Estate on the Petition Date. No enforceable lien, against any Estate property, in favor of a Class 3C Claim holder is known or believed to exist. In addition, if any enforceable lien against any Estate property is determined to exist, all Class 3C Claims are subject to the defenses of offset and any other defenses or objections that may exist against such Claims.

**The Debtor intends to file a Motion pursuant to Bank. Rule 3012 to have the Court determine that the value of this creditor's interest in the Estate's interest in any property alleged to secure such claim is zero.** Unless otherwise ordered by the Court by order entered and final no later than the Effective Date, entry of the Confirmation Order shall constitute a final, and conclusive adjudication and determination, binding on the holders of the NQDC Secured Claims, that any lien securing any Class 3C Claim does not attach to any Litigation and Distribution Trust Assets, and that all Litigation and Distribution Trust Assets shall be transferred to the Litigation and Distribution Trust under this Plan free and clear of any such alleged lien.

3.3.6     <u>Class 4 – Indemnity Claims</u>

Class 4 consists of all Indemnity Claims that are disallowed or subordinated, as applicable, pursuant to Section 502(e) and 509(c) of the Bankruptcy Code. Class 4 Claims shall be disallowed or subordinated, as applicable, to the following General Unsecured Claims, as applicable to each Class 4 Claimant, and to the extent any Class 4 Claim becomes an Allowed Claim, then it shall not be paid or satisfied until the following Claims are satisfied in full: Allowed Claims of (a) FDIC, as Receiver for First NBC Bank, (b) Bondholders, and, (c) any other Claims and/or investigative proceedings asserted against the Debtor and holders of Indemnity Claims.  Once the aforesaid General Unsecured Claims have been paid in full, holders of Allowed Class 4 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

**THE PLAN PROPONENTS INTEND TO OBJECT TO AND TO SEEK DISALLOWANCE OR SUBORDINATION OF ALL CLASS 4 CLAIMS AS FILED.**

3.3.7    Class 5 - Subordinated 510(b) Claims.

The holders of Class 5 Claims shall be subordinated to all Claims or Interests that are senior or equal to the Claim or Interest represented by the security from which the Class 5 Claim arises, except that if such security is common stock, such Claim has the same priority as common stock. Once all Class 1, 2 and 4 Allowed Claims have been paid in full, holders of Allowed Class 5 Claims shall be entitled to receive their Pro Rata Share of the Litigation and Distribution Trust Assets.

While the Plan Proponents do not intend to initiate any Avoidance Actions against holders of Claims, they reserve the right, pursuant to section 6.8 of the Plan, to assert Avoidance Actions against such holders for purposes of defense against and/or offset to Claims. The Plan Proponents (and all successors to them) further reserve any other offset rights that may exist with respect to Claims.

3.3.8    Class 6 – Series E Preferred Equity Interests.

Holders of Class 6 Equity Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interest.

3.3.9    Class 7 - Equity Interests (Common Stock)

Holders of Class 7 Equity Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights to which each such Holder is entitled on account of such Interests. Upon the Effective Date, pursuant to 11 U.S.C. §1145, all Class 7 Equity Interests shall be canceled and reissued to the exact holders of Class 7 Equity Interests in exchange for such interests.

3.3.10    Class 8 – Series D Preferred Equity Interests.

Holders of Class 8 Interests in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all as set forth in the  Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interests.

## ARTICLE IV.

## IDENTIFICATION OF IMPAIRED
## CLASSES OF CLAIMS AND EQUITY INTERESTS

**4.1    Unimpaired Classes of Claims and Equity Interests.**

The following Classes are not impaired under the Plan:

(a)    Class 1 – Priority NQDC Claims;

(b)      Class 6 - Series E Preferred Equity Interests;

(c)      Class 7 – Equity Interests (Common Stock); and,

(d)      Class 8 – Series D Preferred Equity Interests.

**4.2**      **Impaired Classes of Claims and Equity Interests.**

The following Classes are impaired under the Plan:

(a)      Class 2 – General Unsecured Claims;

(b)      Class 3A – STA Secured Claims;

(c)      Class 3B – RCC Secured Claims;

(d)      Class 3C – NQDC Secured Claims;

(e)      Class 4 - Indemnity Claims; and,

(f)      Class 5 - Subordinated 510(b) Claims.

**4.3**      **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE V.

**ACCEPTANCE OR REJECTION OF THE PLAN;
EFFECT OF REJECTION BY ONE OR MORE
CLASSES OF CLAIMS OR EQUITY INTERESTS**

**5.1**      **Classes Entitled to Vote and Default Options.**

Classes 1, 6, 7 and 8 are not impaired under the Plan, and the holders of Claims and Equity Interests in such classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Classes 2, 3A, 3B, 3C, 4 and 5 are impaired under the Plan, and the holders of Allowed Claims in such respective classes are entitled to vote to accept or reject the Plan. **In the event that a holder of a Class 2 Claim fails to timely elect the Debt Option, then such failure shall be deemed to be an election of the Cash Option by such holder.**

**5.2**      **Acceptance by an Impaired Class of Claims and Equity Interests.**

5.2.1      Pursuant to section 1126(c) of the Bankruptcy Code, an impaired class of Claims shall have accepted the Plan if, after excluding any Claims held by any holder designated pursuant

to section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims that have accepted or rejected the Plan.

5.2.2    Pursuant to section 1126(d) of the Bankruptcy Code, an impaired class of Equity Interests shall have accepted the Plan if, after excluding any Equity Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Equity Interests that have accepted or rejected the Plan.

**5.3    Confirmability and Severability of this Plan.**

5.3.1    _Reservation of Rights._  Subject to Sections 14.10 and 14.11 of this Plan, the Plan Proponents reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason.  In addition, and also subject to Sections 14.10 and 14.11 of this Plan, should this Plan fail to be accepted by the requisite number and amount of Claims and Equity Interests, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of this Plan to the contrary, the Plan Proponents reserve the right to reclassify Claims or Equity Interests or otherwise amend, modify or withdraw this Plan in its entirety or in part.

5.3.2    _Severability of Plan Provisions._  If any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    First Round Investment and Exit Facility.**

Prior to the Effective Date, the identities of the First Round Investors and the principal amounts advanced from each First Round Investor shall be provided to the Committee.

The First Round Investment shall be disbursed from escrow to, or on behalf of, the Reorganized Debtor under the Exit Facility; and, as applicable, to, or on behalf of, SPV pursuant to the FRI Escrow Agreement.  The First Round Investment shall be utilized and shall be disbursed for uses contemplated, solely as set forth in this Section 6.1.  Upon the Effective Date, the First Round Investment shall be disbursed by Debtor's counsel from escrow:

(a)     to or on behalf of the SPV: disbursement shall be specifically for  payment of all Plan Distributions of Cash required on the Plan Distribution Date to any Bondholder that has elected or is deemed to have elected the Cash Option under Section 3.3.2(iii)(a). The Reorganized Debtor or Debtor's counsel shall act as disbursing agent for the SPV in making the foregoing Plan Distributions to Bondholders.

(b)     to or on behalf of the Reorganized Debtor: disbursement shall be made under the Exit Facility, specifically for payment of all Plan Distributions of Cash required on the Plan Distribution Date to any holder of other Allowed Class 2 Claims (non-Bondholder Claims) that has or is deemed to have elected the Cash Option.

 (c)     to the Reorganized Debtor: disbursement shall be made under the Exit Facility and shall consist of all funds from the First Round Investment remaining after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Section 3.3.2(iii)(a) of the Plan; such disbursement shall be provided to the Reorganized Debtor specifically for its future business operation expenses.

The Exit Facility shall thus provide to the Reorganized Debtor: (i) all Cash required for its Plan Distributions made on the Plan Distribution Date; and, (ii) all Cash remaining from the First Round Investment after all Plan Distribution Date payments to holders of Allowed Class 2 Claims that have elected (or are deemed to have elected) the Cash Option under Section 3.3.2(iii)(a). The Exit Facility shall rank equally in priority with the indebtedness evidenced by the Senior Debt Instruments.  The Litigation and Distribution Trust and its assets shall have no liability for the Exit Facility, such liability being the sole responsibility of the Reorganized Debtor.

**6.2**     <u>**Senior Debt and Subordinated Debt of the Reorganized Debtor.**</u>

Senior Debt Instruments shall be issued exclusively to the Litigation and Distribution Trust and holders of Class 2 Claims that have elected the Debt Option.  The Senior Debt shall be senior to any and all other indebtedness of the Debtor from and after the Effective Date except for the First Round Investment (which shall be *pari passu* with the Senior Debt).  The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new debt senior to or *pari passu* with Senior Debt unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash.

The Subordinated Instruments 1 shall be senior to any preferred or common stock or any subordinated instruments that do not make up the Subordinated Debt 1.  The Subordinated Debt 1 shall be exclusively comprised of (a) Subordinated Instruments 1 issued pursuant to Section 3.3.2(iii) to holders of Class 2 Claims that have elected the Debt Option in exchange for, and in satisfaction of, such holders' Legacy Subordinated Note (in addition to the Senior Debt Instrument issued as provided in Section 3.3.2(iii) and its Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2 (ii)); and, (b) SPV Claim Rights and associated Legacy Subordinated Notes acquired by the SPV in exchange for, and in full satisfaction of, the Legacy Subordinated Notes deemed to have been assigned to the SPV as a result of the election of the Cash Option by holders of Allowed Class 2 Claims.  The charter of the Debtor and its by-laws shall be revised as of the Effective Date to prohibit the Debtor from issuing any additional or new

debt senior to or *pari passu* with Subordinated Debt 1 or to make any distributions or dividend payments of any kind or character to any Claims or Equity Interests junior or *pari passu* in priority to Subordinated Debt 1 unless and until the holders of Subordinated Instruments 1 have been paid in full and in Cash. The Reorganized Debtor may, however, issue, at any time, additional debt that is subordinate to the Subordinated Debt 1.

**6.3    Establishment of the Administrative Expense and Priority Reserve.**

Prior to the Effective Date, the Debtor shall establish the Administrative Expense and Priority Reserve from its available Cash; and, all distributions to holders of Allowed Unclassified Claims as set forth in Article II of the Plan and Allowed Class 1 Claims as set forth in Article III of the Plan shall be made therefrom. The Administrative Expense and Priority Reserve shall also include a Cash reserve for payment of (a) Contested Unclassified Claims, described in Article II of the Plan, and (b) Contested Class 1 Claims, if and as such Contested Claims become Allowed Claims. Any funds remaining, after all such Claims have been fully disposed of through payment or disallowance, shall be transferred and conveyed to the Litigation and Distribution Trust.

**6.4    Establishment of the Special Purpose Vehicle.**

Prior to the Effective Date, the SPV shall be established by the First Round Investors to acquire the Legacy Subordinated Notes and corresponding SPV Claim Rights from the Bondholders electing or deemed to be electing the Cash Option. Any Bondholder that has elected or is deemed to have elected the Cash Option shall be deemed to have assigned its Legacy Subordinated Note and all of such Bondholder's SPV Claim Rights to First Phoenix SPV, LLC as of the Plan Distribution Date. Thereafter, the SPV shall be deemed to be the record holder of any such acquired Legacy Subordinated Notes, and as a result thereof, shall be entitled to enforce all legal, equitable and contractual rights attributable to such Legacy Subordinated Notes and included within any SPV Claim Rights it acquires. **For the avoidance of doubt, any Legacy Subordinated Notes deemed to have been assigned to the SPV shall not be cancelled upon the Effective Date, but shall instead remain enforceable against the Reorganized Debtor exclusively by the SPV and its successors through the Plan Distribution Date and shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as the acquired SPV Claim Rights and Legacy Subordinated Notes in full satisfaction of the Legacy Subordinated Notes so acquired**. The Reorganized Debtor, as agent for the SPV, shall make all Plan Distributions to holders of any Bondholder Claims electing the Cash Option pursuant to Section 3.3.2(iii)(a).

**6.5    Disposition of Legacy Subordinated Notes.**

On the Confirmation Date, the Debtor shall cause there to be established a register for the recordation of Bondholders as of that date. On the Plan Distribution Date, the Reorganized Debtor or the SPV, as applicable, shall make the Plan distributions described in Plan section 3.3.2, to such Bondholders, or their transferees, as recorded on such register of the Debtor in accordance with such transfer procedures as the Debtor may establish.

Legacy Subordinated Notes of Bondholders Electing Debt Option:

If a Bondholder elects the Debt Option, pursuant to Plan Section 3.3.2(iii)(b), then, on the Plan Distribution Date, in addition to the Senior Debt Instrument issued pursuant to that Section and Pro Rata Share of the Litigation and Distribution Trust Assets as provided under Section 3.3.2 (ii), the Debtor shall issue the Senior Debt Instrument and Subordinated Instrument 1 to such Bondholder in exchange for and in satisfaction of the Bondholder's Legacy Subordinated Note.

Legacy Subordinated Notes of Bondholders Electing Cash Option:

If a Bondholder elects the Cash Option, pursuant to Plan section 3.3.2(iii)(a), then, on the Plan Distribution Date, in exchange for the Cash payment provided by the SPV to the Bondholder, the Bondholder shall be deemed to have assigned its Legacy Subordinated Note to the SPV, and the SPV shall thereafter be deemed to be the record holder of such Bondholder's Legacy Subordinated Note and SPV Claim Rights which shall be deemed to have been exchanged on the Plan Distribution Date by the SPV for Subordinated Debt 1 instruments having the same face value as, and in full satisfaction of, the acquired SPV Claim Rights and Legacy Subordinated Notes.

## 6.6    Debt Option Limitations for Class 2 Claim Treatment.

Notwithstanding the Class 2 Treatment provided for in section 3.3.2(iii)(b), the Debt Option treatment shall be limited to the Debt Option Threshold.  Should the aggregate dollar amount of Allowed Class 2 Claims electing the Debt Option exceed the Debt Option Threshold, then the treatment of such claims shall be modified as follows: the Debt Option shall be applied to the amount of each holder's Pro Rata share of the Debt Option Threshold and the Cash Option shall be applied to the balance of the holder's Claim.  *For illustration purposes only*, the Plan Proponents have provided an ***example*** of the modified treatment that may be required for a Class 2 Claim, electing the Debt Option, if the Debt Option Threshold is exceeded.

EXAMPLE OF MODIFIED TREATMENT FOR HOLDERS, ELECTING DEBT OPTION, IN A SCENARIO IN WHICH DEBT OPTION THRESHOLD IS EXCEEDED:

Assumptions:

1.  The total amount of Class 2 Claims eligible to vote is $67,000,000.

2.  The total amount of Class 2 Claims electing the Debt Option is $40,000,000 (aggregate Claim amount exceeds Debt Option Threshold by $10,000,000).

3.  The total amount of Class 2 Claims electing (or deemed to be electing) the Cash Option is $27,000,000.

4.  The Class 2 Claims electing the Debt Option are comprised of the following Claims:

    a)  Class 2 Claim of $20,000,000
    b)  Class 2 Claim of $10,000,000
    c)  Class 2 Claim of $8,000,000, and
    d)  Class 2 Claim of $2,000,000.

Under this scenario, treatment of the Class 2 Claims electing the Debt Option would be modified as follows:

a)  Class 2 Claim of $20,000,000 would receive:
    Debt Option Treatment for $15,000,000 of its Class 2 Claim; and,
    Cash Option Treatment for $5,000,000 of its Class 2 Claim.
b)  Class 2 Claim of $10,000,000 would receive:
    Debt Option Treatment for $7,500,000 of its Class 2 Claim; and,
    Cash Option Treatment for $2,500,000 of its Class 2 Claim
c)  Class 2 Claim of $8,000,000 would receive:
    Debt Option Treatment for $6,000,000 of its Class 2 Claim; and,
    Cash Option Treatment for $2,000,000 of its Class 2 Claim
d)  Class 2 Claim of $2,000,000 would receive:
    Debt Option Treatment for $1,500,000 of its Class 2 Claim; and,
    Cash Option Treatment for $500,000 of its Class 2.

**6.7**    **Corporate Action.**

The entry of the Confirmation Order shall constitute authorization for the Debtor and the Litigation and Distribution Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, (a) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (b) the implementation of all settlements and compromises as set forth in or contemplated by the Plan (c) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents); and, (d) the execution of any such documentation necessary for the Debtor to enter into the Exit Facility in order to secure the full release and availability of the First Round Investment.

On or before the Effective Date, the Debtor's Board of Directors shall take all necessary action, in accordance with its corporate governance documents, to elect Navid Abghari of Angel Oak Capital Advisors, the designee of the Committee, to serve as a member of the FNBC Board of Directors, alongside its existing members.

**6.8**    **Preservation of Causes of Action.**

Except as otherwise provided in the Plan, each Tort Claim of the Debtor shall be preserved and, along with the exclusive right to commence, pursue, and enforce such Tort Claim in any appropriate court or tribunal, shall be deemed transferred to the Liquidation and Distribution Trust/

Litigation and Distribution Trustee as of the Effective Date, and shall vest exclusively in the Litigation and Distribution Trust/Litigation and Distribution Trustee (as applicable) as of the Effective Date.  In addition, each Tort Claim to which the Committee, pursuant to Bankruptcy Court Orders [Doc. 261 and 563] was granted standing on behalf of and for the benefit of the Debtor's Estate, to assert, commence, prosecute, and, if appropriate, settle (with Court approval), shall vest exclusively in the Litigation and Distribution Trust /Litigation and Distribution Trustee (as applicable) as of the Effective Date.

Except as otherwise provided for below with respect to Causes of Action retained by the Debtor or Reorganized Debtor, unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised, settled or transferred in the Plan or any other Final Order, the Debtor, Committee and the Litigation and Distribution Trustee, as applicable, expressly reserve such claim or Cause of Action for later pursuit by the Litigation and Distribution Trustee, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon, after, or as a result of the Confirmation Date or Effective Date of the Plan, the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Debtor and the Litigation and Distribution Trustee, as applicable, expressly reserve the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtor, not so specifically and expressly waived, relinquished, released, compromised, settled or transferred that are alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person, including, without limitation, the plaintiffs or codefendants in such lawsuits.

Any Person to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor should assume that such obligation, transfer, or transaction may be reviewed by the Litigation and Distribution Trustee subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised, settled or transferred, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Person has filed a proof of claim against the Debtor in the Chapter 11 Case, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtor's Schedules, or (d) such Person's scheduled Claim has been objected to by the Debtor, the Litigation and Distribution Trustee or has been identified by the Debtor as disputed, contingent, or unliquidated.

**No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Litigation and Distribution Trustee will not pursue any and all available Causes of Action against them.  The Debtor and the Litigation and Distribution Trustee, and the Estate expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise explicitly provided in the Plan**.

The retained claims and Causes of Action, include, without limitation:

• Causes of Action, including Avoidance Actions (the Plan Proponents and their successors do not intend to initiate any direct Avoidance Actions against Claim holders, but reserve the right to assert Avoidance Actions as a defense to any Claims) and Tort Claims, as defined in the Plan;

• Objections to Claims under the Plan;

• Any and all litigation, claims, or Causes of Action of the Debtor and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, claims, or Causes of Action listed or described in the Plan, Disclosure Statement, or the Confirmation Order;

• Actions against insurance carriers relating to coverage, indemnity or other matters;

• Counterclaims and defenses relating to notes or other obligations;

• Contract, tort, or equitable claims which may exist or subsequently arise;

• Any claims of the Debtor arising under Section 362 of the Bankruptcy Code;

• Equitable subordination claims arising under Section 510 of the Bankruptcy Code or other applicable law;

• Any and all claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under Section 547 of the Bankruptcy Code, turnover Claims arising under Sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under Section 548 of the Bankruptcy Code, including, but not limited to, any transfers listed the Debtor's Statements of Financial Affairs;

• Any derivative Causes of Action, of the Debtor pursuant to the Bankruptcy Code or any other statute or legal theory or theory under equity, including all claims included within the suit styled, *Doug Smith, Individually and on Behalf of First NBC Bank Holding Company v. Ashton J. Ryan, et. al. and First NBC Bank Holding Company*, Case No. 16-17001, U.S. District Court, Eastern District of Louisiana.

• Any claims asserted in the litigation styled, *Eric R. Kinzler, Individually and on Behalf of All Others Similarly Situated, v. First NBC Bank Holding Company, Ashton J. Ryan, Jr. and Mary Beth Verdigets, Case No. 16-04243, U.S. District Court, Eastern District of Louisiana.* However, notwithstanding any other provision of this Plan that may be to the contrary, nothing in this Plan shall be deemed to be a finding or determination by the Bankruptcy Court that such claims or Causes of Action are property of the Estate.

