**Exhibit A**

# DEBTOR BACKGROUND AND CASE HISTORY

## I. BACKGROUND OF THE DEBTOR

A. FORMATION OF THE DEBTOR

FNBC was incorporated on May 9, 2006, and headquartered in New Orleans, Louisiana. It was formed as a holding company for First NBC Bank ("Bank"), whose primary market was the New Orleans metropolitan area and the Florida panhandle. Prior to its removal on May 18, 2018, FNBC was publicly traded on the NASDAQ Global Select Market.

On April 28, 2017, the Bank was closed ("Bank Closure") by the Louisiana Office of Financial Institutions, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver. At the time of the Bank Closure, FNBC's principal asset was the capital stock that it owned in the Bank; and, as a result of the Bank Closure, FNBC had no remaining material tangible assets. Specifically, after the Bank Closure, FNBC held no operating business assets; and, thus, no active business operations have been conducted since the Bank Closure.

B. PRE-PETITION CAPITAL STRUCTURE

FNBC's capital structure consists of one class of common stock and two classes of preferred stock. The authorized capital stock of FNBC consists of 100 million shares of common stock and 39,660 shares of preferred stock. As of March 31, 2017, FNBC had 19,212,751 shares of common stock outstanding which was traded under the symbol "FNBC" on the NASDAQ Global Select Market. Additionally, FNBC had 37,925 shares of its Senior Non-Cumulative Perpetual Preferred Stock, Series D; and, 1,725 shares of its Non-Cumulative Mandatorily Convertible Perpetual Stock, Series E outstanding as of that date.

C. CORPORATE GOVERNANCE

The Debtor is governed by its Board of Directors, existing on the Petition Date:

| | |
|---|---|
| William D. Aaron, Jr. | Director |
| William M. Carrouche | Director |
| Leander J. Foley, III | Director |
| John F. French | Director |
| Leon L. Giorgio, Jr. | Vice Chairman |
| Shivan Govindan | Chairman |
| Lawrence Blake Jones | Director |
| Louis V. Lauricella | Director |
| Mark G. Merlo | Director |
| Dr. Charles C. Teamer | Director |
| Joseph F. Toomy | Director |

Immediately prior to the commencement of this case ("Chapter 11 Case"), the Board appointed Mr. Lawrence Blake Jones as Chief Restructuring Officer to address the day-to-day affairs of the Debtor during the pendency of the Chapter 11 Case. The Board of Directors and the Chief Restructuring Officer have served without compensation since commencement of the case.

D. PRIMARY LIABILITIES OF THE DEBTOR

The primary indebtedness of the Debtor is represented by an Indenture, dated as of February 18, 2015, pursuant to which FNBC issued subordinated notes in the aggregate principal amount of $60.0 million (the "Notes"). As a result of the Bank Closure, the holders of over two-thirds (2/3) of the Notes requested that FNBC be placed into Chapter 11 bankruptcy to protect the value of its remaining assets including its significant tax attributes, currently estimated to be $151.0 million in tax credits and $366.0 million in net operating loss carryforwards (the "Tax Assets").

## II. CHAPTER 11 CASE HISTORY

A. PRELIMINARY MATTERS

On May 11, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On May 23, 2017, an official committee of unsecured creditors ("Committee") was appointed in the Chapter 11 Case.

B. PRESERVATION AND RECOVERY OF ESTATE ASSETS

On the Petition Date, the Bankruptcy Court granted an order establishing notice, hearing and sell-down procedures for trading in equity securities and claims against FNBC's estate (the "Trading Order"). The Trading Order[1] was sought to preserve the Debtor's significant Tax Assets that existed on the Petition Date. On September 15, 2017, the Debtor engaged PricewaterhouseCoopers ("PwC") to conduct an analysis of FNBC's stock ownership history ("PwC Analysis 1") to determine whether or not an ownership change had occurred which would preclude utilization of the Tax Assets under IRC §362. The PwC Analysis 1 determined that no such ownership change had occurred.

