IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:<br><br>**First NBC Bank Holding Company,**<br><br>Debtor. | Case No. 17-11213<br><br>Section "A"<br><br>Chapter 11 |

**UNITED STATES' REPLY BRIEF IN SUPPORT OF ITS
OBJECTION TO CONFIRMATION OF THE SECOND
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

**NOW INTO COURT**, comes the United States on behalf of its Department of the Treasury (the "United States"), and submits this Reply Brief ("United States' Reply Brief") in support of its Objection ("United States Objection," P-669) and Supplemental Brief ("United States' Supplemental Brief," P-691) opposing confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization (the "Plan," P-621).[1]

### Introduction

1. The United States invested approximately $38 million of taxpayer money—as preferred equity—in the Debtor in order to provide tier 1 capital to a bank holding company. This purpose was clear as the Securities Purchase Agreement ("Purchase Agreement") had covenants requiring, among other things, that as long as the United States owned this preferred equity ("Series D Preferred Equity"), the Debtor was required to maintain its status as a bank holding company and to remain "predominantly engaged in financial activities." The Purchase Agreement was incorporated by reference in the stock certificate for the Series D Preferred Equity ("Stock Certificate"), and accordingly

---

[1] The Debtor made a motion (P-741) — which has not yet been ruled on and which may be amended—for an order approving immaterial modifications ("Modifications") to the Second Amended Joint Chapter 11 Plan. The United States understands that these Modifications generally will not affect treatment of Class 8 under the Plan (P-621).

under Louisiana law, the covenants in the Purchase Agreement are an integral part of the Series D Preferred Equity.

2. The Plan, however, seeks to require the United States to maintain this investment in an entity that is no longer a bank holding company—this alone constitutes impairment. Additional impairments exist to the extent that the Plan seeks to alter the other rights of the Series D Preferred Equity. Moreover, these impairments are impermissible given that the Plan seeks to leave a junior class—common equity—with unaltered rights. Accordingly, this Court cannot confirm the Plan.

## Background

3. The Plan purports not to impair the Series D Preferred Equity, Second Amended Disclosure Statement at 23 (P-622 at 26), stating that this equity interest—Class 8—would have unaltered "legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation." *Id.* at 35 (P-622 at 38). However, the Plan does not recognize the rights provided to Class 8 through the Stock Certificate's incorporation of the Purchase Agreement. In their Supplemental Memorandum in Response to the United States' Objection ("Proponents' Response," P-775), the Plan Proponents continue to dispute that the Purchase Agreement's covenants were incorporated by the Stock Certificate. (P-775 at 12).

4. At the initial confirmation hearing, at which the United States' Objection was first argued, Judge Magner ordered supplemental briefing on whether the covenants in the Purchase Agreement were binding. (P-680 at 2). At that hearing, Exhibits A and B of the United States' Objection were admitted into evidence. *Id*. A subsequent confirmation hearing—scheduled to occur after supplemental briefing—was converted to

a status conference approximately a day before it was held. Consequently, Exhibits C[2] [Second McGrail Decl.] and D [Stock Certificate] of the United States' Supplemental Brief have not yet been considered for admission into evidence.

5. The Purchase Agreement, among other things, contains the following covenants: (a) a covenant ("BHC covenant") that requires the Series D Preferred to be redeemed if the Debtor is no longer a bank holding company; (b) a covenant that the Debtor remain "predominantly engaged in financial activities" while the United States owns Series D Preferred Equity; and (c) a covenant that the Debtor meet the minimum capital requirements of the "Appropriate Federal Banking Agency." These covenants are ¶ 3.1 (e), (f), and (g) of the Purchase Agreement, respectively. (P-669-2 at 28).

6. In particular, the BHC covenant requires the Debtor to "maintain its status as a" bank holding company as long as the United States owns any Series D Preferred Equity shares. Purchase Agreement, ¶ 3.1 (e) (P-669-2 at 28). That covenant also requires the Debtor to redeem all Series D Preferred Equity shares owned by the United States before termination of bank holding company status. *Id.* The United States owns 37,935 shares of Series D Preferred Equity, and their redemption price is at least $1,000 per share for a total of at least $37,935,000. *See* United States Objection at 2-3 (P-669 at 2-3).