• Any and all alter ego, veil piercing and/or single business enterprise Claims against the Debtor.

• Any and all claims against Ernst & Young, LLP, its insurer(s), and against any other entities which provided professional services to the Debtor prior to the Petition Date.

• Any Cause of Action included within the suit styled *Official Committee of Unsecured Creditors of First NBC Bank Holding Company v. Ashton J. Ryan, Mary Beth Verdigets, William J. Burnell, Gregory St. Angelo, Officer Does 1-20, Ernst & Young, LLP, Mark Bell, and Auditor Does 1-20*, Case No. 2:19-cv-10341, U.S. District Court, Eastern District of Louisiana.

Without limiting, and in addition to, the foregoing reservations of claims and Causes of Actions, the Liquidation and Distribution Trust/Liquidation and Distribution Trustee expressly reserves and retains any and all past and present legal and equitable claims and Causes of Action (including any derivative Causes of Action) against any former or current director or officer of the Debtor, as well as direct action or other claims against its liability insurers, arising under state or other non-bankruptcy law or arising under the Bankruptcy Code, in this Chapter 11 Case, or in any way related to this Chapter 11 Case, or under and/or pursuant to any statute or legal or equitable theory that is in any manner arising from, connected with or related to any act or omission of such director or officer that occurred prior to the Petition Date, including, but not limited to, claims and Causes of Action for breach of fiduciary duty, violations of applicable federal or state securities law, negligence, gross negligence, willful misconduct, misrepresentation, omission, mismanagement, waste, fraud, bad faith, tortious interference with contract, detrimental reliance, including, but not limited to, any damages allowed by law or equity, including compensatory, punitive and anticipated future damages, plus all costs including attorney's fees, court costs, and expert witness fees. Such claims and Causes of Action include those arising in connection with or relating to any and all claims directly or indirectly related to the letters to the Debtors' insurers from the Committee attached to the Disclosure Statement.

*Notwithstanding the foregoing reservations of claims and Causes of Action for the benefit of the Litigation and Distribution Trust and its beneficiaries, the following are specifically preserved and shall re-vest in the Debtor: (a) any objections to Claims other than Claims in Classes 2, 3A, 3B, 3C, 4 and 5; and, (b) any claims or Causes of Action, whether legal, equitable or statutory in nature that may affect the Reorganized Debtor's ability to utilize or have recognized with any taxing authority any Tax Assets that may exist, whether known or unknown to the Debtor prior to the Effective Date.*

Due to the size and scope of the Debtor's business operations, there may be numerous other claims and Causes of Action that currently exist or may subsequently arise, in addition to the claims and Causes of Action identified above. The Debtor and Committee are also continuing to investigate and assess which claims and Causes of Action may be pursued. The Debtor and the Litigation and Distribution Trustee do not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued or do not fall within the list above, that any such claims or Causes of Action have been waived.

**THIS PLAN SHALL BE INTERPRETED SO AS TO AFFORD, FOR THE BENEFIT OF ALL HOLDERS OF ALLOWED CLAIMS, THE GREATEST OPPORTUNITY FOR MAXIMUM RECOVERY BY THE LIQUIDATION AND DISTRIBUTION TRUSTEE ON THE ASSETS, TORT CLAIMS, AND RIGHTS IN AND PROCEEDS OF ANY INSURANCE POLICIES**.

**6.9**  **Establishment of the Litigation and Distribution Trust and Appointment of the Litigation and Distribution Trustee.**

The Litigation and Distribution Trust shall be established and the Litigation and Distribution Trustee shall be appointed as set forth below in Article VII. In addition to the Litigation and Distribution Trust Assets transferred to the Litigation and Distribution Trust, the Reorganized Debtor shall issue a Senior Debt Instrument to the Litigation and Distribution Trust in the principal amount of $300,000 on the Effective Date.

**6.10**  **Vesting of the Tort Claims and Insurance Policies.**

On the Effective Date, the Estate's interest in any Tort Claims and rights in and proceeds of any Insurance Policies necessary for the prosecution of all such Claims shall be transferred to and vest in the Litigation and Distribution Trust. The Litigation and Distribution Trustee shall have standing and be authorized to institute and prosecute through final judgment or settle the Tort Claims. Upon entry of a final judgment or settlement, the relevant proceeds of the Tort Claims and relevant Insurance Policies shall be property of the Litigation and Distribution Trust for the benefit of holders of Allowed Claims in Classes 2, 4 and 5 in accordance with the provisions of this Plan. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise affect other obligations of the Insurance Policies such that the full benefits of all such policies can be realized for the Litigation and Distribution Trust Beneficiaries, and, if applicable, the Subordinated Beneficiaries.

**6.11**  **Sources of Cash for Plan Distributions.**

All Cash necessary for the Debtor or Reorganized Debtor to make payments and Plan Distributions under the Plan by the Debtor shall be made (or reserved) from its available Cash prior to the transfer of the remaining Estate Cash to the Litigation and Distribution Trust; and, from the First Round Investment. All Plan Distributions to be made by the Litigation and Distribution Trustee shall be obtained from the liquidation of Litigation and Distribution Trust Assets (including the proceeds of any Tort Claims and related Insurance Policies).

**6.12**  **Continued Corporate Existence and Vesting of Assets in the Debtor.**

On and after the Effective Date, the Reorganized Debtor will continue to exist as a corporation and shall retain all of the powers of corporations under applicable non- bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be deemed amended to conform to the requirements of Section 1123(a)(6) of the Bankruptcy Code. Furthermore, as of the Effective Date, the Debtor shall have taken such steps as may be necessary to delist and deregister its common stock under the Securities Exchange Act of 1934; and, thereafter, shall take appropriate action to assure compliance with applicable securities laws.

Except as otherwise provided for in the Plan, on and after the Effective Date, all assets and property of the Debtor and its Estate, including any Tax Assets and any other assets of the Debtor but excluding the Litigation and Distribution Trust Assets, will re-vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, and other encumbrances.

31

On and after the Effective Date, the Reorganized Debtor shall be permitted to conduct its business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The Reorganized Debtor shall be authorized, without limitation, to use and dispose of assets of the Debtor other than the Litigation and Distribution Trust Assets, as the representative of Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs. It is anticipated that, in addition to the funds available to the Reorganized Debtor from the First Round Investment, First Round Investors and/or additional investors will provide capital to the Reorganized Debtor to enable the Reorganized Debtor to acquire assets after the Effective Date and that the Reorganized Debtor will have future business operation.

**6.13    Cancellation of Instruments.**

On the Effective Date, except as otherwise specifically provided for in Article VI of this Plan: (1) the obligations of the Debtor under the Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, existing management incentive plan or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically left unaltered by the Plan, including, but not limited to, the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be), shall be cancelled, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically left unaltered by the Plan, including, but not limited, to the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be) shall be released and discharged; provided, however, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (1) allowing holders to receive Plan Distributions as provided herein and (2) allowing the Indenture Trustee to exercise its charging liens for the payment of its fees and expenses and for indemnification as provided in the applicable Indenture; provided, further, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, the Indenture shall continue in effect solely for the purposes of allowing the Bondholder Claims under this Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or this Plan, or result in any expense or liability to the Reorganized Debtor or Bondholders. Notwithstanding anything to the contrary herein, no instruments or rights shall be deemed cancelled to the extent the preservation or non-cancellation of such instruments is necessary to preserve unimpaired any and all Causes of Action and to permit the Litigation and Distribution Trustee to assert any and all Causes of Action pursuant to this Plan.

**6.14    Amendment of Indenture and Preservation of Trustee Rights.**

On the Effective Date, and without further order of the Court, i) the Indenture shall be, automatically and without further act, amended to delete Section 107 and Section 510 thereof to remove references to the Trust Indenture Act and effectuate automatic resignation of the Indenture Trustee and appointment of a successor trustee; (ii) the Indenture shall be, automatically and without further act, amended to revise sections 509 thereof to permit and effectuate the resignation of the Indenture Trustee, including in its role as Registrar and Paying Agent, and the appointment of a successor trustee, as set forth herein;  (iii) the Indenture Trustee will be deemed to have resigned as Trustee, Registrar and Paying Agent and any other role it may have under the Indenture in accordance with Section 509(2) of the Indenture; (iv) Shivan Govindan will be automatically and without further act appointed as successor trustee, registrar and paying agent (the "Successor Trustee") under the Indenture and will be deemed to have accepted such appointment under the Indenture; (v) except as otherwise expressly set forth herein, all rights, duties and obligations of the Indenture Trustee under the Notes, the Indenture and such other agreements, instruments and other documents related thereto, including those related to the Indenture Trustee's resignation, will be deemed fully and finally satisfied, released and discharged.   The Indenture Trustee will be relieved of and have no further responsibility for the exercise of rights and powers or for the performance of the duties and obligations vested in the Trustee under the Indenture and the Successor Trustee will become vested with all the rights, powers, trusts and duties of the retiring Indenture Trustee.  Notwithstanding anything herein to the contrary, the amendment of the Indenture will not impair in any way (i) the rights of the Indenture Trustee to the Indenture Trustee's claims under this Plan, or (ii) the indemnification rights of the Trustee or the indemnification obligations of the Debtor under the Indenture, as the same existed immediately prior to the Effective Date.

**6.15    Dissolution of the Committee.**

Upon the Effective Date, the Committee shall be deemed to have transferred and conveyed to the Litigation and Distribution Trust/Litigation and Distribution Trustee all of its rights, interests, and standing to assert the Tort Claims; and, shall thereafter dissolve automatically, whereupon its members, professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

**6.16    Delisting of Stock.**

Promptly upon the occurrence of the Effective Date, the Reorganized Debtor shall take all actions necessary to delist the Debtor's pre-confirmation common stock by having the Financial Industry Regulatory Authority ("FINRA") remove the Debtor's trading symbol from FINRA's quotation system.

## ARTICLE VII.

## THE LITIGATION AND DISTRIBUTION TRUST

**7.1     Establishment of Litigation and Distribution Trust.**

On the Effective Date, the Litigation and Distribution Trust shall be established pursuant to the Litigation and Distribution Trust Agreement for the purposes of administering the Litigation and Distribution Trust Assets and making all distributions to Litigation and Distribution Trust Beneficiaries, and, as applicable, to the Subordinated Beneficiaries, as provided for under this Plan. The Litigation and Distribution Trust Agreement shall be substantially in the form provided in the Plan Documents.

The beneficial interests in the Litigation and Distribution Trust shall not be certificated, unless otherwise provided in the Litigation and Distribution Trust Agreement.  The issuance of any beneficial interests of the Litigation and Distribution Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration.

**7.2     Execution of the Litigation and Distribution Trust Agreement.**

The Litigation and Distribution Trust Agreement, in a form reasonably acceptable to the Debtor and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Litigation and Distribution Trust and the beneficial interests therein, which shall be for the benefit of holders of Allowed Claims in Classes 2, 4 and 5, as set forth in the Litigation and Distribution Trust Agreement.  This Article VII sets forth certain of the rights, duties and obligations of the Litigation and Distribution Trustee.  In the event of any conflict between the terms of this Article VII and the terms of the Litigation and Distribution Trust Agreement, the terms of the Plan shall govern.

**7.3     Litigation and Distribution Trust Assets.**

7.3.1     Except as otherwise provided in the Litigation and Distribution Trust Agreement, on the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all of the Litigation and Distribution Trust Assets, as well as the rights, privileges (including, but not limited to, the attorney-client privilege), and powers of the Debtor and its Estate applicable to the Litigation and Distribution Trust Assets, shall automatically vest in the Litigation and Distribution Trust, free and clear of all Claims and Equity Interests for the benefit of the Litigation and Distribution Trust Beneficiaries, and, as applicable, the Subordinated Beneficiaries.  For the avoidance of doubt, (i) in no event shall the term "Litigation and Distribution Trust Assets" be deemed to include any released claims against any Exculpated Parties, and (ii) the Litigation and Distribution Trust shall not have the right to assert any released claims against any Exculpated Parties.  Upon the transfer of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust, the Litigation and Distribution Trust shall succeed to all of the Debtor's and Estate's rights, title and interest in such Litigation and Distribution Trust Assets, and the Debtor shall have no further interest in or with respect to such Litigation and Distribution Trust Assets. **The Litigation and Distribution Trust Assets are properties dealt with by this Plan and the**

**transfer of each of such properties to the Litigation and Distribution Trust shall be free and clear of all claims and interests of creditors, equity security holders, and of general partners, if any, of the Debtor, as provided in 11 U.S.C. § 1141(c).**

The Confirmation Order shall constitute a determination that the transfers of assets to the Litigation and Distribution Trust are legal and valid and consistent with the laws of the State of Louisiana.

All parties shall execute any documents or other instruments necessary to cause title to the Litigation and Distribution Trust Assets to be transferred to the Litigation and Distribution Trust. The Litigation and Distribution Trust Assets will be held in trust for the benefit of all holders of Allowed Claims in Classes 2, 4 and 5 pursuant to the terms of the Plan and Litigation and Distribution Trust Agreement.

7.3.2    As more fully set forth in Section 7.9 hereof, the transfer of each of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust shall be treated for U.S. federal income tax purposes as a transfer of the Litigation and Distribution Trust Assets to the Litigation and Distribution Trust Beneficiaries and, as applicable, to the Subordinated Beneficiaries, who will immediately thereafter be deemed to have automatically transferred all such Assets to the Litigation and Distribution Trust.

**7.4    Governance of Litigation and Distribution Trust.**

The Litigation and Distribution Trust shall be governed and administered by the Litigation and Distribution Trustee and the Oversight Committee, as provided under the Litigation and Distribution Trust Agreement.  The Litigation and Distribution Trustee and the Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Litigation and Distribution Trust and shall act in the best interests of the Litigation and Distribution Trust Beneficiaries and the Subordinated Beneficiaries.

**7.5    Litigation and Distribution Trustee.**

In accordance with the Litigation and Distribution Trust Agreement, and subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall be authorized to exercise and perform the rights, powers, and duties held by the Debtor and the Estate with respect to the Litigation and Distribution Trust Assets upon their transfer to the Litigation and Distribution Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, manage, and to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Litigation and Distribution Trust Assets.

7.5.1    Responsibilities of Litigation and Distribution Trustee.

The responsibilities of the Litigation and Distribution Trustee shall be subject to the rights and powers of the Oversight Committee and shall be as set forth in the Litigation and Distribution Trust Agreement and shall include, but shall not be limited to: (i) the receipt, management, supervision, and protection of the Litigation and Distribution Trust Assets on behalf of and for the

benefit of the beneficiaries of the Litigation and Distribution Trust; (ii) pursuit of objections to, and estimations and settlements of certain Contested Claims; (iii) investigation, analysis, prosecution, and, if necessary and appropriate, compromise of the claims and Causes of Action included among the Litigation and Distribution Trust Assets, including, without limitation, the Avoidance Actions and any other claims and Causes of Action transferred to the Litigation and Distribution Trust pursuant to the Plan; (iv) calculation and implementation of all distributions to be made by the Litigation and Distribution Trustee under the Plan to the beneficiaries of the Trust; (v) filing all required federal, state, and local tax returns and paying taxes and all other obligations of the Litigation and Distribution Trust; and (vi) such other responsibilities as may be vested in the Litigation and Distribution Trustee pursuant to the Plan, the Litigation and Distribution Trust Agreement, orders of the Bankruptcy Court, or as necessary and proper to carry out the provisions of the Plan.

The Liquidation and Distribution Trustee shall provide an annual reporting to Litigation and Distribution Trust Beneficiaries and the Subordinated Beneficiaries, which shall include: the current status of any pending litigation of the Litigation and Distribution Trust; the Litigation and Distribution Trust's income and expenses for the prior fiscal year, and the number of Litigation and Distribution Trust Beneficiaries and outstanding Claim amounts.

The Litigation and Distribution Trustee shall maintain good and sufficient books and records of account relating to the Litigation and Distribution Trust Assets, the management thereof, all transactions undertaken by the Litigation and Distribution Trustee, all expenses incurred by or on behalf of the Litigation and Distribution Trustee, and all distributions to Litigation and Distribution Trust Beneficiaries and, as applicable, to the Subordinated Beneficiaries, contemplated or effectuated under the Plan.

7.5.2    <u>Authority and Powers of Litigation and Distribution Trustee.</u>

(a) The powers of the Litigation and Distribution Trustee are set forth in full in the Litigation and Distribution Trust Agreement and subject to the rights and powers of the Oversight Committee shall include, among other things, the right, without any further approval from the Bankruptcy Court, to:  Subject to any limitations contained in the Plan and Litigation and Distribution Trust Agreement, including subject to the rights and powers of the Oversight Committee, pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all claims and Causes of Action transferred to the Litigation and Distribution Trust as provided in the Plan and Litigation and Distribution Trust Agreement;

(b) Pay all taxes, expenses and obligations of the Litigation and Distribution Trust out of the Litigation and Distribution Trust Assets;

(c) Investigate, prosecute and, if necessary, litigate, any and all Avoidance Actions and Causes of Action that may belong to the Debtor or its Estate that are transferred to the Litigation and Distribution Trust pursuant to the Plan, including any Avoidance Action or any other claims or Causes

36

of Action brought by the Debtor or the Unsecured Creditors' Committee on behalf of the Debtor prior to the Effective Date, which Causes of Action, rights to payment and claims as of the Effective Date shall vest solely and exclusively in the Litigation and Distribution Trustee, for the benefit of the Litigation and Distribution Trust, pursuant to the terms of the Plan;

(d) And, additionally:

(i) Invest funds; (ii) make distributions; (iii) pay taxes and other obligations owed by the Litigation and Distribution Trust or incurred by the Litigation and Distribution Trustee; (iv) subject to Sections 4.3 and 4.9 of the Litigation and Distribution Trust Agreement, engage and compensate from the Litigation and Distribution Trust Assets, consultants, agents, employees, and professional persons (including, without limitation, attorneys on a contingency fee basis) to assist the Litigation and Distribution Trustee with respect to the Litigation and Distribution Trustee's responsibilities; (v) liquidate and dispose of the Litigation and Distribution Trust Assets; (vi) compromise and settle Claims and Causes of Actions; (vii) act on behalf of the Debtor, its Estate, and the Committee in all civil actions, judicial proceedings, administrative proceedings, adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (viii) commence and/or pursue any and all actions involving Litigation and Distribution Trust Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (ix) utilize Litigation and Distribution Trust Assets to purchase appropriate insurance to insure the acts and omissions of the Litigation and Distribution Trustee; and (x) act and implement the Plan, the Litigation and Distribution Trust Agreement, and orders of the Bankruptcy Court.

The authority of the Litigation and Distribution Trustee and the Oversight Committee will commence as of the Effective Date and will remain and continue in full force and effect until all of the Litigation and Distribution Trust Assets have liquidated in accordance with the Plan, the funds in the Litigation and Distribution Trust have been completely distributed in accordance with the Plan, all tax returns and any other required filings or reports have been filed with the appropriate state or federal regulatory authorities, and the Order closing the Chapter 11 Case is a Final Order.

7.5.3    Litigation and Distribution Trustee as Successor in Interest to the Debtor and Committee.

Solely with respect to the Litigation and Distribution Trust Assets, the Litigation and Distribution Trustee is the successor in interest to the Debtor and the Committee, and thus, after the Effective Date, to the extent the Plan requires an action by the Debtor or the Committee with respect to any of the Litigation and Distribution Trust Assets or with respect to Claim objections filed by either of the Plan Proponents as of the Effective Date, to any Claim as to which the Litigation and Distribution Trustee may file objections pursuant to section 10.1, the action shall be taken or continued, as applicable, by the Litigation and Distribution Trustee on behalf of the Debtor or the Committee, as applicable.

7.5.4      <u>Retention of Professionals by Litigation and Distribution Trustee</u>.

As set forth in Section 7.5.2 of this Plan and the Litigation and Distribution Trust Agreement, subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee may, without further order of the Bankruptcy Court, employ various Persons on behalf of the Litigation and Distribution Trust, including, but not limited to, attorneys, consultants and financial advisors, as needed to assist him/her in fulfilling his/her obligations under the Litigation and Distribution Trust Agreement and this Plan, and on whatever fee arrangement he/she deems appropriate, including, without limitation, contingency fee arrangements. For the avoidance of doubt, the Litigation and Distribution Trustee may retain professionals who represented parties in interest in the Chapter 11 Case.