On August 18, 2017, the Debtor filed its *Ex Parte Motion for Turnover of Property of the Estate* [Doc. 91], seeking turnover of $593,686.84 held by Whitney Bank (the "Trust Funds"), as successor trustee of the Trust. Litigation arose between the FDIC and the Debtor regarding ownership of the Trust Funds; and, pursuant to a settlement reached between the parties ("FDIC Settlement")[2], the Trust Funds were apportioned between and distributed to the FDIC and the Debtor.

---

[1] The 13th Interim Trading Order [Doc. 750] is currently in effect until December 4, 2019.
[2] The FDIC Settlement was approved by the Bankruptcy Court on December 19, 2017 (Doc. 297).

On October 13, 2017, the Debtor filed a second *Motion for Turnover of Property of the Estate* [Doc. 183], seeking recovery of $2,069,359.11 from Zurich American Insurance Company as reimbursement for certain pre-Petition Date litigation expenses covered under the Zurich policy. The FDIC again objected to the Debtor's turnover motion; and, that objection was also resolved through the FDIC Settlement, which resulted in $1,500,000.00 being distributed to the Debtor's estate.

C.     ESTABLISHMENT OF BAR DATES

On July 8, 2019 the Bankruptcy Court entered an order [Doc. 626] ("Rejection Order") granting the Debtor's *Motion To Reject Executory Contracts And Unexpired Leases and To Establish Bar Date For Rejection Damages,* which order (a) formally rejected all such contracts and leases other than the Debtor's transfer services contract with Computershare: and, (b) established July 23, 2019 as the bar date for filing claims for rejection damages. No such damage claims were filed.

The Bankruptcy Court had previously established October 20, 2017 as the general bar date for filing proofs of claim [Doc. 119] and November 7, 2017 for all governmental units. In addition, May 13, 2019 was established as the deadline for filing requests for allowance of most administrative expense claims. [Doc. 543].

D.     DEVELOPMENT OF THE CHAPTER 11 PLAN

On March 14, 2018, the Debtor and the Committee filed competing plans of reorganization in the Chapter 11 Case. In response to the Committee's proposed chapter 11 plan ("Committee Plan"), the Debtor expanded the PwC engagement to conduct an analysis ("PwC Analysis 2") of preservation of the Tax Assets through the Committee Plan. The PwC Analysis 2 determined that the Tax Assets could not be preserved under the Committee Plan. Following *many months* of

negotiations between the Debtor and the Committee, the parties agreed to file a joint chapter 11 plan of reorganization ("Joint Plan" or "Plan"). The initial Joint Plan was filed on April 17, 2019. On May 30, 2019, the Debtor again expanded the scope of PwC's engagement ("PwC Analysis 3") to confirm that the provisions of the Joint Plan would not trigger an ownership change under IRC §362 and preclude the Debtor's ability to utilize the Tax Assets in the future. The PwC Analysis 3 determined that the Joint Plan, as amended, would not trigger such ownership change.

      E.      ACCEPTANCE OF THE CHAPTER 11 PLAN

On July 3, 2019, solicitation of votes for approval of the Plan commenced. Pursuant to the Tabulation of Voting [Doc. 676] filed on August 5, 2019, the Plan has been accepted by 100% of the claimants voting in all classes entitled to vote. The Plan Proponents maintain that all requirements of confirmation have been satisfied; and, that after approximately 2 ½ years in bankruptcy, save the Treasury Objection, this Chapter 11 Case is on track for prompt conclusion with distributions to creditors. As set forth in the Plan, such distributions are contingent upon investor funding on the Effective Date. *Thus, if the Plan is not confirmed, creditors will not receive at least $4.25 Million they are to receive under the Plan and, indeed, Treasury will be assured of receiving nothing at all. Moreover, sustaining Treasury's Objection will also deny the FDIC, another arm of the United States, any recovery from the estate as the holder of a $3.5 Million claim. On the other hand, if the Plan is confirmed, Treasury will continue to have a right to receive dividends from future profits going forward and may well eventually receive its liquidation preference of nearly $38 million.*