7. The Amendment to the Articles of Incorporation (the "Amended Articles") is part of the Purchase Agreement, which consists of several annexes including the Amended Articles, "which together constitute the entire agreement." *See* (P-669-2 at 2, 51-70).

---

[2] Exhibits to the United States' Supplemental Brief were lettered in sequence with the exhibits to the United States' Objection.

**Argument**

**I. Through Incorporation by Reference on the Stock Certificate, the Terms of the Purchase Agreement Were Incorporated into the Series D Preferred Equity.**

8. As discussed in the United States' Supplemental Brief, *see* (P-691 at 4), under Louisiana law, the "rights of a shareholder include" those rights "stated" or "referenced" on the stock certificate. James S. Holliday, Jr. et al., Louisiana Corporations § 8:98 (2019 ed.) (citing LA. Rev. Stat. Ann. § 10:8-202). Louisiana statutory law specifically recognizes that terms of "another instrument" can be made part of a security by reference on the certificate "to the extent the terms referred to do not conflict with terms stated on certificate." LA. Rev. Stat. Ann. § 10:8-202 (a). Here, the Stock Certificate references "the restrictions on transfer and *other provisions*" of the Purchase Agreement. Supplemental Brief at 4 (P-691 at 4) (emphasis added). The plain language of the Stock Certificate incorporates the "other provisions" of the Purchase Agreement besides those pertaining to restrictions on transfer. The "other provisions" incorporated do not conflict with terms stated on the Stock Certificate.

9. The plain language of the Stock Certificate includes no limitation as to the scope of the term "other provisions" and the scope of the term cannot be limited by the Plan Proponents' contention, *see* (P-775 at 12), that the language on the Stock Certificate concerns transfer. Although the Plan Proponents argue that only the Amended Articles define the rights associated with the Series D Preferred Equtiy, *see* (P-775 at 12), one must consider that the Amended Articles are part of the Purchase Agreement. *See* (P-669-2 at 2, 51-70). As discussed below at ¶ 15 a., the law of contract interpretation mandates that all provisions of a contract be given meaning. If the rights associated with

the Series D Preferred Equity were defined only by the Amended Articles, the remainder of the Purchase Agreement would have to be deemed meaningless—that interpretation is impermissible under the law of contract interpretation. The incorporation of the Amended Articles into the Purchase Agreement demonstrates that the rights outlined in other parts of the Purchase Agreement were intended to be part of the security. This is why the Stock Certificate referenced the "the restrictions on transfer and *other provisions*" of Purchase Agreement. In fact, these "other provisions" include the Amended Articles themselves. Therefore, "the restrictions on transfer" and all "other provisions" of the Purchase Agreement are incorporated into the United States' Series D Preferred Equity.

10. The incorporation of "the restrictions on transfer and other provisions" of the Purchase Agreement does not conflict with the Amended Articles § 14. As noted in the Proponents' Response, the Amended Articles § 14 recognizes that the Series D Preferred Equity has "rights" that are "provided by applicable law." (P-775 at 5-6 ). LA. Rev. Stat. Ann. § 10:8-202 is the applicable law that authorizes incorporation of the "the restrictions on transfer and other provisions" of the Purchase Agreement by reference.

11. Finally, the fact that the provisions of the Purchase Agreement are—by their own terms—limited to the time period when the United States owns the Series D Preferred Equity, see Proponents' Response at 13-14 (P-775 at 13-14), does not mean the "other provisions" were not incorporated into that security. It means only that—by their own terms—they expire upon transfer of ownership. This does not affect their applicability as an integral part of the Series D Preferred Equity while the United States is the holder.

## II. Despite the Language of the Plan, the United States Series D Preferred Equity Is Impaired, and Consequently, the Plan Violates the Absolute Priority Rule.