Professionals engaged by the Litigation and Distribution Trustee shall not be required to file applications with the Bankruptcy Court in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid from the Litigation and Distribution Trust with Litigation and Distribution Trust Assets. Notwithstanding the foregoing, all invoices for such Professionals will be submitted to the Litigation and Distribution Trustee and the Oversight Committee for review prior to payment.  If the Litigation and Distribution Trustee and a majority of the members of the Oversight Committee do not object to a submitted invoice, the invoice will be paid.  If the Litigation and Distribution Trustee or a majority of the members of the Oversight Committee object to the invoice, the parties will work in good faith to resolve the objection.  If the parties cannot resolve the objection, one or more of the parties may raise the dispute to the Bankruptcy Court for resolution.

7.5.5      <u>Compensation of Litigation and Distribution Trustee</u>.

In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation and Distribution Trustee, the Litigation and Distribution Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Litigation and Distribution Trust on terms to be established by the Oversight Committee, and all such compensation and reimbursement shall be paid from the Litigation and Distribution Trust using Litigation and Distribution Trust Assets and their proceeds.

All invoices for the Litigation and Distribution Trustee will be submitted to the Oversight Committee for review prior to payment.  If a majority of the members of the Oversight Committee do not object to a submitted invoice, the invoice will be paid.  If a majority of the members of the Oversight Committee object to the invoice, the parties will work in good faith to resolve the objection.  If the parties cannot resolve the objection, one or more of the parties may raise the dispute to the Bankruptcy Court for resolution.

**7.6**      <u>**Oversight Committee.**</u>

7.6.1      <u>Appointment of the Oversight Committee</u>. On the Effective Date, the Oversight Committee shall be formed.  The Oversight Committee shall have members in an amount determined by majority vote of the members of the Oversight Committee to advise, assist, supervise and direct the Litigation and Distribution Trustee in the administration of the Litigation

and Distribution Trust pursuant to the Litigation and Distribution Trust Agreement. The initial members of the Oversight Committee shall be Vikaran Ghei, Michael Zaitzeff and Donna Ennis. Members of the Oversight Committee constituting a majority of the total number of members of the Oversight Committee then in office shall have the right to direct and remove the Litigation and Distribution Trustee, and shall have such other rights to operate and manage the Litigation and Distribution Trust as are not inconsistent with the Confirmation Order, the Plan and the terms of the Litigation and Distribution Trust Agreement. No other Litigation and Distribution Trust Beneficiary shall have any approval rights whatsoever in respect of management and operation of the Litigation and Distribution Trust. A member of the Oversight Committee may from time to time consult with the Litigation and Distribution Trust Beneficiary that appointed such member subject to such confidentiality provisions as required by the Oversight Committee.

7.6.2    <u>Authority of the Oversight Committee</u>.  The Oversight Committee shall have the authority and responsibility to advise, assist, supervise, and direct the Litigation and Distribution Trustee in the administration of the Litigation and Distribution Trust and shall have the authority to remove the Litigation and Distribution Trustee. The Litigation and Distribution Trustee shall consult with and provide information to the Oversight Committee in accordance with and pursuant to the terms of the Litigation and Distribution Trust Agreement and the Plan. The Oversight Committee shall have the authority to select and engage such professionals as the Oversight Committee deems necessary and desirable to assist the Oversight Committee in fulfilling its obligations under the Litigation and Distribution Trust Agreement and the Plan, and the Litigation and Distribution Trust shall pay the reasonable and documented fees of such advisors (including on an hourly, contingency, or modified contingency basis) and reimburse such advisors for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of the Litigation and Distribution Trust Agreement.

7.6.3    <u>Regular Meetings of the Oversight Committee</u>.  Meetings of the Oversight Committee are to be held with such frequency and at such place as the Litigation and Distribution Trustee and the members of the Oversight Committee may determine in their reasonable discretion.

7.6.4    <u>Special Meetings of the Oversight Committee</u>. Special meetings of the Oversight Committee may be held whenever and wherever called for by the Litigation and Distribution Trustee or any member of the Oversight Committee, subject to reasonable notice.

7.6.5    <u>Manner of Acting.</u>

A majority of the total number of members of the Oversight Committee then in office shall constitute a quorum for the transaction of business at any meeting of the Oversight Committee. The affirmative vote of a majority of the members of the Oversight Committee present and entitled to vote at a meeting at which a quorum is present shall be the act of the Oversight Committee except as otherwise required by law or as provided in the Litigation and Distribution Trust Agreement or the Plan. Any or all of the members of the Oversight Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.

Any member of the Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the majority of the members at a meeting, be conducted by electronic mail or individual communications by the Litigation and Distribution Trustee and each member of the Oversight Committee. Any member of the Oversight Committee who is present and entitled to vote at a meeting of the Oversight Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Committee, unless: (i) such member of the Oversight Committee objects at the beginning of the meeting (or promptly upon his or her arrival) to holding it or transacting business at the meeting; (ii) his or her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he or she delivers written notice (including by electronic or facsimile transmission) of his or her dissent or abstention to the Oversight Committee before its adjournment. The right of dissent or abstention is not available to any member of the Oversight Committee who votes in favor of the action taken.

Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Oversight Committee shall report to the Oversight Committee any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than as a Litigation and Distribution Trust Beneficiary). A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum and may engage in the Oversight Committee's discussions on such matter or issue); the vote or action with respect to such matter or issue shall be undertaken only by members of the Oversight Committee who are not "conflicted members." Notwithstanding anything to the contrary set forth herein, no member of the Oversight Committee shall be deemed to be a "conflicted member" solely as a result of (i) such member's affiliation with a Person that is a Litigation and Distribution Trust Beneficiary or (ii) such member's affiliation with any Person that is, or is adverse to, a defendant in any action or proceeding to which the Litigation and Distribution Trustee is a party.

7.6.6   <u>Liquidating Oversight Committee's Action Without a Meeting.</u>   Any action required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all members of the Oversight Committee and recorded in the minutes or other transcript of proceedings of the Oversight Committee.

7.6.7   <u>Tenure, Removal, and Replacement of the Members of the Oversight Committee</u>. The authority of the members of the Oversight Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation and Distribution Trust is terminated. The service of the members of the Oversight Committee will be subject to the following:

> 7.6.7.1 The members of the Oversight Committee will serve until disability, death, resignation or removal;

40

7.6.7.2 A member of the Oversight Committee may resign at any time by providing a written notice of resignation to the remaining members of the Oversight Committee. Such resignation will be effective upon the date received by the Oversight Committee or such later date specified in the written notice;

7.6.7.3 A member of the Oversight Committee may be removed by the majority vote of the other members of the Oversight Committee, a written resolution of which shall be delivered to the removed Oversight Committee member; provided, however, that such removal may only be made for cause;

7.6.7.4 In the event of a vacancy on the Oversight Committee (whether by removal, disability, death or resignation), a new member shall be appointed to fill such position by the remaining members of the Oversight Committee.  Immediately upon the appointment of any successor member of the Oversight Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Oversight Committee hereunder will be vested in and undertaken by the successor member of the Oversight Committee without any further act; and the successor member of the Oversight Committee will not be liable personally for any act or omission of the predecessor member of the Oversight Committee; and

7.6.7.5 Every successor member of the Oversight Committee appointed hereunder shall execute, acknowledge and deliver to the Litigation and Distribution Trustee and other members an instrument accepting the appointment under the Litigation and Distribution Trust Agreement and agreeing to be bound thereto, and thereupon the successor member of the Oversight Committee without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring member.

7.6.8   Compensation and Reimbursement of Expenses of the Oversight Committee. The Litigation and Distribution Trust will reimburse the members of the Oversight Committee for all reasonable and documented out-of-pocket expenses incurred by such members in connection with the performance of their respective services hereunder, without duplication, upon demand for payment thereof. All fees and expenses of the members of the Oversight Committee shall be paid solely from Litigation and Distribution Trust Proceeds.

**7.7    Special Governance Provisions Regarding Prosecution and Settlement of Causes of Action.**  All decisions concerning whether to prosecute or settle any Causes of Action shall be made by the Oversight Committee in good faith and in the best interests of the Litigation and Distribution Trust and the Beneficiaries until all Allowed Claims of Beneficiaries are paid and satisfied in full, and thereafter in the best interests of the Litigation and Distribution Trust and the Subordinated Beneficiaries. The settlement of any of the Causes of Action shall require the approval of a majority vote of the members of the Oversight Committee, Rights of Oversight

41

Committee Paramount.  The rights and powers of the Oversight Committee to direct the Litigation and Distribution Trustee as set forth in the Litigation and Distribution Trust Agreement shall govern and be paramount, notwithstanding anything to the contrary herein.

**7.8**     **Indemnification.**

From and after the Effective Date, the Litigation and Distribution Trustee, the members of the Oversight Committee serving at any time in such capacity and all Persons retained by the Litigation and Distribution Trust (collectively, the "Litigation and Distribution Trust Indemnified Parties" and each a "Litigation and Distribution Trust Indemnified Party") shall be, and hereby are, indemnified by the Litigation and Distribution Trust through the Litigation and Distribution Trust Assets, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Litigation and Distribution Trust Indemnified Party's good faith exercise of what such Litigation and Distribution Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation and Distribution Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation and Distribution Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, gross negligence or willful misconduct), including, but not limited to, acts or omissions concerning pursuing or not pursuing the Litigation and Distribution Trust Assets, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (a) the Plan; (b) the Litigation and Distribution Trust Agreement; (c) the services to be rendered pursuant to the Plan or Litigation and Distribution Trust Agreement; (d) any document or information, whether verbal or written, referred to herein or supplied to the Litigation and Distribution Trustee; or (e) proceedings by or on behalf of any creditor or Debtor. The Litigation and Distribution Trust shall, on demand, advance or pay promptly out of the Litigation and Distribution Trust Assets, on behalf of each Litigation and Distribution Trust Indemnified Party, reasonable and documented attorneys' fees and other expenses and disbursements to which such Litigation and Distribution Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Litigation and Distribution Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Litigation and Distribution Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, gross negligence or willful misconduct of such Litigation and Distribution Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any Person entitled to indemnification shall have the right to employ such Person's own separate counsel reasonably acceptable to the Litigation and Distribution Trustee, at the Litigation and Distribution Trust's expense, subject to the foregoing terms and conditions.

**7.9**     **LT Reserves.**

The Litigation and Distribution Trustee may establish one or more LT Reserves on account of Class 2, 4 and 5 Contested Claims, the holders of which would be Litigation and Distribution

Trust Beneficiaries and, as applicable, Subordinated Beneficiaries, were such Class 2, 4 and 5 Contested Claims ultimately Allowed. The amount held back in the LT Reserve(s) shall be equal to the amount necessary to satisfy the Plan Distributions to which the holders of the relevant Contested Claims would be entitled if all such Contested Claims were to be subsequently Allowed.

**7.10**    **Discharge of Litigation and Distribution Trustee and Dissolution.**

The Litigation and Distribution Trustee and the Litigation and Distribution Trust shall be discharged or dissolved, as the case may be, at such time as (i) all assets of the Litigation and Distribution Trust have been liquidated and (ii) all distributions required to be made by the Litigation and Distribution Trustee under the Plan have been made, but in no event shall the Litigation and Distribution Trust be dissolved later than five (5) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation and Distribution Trust for a finite period if (i) such extension is necessary to the purpose of the Litigation and Distribution Trust, (ii) the Litigation and Distribution Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Litigation and Distribution Trust as a liquidating trust for federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Litigation and Distribution Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of the Litigation and Distribution Trust, any remaining Cash on hand and other assets, with the exception of any Causes of Action will be distributed to the Litigation and Distribution Trust Beneficiaries in accordance with the Litigation and Distribution Trust Agreement. Upon the dissolution of the Litigation and Distribution Trust, all remaining Causes of Action shall be deemed void and abandoned and no Litigation and Distribution Trust Beneficiary shall have any right, title or interest in or to any such Cause of Action.

At such time as the Litigation and Distribution Trust has been fully administered (i.e., when all things requiring action by the Litigation and Distribution Trustee – including the liquidation of all Litigation and Distribution Trust Assets and the making of all distributions required under the Plan – have been done, and the Plan has been substantially consummated), the Liquidating Trustee shall file an application for approval of his final report and the entry of a final decree with the Bankruptcy Court.

**7.11**    **Taxes.**

For federal income tax purposes, (i) all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, and the Litigation and Distribution Trust Beneficiaries and Subordinated Beneficiaries) shall treat the Litigation and Distribution Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 684, (ii) the transfer of assets of the Debtor to the Litigation and Distribution Trust under the Plan shall be treated as a deemed transfer to the Litigation and Distribution Trust Beneficiaries and the Subordinated Beneficiaries, in satisfaction of their Claims followed by a deemed transfer of the Litigation and Distribution Assets by the Litigation and Distribution Trust Beneficiaries and the Subordinated Beneficiaries, to the Litigation and Distribution Trust, (iii) the Litigation and Distribution Trust Beneficiaries and, as applicable, the Subordinated Beneficiaries, will be deemed to be the grantors and owners of the Litigation and Distribution Trust and its assets,

and (iv) the Litigation and Distribution Trust will be taxed as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code owned by the Litigation and Distribution Trust Beneficiaries and Subordinated Beneficiaries. The Litigation and Distribution Trust will file federal income tax returns as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 and report, but not pay tax on, the Litigation and Distribution Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The Litigation and Distribution Trust Beneficiaries and Subordinated Beneficiaries, will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Litigation and Distribution Trust Assets transferred to the Litigation and Distribution Trust for all federal income tax purposes. The Litigation and Distribution Trust Assets shall be valued based on the Litigation and Distribution Trustee's good faith determination of their fair market value.

The Litigation and Distribution Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Contested Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Contested Claims either become Allowed or are otherwise resolved. The Litigation and Distribution Trust Beneficiaries and Subordinated Beneficiaries, shall be bound by such election, if made by the Litigation and Distribution Trustee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation and Distribution Trustee, the Litigation and Distribution Trust Beneficiaries and, as applicable, the Subordinated Beneficiaries) shall treat the transfers of Litigation and Distribution Trust Assets to the Litigation and Distribution Trust in accordance with the terms of the Plan as a sale by the Debtor and/or its Estate of such Litigation and Distribution Trust Assets to the Litigation and Distribution Trust at a selling price equal to the fair market value of such Litigation and Distribution Trust Assets on the date of transfer. The Litigation and Distribution Trust shall be treated as the owner of all Litigation and Distribution Trust Assets that it holds.

## ARTICLE VIII.

## INJUNCTIONS, EXCULPATION AND LIMITATION ON LIABILITY

### 8.1 Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate

Order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against the Debtor or the Estate, **except for** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, are, with respect to any such Claims, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Estate, the Reorganized Debtor, or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the Estate, the Reorganized Debtor or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor, the Estate or any of the assets of the Debtor or its Estate, whether remaining with the Reorganized Debtor or being transferred to the Litigation and Distribution Trust, or any successor to any of the foregoing Persons or any property of any such successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, satisfied, or otherwise addressed pursuant to the Plan or the Confirmation Order, including, but not limited to, through the releases and exculpations provided under the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan. Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth herein.

The foregoing injunctions shall extend for the benefit of the Litigation and Distribution Trustee, and any successors of the Debtor or the Reorganized Debtor, and to any property and interest in property subject to this Plan.

**8.2**   **Discharge.**

Except as otherwise provided in the Plan **with respect to** the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, or in the Confirmation Order, rights afforded in, and all consideration distributed under, this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, except as to the Litigation and Distribution Trust Assets. Upon the Effective Date, except as otherwise provided for in the Plan or Confirmation Order, FNBC shall be deemed discharged and released under

section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted this Plan. Nothing in the Plan or Confirmation Order constitutes a determination as to the applicability of 11 U.S.C. §1141(d)(6)(A) and the rights of a domestic governmental unit under such section are preserved.

**8.3**   **Injunction.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATIONS GRANTED IN THIS PLAN, THE DEBTOR AND ALL PARTIES IN INTEREST SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.**

**8.4**   **Exculpation.**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Case, entry into the Litigation and Distribution Trust Agreement, the negotiation and pursuit of this Plan, or the solicitation of votes for, or confirmation of, this Plan, the funding of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, and the issuance of securities under or in connection with this Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as determined by Final Order of the Bankruptcy Court, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to this Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of any securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of securities thereunder.

**8.5**   **Limitation on Liability of Litigation and Distribution Trustee.**

The Litigation and Distribution Trustee will not be liable for any act he may do or omit to do as Litigation and Distribution Trustee under the Plan and the Litigation and Distribution Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Litigation and Distribution Trustee be liable in any event, except for willful misconduct, gross negligence, or intentional fraud. The foregoing limitation on liability will also

apply to any Person (including any professional) employed by the Litigation and Distribution Trustee and acting on behalf of the Litigation and Distribution Trust in the fulfillment of its respective duties hereunder or under the Litigation and Distribution Trust Agreement.

**8.6** **D&O Claims and D&O Policies.**

For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Plan, including this Article VIII, no release, exculpation, injunction, or waiver set forth in this Plan shall apply to any D&O Claims (or claims relating to any D&O Policies) belonging to or pursuable by the Committee or the Litigation and Distribution Trust or Litigation and Distribution Trustee, and all such claims and related Causes of Action are expressly reserved and preserved as set forth in Section 6.3 above.

**8.7** **SEC Rights Preserved.**

Notwithstanding any provision herein to the contrary, no provision of the Plan or any order confirming the Plan: (i) releases or exculpates any non-debtor person or entity from any claim or cause of action of the U.S. Securities and Exchange Commission ("SEC"); or (ii) enjoins, limits, impairs or delays the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

## ARTICLE IX.

## PLAN DISTRIBUTION PROVISIONS

**9.1** **Plan Distributions.**

As set forth above, the Debtor, the Reorganized Debtor or the SPV, as the case may be, shall make all Plan Distributions (or reserve for such Plan Distributions) to Unclassified Claims, Class 1 Claims and Class 2 Claims due or pending as of the Effective Date. The Litigation and Distribution Trustee shall make all Plan Distributions in accordance with the Plan and the Litigation and Distribution Trust Agreement to Class 2, Class 4 and Class 5 claimants and all U.S. Trustee fees accruing after the Effective Date. In the event that a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. Except as otherwise provided herein, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of claims maintained by the Debtor and the Litigation and Distribution Trustee on the Effective Date. **NO DISTRIBUTION SHALL BE MADE PURSUANT TO THIS PLAN TO A HOLDER OF A CLAIM UNLESS AND UNTIL SUCH CLAIM IS OR BECOMES AN ALLOWED CLAIM.** The Litigation and Distribution Trustee and its agents may, but shall have no obligation to, recognize any transfer of a Claim after the Effective Date.

**9.2** **Timing of Plan Distributions.**

Each Plan Distribution shall be made on the relevant Plan Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

**9.3**     **Delivery of Plan Distributions and Undeliverable or Unclaimed Distributions.**

9.3.1     Delivery of Plan Distributions in General.  Subject to Bankruptcy Rule 9010, any Plan Distribution to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (i) in the Schedules, (ii) on the proof of Claim filed by such holder, (iii) in any notice of transfer of claim filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (iv) in any notice served by such holder giving details of a change of address.

9.3.2     Undeliverable and Unclaimed Plan Distributions.

i) General.  None of the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, shall have a duty to make distributions to any holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, unless and until the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, is notified in writing of such holder's then-current address prior the Plan Distribution Date.  If the distribution to any holder of an Allowed Claim is returned to the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, as undeliverable or is otherwise unclaimed, no further Plan Distribution shall be made to such holder unless the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, is notified of such holder's then-current address within six months after such Plan Distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, if the Claim is a Class 2 Claim, the unclaimed Distributions will be redistributed on a Pro Rata basis to all known and locatable holders of Allowed Claims in Class 2 if such a Distribution, after expenses of Distribution, would produce an aggregate minimum dividend of $50,000. If such Distribution would produce an aggregate dividend of less than $50,000, the Litigation and Distribution Trustee may donate any remaining Cash allocable to any unclaimed Distributions to a charitable institution. After such donation, the Litigation and Distribution Trustee, and his agents and Professionals will be fully discharged and released from any claims related to the unclaimed Distributions. If the Claim is an Unclassified Claim or a Class 1 Claim, such forfeited amount shall be retained by the Reorganized Debtor, free of any restrictions.

ii) Non-Negotiated Checks.  Checks issued in respect of Allowed Claims shall be null and void if not presented within six months after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within six months after the date of issuance of such check after such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable or unclaimed Plan Distribution shall be distributed as set forth in 9.3.2 above.