12. Generally, a class is not impaired in a bankruptcy plan within the meaning of 11 U.S.C. § 1124 unless "'the plan' itself alters a claimant's 'legal, equitable, [or] contractual rights.'" *In re Ultra Petroleum Corp.*, 913 F.3d 533, 540 (5th Cir. 2019). Under § 1124, any alteration of rights, "no matter how minor, constitutes 'impairment.'" *In re Village at Camp Bowie I, L.P.,* 710 F.3d 239, 245 (5th Cir. 2013). Although § 1124 allows a debtor to cure a default that triggers an acceleration clause, "any other change in the [contractual] arrangement" constitutes impairment. *In re Elijah*, 41 B.R. 348, 350 (Bankr. W.D. Mo. 1984).

13. The Disclosure Statement asserts that Class 8 is unimpaired, (P-622 at 26) as the Plan leaves "unaltered the legal, equitable, and contractual rights" of the Series D Preferred Equity under the Amended Articles. (P-621 at 26). However, as discussed above, under Louisiana statutory law, the Stock Certificate incorporated by reference the "the restrictions on transfer and other provisions" of the Purchase Agreement. Yet, under the Plan, the United States would not have any of the rights incorporated into the Series D Preferred Equity by the Stock Certificate's reference to the Purchase Agreement. *See* Proponents' Response at 11-12 (P-775 at 11-12). This wholesale elimination of rights is undeniably impairment.

14. For example, the BHC covenant requires the Debtor to "maintain its status as a" bank holding company as long as the United States owns any Series D Preferred Equity shares. Purchase Agreement, ¶ 3.1 (e) (P-669-2 at 28). Bank holding company status was a statutory condition precedent to the United States' investment in the Debtor.

6

The Debtor agreed to participate in the Small Business Lending Fund ("SBLF") program—a temporary investment authority created by the Small Business Jobs Act of 2010, *see* P.L. 111-240 ("Jobs Act") § 4103—under which the United States purchased the Series D Preferred Equity. *See* Purchase Agreement (P-669-2 at 2-5). Bank holding companies were among the four types of institutions designated as "eligible institutions" for participation in the SBLF program. Jobs Act § 4102 (11). The United States' investment in the Debtor was dependent on its status as an "eligible institution." *See* Jobs Act, § 4103 (b)(1). The United States invested approximately $38 million of taxpayer money to provide tier 1 capital to the Debtor, then a bank holding company, in exchange for the Debtor's agreement to, among other things, contribute 90% of the proceeds to a lending subsidiary and "maintain its status as a" bank holding company. Purchase Agreement, ¶ 3.1 (e) and (i) (P-669-2 at 28-29). The Plan now seeks to force the United States to maintain that investment even though the Debtor did not maintain its status as a bank holding company. That is an alteration of rights and is therefore impairment under § 1124, regardless of whether the Series D Preferred Equity must be redeemed upon loss of bank holding company status.

15. Although impairment exists under the Plan based on the BHC covenant irrespective of a requirement for redemption the Series D Preferred Equity, without re-stating its prior arguments, the United States will address some points in the Proponents' Response regarding redemption.

a. To the extent the Proponents' Response attempts to allege conflicts between the BHC covenant and the Amended Articles, this Court should recognize that both provisions are part of the Purchase Agreement. *See* (P-669-2 at 2, 28, 51-70). A court

"must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless." *Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 699 (Fed. Cl. 2002) (citation omitted).[3] The contract must be given "that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Id.* (citation omitted). "If a contract contains general and specific provisions which are in any respect inconsistent or conflicting, the more specific provision controls." *Blaze Constr., Inc. v. United States*, 27 Fed. Cl. 646, 652 (Fed. Cl. 1993) (citation omitted). Here, the BHC covenant is the more specific provision and it requires redemption when the purpose of the investment—providing tier 1 capital to a bank holding company—ceases.