**9.4**     **Plan Distributions Subject to Withholding and Reporting Requirements.**

All Plan Distributions hereunder shall be subject to all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. **The Debtor, the Reorganized Debtor, and the Litigation and Distribution Trustee have the right to withhold a Plan Distribution until such holder has made arrangements satisfactory to the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, for payment of any such tax obligations, including, without limitation, the provision by the holder of a Claim IRS Form W-9 and any other information determined by the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, to be necessary or appropriate to effect information reporting and tax withholding. If the Debtor, the Reorganized Debtor, or the Litigation and Distribution Trustee, as the case may be, has not received IRS Form W-9 or other requested tax reporting information from the holder of a Claim before the relevant Plan Distribution Date, any property or Cash to be distributed pursuant to this Plan shall, pending receipt of IRS Form W-9 or such other requested information, be treated as an unclaimed distribution under this Plan, as set forth in Section 9.3.2.**

**9.5**     **Manner of Payment Under the Plan.**

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**9.6**     **Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

**9.7**     **Settlement of Claims and Controversies.**

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and holders of Claims and is fair, equitable and reasonable.

**9.8**     **Setoffs and Recoupments.**

The Litigation and Distribution Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise the right of setoff or recoupment against any Allowed Class 2, Class 3A, Class 3B, Class 3C, Class 4 or Class 5 Claims and the distributions to be made pursuant to the Plan on account of such Claim (before distribution is made on account of such Claim) of the claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Litigation and Distribution Trustee of any such claims, rights and causes of action that the Litigation and Distribution Trust may possess against such holder.

## ARTICLE X.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

**10.1**     **Claim Objection Deadline.**

Objections to Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims shall be filed by the Litigation and Distribution Trustee and served upon the holders of each of the Claims to which an objection is made within 180 days after the Effective Date of this Plan.  The time period for filing objections to Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims may be extended by the Court upon motion of the Litigation and Distribution Trustee.  Objections to Class 1 Claims shall be filed by the Debtor on or before the Effective Date of the Plan; and objections to Administrative Expense Claims shall be filed by the Debtor within 60 days of the Effective Date or as otherwise provided for by the Bankruptcy Court's Local Rules applicable to the hearing on such holder's motion or application for Allowance of Administrative Expense Claim.

**10.2**     **Prosecution of Contested Claims.**

After the Effective Date, the Litigation and Distribution Trustee may (i) prosecute any objection to a Class 2, Class 3A, Class 3B, Class 3C, Class 4 and/or Class 5 Claims filed by the Debtor prior to the Effective Date and (ii) object to the allowance of Class 2, Class 3A, Class 3B, Class 3C, Class 4 and Class 5 Claims filed with the Bankruptcy Court before, on or after the Effective Date with respect to which liability is Contested.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 10.3.

**10.3**     **Claims Settlement.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Litigation and Distribution Trustee shall have authority to settle or compromise all claims and Causes of Action without further review or approval of the Bankruptcy Court.

**10.4**   **Entitlement to Plan Distributions upon Allowance.**

Notwithstanding any other provision of the Plan, except as otherwise agreed by the Litigation and Distribution Trustee or the Debtor, as applicable, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights as provided in Section 9.8.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND
## THE OCCURRENCE OF THE EFFECTIVE DATE

**11.1**   **Conditions Precedent to Confirmation.**

The following shall be conditions precedent to confirmation of the Plan:

(a)      the Bankruptcy Court shall have entered an Order or Orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (ii) authorizing the solicitation of votes with respect to the Plan, (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan, (iv) confirming and giving effect to the terms and provisions of the Plan, (vi) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtor and the Plan, (vii) approving the Plan Documents and (viii) authorizing the Debtor to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer or revesting of assets contemplated by the Plan and the Plan Documents;

(b)      the Confirmation Order, the Plan Documents and the Plan are each in a form and substance satisfactory to the Debtor and the Committee; and

(c)      the Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation.

**11.2**   **Conditions Precedent to the Occurrence of the Effective Date.**

The following shall be conditions precedent to the occurrence of the Effective Date with respect to the Debtor's Estate:

(a)      the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(b)     the Litigation and Distribution Trustee shall have accepted, in writing, the terms of his service and compensation, and such terms and compensation shall have been approved by the Bankruptcy Court in the Confirmation Order;

(c)     the First Round Investment shall be immediately available for disbursement from escrow for use in accordance with this Plan;

(d)     the disclosures to the Committee regarding the identities and amounts advanced by each of the First Round Investors required by section 6.1 above shall have occurred and been made;

(e)     the form of amendments to the charter and by-laws of the Debtor as required by this Plan shall be reasonably acceptable to the Committee;

(f)     the Litigation and Distribution Trust shall have been established;

(g)     the SPV shall have been established and all documents required for its acquisition of Bondholder Claims shall have been prepared;

(h)     the Court shall have entered a Final Order determining that the value of the interest of each of those creditors classified in Classes 3A, 3B, and 3C in the Estate's interest in any property alleged to secure such claims is zero; and,

(i)     Unless waived in writing by the authorized agent of the SPV, the aggregate of the Subordinated Instruments 1, to be issued to Bondholders pursuant to Section 3.3.2(iii)(b) of the Plan, does not exceed $30,000,000.

## 11.3    Waiver of Conditions.

The Debtor, with the written concurrence of the Committee, and the Committee, may waive any one or more of the conditions set forth in Section 11.1 or Section 11.2 (a) through (h) in a writing without notice or order of the Bankruptcy Court and without notice to any other parties in interest.  SPV, through its authorized agent, may waive the condition set forth in Section 11.2 (i) in a writing to the Debtor and the Committee without notice or order of the Bankruptcy Court and without notice to any other parties in interest.

## 11.4    Effect of Non-Occurrence of the Effective Date.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtor; (b) prejudice in any manner the rights of the Debtor, including, without limitation, any right to seek propose a new plan; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtor.

## ARTICLE XII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**12.1    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(a)      On June 13, 2019, the Debtor filed Debtor's Motion to Reject Executory Contracts and Leases and to Establish Bar Date for Rejection Damages [Doc. 590] (the "Rejection Motion") which was granted by Order of the Court entered on July 8, 2019.  On the Confirmation Date, **except for Insurance Policies (which shall remain in full force and effect as provided in Section14.2) and except for the Debtor's contract with Computershare Communication Services**, all executory contracts and unexpired leases of the Debtor, *which have not previously been rejected*, if any, by the Order granting the Rejection Motion shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, except: (i) any executory contracts and unexpired leases that are the subject of separate motions to reject, assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtor before the entry of the Confirmation Order; (ii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtor.  Any Order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation.

(b)      Receipt of this Plan by the counterparties to the executory contracts and unexpired leases of the Debtor rejected pursuant to Section 12.1(a) shall constitute adequate and sufficient notice that (i) any Claims arising under the contract, lease or other agreement or related thereto shall be treated under the Plan as General Unsecured Claims as against the Debtor that was a party to the contract, lease or other agreement, and (ii) the Debtor is no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

(c)      The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to this section 12.1(a), and the Debtor shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtor and its Estate.

**12.2    Claims Arising from Rejection, Expiration or Termination.**

Claims created by the rejection of executory contracts and unexpired leases, if any, pursuant solely to this Plan Section 12.1(a) and not previously rejected with respect to which a bar date was previously set by Order of the Court, must be filed with the Bankruptcy Court no later than fifteen (15) days after the Confirmation Date.  **Any such Claims for which a proof of claim is not filed and served by the deadline set forth above will be forever barred from assertion and shall not be enforceable against the Debtor and the Estate**.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as

General Unsecured Claims under the Plan subject to objection by the Litigation and Distribution Trustee. **The Plan Proponents do not believe that rejection claims exist except for those, if any, that arose as a result of the Rejection Motion; the bar date for filing rejection claims resulting from the Rejection Motion has already expired and shall not be deemed to have been extended or reopened by this Plan.**

<div align="center">

**ARTICLE XIII.**

**<u>RETENTION OF JURISDICTION</u>**

</div>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Case or the Plan or (c) that relates to the following:

(i)     to hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable;

(ii)     to hear and determine any and all Claims and any related disputes, including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease;

(iii)     to determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Litigation and Distribution Trustee after the Effective Date;

(iv)     to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(v)     to issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(vi)     to consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vii)     to hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(viii)     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Plan, the Litigation and Distribution Trust Agreement, and any other Plan Documents or their interpretation, implementation, enforcement or consummation;

<div align="center">54</div>

(ix)     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement or consummation;

(x)     to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Bar Dates, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder or for any other purpose;

(xi)     to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of or against the Estate;

(xii)     to determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan or the Confirmation Order;

(xiii)     to hear and determine matters concerning state, local and federal taxes, fines, penalties or additions to taxes for which the Debtor may be liable in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xiv)     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtor, Litigation and Distribution Trustee or any Person under the Plan;

(xv)     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action of the Debtor (including Avoidance Actions) commenced by the Litigation and Distribution Trustee, the Debtor, or any third parties, as applicable, before or after the Effective Date;

(xvi)     to enter an order or final decree closing the Chapter 11 Case;

(xvii)     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and,

(xviii)     to hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1     Satisfaction of Claims.

Subject to the occurrence of the Effective Date, except as otherwise provided in the Plan with respect to the Legacy Subordinated Notes which will be satisfied, and as a result cancelled, on the Plan Distribution Date by the exchange of new debt instruments with either the Class 2 Claim Holder or the SPV, as the case may be, including Article VI hereof, as of the Effective Date, the Debtor shall be discharged of any debt and/or obligation that arose before entry of the order

confirming of the Plan to the full extent provided by 11 U.S.C. § 1141(d); and, except as provided for in Article VI herein and this Section 14.1, **all Persons shall be precluded from asserting against the Debtor, the Reorganized Debtor, the Litigation and Distribution Trustee or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date, including any Claims or Equity Interests that are not placed in a Class under the Plan.**

**14.2    Special Provisions Regarding Insurance Policies and Insured Claims.**

14.2.1    Insurance Policies.  For the avoidance of doubt, the Debtor's and Estate's rights with respect to all Insurance Policies (including all Insurance Policies that may have expired prior to the Petition Date, all Insurance Policies in existence on the Petition Date, and all Insurance Policies under which the Debtor holds rights to make, amend, prosecute and benefit from claims) shall be deemed be transferred to the Litigation and Distribution Trust from the Effective Date until its dissolution.

Notwithstanding anything to the contrary in the Plan, any Insurance Policy in effect as of the Effective Date shall continue in effect after the Effective Date pursuant to its terms and conditions.  Nothing in the Plan shall relieve any insurer from performing its obligations under the Insurance Policies, regardless of whether such obligations arise prior to or after the Effective Date.

Notwithstanding any default by the Debtor with respect to any of the Insurance Policies, nothing in this Plan shall be construed or applied to modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any claims or Causes of Action.  The Plan shall be liberally construed to protect the interests of all creditors in all Causes of Action and to limit any Claims against the Estate.

14.2.2    Notwithstanding anything to the contrary in this Plan or any Plan Supplement, including, but not limited to, the Litigation and Distribution Trust Agreement, nothing herein or in such Plan Supplement shall: (a) affect, impair, modify, or otherwise alter the terms and conditions of any insurance policies, including the D&O Policies, that provide coverage to Debtor's and its subsidiaries' directors and officers, including, without limitation, the priority of payments set forth therein or with respect to any D&O Claim; or (b) constitute a finding or conclusion that the proceeds of such policies are property of the Estate or otherwise subject to the control of the Debtor or the Litigation and Distribution Trustee. All of the Debtor's and its subsidiaries', directors' and officers' rights, including, but not limited to, the rights, if any, of the holders of Allowed Indemnity Claims, in and to such policies are hereby preserved. For the avoidance of doubt, the insurance policies to which this paragraph relates include the D&O Policies as defined herein.

14.2.3    Insured Claims shall be satisfied from the proceeds of any applicable Insurance Policy.  Insured Claims are not entitled to any distributions under the Plan until the relevant holder has exhausted all remedies with respect to the applicable Insurance Policy.  To the extent an Insured Claim is not satisfied in full from the proceeds of the applicable Insurance Policy, any Claim remainder shall be classified in the applicable Class under the Plan and, if allowed, treated in accordance with the treatment of Claims in that Class under the Plan.  Nothing in this Section 14.2.3 shall constitute a waiver of any claim, right or cause of action the Debtor or the Estate may

hold against any Person, including any insurer.  Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which the Debtor is an insured or beneficiary or for purposes of any insurance recovery.

**14.3    Third Party Agreements; Subordination.**

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All such rights and any agreements relating thereto shall remain in full force and effect, except as otherwise compromised and settled pursuant to the Plan.

Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtor or the Litigation and Distribution Trustee to seek subordination of any Claim pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim that becomes a subordinated Claim at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim.

**14.4    Service of Documents.**

Any notices, requests and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtor:

> **THE STEFFES FIRM, LLC**
> 13702 Coursey Blvd., Bldg. 3
> Baton Rouge, Louisiana 70817
> Facsimile: (225) 751-1998
> Attn: William E. Steffes

if to the Committee:

> **JEFFREY D. STERNKLAR, LLC**
>  26th Floor
> 225 Franklin Street
> Boston, MA 02110
> (617) 507-6530
> Attn: Jeffrey D. Sternklar

> and

**STEWART, ROBBINS & BROWN, LLC**
301 Main Street, Suite 1640
P. 0. Box 2348
Baton Rouge, LA 70821-2348
Facsimile: (225) 709-9467
Attn: Paul Douglas Stewart, Jr.

## 14.5   Headings.

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

## 14.6   Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Louisiana, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

## 14.7   Exemption from Transfer Taxes.

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, including the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real Estate transfer, mortgage recording, sales, use or other similar tax.  To effectuate the terms of this Section, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Plan.

## 14.8   Notice of Entry of Confirmation Order and Relevant Dates.

Promptly upon entry of the Confirmation Order, the Debtor shall serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, the deadline for filing rejection damage Claims, if any, resulting solely from Section XII of this Plan.  For the avoidance of doubt, a bar date for the filing of rejection damage claims resulting from the Debtor's Motion to Reject Executory Contracts and Leases and to Establish Bar Date for Rejection Damages [Doc. 590] was previously set by the July 8, 2019 Order of the Court as July 23, 2019.  Nothing in this Plan shall be construed as extending or re-opening that bar date.

## 14.9   Interest and Attorneys' Fees.

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law.  **No interest shall accrue nor be payable between the Confirmation Date and the Plan Distribution Date.**

**14.10   Modification of the Plan.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtor, with the written concurrence of the Committee, at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents shall have complied with section 1125 of the Bankruptcy Code.  The Debtor, with the written concurrence of the Committee, may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

**14.11   Revocation of Plan.**

The Debtor, with the written concurrence of the Committee reserves the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing prior to the occurrence of the Effective Date.  If the Plan Proponents revoke or withdraw the Plan, or if the Effective Date does not occur, then the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in the Debtor or to prejudice in any manner the rights of the Debtor or the Committee or any other Person in any other further proceedings involving the Debtor or the Committee.

**14.12   Compliance with Tax Requirements.**

In connection with the Plan, the Debtor and the Litigation and Distribution Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities.

**14.13   Binding Effect.**

The Plan shall be binding upon the Debtor, the holders of all Claims and Equity Interests, parties in interest, including the SPV, Persons and their respective successors and assigns.  Except as specifically provided in the Plan, to the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

Nothing in this Plan affects, modifies or otherwise alters the rights, claims, interests or defenses of the FDIC as Receiver for First NBC (the "FDIC-R") as receiver for First NBC Bank, a) under the terms of the Settlement Agreement, as approved by order entered on December 19, 2017 [Doc. 297] b) against any non-Debtor person or entity or c) against any insurance policy under which First NBC Bank or the Debtor is named insured or any insurance policy that may cover any claim that is asserted by the FDIC-R or First NBC Bank or that is property of the Debtor's bankruptcy Estate; additionally, for the avoidance of doubt, nothing in this Plan shall be deemed

to preclude the FDIC-R from or otherwise affect the FDIC-R's right, if any, to pursue or defend a claim to ownership of claims or causes of action, including any claims or causes of action brought or otherwise prosecuted by the Debtor or the Liquidating Trustee; provided further, that this sentence does not alter or affect an exculpation granted to an Exculpated Party hereunder for work conducted from the Petition Date to the Effective Date.

**14.14  Rates.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.  Where a Claim has been denominated in foreign currency on a proof of Claim, the Allowed amount of such Claim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

**14.15  Extensions of Time.**

For cause shown, any deadlines herein which are applicable to the Debtor, its Estate, or the Litigation and Distribution Trust and which are not otherwise specifically extendable as provided in the Plan may be extended by the Bankruptcy Court.

**14.16  No Admissions.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PROCEEDINGS CONCERNING CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR IN THE CHAPTER 11 CASE.**

Dated:  July 2, 2019                              Respectfully submitted,

First NBC Bank Holding Company, Debtor
By: /s/ Lawrence Blake Jones
Name:   Lawrence Blake Jones
Title:    Chief Restructuring Officer

AND

Official Committee of Unsecured Creditors
By: /s/ Jeffrey D. Sternklar
Name: Jeffrey D. Sternklar
Title: Counsel for Official Committee of Unsecured
            Creditors

# EXHIBIT B

## DISCLOSURE STATEMENT ORDER

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE                                                    BANKRUPTCY NO.

**FIRST NBC BANK HOLDING**
**COMPANY**                                              **17-11213 "A"**

DEBTOR(S)                                                REORGANIZATION
                                                         CHAPTER 11

<u>**ORDER APPROVING SECOND AMENDED DISCLOSURE STATEMENT, FIXING TIME FOR FILING ACCEPTANCES OR REJECTIONS TO THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION, AND SETTING CONFIRMATION HEARING**</u>

The Debtor, First NBC Bank Holding Company, having filed an Amended Disclosure Statement **(P-605)** on June 21, 2019, and the debtor having been instructed to amend the disclosure statement at the hearing on Approval of the Disclosure Statement which came before the Court on June 28, 2019;

**IT IS ORDERED,** that:

1)      The Second Amended Disclosure Statement filed by the Debtor **(P-622)** on July 2, 2019, be and is hereby **APPROVED.**

2)      The debtor, creditors, and parties in interest may now solicit acceptances or rejections of the debtor's second amended chapter 11 plan of reorganization pursuant to 11 U.S.C. Section 1125.

3)      <u>**July 31, 2019**</u> is fixed as the last day for filing acceptances or rejections of the debtor's second amended chapter 11 plan of reorganization pursuant to 11 U.S.C. Section 1125.

4)      <u>**July 31, 2019**</u> is fixed as the last day for filing and serving, pursuant to Rule 3020(b) (1), written objections to Confirmation of the debtor's second amended chapter 11 plan of reorganization.

5)      No later than <u>**July 8, 2019**</u> the debtor's second amended chapter 11 plan of reorganization, the debtor's approved second amended disclosure statement, a ballot conforming to Official Form No. 14, and a copy of this Order approving the debtor's second amended disclosure statement, shall be transmitted by mail and/or electronic filing in compliance with the Bankruptcy Rules, by the debtor's counsel, to the creditors, equity security holders and other parties in interest, and to the United States Trustee as provided by B.R. 3017(d).

**6)** No later than **July 12, 2019** an affidavit of mailing shall be filed electronically by debtor's counsel.

**7)** A hearing on Confirmation of the debtor's second amended chapter 11 plan of reorganization will be held before the undersigned Bankruptcy Judge in:

<div align="center">

**COURTROOM B-709**
**HALE BOGGS FEDERAL BUILDING**
**500 POYDRAS STREET**
**NEW ORLEANS, LOUISIANA**
**ON**
**WEDNESDAY, AUGUST 7, 2019 AT 10:00 A.M.**

</div>

**8)** Debtor's counsel is to tabulate the acceptances and rejections of the second amended chapter 11 plan of reorganization and is to have same verified by the Clerk of Bankruptcy Court **at least (3) days prior to the confirmation hearing date**.

**9)** Counsel's Tabulation of Ballots **must** include the following:

    **a)** The correct name and number of the case.

    **b)** The identity of the plan, including any modifications.

    **c)** The total amount and number of creditors in each class; the acceptances in number and amount of each class; and the rejections in number and amount of each class.

    **d)** A clear and concise summation of each class as to whether or not each class meets the requirements of the Code for acceptance of the plan.

**10)** The completed, signed ballots are to be returned to Barbara B. Parsons or William E. Steffes, counsel for the debtor.

**11)** Counsel is to file the Tabulation of Ballots electronically.

**12)** Counsel is to submit the ballots in hard copy to the Clerk of Bankruptcy Court **(3) days prior to hearing** for verification of the Tabulation. Said ballots will be returned to counsel subsequent to the court's ruling on confirmation.