    b. The *Carrieri* court did not hold that stock with redemption rights could convert from an equity interest into a claim, but rather that warrants "are equity interests until their expiration." *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 522 (5th Cir. 2004). Unlike stock, the warrants in *Carrieri* had an expiration date, *see Carrieri* at 522, so the Plan Proponents' comparison of the Series D Preferred Equity to warrants, *see* (P-775 at 9-10), is flawed and cannot establish that the United States' Series D Preferred Equity and associated rights converted into a claim.

    c. To the extent that the Plan Proponents contend that redemption of the Series D Preferred Equity would be dependent on solvency, *see* (P-775 at 6-7), the Plan Proponents have not shown that even a partial redemption would be prohibited under applicable law at this time.

16. The Plan also impairs the United States by requiring it to hold the Series D

---

[3] The Purchase Agreement is governed by "the federal law of the United States" if applicable, and otherwise by New York law. *See* Purchase Agreement at ¶ 5.5 (P-669-2 at 34).

8

Preferred Equity in an entity that does not hold capital as required by the capital covenant in ¶ 3.1 (g) the Purchase Agreement (P-669-2 at 28).

17. Moreover, if the Reorganized Debtor would not be a "predominantly financial" entity within the meaning of ¶ 3.1 (f) of the Purchase Agreement (P-669-2 at 28), the United States' Series D Preferred Equity would be impaired on that basis as well. In short, to the extent that other rights—stated in the Purchase Agreement and incorporated into the security by reference on the Stock Certificate—are altered if not eliminated by the Plan, there would be additional bases to constitute impairment.

18. Impairment of the United States' Series D Preferred Equity leads to a violation of the absolute priority rule. Under the absolute priority rule, a plan cannot be confirmed when an impaired class has not voted to accept the plan unless: (a) the impaired class's claim/interest is paid in full; or (b) classes that are junior to the impaired class receive no recovery. *In re IDEARC, Inc.,* 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009) (citing 11 U.S.C. § 1129 (b)(2)). Under § 1129 (b)(2)(C), before junior interests can receive or retain any value, a non-consenting impaired equity class must receive—as of the effective date—the greatest of any liquidation preference, fixed redemption price, or value of the impaired shares. *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984). The United States was deemed to be unimpaired and did not vote on the Plan.

19. The fixed redemption price for the Series D Preferred Equity is at least $1,000 per share for a total of $37,935,000. *See* United States Objection at 2-3 (P-669 at 2-3); Amended Articles at § 5 (a)(ii) (P-669-2 at 62). Under the Plan, the United States' Series D Preferred Equity will not receive the fixed redemption price upon the effective

date. Despite that, under the Plan, common equity—a class junior to Series D Preferred Equity—would be left with unaltered "legal, equitable, and contractual rights." (P-621 at 26). However, the absolute priority rule requires that common equity receive no recovery if the Series D Preferred Equity will not receive its fixed redemption price. Accordingly, the Plan violates the absolute priority rule and cannot be confirmed.

## Conclusion

20. For the reasons stated herein, and in the United States' Supplemental Brief and the United States' Objection, the United States respectfully requests that this Court deny confirmation of the Plan.

Dated: November 10, 2019

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division

**PETER G. STRASSER**
United States Attorney

**GLENN SCHREIBER**
Assistant United States Attorney

 /s/ *Serajul F. Ali*
**RUTH A. HARVEY**
**LLOYD H. RANDOLPH**
**SERAJUL F. ALI** (D.C. Bar No. 478505)
Attorneys
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-0488
Facsimile: (202) 514-9163
E-mail: serajul.ali@usdoj.gov

**Attorneys for the United States**

## **CERTIFICATE OF SERVICE**

On November 10, 2019, I caused a copy of the foregoing UNITED STATES' REPLY BRIEF IN SUPPORT OF ITS OBJECTION TO CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION to be served electronically through the Court's ECF system upon those who have consented to service in that manner.

Dated: November 10, 2019                    /s/ *Serajul F. Ali*
                                                                        Serajul F. Ali