**FAILURE TO COMPLY WITH THE FOREGOING TABULATION AND VERIFICATION REQUIREMENTS MAY RESULT IN <u>FAILURE</u> TO CONFIRM THE PLAN.**

New Orleans, Louisiana, July 3, 2019.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

**COUNSEL FOR DEBTOR:**

**Barbara B. Parsons
The Steffes Firm, LLC
13702 Coursey Blvd.
Building 3
Baton Rouge, LA 70817
(225) 751-1751
Fax: (224) 751-1998
Email: bparsons@steffeslaw.com**

**William E. Steffes
The Steffes Firm, LLC
13702 Coursey Blvd.
Building 3
Baton Rouge, LA 70817
(225) 751-1751
Fax: (224) 751-1998
Email: bsteffes@steffeslaw.com**

**U.S. Trustee
Office of the U.S. Trustee
Eastern District of Louisiana
Texaco Center
400 Poydras Street, Suite 2110
New Orleans, LA 70130**

# EXHIBIT C

## LITIGATION AND DISTRIBUTION TRUST AGREEMENT

# LITIGATION AND DISTRIBUTION TRUST AGREEMENT

## Of

# FIRST NBC BANK HOLDING COMPANY

This *Litigation and Distribution Trust Agreement of First NBC Bank Holding Company* (the "***Agreement***") is entered to as of this ___ day of _____, 2019, by, between and among, First NBC Bank Holding Company ("***FNBC***" or the "***Debtor***") and Stephen B. Darr (the "***Litigation and Distribution Trustee***").

## WITNESSETH:

WHEREAS, on _____, 2019, the *Second Amended Joint Chapter 11 Plan of the Debtor and Official Committee of Unsecured Creditors* (the "***Plan***"), as filed in the United States Bankruptcy Court for the Eastern District of Louisiana (the "***Bankruptcy Court***") in Chapter 11, Case No. 17-11213, was confirmed by the Bankruptcy Court pursuant to Bankruptcy Code § 1129 (the "***Order***"); and

WHEREAS, the Litigation and Distribution Trustee was selected to serve as Litigation and Distribution Trustee under the Plan by the Official Committee of Unsecured Creditors of the Debtor (the "***Committee***"); and,

WHEREAS, an Oversight Committee, with the powers set forth herein and in the Plan, has been duly appointed pursuant to the Plan, and currently consists of the individuals identified in Section 3.4;

WHEREAS, together with the certain other provisions, the Plan provides for the Debtor and its Estate, and the Litigation and Distribution Trustee to enter into this Agreement relative to the administration of the Litigation and Distribution Trust Assets subsequent to confirmation of the Plan; and

WHEREAS, the Litigation and Distribution Trustee is willing to accept the duties of the Litigation and Distribution Trustee upon such terms and conditions as are hereinafter set forth; and

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, pursuant to the Plan, FNBC and the Litigation and Distribution Trustee do hereby covenant and agree as follows:

# ARTICLE I

## Definitions; Interpretive Rules

1. **Defined Terms; Rules of Interpretation**.

   1.1 **Capitalized Terms**. Capitalized terms used herein and not otherwise defined in this Agreement shall have the meanings assigned to them in the Plan. Any term that is not otherwise defined, herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. For purposes of this Agreement, Disputed Claims shall be included in the Class which such Claims would be included if such claims were Allowed Claims.

   1.2 **Computation of Time**. In computing any period of time prescribed or allowed by this Agreement, the provisions of Bankruptcy Rule 9006(a) will apply.

   1.3 **Permitted Investments**. Any of the following: (i) marketable obligations issued or unconditionally guaranteed by the United States of America or an agency thereof maturing or redeemable within 180 days from the date of acquisition thereof; (ii) certificates of deposit, maturing no more than 180 days from the date of creation thereof, issued by commercial banks incorporated under the laws of the United States of America or any state thereof or the District of Columbia having membership in the Federal Deposit Insurance Corporation and in amounts not exceeding the maximum amounts insured thereunder; (iii) time deposits, maturing no more than 30 days from the date of creation thereof with commercial banks or savings banks each having membership in the Federal Deposit Insurance Corporation and in amounts not exceeding the maximum amounts insured thereunder; (iv) money market funds managed by nationally recognized firms and making only investments qualified under (i), (ii), (iii) or (v) herein; (v) variable rate demand notes with a rating from Standard & Poor's of "A-1" or better or from Moody's of "P-1" or better; or (vi) demand deposits at any bank or savings institution organized under the laws of the United States of America or any state thereof or the District of Columbia having membership in the Federal Deposit Insurance Corporation; provided, however, such demand deposits shall be in amounts not to exceed the maximum amounts insured by the Federal Deposit Insurance Corporation.

   1.4 **Rules of Interpretation**. For purposes of this Agreement, unless otherwise provided herein:

      1.4.1 any reference in this Agreement to a contract, instrument, release or other agreement or document being in particular form or any particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;

1.4.2  any reference in this Agreement to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Agreement;

1.4.3  any reference to any entity as a holder of a Claim includes that entity's successors, assigns, and affiliates;

1.4.4  except as otherwise specified, all references in this Agreement to Sections, Articles, and Exhibits are references to sections, articles, and exhibits of or this Agreement;

1.4.5  the words "herein," "hereunder," and "hereto" refer to this Agreement in its entirety rather than to a particular portion of this Agreement;

1.4.6  the rules of construction set forth in section 102 of the Bankruptcy Code will apply;

1.4.7  except where the context otherwise requires, words importing masculine, feminine or neuter gender shall include the feminine, the masculine and the neuter, as appropriate; words importing the singular number shall include the plural number and vice versa; and words importing persons shall include partnerships, associations, and corporations.

1.5  **Headings**.  The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

1.6  **Construction with the Plan**.  The Plan is hereby incorporated fully by reference and is made a part hereof for all purposes.  In the event of any inconsistency or conflict between the terms, conditions and provisions of this Agreement and the terms, conditions and provisions of the Plan, the terms, conditions and provisions of the Plan shall control.

## ARTICLE II

## Purpose; Administration, Supervision

2.1  **Purpose of Agreement**.  FNBC and the Litigation and Distribution Trustee hereby enter in to this Agreement for the following purposes and no other: (a) to hold the Litigation and Distribution Trust Assets for the benefit of the holders of Allowed Claims in Class 2 ("*Beneficiaries*") and Allowed Claims in Class 4 ("*Subordinated Beneficiaries*"), (b) to make distributions of the Litigation and Distribution Trust Assets to the Beneficiaries and, if applicable, to the Subordinated

Beneficiaries, (c) to have the power and authority to prosecute and resolve, in the names of the Debtor, the Reorganized Debtor and/or the Litigation and Distribution Trustee any Transferred Avoidance Actions and all other claims or causes of action transferred to the Litigation and Distribution Trust pursuant to the Plan, (d) to calculate and make distributions of the Litigation and Distribution Trust Assets to the Beneficiaries and, if applicable, to the Subordinated Beneficiaries, (e) liquidate, transfer or otherwise dispose of the Litigation and Distribution Trust Assets or any part thereof or any interest therein upon such terms as the Litigation and Distribution Trustee determines to be necessary, appropriate or desirable, (f) to reconcile (including to object to, seek to subordinate, recharacterize or settle such Claims) (i) Claims in Classes 2, 3A, 3B, 3C, 4 and 5 and (ii) except for Claims of Professionals employed by the Debtor or the Committee, all other Claims asserted to be entitled to priority pursuant to Sections 503 or 507 of the Bankruptcy Code , (g) to terminate this Litigation and Distribution Trust in accordance with the terms of the Plan and this Agreement, (h) to provide the Beneficiaries, annually, with unaudited financial statements, (i) to sell, liquidate, dispose of or abandon Litigation and Distribution Trust Assets; and (j) to otherwise carry out its duties under the Plan and complete distribution of the Litigation and Distribution Trust Assets, all in accordance with the Plan and this Agreement. The Litigation and Distribution Trust has no objective to, and will not, engage in the conduct of a trade or business and, subject to this Agreement, will terminate upon the completion of its liquidation and distribution duties. The Litigation and Distribution Trust will be a "representative of the estate" under Section 1123(b)(3)(B) of the Bankruptcy Code.

  2.2 **Administration of the Litigation and Distribution Trust Assets**. With the advice and assistance of the Oversight Committee, as provided under the Plan and this Agreement, from and after the Effective Date, the Litigation and Distribution Trustee shall manage, administer, invest and reinvest all of the Litigation and Distribution Trust Assets, collect the income therefrom, and distribute the proceeds, all pursuant to the terms and conditions of the Plan and this Agreement. Notwithstanding anything to the contrary herein, the Oversight Committee and the Litigation and Distribution Trustee shall act in furtherance of, and consistent with, the purpose of the Litigation and Distribution Trust and shall act in the best interests of the Beneficiaries and, if applicable, to the Subordinated Beneficiaries. The Litigation and Distribution Trust, by and through the Litigation and Distribution Trustee, shall be authorized to prosecute any and all Avoidance Actions and Causes of Action in the name of the Debtor.

  2.3 **Interests in Litigation and Distribution Trust**. The beneficial interests in the Litigation and Distribution Trust will not be represented by certificates, but rather shall consist of a pro rata share of Litigation and Distribution Trust Assets. Beneficial interests in the Litigation and Distribution Trust will not be transferable except pursuant to the laws of descent and distribution or otherwise by operation of law.

2.4   **No Further Supervision**.  The Litigation and Distribution Trustee may use, operate and deal with the Litigation and Distribution Trust Assets without any supervision by the Bankruptcy Court, and free of any restrictions imposed by the Debtor by the Bankruptcy Code or the Bankruptcy Court during the Chapter 11 Case.

## ARTICLE III

### Responsibilities,

3.1   **Responsibilities of the Litigation and Distribution Trustee**.

3.1.1   The responsibilities of the Litigation and Distribution Trustee shall include (i) the receipt, management, supervision, and protection of the Litigation and Distribution Trust Assets on behalf of and for the benefit of the Beneficiaries and, if applicable, the Subordinated Beneficiaries; (ii) pursuit of objections to, and estimations and settlements of certain Disputed Claims; (iii) investigation, analysis, prosecution, and, if necessary and appropriate, compromise of the claims and Causes of Action included among the Litigation and Distribution Trust Assets, including, without limitation, the Avoidance Actions and any other claims and Causes of Action transferred to the Litigation and Distribution Trust pursuant to the Plan; (iv) calculation and implementation of all distributions to be made by the Litigation and Distribution Trustee under the Plan to the Beneficiaries and, if applicable, to the Subordinated Beneficiaries; (v) filing all required federal, state, and local tax returns and paying taxes and all other obligations of the Litigation and Distribution Trust; and (vi) such other responsibilities as may be vested in the Litigation and Distribution Trustee pursuant to the Plan, the Litigation and Distribution Trust Agreement, orders of the Bankruptcy Court, or as necessary and proper to carry out the provisions of the Plan.

3.1.2   The Litigation and Distribution Trustee shall act in a fiduciary capacity for the interests of its Beneficiaries, and, subject to and upon full payment and satisfaction of all Allowed Claims of Beneficiaries, thereafter for the interests of the Subordinated Beneficiaries.  Prior to full payment and satisfaction of all Allowed Claims of Beneficiaries, the Litigation and Distribution Trustee shall not be required to act in a fiduciary capacity for the interests of the Subordinated Beneficiaries.

3.2   INTENTIONALLY DELETED.

3.3   **Post-Effective Date Management**.  As provided for in the Plan and herein, the Litigation and Distribution Trustee shall have the exclusive right and duty, to manage the Litigation and Distribution Trust Assets, subject to certain limitations as set forth herein.

3.4     **Oversight Committee**.  The Oversight Committee shall have members in an amount determined by majority vote of the members of the Oversight Committee to advise, assist, supervise and direct the Litigation and Distribution Trustee in the administration of the Litigation and Distribution Trust pursuant to this Litigation and Distribution Trust Agreement. The initial members of the Oversight Committee shall be Vikaran Ghei, Michael Zaitzeff and Donna Ennis. Members of the Oversight Committee constituting a majority of the total number of members of the Oversight Committee then in office shall have the right to direct and remove the Litigation and Distribution Trustee, and shall have such other rights to operate and manage the Litigation and Distribution Trust as are not inconsistent with the Confirmation Order, the Plan and the terms of this Litigation and Distribution Trust Agreement. No other Beneficiary or Subordinated Beneficiary shall have any approval rights whatsoever in respect of management and operation of the Litigation and Distribution Trust. A member of the Oversight Committee may from time to time consult with the Beneficiary, if any, that appointed such member subject to such confidentiality provisions as required by the Oversight Committee.

3.4.1   **Authority of the Oversight Committee**. The Oversight Committee shall have the authority and responsibility to advise, assist, supervise, and direct the Litigation and Distribution Trustee in the administration of the Litigation and Distribution Trust and shall have the authority to remove the Litigation and Distribution Trustee. The Litigation and Distribution Trustee shall consult with and provide information to the Oversight Committee in accordance with and pursuant to the terms of this Litigation and Distribution Trust Agreement and the Plan. The Oversight Committee shall have the authority to select and engage such professionals as the Oversight Committee deems necessary and desirable to assist the Oversight Committee in fulfilling its obligations under this Litigation and Distribution Trust Agreement and the Plan, and the Litigation and Distribution Trust shall pay the reasonable and documented fees of such advisors (including on an hourly, contingency, or modified contingency basis) and reimburse such advisors for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Litigation and Distribution Trust Agreement.

3.4.2   **Regular Meetings of the Oversight Committee**. Meetings of the Oversight Committee are to be held with such frequency and at such place as the Litigation and Distribution Trustee and the members of the Oversight Committee may determine in their reasonable discretion.

3.4.3   **Special Meetings of the Oversight Committee**.  Special meetings of the Oversight Committee may be held whenever and wherever called for by the Litigation and Distribution Trustee or any member of the Oversight Committee, subject to reasonable notice.

### 3.4.4 **Manner of Acting**

3.4.4.1     A majority of the total number of members of the Oversight Committee then in office shall constitute a quorum for the transaction of business at any meeting of the Oversight Committee. The affirmative vote of a majority of the members of the Oversight Committee present and entitled to vote at a meeting at which a quorum is present shall be the act of the Oversight Committee except as otherwise required by law or as provided in this Litigation and Distribution Trust Agreement or the Plan. Any or all of the members of the Oversight Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.

3.4.4.2     Any member of the Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the majority of the members at a meeting, be conducted by electronic mail or individual communications by the Litigation and Distribution Trustee and each member of the Oversight Committee. Any member of the Oversight Committee who is present and entitled to vote at a meeting of the Oversight Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Committee, unless: (i) such member of the Oversight Committee objects at the beginning of the meeting (or promptly upon his or her arrival) to holding it or transacting business at the meeting; (ii) his or her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he or she delivers written notice (including by electronic or facsimile transmission) of his or her dissent or abstention to the Oversight Committee before its adjournment. The right of dissent or abstention is not available to any member of the Oversight Committee who votes in favor of the action taken.

     3.4.4.3       Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Oversight Committee shall report to the Oversight Committee any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than as Beneficiary or Subordinated Beneficiary). A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum and may engage in the Oversight Committee's discussions on such matter or issue); the vote or action with respect to such matter or issue shall be undertaken only by members of the Oversight Committee who are not "conflicted members." Notwithstanding anything to the contrary set forth herein, no member of the Oversight Committee shall be deemed to be a "conflicted member" solely as a result of (i) such member's affiliation with a Person that is a Beneficiary or Subordinated Beneficiary, or (ii) such member's affiliation with any Person that is, or is adverse to, a defendant in any action or proceeding to which the Litigation and Distribution Trustee is a party.

     3.4.5   **Liquidating Oversight Committee's Action Without a Meeting**. Any action required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all members of the Oversight Committee and recorded in the minutes or other transcript of proceedings of the Oversight Committee.

     3.4.6  **Tenure, Removal, and Replacement of the Members of the Oversight Committee**. The authority of the members of the Oversight Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation and Distribution Trust is terminated. The service of the members of the Oversight Committee will be subject to the following:

3.4.6.1     The members of the Oversight Committee will serve until disability, death, resignation or removal;

3.4.6.2     A member of the Oversight Committee may resign at any time by providing a written notice of resignation to the remaining members of the Oversight Committee. Such resignation will be effective upon the date received by the Oversight Committee or such later date specified in the written notice;

3.4.6.3     A member of the Oversight Committee may be removed by the majority vote of the other members of the Oversight Committee, a written resolution of which shall be delivered to the removed Oversight Committee member; provided, however, that such removal may only be made for cause;

3.4.6.4     In the event of a vacancy on the Oversight Committee (whether by removal, disability, death or resignation), a new member shall be appointed to fill such position by the remaining members of the Oversight Committee.  Immediately upon the appointment of any successor member of the Oversight Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Oversight Committee hereunder will be vested in and undertaken by the successor member of the Oversight Committee without any further act; and the successor member of the Oversight Committee will not be liable personally for any act or omission of the predecessor member of the Oversight Committee; and

3.4.6.5     Every successor member of the Oversight Committee appointed hereunder shall execute, acknowledge and deliver to the Litigation and Distribution Trustee and other members an instrument accepting the appointment under this Litigation and Distribution Trust Agreement and agreeing to be bound thereto, and thereupon the successor member of the Oversight Committee without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring member.

3.4.7  **Compensation and Reimbursement of Expenses of the Oversight Committee**. The Litigation and Distribution Trust will reimburse the members of the

9

Oversight Committee for all reasonable and documented out-of-pocket expenses incurred by such members in connection with the performance of their respective services hereunder, without duplication, upon demand for payment thereof. All fees and expenses of the members of the Oversight Committee shall be paid solely from Litigation and Distribution Trust Assets.

3.5 **Special Governance Provisions Regarding Prosecution and Settlement of Causes of Action**. All decisions concerning whether to prosecute or settle any Causes of Action shall be made by the Oversight Committee in good faith and in the best interests of the Litigation and Distribution Trust and the Beneficiaries until all Allowed Claims of Beneficiaries are paid and satisfied in full, and thereafter in the best interests of the Litigation and Distribution Trust and the Subordinated Beneficiaries. The settlement of any of the Causes of Action shall require the approval of a majority vote of the members of the Oversight Committee.

## ARTICLE IV

## Duties, Rights and Power of Litigation and Distribution Trustee and the Debtor

4.1 **Litigation and Distribution Trustee's Duties**. Subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall manage the Litigation and Distribution Trust Assets, collect the income and make distributions, including final distributions, to its Beneficiaries and, if applicable, to the Subordinated Beneficiaries, as provided under the Plan.

4.2 **Litigation and Distribution Trustee's Rights and Powers.** Subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall have the powers and authority as set forth herein and in the Plan necessary to manage the Litigation and Distribution Trust Assets and effect the disposition, orderly liquidation and distribution of all Litigation and Distribution Trust Assets and effect the disposition, orderly liquidation and distribution of all Litigation and Distribution Trust Assets. The rights and powers shall include, subject to the limitations set forth in the Plan and this Agreement, and subject to the rights and powers of the Oversight Committee and if so authorized by the Oversight Committee, the right and power to:

(a) Pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all claims and Causes of Action transferred to the Litigation and Distribution Trust as provided in the Plan and herein;

(b) Pay all taxes, expenses and obligations of the Litigation and Distribution Trust out of the Litigation and Distribution Trust Assets;

(c) Investigate, and, if necessary and authorized by the Oversight Committee, prosecute and litigate any and all Avoidance Actions and Causes of

Action that are transferred to the Litigation and Distribution Trust pursuant to the Plan, including any Avoidance Action or any other claims or Causes of Action brought by the Debtor or the Unsecured Creditors' Committee on behalf of the Debtor prior to the Effective Date, which Causes of Action, rights to payment and claims as of the Effective Date shall vest solely and exclusively in the Litigation and Distribution Trustee, for the benefit of the Litigation and Distribution Trust, pursuant to the terms of the Plan;

        (d)     In addition,

        (i) Invest funds; (ii) make distributions; (iii) pay taxes and other obligations owed by the Litigation and Distribution Trust or incurred by the Litigation and Distribution Trustee; (iv) subject to Sections 4.3 and 4.9 herein, engage and compensate from the Litigation and Distribution Trust Assets, consultants, agents, employees, and professional persons (including, without limitation, attorneys on a contingency fee basis) to assist the Litigation and Distribution Trustee with respect to the Litigation and Distribution Trustee's responsibilities; (v) liquidate and dispose of the Litigation and Distribution Trust Assets; (vi) compromise and settle Claims and Causes of Actions; (vii) act on behalf of the Debtor, its Estate, and the Official Committee of Unsecured Creditors (the "*Committee*") in all civil actions, judicial proceedings, administrative proceedings, adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (viii) commence and/or pursue any and all actions involving Litigation and Distribution Trust Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (ix) utilize Litigation and Distribution Trust Assets to purchase appropriate insurance to insure the acts and omissions of the Litigation and Distribution Trustee; and (x) act and implement the Plan, the Litigation and Distribution Trust Agreement, and orders of the Bankruptcy Court.

      4.3   **Limitations as to Losses.**  The Litigation and Distribution Trustee shall not be responsible, and shall have no liability whatsoever, to any person for any loss to the Litigation and Distribution Trust or the amount of interest thereon resulting from the investment thereof in any Permitted Investments.  The Litigation and Distribution Trustee shall not invest or reinvest any Litigation and Distribution Trust Assets in a security or instrument that does not constitute a Permitted Investment.

      4.4   **Selection of Agents.**  Without the need for application to or approval of the Bankruptcy Court, the Litigation and Distribution Trustee may select, determine compensation for and employ attorneys, brokers, consultants, custodians, investment

advisors, asset services, auditors, accountants, and other agents (including, without limitation, attorneys, accountants and consultants retained by the Debtor and the Committee during the Chapter 11 Case). The Litigation and Distribution Trustee may avail himself of the services of counsel or special counsel to FNBC or the Committee. Subject to the Plan, the Litigation and Distribution Trustee may pay the salaries, fees and expenses of such agents or consultants out of the Litigation and Distribution Trust Assets. The Litigation and Distribution Trustee shall not be liable for any loss to the Litigation and Distribution Trust or any person interested therein by reason of any mistake or default of any such agent or consultant. Notwithstanding the foregoing, all invoices for such professionals will be submitted to the Litigation and Distribution Trustee and the Oversight Committee for review prior to payment. If the Litigation and Distribution Trustee and a majority of the members of the Oversight Committee do not object to a submitted invoice, the invoice will be paid. If the Litigation and Distribution Trustee or a majority of the members of the Oversight Committee object to the invoice, the parties will work in good faith to resolve the objection. If the parties cannot resolve the objection, one or more of the parties may raise the dispute to the Bankruptcy Court for resolution.

4.5 **Signature**. As of the Effective Date of the Plan, the Litigation and Distribution Trustee shall have the sole signature power and authority with respect to the Litigation and Distribution Trust to (a) open and close accounts with any banking, financial or investment institution; (b) make deposits and withdrawals of cash and other property into or from any such account; (c) make or endorse checks with respect to any such account; (d) effectuate purchases and sales of securities and give security purchase and sale orders to brokers or any other third parties and the exercise of such power and authority shall be deemed to be authorized by and to represent the decision of the Litigation and Distribution Trustee then entitled to make such decision.

4.6 **Maintenance of Register**. The Litigation and Distribution Trustee shall at all times maintain a register of names, address, and amount of Claims in Class 2_as in effect on the Effective Date and is revised from time to time thereafter.

4.7 **Liability of Litigation and Distribution Trustee**.

(a) **Standard of Care**. The Litigation and Distribution Trustee shall have a fiduciary duty to the holders of Beneficiaries, and subject to and upon full payment and satisfaction of all Allowed Claims of Beneficiaries, thereafter to the Subordinated Beneficiaries, to perform the duties expressly provided for by this Agreement. The Litigation and Distribution Trustee shall not be liable for any action taken or omitted to be taken by him or her in good faith and in the exercise of reasonable judgment and believed to be within the discretion or power conferred by this Agreement, or be responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct. The Litigation and Distribution

12

Trustee shall not have any fiduciary relationship with any party by virtue of this Agreement except as specifically set forth in this Agreement, and shall not have any fiduciary relationship with any Subordinated Beneficiary prior to payment and satisfaction in full of all Allowed Claims of all Beneficiaries.

      (1)     The Litigation and Distribution Trustee shall not be liable or in any way responsible for the acts or omissions of the Debtor or its agents;

      (2)     Unless further indemnified to his satisfaction against liability and expense, the Litigation and Distribution Trustee shall not be compelled to do any act or to take any action toward the execution or enforcement of the powers created under the Plan or this Agreement or to prosecute or defend any suit in respect hereof.  If the Litigation and Distribution Trustee requests approval from the Bankruptcy Court with respect to any act or action in connection with the Plan or this Agreement, the Litigation and Distribution Trustee shall be entitled (but shall not be required) to refrain (without incurring any liability to any person by so refraining) from such act or action unless and until he has received such instructions of approval.  In no event, however, shall the Litigation and Distribution Trustee or any of his representatives be required to take any action which he reasonably determines could lead to criminal activity or civil liability.

      (3)     The Litigation and Distribution Trustee shall not be responsible in any manner to the Debtor, its Estate, any Claim Holder, any Beneficiary, any Subordinated Beneficiary and/or any party in interest for:

      (i)     the creditworthiness of any party and the risks involved to the Debtor or such Claim holder or party in interest;

      (ii)     the effectiveness, enforceability, genuineness, validity, or any due execution of the Plan or this Agreement as to any person other than the Litigation and Distribution Trustee;

      (iii)     any representation, warranty, document, certificate, report or statement made herein or furnished hereunder or in connection with the Plan or this Agreement not constituting a breach of the standard of care as set forth in this Agreement on the part of the Litigation and Distribution Trustee;

(iv)    the existence, priority or perfection of any existing lien, encumbrance or security interest; or

(v)    the observation or compliance with any of the terms, covenants or conditions of the Plan or this Agreement on the part of any party other than the Litigation and Distribution Trustee.

(4)    The Litigation and Distribution Trustee shall be entitled to rely on negative notice to any person and entity, including any Beneficiary or Subordinated Beneficiary.  Subject to the rights and powers of the Oversight Committee, at the election of the Litigation and Distribution Trustee in his sole and absolute discretion, and without in any way limiting or impairing the rights and powers of the Litigation and Distribution Trustee to act or forbear from acting on any matter without notice to or consent of any person or entity, the Litigation and Distribution Trustee may send notice of any proposed action or determination not to take action with respect to any matter to holders of Claims, or any subset of such holders of Claims.. Any Claim holder to whom any such notice is sent that fails to object in writing so as to be received by the Litigation and Distribution Trustee on or before three (3) days after service by the Litigation and Distribution Trustee of a proposed action (or determination not to take action) shall be deemed to have consented to such action or determination not to take action.

(5)    The Debtors and all persons and entities voting for the Plan and/or accepting the benefits thereof, have agreed not to sue or otherwise pursue or seek damages from the Litigation and Distribution Trustee pursuant to the Plan or this Agreement, except for willful misconduct or gross negligence. The Litigation and Distribution Trustee shall be and hereby is indemnified and held harmless by the Litigation and Distribution Trust to the full extent of all existing and future Litigation and Distribution Trust Assets to the maximum extent permitted by law for any and all acts and omissions except for the Litigation and Distribution Trustee's gross negligence or wilfull misconduct.  The Litigation and Distribution Trust Assets will be used to further indemnify, hold harmless and reimburse the Litigation and Distribution Trustee from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities, and actions for which liability is limited pursuant to this Agreement and Plan.

(b)    **Surety Bond**. In order to secure the faithful performance of his duties under the Plan and this Agreement, the Litigation and Distribution Trustee shall obtain at the expense of the Litigation and Distribution Trust and file with the

Bankruptcy Court a surety bond, naming the United States as the oblige thereunder, in an amount equal to <u>one hundred</u> percent (<u>100</u>%) of the Cash in the Litigation and Distribution Trust.  The surety on such bond shall be among those listed as acceptable sureties on federal bonds in Circular 570 of the United States Department of the Treasury or a similar listing if no longer published.  The Litigation and Distribution Trustee may increase the amount of the bond or reduce the amount of the bond from time to time as he deems necessary or proper provided that such amount equals or exceeds the amount of Cash in the Litigation and Distribution Trust.  No bond shall be required if and when the value of the Litigation and Distribution Trust Assets shall be less than $100,000.00.

(c)     **No Liability for Acts of Predecessor**.  No successor Litigation and Distribution Trustee shall be in any way responsible for the acts or omissions of any Litigation and Distribution Trustee in office prior to the date on which such person becomes a Litigation and Distribution Trustee, nor shall he or she be obligated to inquire into the validity or propriety of any such act or omission unless such Litigation and Distribution Trustee expressly assumes such responsibility.  Any successor Litigation and Distribution Trustee shall be entitled to accept as conclusive any final accounting and statement of Litigation and Distribution Trust Assets furnished to such successor Litigation and Distribution Trustee by such predecessor Litigation and Distribution Trustee and shall further be responsible only for those Litigation and Distribution Trust Assets included in such statement.

(d)     **No Implied Obligations**. The Litigation and Distribution Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and in the Plan, and no other or further covenants or obligations shall be implied into this Agreement. The Litigation and Distribution Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties herein or in any documents or instrument evidencing or otherwise constituting a part of the Litigation and Distribution Trust Assets. The Litigation and Distribution Trustee makes no representations as to the value of the Litigation and Distribution Trust Assets or any part thereof, nor as to the validity, execution, enforceability, legality or sufficiency of this Agreement, and the Litigation and Distribution Trustee shall incur no liability or responsibility with respect to any such matters.

(e)     **Reliance on Documents or Advice of Counsel or Other Persons**. Except as otherwise provided herein, the Litigation and Distribution Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order and other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties, and shall have no liability or responsibility with respect to the form, execution or validity thereof; nor shall the Litigation and Distribution Trustee be liable for any act which he may do or omit to do hereunder, all subject only

15

to the limitation that the Litigation and Distribution Trustee acts in accordance with the standard of care set forth in Section 4.7(a). None of the provisions hereof shall require the Litigation and Distribution Trustee to expend or risk his own funds or otherwise incur financial liability or expense in the performance of any duties hereunder. The Litigation and Distribution Trustee may consult with its legal counsel and shall not be liable for any action taken or suffered in reliance upon the advice of such counsel.

(f) **No Personal Obligation for Liabilities of the Debtor**. Claims holders and other persons dealing with the Litigation and Distribution Trustee in its respective capacity as Litigation and Distribution Trustee within the scope of this Agreement shall look only to the Litigation and Distribution Trust Assets to satisfy any liability incurred by the Litigation and Distribution Trustee to such person in carrying out the terms of this Agreement, and the Litigation and Distribution Trustee shall have no personal or individual obligation to satisfy any such liability.

4.8 **Reports and Fees**. The Litigation and Distribution Trustee shall provide quarterly statements of receipts and disbursements to the Office of the United States Trustee. The Litigation and Distribution Trustee will be responsible for timely payment from the Litigation and Distribution Trust Assets of the United States Trustee fees incurred pursuant to 28 U.S.C. § 1930(a)(b) subsequent to the Effective Date of the Plan.

4.9 **Withholding and Reporting Requirements**; Tax Treatment of Litigation and Distribution Trust. The Litigation and Distribution Trust will be treated as a "Litigation and Distribution Trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations. The transfer of the Assets to the Litigation and Distribution Trust shall be treated as a transfer to the beneficiaries of the Litigation and Distribution Trust for all purposes of the Internal Revenue Code (e.g., sections 61(a)(12), 483, 1001, 1012, and 1274) followed by a deemed transfer by such beneficiaries to the Litigation and Distribution Trust. The Litigation and Distribution Trust shall be considered a "grantor" trust, and the Beneficiaries and Subordinated Beneficiaries shall be treated as the grantors and deemed owners of the Litigation and Distribution Trust in accordance with their rank and priority. The Litigation and Distribution Trustee shall value the transferred property and notify the Beneficiaries and Subordinated Beneficiaries, in writing, of such valuations. The assets transferred to the Litigation and Distribution Trust shall be valued consistently by the Beneficiaries and Subordinated Beneficiaries for all federal income tax purposes. In connection with all Distributions made pursuant to the Litigation and Distribution Trust and all activities of the Litigation and Distribution Trust, the Litigation and Distribution Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority. All Distributions made pursuant to the Plan and the Litigation and Distribution Trust will be subject to any such withholding and reporting requirements. The Beneficiaries and

16

Subordinated Beneficiaries shall be treated as the grantors and deemed owners of the Litigation and Distribution Trust. The Litigation and Distribution Trustee shall file tax returns for the Litigation and Distribution Trust as a grantor trust pursuant to 1.671-4(a) of the Income Tax Regulations promulgated pursuant to the United States Internal Revenue Code. *The Litigation and Distribution Trustee may require Beneficiaries and Subordinated Beneficiaries to furnish to the Litigation and Distribution Trustee its, his or her employer or taxpayer identification number ("TIN") as assigned by the Internal Revenue Service, and the Litigation and Distribution Trustee may condition any Distribution to any such beneficiaries upon receipt of such identification number. If a Beneficiary or Subordinated Beneficiary shall fail to provide the Litigation and Distribution Trustee with any requested TIN within 90 days after the request, such failure shall be deemed a waiver of all of such Beneficiaries' and Subordinated Beneficiaries' interests in the Litigation and Distribution Trust and rights to Distribution under the Plan. Distributions that would have been made to such Beneficiary or Subordinated Beneficiary shall be distributed to the other Beneficiaries or Subordinated Beneficiaries, as applicable, based on their Pro Rata interests in the Litigation and Distribution Trust.*

     4.10   **Litigation and Distribution Trustee's Compensation**. The Litigation and Distribution Trustee's compensation shall be based upon hourly rates typically charged in the conduct of the Litigation and Distribution Trustee's business.

     In addition to reimbursements for the actual reasonable and necessary expenses incurred, the Litigation and Distribution Trustee, and any employees, agents, consultants, or professionals engaged or retained by the Litigation and Distribution Trustee, shall be entitled to reasonable compensation from the Litigation and Distribution Trust Assets for services rendered in connection with performance of the duties of the Litigation and Distribution Trustee, as set forth above.

     Compensation and expense reimbursement of any agents, consultants, employees, and/or professionals engaged or retained by the Litigation and Distribution Trust and the Litigation and Distribution Trustee, such compensation shall be in an amount and on such terms as may be agreed to by the Litigation and Distribution Trustee and such agents, consultants, employees, and/or professionals. The Litigation and Distribution Trustee may retain, compensate, employ and pay, including on a contingency basis, any and all professionals and employees (including attorneys) without need for notice or any order of this Court, on such terms and condition as the Litigation and Distribution Trustee deems appropriate.

     4.11   **Reimbursements**. The Litigation and Distribution Trustee and any agents or consultants employed pursuant to this Agreement shall be reimbursed as a priority form the Litigation and Distribution Trust Assets for all reasonable out-of-pocket expenses incurred in performance of their duties hereunder in addition to any compensation received.

4.12   **Indemnification**.  The Litigation and Distribution Trustee shall be and hereby is indemnified by, held harmless and receive reimbursement from Litigation and Distribution Trust Assets for any and all claims, actions, demands, losses, damages, expenses, and liabilities, including, without limitation, court costs, attorneys' fees and accountants' fees incurred to the maximum extent permitted by law, as set forth above.

4.13   **Current Taxation of Earnings**.   All earnings of the Litigation and Distribution Trust, including those retained in a Distribution Reserve established pursuant to section 5.1 below, shall be taxed on a cash basis for the calendar in which such earnings are recognized.

4.14   **Rights of Oversight Committee Paramount**.   The rights and powers of the Oversight Committee to direct the Litigation and Distribution Trustee shall govern and be paramount, notwithstanding anything to the contrary herein.

4.15   **Power to Enter Into Agreements**.   The Oversight Committee and the Litigation and Distribution Trustee may enter into one or more written agreements from time to time to effectuate and implement the provisions of this Agreement and the Plan, including, without limitation, to further indemnify the Litigation and Distribution Trustee, to provide for indemnity for members of the Oversight Committee, to state with specificity the standard of care with which members of the Oversight Committee shall act, and for any further or other matters not specifically set forth in this Agreement, the Plan or the Confirmation Order.

## ARTICLE V

### Distributions And Treatment of Disputed Claims

5.1    **Establishment of Reserves**.   The Litigation and Distribution Trustee shall establish the Distribution Reserve from the Litigation and Distribution Trust Assets as the Litigation and Distribution Trustee determines may be appropriate. Thereafter, as Litigation and Distribution Trust Assets are liquidated and reduced to Cash, the Litigation and Distribution Trustee shall fund the Distribution Reserve with such Cash as practicable.

5.2    **Disbursing Agent**.  The Litigation and Distribution Trustee, or an agent employed by the Litigation and Distribution Trustee, shall serve as a "disbursing agent" and shall make all Distributions to the beneficiaries of the Litigation and Distribution Trust derived from Litigation and Distribution Assets as provided for under the Plan.

5.3     **Distributions**.   As of the Effective Date, to the extent there exist Disputed Claims in any Class, the Litigation and Distribution Trustee shall reserve from any Distributions, an amount equal to the Pro Rata portion of such Distribution to which such Disputed Claim would be entitled if allowed in the amount asserted by the Holder of such Disputed Claim.  If a Disputed Claim is allowed, in part or in full, then the Litigation and Distribution Trustee shall distribute to the Holder of any such Claim an amount equal to such Holder's Pro Rata share, based on such Allowed Claim, of all Distributions previously made to Holders of Allowed Claims in the Class of Claims at issue.

5.4     **Rounding**.   Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as unclaimed property under the Plan.

5.5     **Payment or Distribution Upon Resolution of Disputed Claims**.  Except as the Litigation and Distribution Trustee may otherwise agree with respect to any Disputed Claim, no payments or distributions shall be made with respect to any portion of a Disputed Claim unless and until (a) all objections to such Disputed Claim have been resolved or determined by a Final Order of the Bankruptcy Court, or (b) the Bankruptcy Court shall have entered an order treating any portion of a Disputed Claim as an Allowed Claim. Payments and distributions to each holder of a Disputed Claim to the extent that it ultimately becomes an Allowed Claim shall be made in accordance with the provisions of this Plan with respect to the Class of Claims to which such Allowed Claim belongs. A Disputed Claim that is estimated for purposes of allowance and distribution pursuant to section 502(c) of the Bankruptcy Code and which is estimated and Allowed at a fixed amount by Final Order of the Bankruptcy Court shall thereupon be an Allowed Claim for all purposes in the amount so estimated and Allowed.

5.6     **Unclaimed Property**.  The Litigation and Distribution Trustee will make all reasonable efforts to locate holders of Allowed Claims in Class 2: however, if any Distributions remain unclaimed six (6) months after the original date of Distribution of such Claims, the unclaimed Distributions will be redistributed on a Pro Rata basis to all known and locatable holders of Allowed Claims in Class 2 if such a Distribution, after expenses of Distribution, would produce an aggregate minimum dividend of $50,000. If such Distribution would produce an aggregate dividend of less than $50,000, the Litigation and Distribution Trustee may donate any remaining Cash allocable to any unclaimed Distributions to a charitable institution. After such donation, the Litigation and Distribution Trustee, and his agents and Professionals will be fully discharged and released from any claims related to the unclaimed Distributions.

5.7   **Setoff**. The Litigation and Distribution Trustee may, but shall not be required to, setoff against any Claim (and the distributions to be made pursuant to this Plan with respect to such Claim), claims of any nature whatsoever that the Debtor, its Estate, the Committee, or the Litigation and Distribution Trust may have against the holder of such Claim.  Notwithstanding the foregoing, the failure to effect such a setoff will not constitute a waiver or release by the Litigation and Distribution Trust of any such claim against such holder.

## ARTICLE VI

### Beneficiaries and Subordinated Beneficiaries

6.1   **Interest Beneficial Only**.  The ownership of a beneficial interest in the Litigation and Distribution Trust shall not entitle any Beneficiary or Subordinated Beneficiary to any title in or to the Litigation and Distribution Trust Assets or to any right to call for a partition or division of such assets or to require an accounting except as may be specifically provided herein, in the Plan or the Confirmation Order.

6.2   **Ownership of Beneficial Interests Hereunder**. Each Beneficiary and Subordinated Beneficiary shall have a beneficial interest in the Litigation and Distribution Trust solely to the extent that such Beneficiary or Subordinated Beneficiary is entitled to a distribution from the Litigation and Distribution Trust pursuant to the Plan or the Confirmation Order. Each Beneficiary and Subordinated Beneficiary shall cease to own a beneficial interest in the Litigation and Distribution Trust and cease to be a Beneficiary or Subordinated Beneficiary hereunder for all purposes immediately upon completion of the Distribution by the Litigation and Distribution Trustee to such Beneficiary or Subordinated Beneficiary, as applicable, as required by this Litigation and Distribution Trust Agreement, the Plan and the Confirmation Order.

6.3   **Standing**.  No Beneficiary or Subordinated Beneficiary shall have standing to direct the Litigation and Distribution Trustee to do or not to do any act other than as described herein.

## ARTICLE VII

### Objections to Claims

Following the Effective Date, the Litigation and Distribution Trustee shall be authorized to object, or to succeed or otherwise join any objection filed by the Debtor prior to the Effective Date, to Claims in Classes 2, 3A, 3B, 3C, 4 and 5, as well as any other Claims asserted to be entitled to priority pursuant to Sections 503 or  507 of the Bankruptcy Code (except for Claims of Professionals employed by the Debtor or the

Committee) so as to have the Bankruptcy Court determine the amounts to be allowed, if any, of such Claims and thus paid pursuant to the Plan. The Litigation and Distribution shall have no right to object to any Equity Interests nor to Claims of Professionals employed by the Debtor or the Committee. Objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of such Claims as set forth in the Plan; provided, however, that any deadline may be extended by the Bankruptcy Court upon the entry of an order by the Bankruptcy Court extending such deadline. An objection to the allowance of a Claim by the Litigation and Distribution Trustee must be filed with the Bankruptcy Court and served upon the holder of the Claim and all parties who have requested notice, unless such objection was filed prior to the Effective Date by the Debtor or Committee, in which event the Litigation and Distribution Trustee shall be substituted for the Debtor or Committee, as applicable, as the objecting party without the need for the filing by the Litigation and Distribution Trustee of a separate objection.

Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of claim for pre-petition debts of the Debtor filed after the Bar Dates shall be disallowed as a late-filed claim, without any action by the Debtor or Litigation and Distribution Trustee, unless and until the party filing such Claim obtains (i) the written consent of the Litigation and Distribution Trustee to file such Claim late or (ii) approval from the Bankruptcy Court upon notice to the Debtor and Litigation and Distribution Trustee that permits the late filing of the Claim, in which event, the Litigation and Distribution Trustee shall have 120 days from the date of such written consent or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Debtor.

From and after the Effective Date, the Litigation and Distribution Trustee shall litigate to judgment, propose settlements of, or withdraw objections to all Disputed Claims.

## ARTICLE VIII

## Appointment, Removal and Resignation of Litigation and Distribution Trustee

8.1 **Appointment of Litigation and Distribution Trustee; Acceptance of Appointment**. Stephen B. Darr is hereby appointed to serve as the initial Litigation and Distribution Trustee hereunder and pursuant to the Plan. Stephen B. Darr is willing to, and does hereby, accept the appointment to serve as the initial Litigation and Distribution Trustee, and to hold and administer the Litigation and Distribution Trust Assets pursuant to the terms of the Plan and this Agreement.

8.2 **Removal of the Litigation and Distribution Trustee**. A Litigation and Distribution Trustee appointed pursuant to this Agreement may be removed with

cause by order of the Bankruptcy Court after notice and opportunity for a hearing For purposes of this Agreement, the term "cause" shall mean: (a) the Litigation and Distribution Trustee's gross negligence or willful failure to perform his duties under this Agreement; (b) the Litigation and Distribution Trustee's misappropriation or embezzlement of any Litigation and Distribution Trust Assets or the proceeds thereof; or (c) the Litigation and Distribution Trustee's continued or repeated negligence or failure to perform his duties hereunder. If a Litigation and Distribution Trustee is removed, or is unwilling or unable to serve (1) by virtue of his inability to perform his duties under this Agreement due to death, illness or other physical or mental disability, (2) following the liquidation of all or substantially all of the Litigation and Distribution Trust Assets, or (3) for any other reason whatsoever, such Litigation and Distribution Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Litigation and Distribution Trustee.

8.3    **Resignation of Litigation and Distribution Trustee**.  A Litigation and Distribution Trustee may resign upon motion to the Bankruptcy Court, which resignation shall become effective at the time specified by the Court, contemporaneous with the appointment of a successor Litigation and Distribution Trustee. If a Litigation and Distribution Trustee resigns from his or her position hereunder, subject to a final accounting and the approval of the Bankruptcy Court, such Litigation and Distribution Trustee shall be entitled to all accrued unpaid fees, reimbursement, and other compensation to the extent incurred or arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Litigation and Distribution Trustee.

8.4    **Successor Litigation and Distribution Trustee**.  In the event that a Litigation and Distribution Trustee is removed, resigns, or otherwise ceases to serve as Litigation and Distribution Trustee, a successor Litigation and Distribution Trustee shall be appointed by the Oversight Committee.

## ARTICLE IX

### Effect of Agreement on Third Parties

9.1    **Effect of Agreement on Third Parties**.  There is no obligation on the part of any purchaser or purchasers from the Litigation and Distribution Trustee or any agent of the Litigation and Distribution Trustee, or on the part of any other person dealing with the Litigation and Distribution Trustee or any agent of the Litigation and Distribution Trustee, to see to the application of the purchase money or other consideration paid or delivered to the Litigation and Distribution Trustee, or any

agent of the Litigation and Distribution Trustee, or to inquire in to the validity, expediency, or propriety of any such transaction, or the authority of the Litigation and Distribution Trustee, or any agent of the Litigation and Distribution Trustee, to enter into or consummate the same upon such terms as the Litigation and Distribution Trustee may deem advisable.

## ARTICLE X

### Waiver

10.1  **Waiver**.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

## ARTICLE XI

### Termination of the Agreement; Amendment of the Agreement

11.1  **Termination of the Agreement**.  This Agreement will terminate only upon authorization of the Bankruptcy Court.  The duties, responsibilities and powers of the Litigation and Distribution Trustee shall terminate after (i) all Causes of Action transferred and assigned to the Litigation and Distribution Trust or involving the Litigation and Distribution Trustee on behalf of the Litigation and Distribution Trust, including but not limited to the Avoidance Actions, are fully resolved, and (ii) the Litigation and Distribution Trust Assets have been distributed on the final Distribution Date in accordance with the Plan and Litigation and Distribution Trust Agreement.  Notwithstanding the foregoing, this Agreement and the Litigation and Distribution Trust shall terminate on the later of the fifth (5th) year from the date hereof or such extended finite period(s) as approved by the Bankruptcy Court within six (6) months of the beginning of any such extended term(s),

11.2  **Amendment of Agreement**.  Except as otherwise set forth herein, any provisions of the Agreement may, consist with the terms of the Plan, be amended, modified, terminated, revoked or altered only upon Bankruptcy Court approval.

## ARTICLE XII

### Miscellaneous

12.1  **Severability**.  If any one or more of the provisions herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect, and of the remaining provisions, shall not be in any

way impaired or affected. In such event, there shall be added as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable. The effective date of the added provision shall be the date upon which the prior provision was held to be invalid, illegal or unenforceable.

12.2 **Entire Agreement**. This Agreement, the Plan and the Confirmation Order constitute the entire agreement of the parties and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. In the event of any inconsistency between this Agreement and the Plan, the Plan shall govern. Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

12.3 **Waiver of Jury Trial**. Each party to this Agreement hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this agreement or the transactions contemplated hereby.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the day and year first above written to evidence their counsel and agreement with the terms and provisions of this Agreement.

| FIRST NBC BANK HOLDING COMPANY | LITIGATION AND DISTRIBUTION TRUSTEE |
|---|---|
| By: | |
| Its: | Stephen B. Darr |

# EXHIBIT D

## DEMAND LETTER OF THE COMMITTEE

# Stewart | Robbins | Brown
## Attorneys at Law

Paul Douglas Stewart, Jr
Member

dstewart@stewartrobbins.com

December 21, 2017

**VIA FEDERAL EXPRESS**

Ashton J. Ryan, Jr.
151 Chateau St. Michel Dr.
Kenner, LA  70065

William B. Carrouche
2709 Old Spanish Trail
Slidell, LA  70461

James E. Fitzmorris, Jr.
700 Emerald Street
New Orleans, LA  70124

William David Aaron, Jr.
10 Natchez Trace Drive
Harvey, LA  70058

Peter W. Babin, III
68 Inlet Drive
Slidell, LA  70458

Lawrence Blake Jones
701 Poydras, Suite 4100
New Orleans, LA  70139

Herbert W. Anderson, Jr.
1400 Webster Street
New Orleans, LA  70118

Leon L. Giorgio, Jr.
Post Office Box 75010
Metairie, LA  70033-5010

Mary Beth Verdigets
2400 Gay Lynn Drive
Kenner, LA  70065

John Fenner French, Sr.
230 Carondelet Street
New Orleans, LA  70130

Marsha Crowle
6208 Pratt Place
New Orleans, LA  70122

Stephen P. Petagana
5533 S. Galvez Street
New Orleans, LA  70125

William Burnell
9 Rue Calais
Kenner, LA  70065-2010

Grish Roy B. Pandit
25 Chateau Mouton Drive
Kenner, LA  70065

Dale B. Atkins
2411 Oriole Street
New Orleans, LA  70122

Hermann B. Moyse, III
5926 Boone Drive
Baton Rouge, LA  70808

Richard M. Wilkinson
813 Barracks Street
New Orleans, LA  70116

Louis P. Ballero, Jr.
6537 Argonne Boulevard
New Orleans, LA  70124

James C. Roddy
26 Audubon Place
New Orleans, LA  70118

John C. Calhoun
5422 Prytania Street
New Orleans, LA  70115

Leander J. Foley, III
122 C Street, NW, Ste. 650
Washington, D.C. 20001

David W. Anderson
579 Audubon Street
New Orleans, LA  70118

Joseph F. Toomy
Post Office Box 663
Gretna, LA  70054-0663

George L. Jourdan
19 Briarfield Dr.
Marrero, LA 70072

Shivan Govindan
230 Gaylord Street
Denver, CO  80206

Charles C. Teamer, Sr.
32 Fairway Oaks Drive
New Orleans, LA  70131

Louis V Lauricella
1200 South Clearview
Parkway, Suite 1166
Elmwood LA 70123

Stewart Robbins & Brown LLC
Attorneys at Law

Post Office Box 2348
Baton Rouge, LA 70821-2348

301 Main Street, Suite 1640
Baton Rouge, LA 70801-0016

Phone:   (225) 231-9998
Facsimile: (225) 709-9467

First NBC Holding Directors and Officers
December 21, 2017
Page 2 of 7

Mark G Merlo
2828 Lloyd Street
San Diego CA 92117

William Roohi
5409 Reclanada Dr.
Metairie, LA 70003

Re:   In re First NBC Bank Holding Company

### NOTICE OF CLAIMS

Dear Sir or Madam:

This firm, along with co-counsel Jeffrey D. Sternklar, represents the Official Committee of Unsecured Creditors of First NBC Bank Holding Company (the "Committee"), appointed in the chapter 11 bankruptcy proceeding of First NBC Bank Holding Company ("FNBC" or "Debtor"), currently pending before the Honorable Elizabeth Wall Magner, Chief Judge for the U.S. Bankruptcy Court for the Eastern District of Louisiana.[1]  By order dated December 1, 2017 [ECF #261], the Bankruptcy Court conferred the Committee with standing to pursue FNBC's claims against FNBC's officers and directors.  Accordingly, the Committee, on behalf of the Debtor's bankruptcy estate (the "Estate"), hereby provides notice of a claim or claims (collectively, the "Claims"), and demand for payment, against you for damages exceeding the sum of $60,000,000.00.

The Estate's Claims and demand for payment of civil damages arise from and are based upon your breaches of fiduciary duty and/or gross negligence in connection with the business affairs of FNBC and its subsidiaries.  The Claims, and damages arising therefrom, result from your grossly negligent acts, errors, misstatements, misleading statements, and/or breaches of duty engaged in or permitted by you, including, but not limited to:

- Failure to properly supervise the FNBC's accounting, financial reporting, and internal audit and control functions and ensure compliance with the requirements imposed as a matter of law and practice on publicly traded entities and bank holding companies such as FNBC;

- Utilizing an improper accounting method related to tax deferred assets and tax credits which required FNBC to restate financial statements in various documents filed with the United States Securities and Exchange Commission ("SEC"), including, without limitation, restatements purporting to correct the use of an inappropriate amortization method in accounting for FNBC's various investments in tax credit partnerships, as opposed to proper application of the equity method of accounting, consolidation of certain investments in Federal Low-Income Housing Tax Credit entities because such entities were determined to be variable interest entities in which FNBC was the primary beneficiary, various other adjustments and income tax effects related to the these adjustments. All

---

[1]   *In re First NBC Bank Holding Company*, Case No. 17-11213, Section A, U.S. Bankruptcy Court, EDLA.

First NBC Holding Directors and Officers
December 21, 2017
Page 3 of 7

applicable amounts relating to this Restatement have been reflected in the consolidated financial statements and disclosed in the notes to the consolidated financial statements in multiple documents filed by FNBC with the SEC;

• Utilizing one or more improper accounting methods, resulting in the restatement of FNBC's financial statements as of and for the years ended December 31, 2014, 2013, 2012 and 2011 as well as each of the interim periods within the years ended December 31, 2015, 2014 and 2013;

• Restatement and revocation of press releases and earnings releases related to such periods, as well as management's report on the effectiveness of internal control over financial reporting as of December 31, 2013 and 2014, and the admission that they should no longer be relied upon;

• Utilizing an improper methodology for the recognition of impairment of FNBC's investment in tax credit entities and FNBC's failure to properly consolidate variable interest entities related to Low-Income Housing Tax Credit entities;

• Failure to ensure FNBC deducted its deferred tax assets from its common equity tier 1 capital properly, and failure to disclose the adverse effects that FNBC would suffer if it deducted its deferred tax assets properly;

• Failure to properly account for and state tier 1 capital in conformity with "Basel III";

• Failing to file or pursue claims or to take action that could have mitigated or lessened FNBC's losses;

• Failing to supervise, manage, direct, and/or conduct the business and affairs of FNBC to ensure compliance with all applicable laws and regulations and FNBC policies;

• Failing to adopt and implement policies and procedures to protect the financial stability of FNBC, and failing to take steps to mitigate or lessen losses to FNBC;

• Failure to provide truthful information to creditors, shareholders and the public regarding all of these matters;

• Misrepresentations of material facts and false and misleading representations of material facts, including, without limitation, with respect to the adequacy or inadequacy of FNBC's equity capital;

First NBC Holding Directors and Officers
December 21, 2017
Page 4 of 7

    •    Omission of disclosure of material facts necessary in order to make statements made by FNBC, in light of the circumstances under which they were made, not misleading;

    •    Any and all activities related to the foregoing that violated the duties of FNBC's officers and directors owed to FNBC.

These deficiencies, errors, misstatements, restatements, misrepresentations, and omissions, demonstrate grossly negligent conduct and breaches of fiduciary duty, and such actions or non-actions resulted in damage to FNBC. Although the Committee has not been able to quantify at this time the precise damages resulting from your grossly negligent conduct and/or breaches of fiduciary duty, the Committee believes the damages causes FNBC are in excess of $60,000,000. In light of the grossly negligent conduct and/or breaches of fiduciary duty, demand is hereby made for you, collectively to immediately and promptly pay the sum of $60,000,000 to the Estate. Payment may be made by cashier's check to the address above. Wire transfer instructions will be provided upon request.

This demand for payment for civil monetary damages is made with full reservation of, and without limitation to, all rights of the Committee and the Estate. The Committee is continuing its investigation of this matter and the Committee reserves the right to amend and/or supplement its demand for monetary damages against you and any other former FNBC officer, director, employee or any other third-party who provided services to FNBC. The estimated damages are the direct result of grossly negligent conduct and/or breaches of fiduciary conduct described herein (and as may be supplemented).

We are simultaneously providing direct notice to your insurers listed herein pursuant to the notice provisions in the primary and excess policies. The Committee hereby makes demand on said insurers listed herein pursuant to the Louisiana Direct Action Statute, La. R.S. § 22:1269, to the same extent made against you.

You may have insurance coverage available for all or some of the Claims asserted herein. Please note, you should forward this letter to such insurers to protect your legal rights under applicable insurance policies. The Committee is willing to discuss resolution of the Claims prior to filing any legal action. Please confirm receipt of this letter and let us know if you would like to engage in discussions towards resolving the Claims. Please direct all substantive inquiries and communications to:

    Jeffrey D. Sternklar
    Jeffrey D. Sternklar LLC
    26th Floor
    225 Franklin Street
    Boston, MA 02110
    jeffrey@sternklarlaw.com

First NBC Holding Directors and Officers
December 21, 2017
Page 5 of 7

and

Paul Douglas Stewart, Jr.
Stewart Robbins & Brown
301 Main Street (70801-0016)
Post Office Box 2348
Baton Rouge, Louisiana 70821-2348
dstewart@stewartrobbins.com

Finally, the Committee demands that you and your insurers hereby preserve, and not discard, destroy, mutilate or otherwise efface, any documents or electronically stored information in your possession, custody or control that pertains or relates, in any way, to the Claims, facts, transactions or other matters or circumstances referred to in this letter, or insurance coverage related thereto.

Sincerely yours,

Paul Douglas Stewart, Jr.

PDS/kah

cc:   William E. Steffes, Esq.
      Jeffrey D. Sternklar, Esq.
      Zurich Insurance (Policy No. DOP 9311203-04)

First NBC Holding Directors and Officers
December 21, 2017
Page 6 of 7

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED), EMAIL, AND FAX**
AIG, Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225
Fax: (866) 227-1750
Email: c-claim@AIG.com
Ref: Illinois National Insurance Company, Policy No. 06-473-18-11; Illinois National Insurance
Company, Policy No. 06-481-51-29

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED) AND EMAIL**
XL Professional Insurance
100 Constitution Plaza, 13th Floor
Hartford, CT 06103
Email: proclaimnewnotices@xlcatlin.com
Ref: XL Specialty Insurance Company, Policy No. ELU148261-16

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED) AND EMAIL**
Freedom Specialty Insurance Company
Attention: Claims Manager
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007
Email: fsreportaclaim@freedomspecialtyins.com
Ref: Freedom Specialty Insurance Company, Policy No. XMF1602583

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED), EMAIL, AND FAX**
Berkshire Hathaway Specialty Insurance
500 Northpark Town Center
1100 Abernathy Road, N.E., Suite 1200
Atlanta, GA 30328
Email: claimsnotice@bhspecialty.com
Fax: (617) 507-8259
Ref: Berkshire Hathaway Specialty Insurance Company, Policy No. EPF-303265-01

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED), EMAIL, AND FAX**
Claims Manager
Markel American Insurance Company
P.O. Box 2009
Glen Allen, VA 23058
Fax: (855) 662-7535
Email: newclaims@markelcorp.com
Ref: Markel American Insurance Company, Policy No. MKLM6EL0002907

First NBC Holding Directors and Officers
December 21, 2017
Page 7 of 7

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED) AND EMAIL**
Tokio Marine HCC- D&O Group
8 Forest Park Drive
Farmington, CT 06032
Attn: Claims Manager
Email: usclaims@tmhcc.com
Ref: U.S. Specialty Insurance Company, Policy No. 14-MGU-16-A39690; U.S. Specialty
Insurance Company, Policy No. 14-MGU-16-A39694

# EXHIBIT E

## ESTIMATED ADMINISTRATIVE EXPENSE

## AND PRIORITY CLAIMS

Estimated Administrative Expense and Priority Claims (estimated through the Confirmation Date)

| | |
|---|---|
| Debtor's DIP Account Balance as of May 31 | $756,541 |
| | |
| Office of the U.S. Trustee | $5,525 |
| Committee Counsel - Sternklar | $50,000 |
| Committee Counsel-Stewart Robbins & Brown | $81,731 |
| Indenture Trustee Fees and Expenses | $180,000 |
| Debtor General Bankruptcy Counsel | $128,755 |
| Debtor Special Counsel - Geoffrey Kay | $20,000 |
| Debtor Accountants - PwC | $150,000 |
| Debtor Transfer Agent Computershare | $5,000 |
| Debtor Notice and Solicitation Agent - Globic | $18,000 |
| Debtor CPA (LDR tax returns) -Nash | $5,000 |
| Phelps Dunbar | $3,712 |
| Priority NQDC Claims | $0 |
| Priority Tax Claims | $0 |
| Total Estimated Admin and Priority Claims | <u>$647,723</u> |
| | |
| Balance to Litigation & Distribution trust | $108,818 |

# EXHIBIT F

## LITIGATION AND DISTRIBUTION TRUSTEE BACKGROUND



**STEPHEN DARR**

T 617.226.5593
E sdarr
@huronconsultinggroup.com

**BUSINESS ADVISORY**
MANAGING DIRECTOR

- Mr. Darr has more than 30 years of experience providing accounting, auditing and financial consulting services to business organizations, many of which are experiencing significant financial and operating difficulties. Mr. Darr has led advisory engagements involving several significant reorganization cases, has served in a variety of fiduciary capacities, including Creditors' Trustee, Liquidating Trustee, Assignee for the Benefit of Creditors and Chapter 11 Trustee. In addition, Mr. Darr was formerly a Chapter 7 Trustee for the District of New Hampshire.

- Mr. Darr's fiduciary experience includes identification and pursuit of potential causes of action, including tortious interference, claims against directors and officers, fraudulent conveyance, preferential payments, solvency, indubitable equivalency and other related matters.

- His industry experience includes banking, law and professional services firms, healthcare, pharmaceuticals, energy, automotive, real estate/construction, mortgages/derivatives, telecommunications, and manufacturing and distribution.

- Mr. Darr's experience also includes providing litigation support and expert testimony in bankruptcy and non-bankruptcy matters involving preference and fraudulent conveyance actions, professional liability claims, patent infringement, royalty and intellectual property disputes, construction claims, wrongful employment discharge and lender liability and business tort claims. He has testified in U.S. Bankruptcy Court proceedings in Delaware, New York, Pennsylvania, Massachusetts, Rhode Island, Connecticut, Maine, New Hampshire and Vermont on a wide range of bankruptcy matters, including feasibility of business plans, allowability of creditors' claims, best-interests test for unsecured creditors, fraudulent conveyance claims, preference actions, solvency, debtor-in-possession financing, substantive consolidation issues, cash collateral arrangements, valuation, equitable subordination, reorganization tax issues, and key employee retention plans.

- **Education and Certification**
  - M.B.A., University of Chicago
  - B.B.A., Boston College
  - Certified Public Accountant - Massachusetts, New Hampshire
  - Certified Insolvency and Restructuring Advisor
  - Certification in Financial Forensics
  - Certification in Distressed Business Valuation
  - FINRA Series 7, 24, 79
  - **Professional Associations**
  - Fellow, American College of Bankruptcy

**Bankruptcy Proceedings**

- TelexFree LLC et al.-Currently serve as Chapter 11 trustee involving a world-wide pyramid/Ponzi scheme with approximately 2,000,000 victims holding 11,000,000 user accounts. Work closely with the Enforcement Division of the SEC, Homeland Security Investigations and the office of the U.S. Attorney for Massachusetts. Key accomplishments

  — Devised a working version of the Debtors' accounting system for participants

  — Directed the development and administration of an electronic portal for submission of claims (approximately 130,000 claims received)

  — Instituted two reverse class action complaints seeking recovery of fraudulent transfers from 93,000 defendants

- Columbus Mortgage-Served as Chapter 11 trustee for a mortgage lending company which failed to release fully-paid mortgage liens, defrauded investors and violated state and Federal securities laws.

  • Identified and directed successful prosecution of fraud claims against the Debtor's principals

- Oscient Pharmaceuticals, Inc.-Served as post-confirmation Plan Trustee; responsibilities include liquidation of remaining assets, claims review and objections, identification and prosecution of preference actions, tax reporting, wind-up of employee benefit plans and distributions to creditors

  • Identified and directed successful prosecution of preference and fraudulent conveyance complaints

- Armco, International, Inc.-Served as Chapter 11 trustee for major importer of firearms and ammunition; responsibilities included controlling extensive inventory of firearms and ammunition (including automatic weapons (BATF Class 3) and destructive devices (BATF Class 10), conducting a public auction under the supervision of the BATF and the FBI, claims review and distribution to shareholders; identified and pursued preference actions.

  • Identified and directed successful prosecution of preference and fraudulent conveyance complaints

- BKW Systems, Inc. - Served as Chapter 11 Trustee for multi-state provider of data processing services to mid-size banks having assets $500 million to $1 Billion; responsibilities included operating the business for approximately 8 months while stabilizing operations and maintaining relations with user group; directed sale process and negotiated sale of Company.

  • Identified and directed successful prosecution of preference and fraudulent conveyance complaints

- Access Cardiosystems, Inc.-Served as Chief Restructuring Officer during Chapter 11; responsibilities included financial reporting, bankruptcy planning and execution, human resources, information technology, claims review and assisted in directing wind-down of the Debtor.

- Androscoggin Energy-Served as distribution agent; responsibilities included preparing and reporting on payments made to creditors pursuant to confirmed Plan

- Legal Data Systems, Inc. – Served as Chapter 11 Trustee for approximately two years; responsibilities included stabilizing operations, maintaining relations with user group and developing next generation computer software; directed sale process and negotiated sale of Company.

  • Identified and directed successful prosecution of preference and fraudulent conveyance complaints



## STEPHEN DARR

**T** 617.226.5593
**E** sdarr
@huronconsultinggroup.com

**BUSINESS ADVISORY**
MANAGING DIRECTOR

# Stephen Darr

## Managing Director



Mr. Darr has over 35 years of experience providing accounting, auditing and financial consulting services to business organizations, many of which are experiencing significant financial and operating difficulties. His industry experience includes law and professional services firms, healthcare, pharmaceuticals, energy, automotive, real estate/construction, mortgages/derivatives, telecommunications, and manufacturing and distribution.

**Professional experience**

Mr. Darr's experience also includes providing litigation support and expert testimony in bankruptcy and non-bankruptcy matters involving preference and fraudulent conveyance actions, professional liability claims, patent infringement, royalty and intellectual property disputes, construction claims, wrongful employment discharge and lender liability and business tort claims. He has testified in court proceedings in Delaware, New York, Pennsylvania, Massachusetts, Rhode Island, Connecticut, Maine, New Hampshire, California and Vermont on a wide range of matters, including valuation, contract disputes, feasibility of business plans, financing arrangements, allowability of creditors' claims, Preference and fraudulent conveyance claims, solvency, substantive consolidation and veil-piercing issues, equitable subordination, reorganization tax issues, and key employee retention plans.

Representative examples of Stephen's engagement experience include:

- Currently serve as Chapter 11 Trustee for TelexFree, LLC, an international Ponzi/pyramid scheme involving Voice Over the Internet Protocol (both landline and mobile) with approximately 1,500,000 participants

- Provided analysis and testimony on behalf of the Vermont Public Service Board before the Vermont Public Service Commission regarding FairPoint Communication, Inc.'s proposed Plan of Reorganization. (engagement performed while with a previous firm).

- Served as a consulting expert for the defendant in an intellectual property dispute alleging damages in excess of $250 million.

- Testified regarding make-whole damages asserted in Calpine's bankruptcy case on behalf of bondholders with bonds totaling $2.5 billion.

- Testified in support of Plan of Liquidation of New England Compounding Pharmacy, Inc.

- Retained by the Creditors' Committee to investigate and report on intercompany transfers exceeding $1 billion to pre-petition transfers made shortly prior to Chapter 11 proceedings

**Education and certification**

- M.B.A., University of Chicago

- B.B.A., Boston College

- Certified Public Accountant - Massachusetts, New Hampshire

- Certified Insolvency and Restructuring Advisor

- Certification in Financial Forensics

- Certification in Distressed Business Valuation

- FINRA Series 7, 24, 79

**Past & Current Board Memberships**

- Fellow, American College of Bankruptcy

- Director, Association of Insolvency and Restructuring Advisors

P: 617-226-5593

C: 617-510-7766

sdarr@huronconsultinggroup.com

**Huron**BusinessAdvisory

© 2015 Huron Consulting Group. All rights reserved. Proprietary & Confidential.

# SCHEDULE 1

## <u>CHAPTER 7 LIQUIDATION ANALYSIS</u>

*In re First NBC Bank Holding Company*, Case No. 17-11213

## Liquidation Analysis

|  | **Chapter 11 Plan** | **Chapter 7 Liquidation** |
|---|---|---|
| **ASSETS** | | |
| Cash on Hand as of Effective Date | $756,000 | $756,000 |
| Guaranteed Minimum Payment | $4,250,000 | $   0 |
| Senior debt instrument to Distribution & Litigation Trust | $300,000 | $   0 |
| Proceeds from Tort Claims of Debtor | unknown | unknown |
| Tax Attributes[1] | n/a | $   0 |
| **Total Assets** Available for Distribution | **$5,306,000+** | **$756,000+** |
| Less Trustee and/or Professional Fees | ($647,000) | ($747,000) |
| **Total Available Funds** | **$4,659,000** | **$9,000** |
| | | |
| **CREDITOR CLAIMS** | | |
| Priority Tax Claims | $   0 | $   0 |
| Priority NQDC Claims | $   0 | $   0 |
| **Total Available for Unsecured** | $4,659,000 | $9,000 |
| | | |
| Estimated General Unsecured Claims | $66,405,000 | $66,405,000 |
| **Estimated Recovery for Unsecured Creditors** | **7%-50%+**[2] | **0%+** |

---

[1]  Because Tax Attributes will be revest in the Reorganized Debtor and are not included in distributions contemplated under the Plan, their value is not included in this Liquidation Analysis. They have no value in Chapter 7 liquidation.

[2]  Up to $30,000,000 in Allowed General Unsecured Claims are eligible to receive payment in full under the Debt Option provided in the Plan.

# First NBC Bank Holding Company

## Liquidation Analysis Assumptions

1. Trustee and/or Professional Fees – The amount shown for the Chapter 11 scenario is the Debtor's best estimate of amounts due to professionals engaged in the Chapter 11 case by the Debtor and the Committee.  The amount shown for the Chapter 7 scenario includes the fee amounts estimated for the Chapter 7 Trustee; the Chapter 11 (as earned and entitled to priority) professional fees; plus an additional $100,000 as estimated fees and expenses for professionals who would likely be retained by a Chapter 7 Trustee to assist in the liquidation of the estate, including attorneys and certified public accountants.  See Exhibit E to Disclosure Statement.

2. Proceeds from Tort Claims - The value of the Tort Claims will be the same under the Plan and in a Chapter 7 Case and could range from $0 to $60,000,000; however, the $300,000 senior debt instrument is only available to the Litigation and Distribution Trust to assist with the prosecution of those claims under the Plan.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:

FIRST NBC BANK HOLDING COMPANY                    CASE NO. 17-11213

                                                  SECTION A

DEBTOR                                            CHAPTER 11

### CLASS 2: REGISTERED HOLDER BALLOT FOR ACCEPTING OR REJECTING THE JOINT PLAN OF REORGANIZATION FILED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS AMENDED ON JULY 2, 2019

**First NBC Bank Holding Company
5.75% Subordinated Notes due February 2025
CUSIPs:  32115DAA4 and 32115DAB2
(collectively, the "Notes")**

**Voting Record Date:   July 3, 2019
Voting Deadline: July 31, 2019**

First NBC Bank Holding Company (the "Debtor") and the Official Committee of Unsecured Creditors ("Committee"), filed a Joint Amended Plan of Reorganization dated July 2, 2019 (the "Plan"). The Court has approved a Disclosure Statement dated July 2, 2019 with respect to the Plan (the "Disclosure Statement").  If you do not have a Disclosure Statement, you may obtain a copy from Barbara B. Parsons, The Steffes Firm, LLC, 13702 Coursey Boulevard, Building 3, Baton Rouge, Louisiana, 70817, (225)751-1751, (225)751-1998 (facsimile), bparsons@steffeslaw.com.  All capitalized terms not defined herein shall have the meanings given to them in the Plan.

You are receiving this Ballot because records maintained by the Note Indenture Trustee indicate that you are a registered Holder of Notes[1] as of the Voting Record Date of July 3, 2019. Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is included in the Solicitation Package you are receiving with this Ballot.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.  This Ballot may not be used for any purpose other than casting votes to accept or reject the Plan and electing a Class 2 Claim treatment option. The Plan can be confirmed by the Bankruptcy Court and thereby made binding on creditors and interest holders if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each class that has accepted or rejected the Plan and such class is eligible to vote on the Plan.  In the event the required acceptances are not obtained, the

---

[1] Referred to in the Plan and Disclosure Statement as "**Bondholder**".

Bankruptcy Court may nevertheless confirm the Plan if the Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b).

## INSTRUCTIONS FOR COMPLETING
## THE FIRST NBC BANK HOLDING COMPANY BALLOT

The Debtor and the Committee are soliciting your vote on their proposed Plan, attached as Exhibit A to the Disclosure Statement accompanying this Ballot. You should review the Disclosure Statement and the Plan carefully before you complete the Ballot. You may wish to seek legal advice concerning the Plan, your classification and the treatment under the Plan. If you hold claims in more than one class or in one or more of the above CUSIPs, you will receive a ballot for each class or CUSIP in which you are entitled to vote. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU MUST COMPLETE EACH BALLOT SEPARATELY.**

In order for this Ballot to be validly cast, you must complete, sign, date and return this Ballot to the Voting Agent at the address set forth on the enclosed envelope. If you hold your Notes via a Custodian or Nominee, please instruct your Custodian or Nominee in the manner that they have provided you. **Unsigned Ballots may not be counted or considered by the Court for any purpose in determining whether the Plan has been accepted or rejected. Ballots executed in a manner that (i) indicate no election of a Class 2 Claim treatment option, or (ii) indicate an election of both Class 2 Claim treatment options will be deemed by the Court as an election of the Cash Option under the Plan.** The Voting Agent will accept electronic receipt (scanned and sent via e-mail or facsimile) prior to the Voting Deadline set forth above, unless such deadline is extended by the Bankruptcy Court. **If you fail to timely return a Ballot properly executed, you will be deemed to have elected the Cash Option.**

**A vote to accept the Plan or to elect a Class 2 Claim treatment option does not constitute a waiver of any right to object to the Plan.**

Creditors may *not* split their claims to submit partial votes. For each claim on which a creditor is entitled to vote, a ballot for that entire claim must be cast for, or against, the plan (*i.e.*, entire claim "accepts" or "rejects").

All authorized signatories (*e.g.,* guardian, conservator, executor, or other agent or representative) may execute this Ballot, *provided* that such signatory includes the name and address of the claim holder on this Ballot and is ready, willing and able to provide supporting evidence to the Debtor and the Bankruptcy Court demonstrating such signatory's authorization to vote on behalf of such claim holder. Authorized signatories voting on behalf of more than one claim holder must complete a separate Ballot for each claim holder.

To complete the Ballot properly, take the following steps:

1) **Step 1. The Claim Amount.** If no claim amount is pre-printed in Step 1, fill in the unpaid amount of your claim in Item 1. This should be the amount asserted in your proof of claim or, if you did not file a proof of claim, the debt scheduled by the Debtor.

2) **Step 2.  Voting on the Plan.**  Vote to accept or reject the Plan by checking one of the boxes under Step 2.

3) **Step 3.  Election of Class 2 Claim Treatment Option.**  Elect one of the alternative Class 2 Claim treatment options by checking one of the boxes under Step 3. Should you elect or be deemed to elect the Cash Option provided for Class 2 Claim holders, you shall be deemed to have assigned all your SPV Claim Rights to First Phoenix, LLC as of the Effective Date of the Plan.

4) **Step 4.  Certification.**  Provide your name, mailing address, other information indicated, and <u>sign and date.</u>

5) **Step 5. Return the Ballot to the Voting Agent:**

<div align="center">

**Globic Advisors**
**Attn: Robert Stevens**
**485 Madison Avenue, 7th Floor**
**New York, NY 10022**
Facsimile: 212-271-3252
E-mail: rstevens@globic.com

</div>

**IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, PLEASE CONTACT ROBERT STEVENS OF GLOBIC ADVISORS AT 212-201-5346 OR VIA EMAIL AT RSTEVENS@GLOBIC.COM.**

**STEP 1.**          <u>**PRINCIPAL AMOUNT OF NOTES HELD AS OF THE RECORD DATE**</u>

As of the Voting Record Date, July 3, 2019, the undersigned was the Registered Holder (or authorized signatory for a Registered Holder) of the Notes in the following amount:

<div style="border:1px dotted;">

**[Put Label Here]**

Name(s) _____

CUSIP No._____

Amount Held $_____

</div>

**STEP 2.**          <u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

The undersigned Registered Holder of the Notes and Class #2 Claim, as listed above in Step 1, hereby votes to:

<u>Check one box only</u>      [   ]    ACCEPT THE PLAN

                              [   ]    REJECT THE PLAN

## STEP 3.        <u>ELECTION OF THE CLASS 2 CLAIM TREATMENT OPTION</u>

The undersigned Registered Holder of the Notes and Class #2 Claim, as listed above in Step 1, hereby elects:

<u>Check one box only</u>      [   ]    THE CASH OPTION

                              [   ]    THE DEBT OPTION

## STEP 4.      <u>CERTIFICATION</u>

By returning this ballot, you certify that you (a) on July 3, 2019, you were the Registered Holder of the Notes to which this Ballot pertains (or an authorized signatory); (b) have full power and authority to vote to accept or reject the plan and (c) have received a copy of the disclosure statement (including exhibits thereto) and understand that the solicitation of votes for the plan is subject to all the terms and conditions set forth in the disclosure statement and the relevant Court Order(s).

By voting on the Plan, you will be deemed to have consented to the submission of your Ballot to the Voting Agent and the Debtor or its agents by you or your Nominee as applicable.

Date: _____

Signature: _____

Print Name: _____

Company/Creditor: _____

Title (if appropriate): _____

Address: _____

City/State/Zip: _____

Phone: _____ Email Address: _____

**PLEASE RETURN THIS BALLOT IMMEDIATELY IN THE ENVELOPE PROVIDED**

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, PLEASE CONTACT **ROBERT STEVENS OF GLOBIC ADVISORS AT 212-227-9699 OR VIA EMAIL AT RSTEVENS@GLOBIC.COM.**

# EXHIBIT 2

| CUSIP | NAME | NAME 2 | ATTN | ADDRESS | ADDRESS 2 | CITY STATE ZIP |
|---|---|---|---|---|---|---|
| 32115DAA4 | MACON BANK, INC. | | | 102 W MAIN STREET | | FRANKLIN NC 28734 |
| 32115DAB2 | BROWN BROTHERS HARRIMAN | FBO FIDELITY & GUARANTEE LIFE INSURANCE CO. | | 1001 FLEET STREET | 6TH FLOOR | BALTIMORE MD 21202 |
| 32115DAB2 | US BANK NA | FBO ANGEL OAK MULTI-STRATEGY INCOME FUND | | P.O. BOX 1787 | | MILWAUKEE WI 53201-1787 |
| 32115DAB2 | HARE & CO., LLC | C/O BNYMELLON | ATTN: BOX 11203 | 500 ROSS STREET | 154-0455 | PITTSBURGH PA 15262-0001 |
| 32115DAB2 | FEDERATED LIFE INSURANCE COMPANY | | ATTN: DONNA ENNIS, INVESTMENTS | 121 EAST PARK SQUARE | | OWATONNA MN 55060 |
| 32115DAB2 | FEDERATED MUTUAL INSURANCE COMPANY | | ATTN: DONNA ENNIS, INVESTMENTS | 121 EAST PARK SQUARE | | OWATONNA MN 55060 |
| 32115DAB2 | CINCINNATI INSURANCE COMPANY | | | 6200 SOUTH GILMORE ROAD | | FAIRFIELD OH 45014 |
| 32115DAB2 | BROWN BROTHERS HARRIMAN & CO | | | 140 BROADWAY | | NEW YORK NY 10005 |
| 32115DAB2 | CINCINNATI LIFE INSURANCE COMPANY | | | 6200 SOUTH GILMORE ROAD | | FAIRFIELD OH 45014 |
| 32115DAB2 | FEDERATED SERVICE INSURANCE COMPANY | C/O FEDERATED INSURANCE COMPANY | ATTN: DONNA ENNIS, INVESTMENTS | 121 EAST PARK SQUARE | | OWATONNA MN 55060 |
| 32115DAB2 | FARMERS NATIONAL BANK OF EMLENTON | | | 612 MAIN ST | | EMLENTON PA 16373 |
| 32115DAB2 | AMERICAN MUTUAL LIFE ASSOCIATION | C/O SANDLER O'NEILL & PARTNERS, LP | ATTN: JOE FIORITO | 1251 AVENUE OF THE AMERICAS | 6TH FLOOR | NEW YORK NY 10020 |