## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 17-11213 |
| **FIRST NBC BANK HOLDING COMPANY** | SECTION "A" |
| *Debtor* | CHAPTER 11 |

---

### NOTICE OF FILING OF PLAN DOCUMENTS WITH RESPECT TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

**PLEASE TAKE NOTICE THAT** First NBC Bank Holding Company ("the Debtor" or "FNBC"), as the joint proponent with the Official Unsecured Creditors' Committee ("the Committee"), hereby files the attached as **Plan Documents** as contemplated by Section 1.1.77 of the *Second Amended Joint Chapter 11 Plan of Reorganization* [Doc. 621] (the "Plan") filed on July 2, 2019 as well as the proposed immaterial Modifications to the Plan filed on March 6, 2020 and as may be required by 11 U.S.C. 1129(a)(4),(5), and (11).

 A. Form of *FRI Escrow Agreement* between **FIRST PHOENIX SPV, LLC** ("the Company"), **FIRST NBC BANK HOLDING COMPANY**, and **THE STEFFES FIRM, LLC** ("Escrow Agent") establishing an escrow account with Escrow Agent for funds forwarded by First Round Investors, to be held for the benefit of First Round Investors and the Company until the first to occur of the expiration of the Offering, or such time as all Plan Conditions (as defined in Section 3 of the Escrow Agreement) have been satisfied.

B.  A copy of the *Litigation and Distribution Trust Agreement* as filed with the Court on July 2, 2019 at Docket No. 622-3.

C.  Copies of FNBC Employment Agreements with Shivan Govindan and Andrew Nash, insiders of the Debtor.

D.  A brief summary of the Business Plan to be implemented upon Confirmation of the Plan and occurrence of the Effective Date (as defined in the Plan).

E.  A disclosure of the identities of the directors and officers, and their compensation, who will serve upon Confirmation of the Plan and occurrence of the Effective Date.

F.  A disclosure of certain compensatory stock options to be granted to directors and certain cash incentives of $75,000 to each of Matt Elsom, Mark Haden, and Andrew Nash upon Confirmation of the Plan and occurrence of the Effective Date; and, warrants to be issued after Confirmation of the Plan and occurrence of the Effective Date.

Respectfully submitted by:

/s/ William E. Steffes
William E. Steffes, #12426
Barbara B. Parsons, #28714
**THE STEFFES FIRM, LLC**
13702 Coursey Boulevard Building 3
Baton Rouge, LA 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998
Email: bsteffes@steffeslaw.com

*Counsel for First NBC Bank Holding Company, Debtor*

# **EXHIBIT A**

FRI ESCROW AGREEMENT

*EXECUTION VERSION*

## ESCROW AGREEMENT

This Escrow Agreement (hereinafter referred to as this "Agreement") is made and entered into on this ____ day of March, 2020, between **FIRST PHOENIX SPV, LLC**, a Delaware limited liability company (hereinafter referred to as "Company"), **FIRST NBC BANK HOLDING COMPANY**, a Louisiana corporation (hereinafter referred to as "FNBC"), and **THE STEFFES FIRM, LLC**, a Louisiana limited liability company, as Escrow Agent (hereinafter referred to as "Escrow Agent").

### RECITALS:

**WHEREAS**, FNBC is the debtor in the chapter 11 case no. 17-11213 (referred to herein as "Chapter 11 Case"), pending before the U.S. Bankruptcy Court for the Eastern District of Louisiana (hereinafter referred to as "Bankruptcy Court");

**WHEREAS**, the Official Committee of Unsecured Creditors of First NBC Bank Holding Company (the "Committee") and FNBC have filed a joint chapter 11 plan of reorganization dated July 2, 2019 (hereinafter referred to as the "Joint Plan") in the Chapter 11 Case, confirmation of which is currently set for hearing (hereinafter referred to as the "Confirmation Hearing") before the Bankruptcy Court on March 10, 2020;

**WHEREAS**, Company intends to enter into certain transactions with FNBC and the Committee as set forth herein and in the Joint Plan, as amended, provided the Bankruptcy Court enters an order that confirms the Joint Plan, as amended (hereinafter referred to as the "Confirmation Order");

**WHEREAS**, Company proposes to offer and sell up to 6,100 units of the Company ("Units"), for cash consideration in the amount of $1,000 per Unit, to investors in a private offering solely to accredited investors (hereinafter referred to as the "Purchasers"), with a minimum amount of $5,000,000 required to be sold in the offering (hereinafter referred to as the "Offering");

**WHEREAS**, the Units will be sold pursuant to the Subscription Agreement ("Subscription Agreement"), a copy of which is attached to this Agreement as **Exhibit A**;

**WHEREAS**, Company desires to establish an escrow account with Escrow Agent for funds forwarded by Purchasers, to be held for the benefit of Purchasers and the Company until the first to occur of the expiration of the Offering, or such time as all Plan Conditions (as defined in Section 3 of this Agreement) have been satisfied; and,

**WHEREAS**, Escrow Agent is willing to serve as Escrow Agent upon the terms and conditions herein set forth.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      The Company and FNBC (collectively referred to herein as "Escrow Parties") hereby appoint The Steffes Firm, LLC as Escrow Agent in accordance with the terms and conditions set forth herein, and the Escrow Agent hereby accepts such appointment.

2.      Deposit of Subscription Funds with Escrow Agent.

(a)      Escrow Agent agrees that it will from time to time, until the Effective Date of the Joint Plan, accept, in its capacity as escrow agent, subscription funds for the Units ("Escrowed Funds") in the

*EXECUTION VERSION*

form of cashier's checks or wire transfers received by the Escrow Agent, on behalf of the Company, from Purchasers in accordance with the *Payment Instructions*, attached hereto as **Exhibit B**. Company in its sole and absolute discretion may reject, in whole or in part, any subscription for the Units, for any reason, and upon such rejection it shall notify and instruct Escrow Agent in writing to return the Escrowed Funds by check made payable to the subscriber.

(b)      Escrowed Funds shall consist of Subscription Deposits and Subscription Balances as defined below:

i)      Subscription Deposits
Contemporaneously with execution of the Subscription Agreement or no later than March 5, 2020 4:00p.m. CST, Purchaser shall have remitted to Escrow Agent funds equal to 10% of the amount due for the subscribed Units (referred to herein as "Subscription Deposit").

ii)      Subscription Balances
No later than twenty-nine (29) business days after the Bankruptcy Court enters the Confirmation Order (referred to herein as the "First Funding Date"), Purchaser shall have remitted to Escrow Agent the remaining 90% balance of the funds due for the subscribed Units (referred to herein as "Subscription Balance"); provided, however, (a) the First Funding Date shall not occur if, with respect to the Confirmation Order, there is pending a motion for stay in connection with a motion for a new trial, reargument or rehearing, or a notice of appeal, writ or certiorari (collectively referred to herein as a "Stay Motion"), and (b) if any Stay Motion is pending, the deadline for remittance of the Subscription Balance shall be delayed until five (5) business days after entry of an order that denies any such Stay Motion.

(c)      Escrow Agent shall hold Escrowed Funds, at least initially, in its IOLTA Account ("Escrow Account"), at Chase Bank, N.A., a federally-insured institution; and, shall disburse the funds in accordance with the terms of this Agreement. Upon request of Escrow Agent, and with consent of the Escrow Parties, the Escrow Agent shall transfer the Escrowed Funds to a segregated escrow account at Chase Bank, N.A., utilized exclusively for purposes of and pursuant to this Agreement.

(d)      Escrow Agent will accept, along with the Escrowed Funds, the accompanying Subscription Agreements from Purchasers. As Escrow Agent receives Subscription Agreements from Purchasers, it will retain one copy of each Subscription Agreement and send another copy of each Subscription Agreement to the Company.

(e)      In the event that Company receives Subscription Agreements from Purchasers, Company will retain one copy of each Subscription Agreement and send another copy of each Subscription Agreement to Escrow Agent.

(f)      All Escrowed Funds shall be held in the Escrow Account in accordance with the terms of this Agreement for each Purchaser's benefit, pending (i) release to or on behalf of the Company as set forth herein, or (ii) return to the Purchaser.

(g)      The Escrowed Funds, held in the Escrow Account, shall remain un-invested and shall be subject to the IOLTA Rules of the Louisiana State Bar Association while deposited in the Escrow Agent's IOLTA Account. All parties acknowledge and agree that the balance in the Escrow Account may exceed the amount of federal insurance coverage for such accounts, and hereby agree that Escrow Agent shall neither have nor incur any claims that may arise in the future as a result of insufficient federal deposit insurance coverage.

*EXECUTION VERSION*

(h)     Unless released to the Company pursuant to the terms of Sections 3 and 4 of this Agreement, all Escrowed Funds shall be and remain the property of the respective Purchasers and shall not be subject to any liens or charges by or against the Company, FNBC, or any creditors' claims against the Company or FNBC or, except otherwise as provided herein, the Escrow Agent.

(i)     For purposes of this Agreement, "collected funds" shall mean all funds received by Escrow Agent, which have cleared normal banking channels.

3.     <u>Conditions for Distribution of Escrowed Funds to or on behalf of the Company.</u>  Escrow Agent shall distribute the Escrowed Funds to or on behalf of Company provided each of the following conditions (referred to herein as the "<u>Plan Conditions</u>") are satisfied:

(a)     Escrow Agent has notified the Company in writing that the Escrow Agent has received at least $5,000,000 in Escrowed Funds; (b) the Joint Plan, substantially in the form filed on July 2, 2019, shall have been confirmed and the Confirmation Order shall have been entered; (c) unless waived, in writing, by 100% of Purchasers, the Confirmation Order shall have become a Final Order, as that term is defined in the Joint Plan; and, (d) the Effective Date of the Joint Plan shall have occurred within (i) sixty (60) days of the date that the Bankruptcy Court enters the Confirmation Order, or (ii) subject to the consent, in writing of 100% of Purchasers, such longer period, not to exceed 180 days, as the same may be extended by the Bankruptcy Court after motion and notice (the "<u>Escrow Expiration Date</u>").

4.     <u>Release of Escrowed Funds.</u>

(a)     <u>To or on behalf of the Company</u>.  At such time as all Plan Conditions have been satisfied or waived in accordance with Section 3 of this Agreement, Escrow Agent shall promptly disburse all Escrowed Funds to or on behalf of Company, to the extent such Escrowed Funds are collected funds, as follows:

(i)     On behalf of FNBC, $4.25 million shall be paid directly to holders of allowed Class 2 Claims in accordance with the conditions and payment terms set forth in the Joint Plan, as amended;

(ii)     on behalf of FNBC, $300,000 shall be paid to the *Litigation and Distribution Trust of First NBC Bank Holding Company,* established pursuant to the Joint Plan;

(iii)     up to a maximum of $150,000, to the extent required to satisfy allowed administrative and priority claims of FNBC, funds shall be paid directly to holders of allowed administrative expense claims and/or allowed priority claims of FNBC in accordance with the conditions and payment terms set forth in the Joint Plan, as amended; and

(iv)     all remaining Escrowed Funds shall be delivered to Company via wire transfer within two (2) business days of the final disbursement made in accordance with Section 4(a)(i)-(iii) above. On or before the date on which the Plan Conditions are satisfied, Company shall provide wire instructions to Escrow Agent for disbursement of Escrowed Funds under this Section 4(a)(iv).

(b)     <u>To Purchasers</u>.

(i)     If, on or prior to the Escrow Expiration Date, the Escrowed Funds do not become deliverable to Company based on failure to meet the Plan Conditions of Section 3 of this Agreement, Escrow Agent shall return the Escrowed Funds, to the extent that such Escrowed Funds are collected funds, to the respective Purchasers in amounts equal to the subscription amount theretofore paid by each Purchaser less any deductions made in accordance with Section 6 of this Agreement; <u>provided</u>, <u>however</u>, that the Escrow Expiration Date may be extended, in writing, by 100% of Purchasers and, in such event, the Escrow Funds shall remain in the Escrow Account until such extended Escrow Expiration Date.

(ii)     Notwithstanding Section 4(b)(i) above, if the Bankruptcy Court enters an order denying confirmation of the Joint Plan, within three (3) business days of entry of such order, after deducting an amount necessary to comply with Section 6 of this Agreement, Escrow Agent shall return the Escrowed Funds, to the extent that such Escrowed Funds are collected funds, to the respective Purchasers in amounts equal to the subscription amount theretofore paid by each Purchaser.

(c)     Forfeiture of Subscription Deposits. If the Escrowed Funds become deliverable to Company upon satisfaction of the conditions set forth in Section 3 of this Agreement, and any Purchaser fails to timely remit the Subscription Balance due, such Purchaser's Subscription Deposit shall not be refunded to Purchaser; instead such Subscription Balance shall be released to and for the sole benefit of FNBC's bankruptcy estate and deposited into the debtor-in-possession account maintained by FNBC at Regions Bank.

5.     Expenses of Escrow Account and Escrow Agent. As set forth below, Company or FNBC will pay all bank charges incurred by Escrow Account and any reasonable, documented out-of-pocket expenses incurred by Escrow Agent in such capacity under this Agreement. Such expenses and charges shall be payable by Company upon the release of the Escrowed Funds pursuant to Section 4 of this Agreement; and, upon such release, Escrow Agent is hereby authorized to deduct such expenses and charges from the Escrowed Funds prior to any release thereof under Section 4 up to the amount delivered to the Company pursuant to Section 4(a)(iv) of this Agreement. In the event that the Plan Conditions are not satisfied or, where applicable waived, and Escrow Agent is required to return the Escrowed Funds pursuant to Section 4(b) of this Agreement to Purchasers, Company and/or FNBC shall be obligated to reimburse Escrow Agent for any bank charges and out-of-pocket expenses described above.

6.     Expenses of Company in Connection with Offering. In preparation for and in furtherance thereof, Company has and will incur certain expenses for services performed by professionals ("Offering Professionals") which are directly attributable to the Offering. Company represents that it has expressly advised all Purchasers that, in the event that the Plan Conditions are not satisfied or expressly waived as set forth in Section 3, up to a maximum of 2% of each Purchaser's investment may be withheld from the Escrowed Funds to be returned pursuant to Section 4(b) of this Agreement; provided, however, that only 1% of the investment of Nexxus Holdings, Inc. ("Nexxus") may be withheld from the Escrowed Funds.. In such event, Escrow Agent shall, contemporaneously with the return of net Escrowed Funds to each Purchaser as set forth in Section 4(b) of this Agreement, distribute up to a maximum of 2% (1% with respect to Nexxus) of the Escrowed Funds to Company for the exclusive purpose of satisfaction of fees and expenses incurred for services provided by the Offering Professionals through the termination of this Agreement. The Company shall advise the Escrow Agent in writing of the total amount required to be deducted from the Escrowed Funds and distributed to Company for satisfaction of fees and expenses of the Offering Professionals. Except as set forth herein as to the maximum amount permitted to be withheld, i.e., 2% of Escrowed Funds (1% with respect to Nexxus), and the restrictions on the use of any funds withheld, Company shall have the sole discretion and authority with regard to the amount withheld from the Escrowed Funds returned pursuant to this Section 6 and Section 4(b) of the Agreement.

7.     Rights and Liabilities of Escrow Agent. Company agrees that the following provisions shall control with respect to the rights, duties, liabilities, privileges and immunities of Escrow Agent.

(a)     Escrow Agent is not a party to, and is not bound by, or charged with notice of, any agreement out of which this Agreement may arise.

(b)     Escrow Agent's sole responsibility under this Agreement is to act as a depository, and it is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity

*EXECUTION VERSION*

of the subject matter of the escrow, or any part thereof, or for the form or execution thereof, or for the identity or authority of any person executing or depositing the Escrowed Funds.

(c)     In the event any party to this Agreement becomes involved in litigation in connection with this escrow as a result of an act or omission by the other party, the party whose actions have caused such litigation agrees to indemnify and hold the other harmless from all loss, cost, damages, expenses and attorney's fees suffered or incurred as a result thereof.  All parties hereto expressly consent to the jurisdiction of the Bankruptcy Court and acknowledge and agree that any disputes arising hereunder shall be resolved by the Bankruptcy Court.

(d)     Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which Escrow Agent in good faith believes to be genuine and what it purports to be.

(e)     Escrow Agent shall not be liable for any actions which it may take or refrain from taking in connection with this Agreement, except for actions that are directly caused by or are the direct result of its own gross negligence or willful misconduct.

(f)     Escrow Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability for doing so and shall be fully protected in acting in accordance with the opinion and instructions of such counsel.

(g)     In the event of any disagreement between any of the parties to this Agreement, or between them or either or any of them and any other person, including any Purchaser, resulting in adverse claims or demands being made in connection with the subject matter of the escrow, or in the event that Escrow Agent in good faith, be in doubt as to what action it should take hereunder, Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event Escrow Agent shall not be or become liable in any way or to any person for its failure or refusal to act, and Escrow Agent shall be entitled to continue so to refrain from acting until:

(i)     the rights of all parties, including Purchasers, shall have been fully and finally adjudicated by the Bankruptcy Court; or

(ii)     all differences shall have been settled and all doubt resolved by agreement among all of the interested persons, and Escrow Agent shall have been notified thereof, in writing signed by all persons involved in the dispute.

8.     <u>Escrow Agent's Right to Terminate</u>.

(a)     Escrow Agent may, upon the delivery of thirty (30) days' written notice to the Escrow Parties, terminate its services as Escrow Agent.  In the event that Escrow Agent elects to terminate its services, this Agreement will terminate and Escrow Agent will be entitled to recover from Company and/or FNBC any bank charges and out-of-pocket expenses incurred in its capacity as Escrow Agent pursuant to this Agreement.

(b)     In the event that Escrow Agent elects to terminate its services, a successor escrow agent, which shall selected by the Escrow Parties (or, if the Escrow Parties are unable to agree on a successor escrow agent, then such escrow agent shall be selected by the Bankruptcy Court) and appointed by a written instrument executed and delivered to Escrow Agent and to the successor escrow agent.  Upon such appointment, Escrow Agent shall immediately deliver to the successor escrow agent selected by the Escrow Parties, all documentation and the Escrowed Funds, including any interest earnings thereon in its possession, less any bank charges and out-of-pocket expenses incurred in its capacity as Escrow Agent

*EXECUTION VERSION*

pursuant to this Agreement. If no successor escrow agent is appointed within the thirty (30) days after Escrow Agent has given its termination notice, Escrow Agent shall pay over all cash and property held by Escrow Agent hereunder to the Bankruptcy Court in interpleader proceedings in which each of the Escrow Parties shall be joined as a party.

9.   Notice.  Subject to the exception for Subscription Agreements set forth in this Section 9, all notices, requests, demands and other communications or deliveries required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given three (3) days after having been deposited for mailing if sent by registered mail, or certified mail return receipt requested, or delivery by courier, to the respective addresses set forth below: (a) If to Purchasers for Units: to their respective addresses as specified in their subscription agreements; (b) if to Company: First Phoenix SPV, LLC, 701 Poydras Street, Suite 4100, New Orleans, LA 70139, Attn: Shivan Govindan; (c) if to Escrow Agent: The Steffes Firm, 13702 Coursey Blvd., Building 3, Baton Rouge, LA 70817, Attn: William E. Steffes; (d) if to FNBC: Lawrence Blake Jones, Chief Restructuring Officer, 701 Poydras Street, Suite 4100, New Orleans, LA 70139; and, (e) if to the Committee: Jeffrey Sternklar, 225 Franklin Street, 26th Floor, Boston, MA 02110. Subscription Agreements transmitted *via* e-mail to Escrow Agent at bparsons@steffeslaw.com and/or bsteffes@steffeslaw.com shall be deemed to have been duly received by Escrow Agent pursuant to this Agreement, subject to receipt of original Subscription Agreement by Company or Escrow Agent within three (3) business days of such e-mail transmission.

10.   Representations of Company.  Company hereby acknowledges that the status of Escrow Agent with respect to the Offering of the Units is that of agent only for the limited purposes herein set forth, and hereby agrees it will not represent or imply that Escrow Agent, by serving as Escrow Agent hereunder or otherwise, has investigated the desirability or advisability in an investment in the Units, or has approved, endorsed or passed upon the merits of the Units.

11.   General Provisions.

(a)   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Louisiana, without regard to principles governing conflicts of laws.

(b)   The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)   This Agreement sets forth the entire agreement and understanding of the parties with regard to this escrow transaction and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof.

(d)   This Agreement may be amended, modified, superseded or canceled, and any of the terms or conditions hereof may be waived, only by a written instrument executed by (i) each party hereto and (ii) each Purchaser, and (iii) in the case of a waiver, by the party waiving compliance. The failure of any part at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver in any one or more instances by any part of any condition, or of the breach of any term contained in this Agreement, whether by conduct or otherwise, shall be deemed to be, or construed as, a further or continuing waiver of any such condition or breach, or a waiver of any other condition or of the breach of any other terms of this Agreement.

(e)   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(f)   This Agreement shall inure to the benefit of the parties hereto, Purchasers, and their respective administrators, successors and assigns.

(g)     No interest in any part to this Agreement shall be assignable in the absence of a written agreement by and between all the parties to this Agreement, executed with the same formalities as this original Agreement.

*[Signature Page Follows]*

*EXECUTION VERSION*

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the date stated above.

**COMPANY:**

First Phoenix SPV, LLC

By: _____

Shiv Govindan , Manager

**ESCROW AGENT:**

The Steffes Firm, LLC

By: _____

Name: _____

Title: _____

**FBNC:**

First NBC Bank Holding Company

By: _____

Name: Lawrence Blake Jones

Title: Chief Restructuring Officer

EXECUTION VERSION

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the date stated above.

**COMPANY:**

First Phoenix SPV, LLC

By: _____

_____, Manager

**FBNC:**

First NBC Bank Holding Company

By: _____

Name: ence Blake Jones

Title: Chief Restructuring Officer

**ESCROW AGENT:**

The Steffes Firm, LLC

By: _____

Name: WILLIAM E. STEFFES

Title: SOLE MEMBER

ESCROW AGREEMENT
PAGE 8 OF 8

# **EXHIBIT B**

Litigation and Distribution Trust Agreement

## LITIGATION AND DISTRIBUTION TRUST AGREEMENT

Of

## FIRST NBC BANK HOLDING COMPANY

This *Litigation and Distribution Trust Agreement of First NBC Bank Holding Company* (the "*Agreement*") is entered to as of this ___ day of _____, 2019, by, between and among, First NBC Bank Holding Company ("*FNBC*" or the "*Debtor*") and Stephen B. Darr (the "*Litigation and Distribution Trustee*").

## WITNESSETH:

WHEREAS, on _____, 2019, the *Second Amended Joint Chapter 11 Plan of the Debtor and Official Committee of Unsecured Creditors* (the "*Plan*"), as filed in the United States Bankruptcy Court for the Eastern District of Louisiana (the "*Bankruptcy Court*") in Chapter 11, Case No. 17-11213, was confirmed by the Bankruptcy Court pursuant to Bankruptcy Code § 1129 (the "*Order*"); and

WHEREAS, the Litigation and Distribution Trustee was selected to serve as Litigation and Distribution Trustee under the Plan by the Official Committee of Unsecured Creditors of the Debtor (the "*Committee*"); and,

WHEREAS, an Oversight Committee, with the powers set forth herein and in the Plan, has been duly appointed pursuant to the Plan, and currently consists of the individuals identified in Section 3.4;

WHEREAS, together with the certain other provisions, the Plan provides for the Debtor and its Estate, and the Litigation and Distribution Trustee to enter into this Agreement relative to the administration of the Litigation and Distribution Trust Assets subsequent to confirmation of the Plan; and

WHEREAS, the Litigation and Distribution Trustee is willing to accept the duties of the Litigation and Distribution Trustee upon such terms and conditions as are hereinafter set forth; and

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, pursuant to the Plan, FNBC and the Litigation and Distribution Trustee do hereby covenant and agree as follows:

1

# ARTICLE I

## Definitions; Interpretive Rules

1. **Defined Terms; Rules of Interpretation.**

1.1 **Capitalized Terms.** Capitalized terms used herein and not otherwise defined in this Agreement shall have the meanings assigned to them in the Plan. Any term that is not otherwise defined, herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. For purposes of this Agreement, Disputed Claims shall be included in the Class which such Claims would be included if such claims were Allowed Claims.

1.2 **Computation of Time.** In computing any period of time prescribed or allowed by this Agreement, the provisions of Bankruptcy Rule 9006(a) will apply.

1.3 **Permitted Investments.** Any of the following: (i) marketable obligations issued or unconditionally guaranteed by the United States of America or an agency thereof maturing or redeemable within 180 days from the date of acquisition thereof; (ii) certificates of deposit, maturing no more than 180 days from the date of creation thereof, issued by commercial banks incorporated under the laws of the United States of America or any state thereof or the District of Columbia having membership in the Federal Deposit Insurance Corporation and in amounts not exceeding the maximum amounts insured thereunder; (iii) time deposits, maturing no more than 30 days from the date of creation thereof with commercial banks or savings banks each having membership in the Federal Deposit Insurance Corporation and in amounts not exceeding the maximum amounts insured thereunder; (iv) money market funds managed by nationally recognized firms and making only investments qualified under (i), (ii), (iii) or (v) herein; (v) variable rate demand notes with a rating from Standard & Poor's of "A-1" or better or from Moody's of "P-1" or better; or (vi) demand deposits at any bank or savings institution organized under the laws of the United States of America or any state thereof or the District of Columbia having membership in the Federal Deposit Insurance Corporation; provided, however, such demand deposits shall be in amounts not to exceed the maximum amounts insured by the Federal Deposit Insurance Corporation.

1.4 **Rules of Interpretation.** For purposes of this Agreement, unless otherwise provided herein:

1.4.1 any reference in this Agreement to a contract, instrument, release or other agreement or document being in particular form or any particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;

1.4.2 any reference in this Agreement to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Agreement;

1.4.3 any reference to any entity as a holder of a Claim includes that entity's successors, assigns, and affiliates;

1.4.4 except as otherwise specified, all references in this Agreement to Sections, Articles, and Exhibits are references to sections, articles, and exhibits of or this Agreement;

1.4.5 the words "herein," "hereunder," and "hereto" refer to this Agreement in its entirety rather than to a particular portion of this Agreement;

1.4.6 the rules of construction set forth in section 102 of the Bankruptcy Code will apply;

1.4.7 except where the context otherwise requires, words importing masculine, feminine or neuter gender shall include the feminine, the masculine and the neuter, as appropriate; words importing the singular number shall include the plural number and vice versa; and words importing persons shall include partnerships, associations, and corporations.

1.5   **Headings**.   The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

1.6   **Construction with the Plan**.  The Plan is hereby incorporated fully by reference and is made a part hereof for all purposes.  In the event of any inconsistency or conflict between the terms, conditions and provisions of this Agreement and the terms, conditions and provisions of the Plan, the terms, conditions and provisions of the Plan shall control.

## ARTICLE II

### Purpose; Administration, Supervision

2.1   **Purpose of Agreement**.   FNBC and the Litigation and Distribution Trustee hereby enter in to this Agreement for the following purposes and no other: (a) to hold the Litigation and Distribution Trust Assets for the benefit of the holders of Allowed Claims in Class 2 ("*Beneficiaries*") and Allowed Claims in Class 4 ("*Subordinated Beneficiaries*"), (b) to make distributions of the Litigation and Distribution Trust Assets to the Beneficiaries and, if applicable, to the Subordinated

3

Beneficiaries, (c) to have the power and authority to prosecute and resolve, in the names of the Debtor, the Reorganized Debtor and/or the Litigation and Distribution Trustee any Transferred Avoidance Actions and all other claims or causes of action transferred to the Litigation and Distribution Trust pursuant to the Plan, (d) to calculate and make distributions of the Litigation and Distribution Trust Assets to the Beneficiaries and, if applicable, to the Subordinated Beneficiaries, (e) liquidate, transfer or otherwise dispose of the Litigation and Distribution Trust Assets or any part thereof or any interest therein upon such terms as the Litigation and Distribution Trustee determines to be necessary, appropriate or desirable, (f) to reconcile (including to object to, seek to subordinate, recharacterize or settle such Claims) (i) Claims in Classes 2, 3A, 3B, 3C, 4 and 5 and (ii) except for Claims of Professionals employed by the Debtor or the Committee, all other Claims asserted to be entitled to priority pursuant to Sections 503 or 507 of the Bankruptcy Code , (g) to terminate this Litigation and Distribution Trust in accordance with the terms of the Plan and this Agreement, (h) to provide the Beneficiaries, annually, with unaudited financial statements, (i) to sell, liquidate, dispose of or abandon Litigation and Distribution Trust Assets; and (j) to otherwise carry out its duties under the Plan and complete distribution of the Litigation and Distribution Trust Assets, all in accordance with the Plan and this Agreement. The Litigation and Distribution Trust has no objective to, and will not, engage in the conduct of a trade or business and, subject to this Agreement, will terminate upon the completion of its liquidation and distribution duties. The Litigation and Distribution Trust will be a "representative of the estate" under Section 1123(b)(3)(B) of the Bankruptcy Code.

2.2     **Administration of the Litigation and Distribution Trust Assets.** With the advice and assistance of the Oversight Committee, as provided under the Plan and this Agreement, from and after the Effective Date, the Litigation and Distribution Trustee shall manage, administer, invest and reinvest all of the Litigation and Distribution Trust Assets, collect the income therefrom, and distribute the proceeds, all pursuant to the terms and conditions of the Plan and this Agreement. Notwithstanding anything to the contrary herein, the Oversight Committee and the Litigation and Distribution Trustee shall act in furtherance of, and consistent with, the purpose of the Litigation and Distribution Trust and shall act in the best interests of the Beneficiaries and, if applicable, to the Subordinated Beneficiaries. The Litigation and Distribution Trust, by and through the Litigation and Distribution Trustee, shall be authorized to prosecute any and all Avoidance Actions and Causes of Action in the name of the Debtor.

2.3     **Interests in Litigation and Distribution Trust.** The beneficial interests in the Litigation and Distribution Trust will not be represented by certificates, but rather shall consist of a pro rata share of Litigation and Distribution Trust Assets. Beneficial interests in the Litigation and Distribution Trust will not be transferable except pursuant to the laws of descent and distribution or otherwise by operation of law.

2.4    **No Further Supervision.**  The Litigation and Distribution Trustee may use, operate and deal with the Litigation and Distribution Trust Assets without any supervision by the Bankruptcy Court, and free of any restrictions imposed by the Debtor by the Bankruptcy Code or the Bankruptcy Court during the Chapter 11 Case.

## ARTICLE III

### Responsibilities,

3.1    Responsibilities of the Litigation and Distribution Trustee.

3.1.1 The responsibilities of the Litigation and Distribution Trustee shall include (i) the receipt, management, supervision, and protection of the Litigation and Distribution Trust Assets on behalf of and for the benefit of the Beneficiaries and, if applicable, the Subordinated Beneficiaries; (ii) pursuit of objections to, and estimations and settlements of certain Disputed Claims; (iii) investigation, analysis, prosecution, and, if necessary and appropriate, compromise of the claims and Causes of Action included among the Litigation and Distribution Trust Assets, including, without limitation, the Avoidance Actions and any other claims and Causes of Action transferred to the Litigation and Distribution Trust pursuant to the Plan; (iv) calculation and implementation of all distributions to be made by the Litigation and Distribution Trustee under the Plan to the Beneficiaries and, if applicable, to the Subordinated Beneficiaries; (v) filing all required federal, state, and local tax returns and paying taxes and all other obligations of the Litigation and Distribution Trust; and (vi) such other responsibilities as may be vested in the Litigation and Distribution Trustee pursuant to the Plan, the Litigation and Distribution Trust Agreement, orders of the Bankruptcy Court, or as necessary and proper to carry out the provisions of the Plan.

3.1.2 The Litigation and Distribution Trustee shall act in a fiduciary capacity for the interests of its Beneficiaries, and, subject to and upon full payment and satisfaction of all Allowed Claims of Beneficiaries, thereafter for the interests of the Subordinated Beneficiaries.  Prior to full payment and satisfaction of all Allowed Claims of Beneficiaries, the Litigation and Distribution Trustee shall not be required to act in a fiduciary capacity for the interests of the Subordinated Beneficiaries.

3.2    INTENTIONALLY DELETED.

3.3    **Post-Effective Date Management.**  As provided for in the Plan and herein, the Litigation and Distribution Trustee shall have the exclusive right and duty, to manage the Litigation and Distribution Trust Assets, subject to certain limitations as set forth herein.

3.4     **Oversight Committee**. The Oversight Committee shall have members in an amount determined by majority vote of the members of the Oversight Committee to advise, assist, supervise and direct the Litigation and Distribution Trustee in the administration of the Litigation and Distribution Trust pursuant to this Litigation and Distribution Trust Agreement. The initial members of the Oversight Committee shall be Vikaran Ghei, Michael Zaitzeff and Donna Ennis. Members of the Oversight Committee constituting a majority of the total number of members of the Oversight Committee then in office shall have the right to direct and remove the Litigation and Distribution Trustee, and shall have such other rights to operate and manage the Litigation and Distribution Trust as are not inconsistent with the Confirmation Order, the Plan and the terms of this Litigation and Distribution Trust Agreement. No other Beneficiary or Subordinated Beneficiary shall have any approval rights whatsoever in respect of management and operation of the Litigation and Distribution Trust. A member of the Oversight Committee may from time to time consult with the Beneficiary, if any, that appointed such member subject to such confidentiality provisions as required by the Oversight Committee.

3.4.1   **Authority of the Oversight Committee**. The Oversight Committee shall have the authority and responsibility to advise, assist, supervise, and direct the Litigation and Distribution Trustee in the administration of the Litigation and Distribution Trust and shall have the authority to remove the Litigation and Distribution Trustee. The Litigation and Distribution Trustee shall consult with and provide information to the Oversight Committee in accordance with and pursuant to the terms of this Litigation and Distribution Trust Agreement and the Plan. The Oversight Committee shall have the authority to select and engage such professionals as the Oversight Committee deems necessary and desirable to assist the Oversight Committee in fulfilling its obligations under this Litigation and Distribution Trust Agreement and the Plan, and the Litigation and Distribution Trust shall pay the reasonable and documented fees of such advisors (including on an hourly, contingency, or modified contingency basis) and reimburse such advisors for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Litigation and Distribution Trust Agreement.

3.4.2   **Regular Meetings of the Oversight Committee**. Meetings of the Oversight Committee are to be held with such frequency and at such place as the Litigation and Distribution Trustee and the members of the Oversight Committee may determine in their reasonable discretion.

3.4.3   **Special Meetings of the Oversight Committee**. Special meetings of the Oversight Committee may be held whenever and wherever called for by the Litigation and Distribution Trustee or any member of the Oversight Committee, subject to reasonable notice.

### 3.4.4  Manner of Acting

3.4.4.1     A majority of the total number of members of the Oversight Committee then in office shall constitute a quorum for the transaction of business at any meeting of the Oversight Committee. The affirmative vote of a majority of the members of the Oversight Committee present and entitled to vote at a meeting at which a quorum is present shall be the act of the Oversight Committee except as otherwise required by law or as provided in this Litigation and Distribution Trust Agreement or the Plan. Any or all of the members of the Oversight Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.

3.4.4.2     Any member of the Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the majority of the members at a meeting, be conducted by electronic mail or individual communications by the Litigation and Distribution Trustee and each member of the Oversight Committee. Any member of the Oversight Committee who is present and entitled to vote at a meeting of the Oversight Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Committee, unless: (i) such member of the Oversight Committee objects at the beginning of the meeting (or promptly upon his or her arrival) to holding it or transacting business at the meeting; (ii) his or her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he or she delivers written notice (including by electronic or facsimile transmission) of his or her dissent or abstention to the Oversight Committee before its adjournment. The right of dissent or abstention is not available to any member of the Oversight Committee who votes in favor of the action taken.

3.4.4.3     Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Oversight Committee shall report to the Oversight Committee any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than as Beneficiary or Subordinated Beneficiary). A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum and may engage in the Oversight Committee's discussions on such matter or issue); the vote or action with respect to such matter or issue shall be undertaken only by members of the Oversight Committee who are not "conflicted members." Notwithstanding anything to the contrary set forth herein, no member of the Oversight Committee shall be deemed to be a "conflicted member" solely as a result of (i) such member's affiliation with a Person that is a Beneficiary or Subordinated Beneficiary, or (ii) such member's affiliation with any Person that is, or is adverse to, a defendant in any action or proceeding to which the Litigation and Distribution Trustee is a party.

3.4.5    **Liquidating Oversight Committee's Action Without a Meeting.** Any action required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all members of the Oversight Committee and recorded in the minutes or other transcript of proceedings of the Oversight Committee.

3.4.6 **Tenure, Removal, and Replacement of the Members of the Oversight Committee.** The authority of the members of the Oversight Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation and Distribution Trust is terminated. The service of the members of the Oversight Committee will be subject to the following:

3.4.6.1    The members of the Oversight Committee will serve until disability, death, resignation or removal;

3.4.6.2    A member of the Oversight Committee may resign at any time by providing a written notice of resignation to the remaining members of the Oversight Committee. Such resignation will be effective upon the date received by the Oversight Committee or such later date specified in the written notice;

3.4.6.3    A member of the Oversight Committee may be removed by the majority vote of the other members of the Oversight Committee, a written resolution of which shall be delivered to the removed Oversight Committee member; provided, however, that such removal may only be made for cause;

3.4.6.4    In the event of a vacancy on the Oversight Committee (whether by removal, disability, death or resignation), a new member shall be appointed to fill such position by the remaining members of the Oversight Committee.  Immediately upon the appointment of any successor member of the Oversight Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Oversight Committee hereunder will be vested in and undertaken by the successor member of the Oversight Committee without any further act; and the successor member of the Oversight Committee will not be liable personally for any act or omission of the predecessor member of the Oversight Committee; and

3.4.6.5    Every successor member of the Oversight Committee appointed hereunder shall execute, acknowledge and deliver to the Litigation and Distribution Trustee and other members an instrument accepting the appointment under this Litigation and Distribution Trust Agreement and agreeing to be bound thereto, and thereupon the successor member of the Oversight Committee without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring member.

3.4.7  **Compensation and Reimbursement of Expenses of the Oversight Committee.** The Litigation and Distribution Trust will reimburse the members of the

9

Oversight Committee for all reasonable and documented out-of-pocket expenses incurred by such members in connection with the performance of their respective services hereunder, without duplication, upon demand for payment thereof. All fees and expenses of the members of the Oversight Committee shall be paid solely from Litigation and Distribution Trust Assets.

3.5 **Special Governance Provisions Regarding Prosecution and Settlement of Causes of Action**. All decisions concerning whether to prosecute or settle any Causes of Action shall be made by the Oversight Committee in good faith and in the best interests of the Litigation and Distribution Trust and the Beneficiaries until all Allowed Claims of Beneficiaries are paid and satisfied in full, and thereafter in the best interests of the Litigation and Distribution Trust and the Subordinated Beneficiaries. The settlement of any of the Causes of Action shall require the approval of a majority vote of the members of the Oversight Committee.

## ARTICLE IV

### Duties, Rights and Power of Litigation and Distribution Trustee and the Debtor

4.1 **Litigation and Distribution Trustee's Duties**. Subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall manage the Litigation and Distribution Trust Assets, collect the income and make distributions, including final distributions, to its Beneficiaries and, if applicable, to the Subordinated Beneficiaries, as provided under the Plan.

4.2 **Litigation and Distribution Trustee's Rights and Powers**. Subject to the rights and powers of the Oversight Committee, the Litigation and Distribution Trustee shall have the powers and authority as set forth herein and in the Plan necessary to manage the Litigation and Distribution Trust Assets and effect the disposition, orderly liquidation and distribution of all Litigation and Distribution Trust Assets and effect the disposition, orderly liquidation and distribution of all Litigation and Distribution Trust Assets. The rights and powers shall include, subject to the limitations set forth in the Plan and this Agreement, and subject to the rights and powers of the Oversight Committee and if so authorized by the Oversight Committee, the right and power to:

(a) Pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all claims and Causes of Action transferred to the Litigation and Distribution Trust as provided in the Plan and herein;

(b) Pay all taxes, expenses and obligations of the Litigation and Distribution Trust out of the Litigation and Distribution Trust Assets;

(c) Investigate, and, if necessary and authorized by the Oversight Committee, prosecute and litigate any and all Avoidance Actions and Causes of

Action that are transferred to the Litigation and Distribution Trust pursuant to the Plan, including any Avoidance Action or any other claims or Causes of Action brought by the Debtor or the Unsecured Creditors' Committee on behalf of the Debtor prior to the Effective Date, which Causes of Action, rights to payment and claims as of the Effective Date shall vest solely and exclusively in the Litigation and Distribution Trustee, for the benefit of the Litigation and Distribution Trust, pursuant to the terms of the Plan;

   (d)  In addition,

   (i) Invest funds; (ii) make distributions; (iii) pay taxes and other obligations owed by the Litigation and Distribution Trust or incurred by the Litigation and Distribution Trustee; (iv) subject to Sections 4.3 and 4.9 herein, engage and compensate from the Litigation and Distribution Trust Assets, consultants, agents, employees, and professional persons (including, without limitation, attorneys on a contingency fee basis) to assist the Litigation and Distribution Trustee with respect to the Litigation and Distribution Trustee's responsibilities; (v) liquidate and dispose of the Litigation and Distribution Trust Assets; (vi) compromise and settle Claims and Causes of Actions; (vii) act on behalf of the Debtor, its Estate, and the Official Committee of Unsecured Creditors (the "*Committee*") in all civil actions, judicial proceedings, administrative proceedings, adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (viii) commence and/or pursue any and all actions involving Litigation and Distribution Trust Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (ix) utilize Litigation and Distribution Trust Assets to purchase appropriate insurance to insure the acts and omissions of the Litigation and Distribution Trustee; and (x) act and implement the Plan, the Litigation and Distribution Trust Agreement, and orders of the Bankruptcy Court.

  4.3  **Limitations as to Losses.** The Litigation and Distribution Trustee shall not be responsible, and shall have no liability whatsoever, to any person for any loss to the Litigation and Distribution Trust or the amount of interest thereon resulting from the investment thereof in any Permitted Investments. The Litigation and Distribution Trustee shall not invest or reinvest any Litigation and Distribution Trust Assets in a security or instrument that does not constitute a Permitted Investment.

  4.4  **Selection of Agents.** Without the need for application to or approval of the Bankruptcy Court, the Litigation and Distribution Trustee may select, determine compensation for and employ attorneys, brokers, consultants, custodians, investment

advisors, asset services, auditors, accountants, and other agents (including, without limitation, attorneys, accountants and consultants retained by the Debtor and the Committee during the Chapter 11 Case). The Litigation and Distribution Trustee may avail himself of the services of counsel or special counsel to FNBC or the Committee. Subject to the Plan, the Litigation and Distribution Trustee may pay the salaries, fees and expenses of such agents or consultants out of the Litigation and Distribution Trust Assets. The Litigation and Distribution Trustee shall not be liable for any loss to the Litigation and Distribution Trust or any person interested therein by reason of any mistake or default of any such agent or consultant. Notwithstanding the foregoing, all invoices for such professionals will be submitted to the Litigation and Distribution Trustee and the Oversight Committee for review prior to payment. If the Litigation and Distribution Trustee and a majority of the members of the Oversight Committee do not object to a submitted invoice, the invoice will be paid. If the Litigation and Distribution Trustee or a majority of the members of the Oversight Committee object to the invoice, the parties will work in good faith to resolve the objection. If the parties cannot resolve the objection, one or more of the parties may raise the dispute to the Bankruptcy Court for resolution.

4.5     **Signature**.  As of the Effective Date of the Plan, the Litigation and Distribution Trustee shall have the sole signature power and authority with respect to the Litigation and Distribution Trust to (a) open and close accounts with any banking, financial or investment institution; (b) make deposits and withdrawals of cash and other property into or from any such account; (c) make or endorse checks with respect to any such account; (d) effectuate purchases and sales of securities and give security purchase and sale orders to brokers or any other third parties and the exercise of such power and authority shall be deemed to be authorized by and to represent the decision of the Litigation and Distribution Trustee then entitled to make such decision.

4.6     **Maintenance of Register**.  The Litigation and Distribution Trustee shall at all times maintain a register of names, address, and amount of Claims in Class 2_as in effect on the Effective Date and is revised from time to time thereafter.

4.7     **Liability of Litigation and Distribution Trustee.**

(a)     **Standard of Care**.  The Litigation and Distribution Trustee shall have a fiduciary duty to the holders of Beneficiaries, and subject to and upon full payment and satisfaction of all Allowed Claims of Beneficiaries, thereafter to the Subordinated Beneficiaries, to perform the duties expressly provided for by this Agreement. The Litigation and Distribution Trustee shall not be liable for any action taken or omitted to be taken by him or her in good faith and in the exercise of reasonable judgment and believed to be within the discretion or power conferred by this Agreement, or be responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct.  The Litigation and Distribution

12

Trustee shall not have any fiduciary relationship with any party by virtue of this Agreement except as specifically set forth in this Agreement, and shall not have any fiduciary relationship with any Subordinated Beneficiary prior to payment and satisfaction in full of all Allowed Claims of all Beneficiaries.

    (1)    The Litigation and Distribution Trustee shall not be liable or in any way responsible for the acts or omissions of the Debtor or its agents;

    (2)    Unless further indemnified to his satisfaction against liability and expense, the Litigation and Distribution Trustee shall not be compelled to do any act or to take any action toward the execution or enforcement of the powers created under the Plan or this Agreement or to prosecute or defend any suit in respect hereof.  If the Litigation and Distribution Trustee requests approval from the Bankruptcy Court with respect to any act or action in connection with the Plan or this Agreement, the Litigation and Distribution Trustee shall be entitled (but shall not be required) to refrain (without incurring any liability to any person by so refraining) from such act or action unless and until he has received such instructions of approval.  In no event, however, shall the Litigation and Distribution Trustee or any of his representatives be required to take any action which he reasonably determines could lead to criminal activity or civil liability.

    (3)    The Litigation and Distribution Trustee shall not be responsible in any manner to the Debtor, its Estate, any Claim Holder, any Beneficiary, any Subordinated Beneficiary and/or any party in interest for:

    (i)    the creditworthiness of any party and the risks involved to the Debtor or such Claim holder or party in interest;

    (ii)    the effectiveness, enforceability, genuineness, validity, or any due execution of the Plan or this Agreement as to any person other than the Litigation and Distribution Trustee;

    (iii)    any representation, warranty, document, certificate, report or statement made herein or furnished hereunder or in connection with the Plan or this Agreement not constituting a breach of the standard of care as set forth in this Agreement on the part of the Litigation and Distribution Trustee;

(iv)    the existence, priority or perfection of any existing lien, encumbrance or security interest; or

(v)    the observation or compliance with any of the terms, covenants or conditions of the Plan or this Agreement on the part of any party other than the Litigation and Distribution Trustee.

(4)    The Litigation and Distribution Trustee shall be entitled to rely on negative notice to any person and entity, including any Beneficiary or Subordinated Beneficiary. Subject to the rights and powers of the Oversight Committee, at the election of the Litigation and Distribution Trustee in his sole and absolute discretion, and without in any way limiting or impairing the rights and powers of the Litigation and Distribution Trustee to act or forbear from acting on any matter without notice to or consent of any person or entity, the Litigation and Distribution Trustee may send notice of any proposed action or determination not to take action with respect to any matter to holders of Claims, or any subset of such holders of Claims.. Any Claim holder to whom any such notice is sent that fails to object in writing so as to be received by the Litigation and Distribution Trustee on or before three (3) days after service by the Litigation and Distribution Trustee of a proposed action (or determination not to take action) shall be deemed to have consented to such action or determination not to take action.

(5)    The Debtors and all persons and entities voting for the Plan and/or accepting the benefits thereof, have agreed not to sue or otherwise pursue or seek damages from the Litigation and Distribution Trustee pursuant to the Plan or this Agreement, except for willful misconduct or gross negligence. The Litigation and Distribution Trustee shall be and hereby is indemnified and held harmless by the Litigation and Distribution Trust to the full extent of all existing and future Litigation and Distribution Trust Assets to the maximum extent permitted by law for any and all acts and omissions except for the Litigation and Distribution Trustee's gross negligence or wilfull misconduct. The Litigation and Distribution Trust Assets will be used to further indemnify, hold harmless and reimburse the Litigation and Distribution Trustee from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities, and actions for which liability is limited pursuant to this Agreement and Plan.

(b)    **Surety Bond.** In order to secure the faithful performance of his duties under the Plan and this Agreement, the Litigation and Distribution Trustee shall obtain at the expense of the Litigation and Distribution Trust and file with the

Bankruptcy Court a surety bond, naming the United States as the oblige thereunder, in an amount equal to <u>one hundred</u> percent (<u>100</u>%) of the Cash in the Litigation and Distribution Trust. The surety on such bond shall be among those listed as acceptable sureties on federal bonds in Circular 570 of the United States Department of the Treasury or a similar listing if no longer published. The Litigation and Distribution Trustee may increase the amount of the bond or reduce the amount of the bond from time to time as he deems necessary or proper provided that such amount equals or exceeds the amount of Cash in the Litigation and Distribution Trust. No bond shall be required if and when the value of the Litigation and Distribution Trust Assets shall be less than $100,000.00.

(c) **No Liability for Acts of Predecessor.** No successor Litigation and Distribution Trustee shall be in any way responsible for the acts or omissions of any Litigation and Distribution Trustee in office prior to the date on which such person becomes a Litigation and Distribution Trustee, nor shall he or she be obligated to inquire into the validity or propriety of any such act or omission unless such Litigation and Distribution Trustee expressly assumes such responsibility. Any successor Litigation and Distribution Trustee shall be entitled to accept as conclusive any final accounting and statement of Litigation and Distribution Trust Assets furnished to such successor Litigation and Distribution Trustee by such predecessor Litigation and Distribution Trustee and shall further be responsible only for those Litigation and Distribution Trust Assets included in such statement.

(d) **No Implied Obligations.** The Litigation and Distribution Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and in the Plan, and no other or further covenants or obligations shall be implied into this Agreement. The Litigation and Distribution Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties herein or in any documents or instrument evidencing or otherwise constituting a part of the Litigation and Distribution Trust Assets. The Litigation and Distribution Trustee makes no representations as to the value of the Litigation and Distribution Trust Assets or any part thereof, nor as to the validity, execution, enforceability, legality or sufficiency of this Agreement, and the Litigation and Distribution Trustee shall incur no liability or responsibility with respect to any such matters.

(e) **Reliance on Documents or Advice of Counsel or Other Persons.** Except as otherwise provided herein, the Litigation and Distribution Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order and other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties, and shall have no liability or responsibility with respect to the form, execution or validity thereof; nor shall the Litigation and Distribution Trustee be liable for any act which he may do or omit to do hereunder, all subject only

to the limitation that the Litigation and Distribution Trustee acts in accordance with the standard of care set forth in Section 4.7(a). None of the provisions hereof shall require the Litigation and Distribution Trustee to expend or risk his own funds or otherwise incur financial liability or expense in the performance of any duties hereunder. The Litigation and Distribution Trustee may consult with its legal counsel and shall not be liable for any action taken or suffered in reliance upon the advice of such counsel.

(f) **No Personal Obligation for Liabilities of the Debtor.** Claims holders and other persons dealing with the Litigation and Distribution Trustee in its respective capacity as Litigation and Distribution Trustee within the scope of this Agreement shall look only to the Litigation and Distribution Trust Assets to satisfy any liability incurred by the Litigation and Distribution Trustee to such person in carrying out the terms of this Agreement, and the Litigation and Distribution Trustee shall have no personal or individual obligation to satisfy any such liability.

4.8 **Reports and Fees.** The Litigation and Distribution Trustee shall provide quarterly statements of receipts and disbursements to the Office of the United States Trustee. The Litigation and Distribution Trustee will be responsible for timely payment from the Litigation and Distribution Trust Assets of the United States Trustee fees incurred pursuant to 28 U.S.C. § 1930(a)(b) subsequent to the Effective Date of the Plan.

4.9 **Withholding and Reporting Requirements; Tax Treatment of Litigation and Distribution Trust.** The Litigation and Distribution Trust will be treated as a "Litigation and Distribution Trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations. The transfer of the Assets to the Litigation and Distribution Trust shall be treated as a transfer to the beneficiaries of the Litigation and Distribution Trust for all purposes of the Internal Revenue Code (e.g., sections 61(a)(12), 483, 1001, 1012, and 1274) followed by a deemed transfer by such beneficiaries to the Litigation and Distribution Trust. The Litigation and Distribution Trust shall be considered a "grantor" trust, and the Beneficiaries and Subordinated Beneficiaries shall be treated as the grantors and deemed owners of the Litigation and Distribution Trust in accordance with their rank and priority. The Litigation and Distribution Trustee shall value the transferred property and notify the Beneficiaries and Subordinated Beneficiaries, in writing, of such valuations. The assets transferred to the Litigation and Distribution Trust shall be valued consistently by the Beneficiaries and Subordinated Beneficiaries for all federal income tax purposes. In connection with all Distributions made pursuant to the Litigation and Distribution Trust and all activities of the Litigation and Distribution Trust, the Litigation and Distribution Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority. All Distributions made pursuant to the Plan and the Litigation and Distribution Trust will be subject to any such withholding and reporting requirements. The Beneficiaries and

Subordinated Beneficiaries shall be treated as the grantors and deemed owners of the Litigation and Distribution Trust. The Litigation and Distribution Trustee shall file tax returns for the Litigation and Distribution Trust as a grantor trust pursuant to 1.671-4(a) of the Income Tax Regulations promulgated pursuant to the United States Internal Revenue Code. *The Litigation and Distribution Trustee may require Beneficiaries and Subordinated Beneficiaries to furnish to the Litigation and Distribution Trustee its, his or her employer or taxpayer identification number ("TIN") as assigned by the Internal Revenue Service, and the Litigation and Distribution Trustee may condition any Distribution to any such beneficiaries upon receipt of such identification number. If a Beneficiary or Subordinated Beneficiary shall fail to provide the Litigation and Distribution Trustee with any requested TIN within 90 days after the request, such failure shall be deemed a waiver of all of such Beneficiaries' and Subordinated Beneficiaries' interests in the Litigation and Distribution Trust and rights to Distribution under the Plan. Distributions that would have been made to such Beneficiary or Subordinated Beneficiary shall be distributed to the other Beneficiaries or Subordinated Beneficiaries, as applicable, based on their Pro Rata interests in the Litigation and Distribution Trust.*

4.10   **Litigation and Distribution Trustee's Compensation.** The Litigation and Distribution Trustee's compensation shall be based upon hourly rates typically charged in the conduct of the Litigation and Distribution Trustee's business.

In addition to reimbursements for the actual reasonable and necessary expenses incurred, the Litigation and Distribution Trustee, and any employees, agents, consultants, or professionals engaged or retained by the Litigation and Distribution Trustee, shall be entitled to reasonable compensation from the Litigation and Distribution Trust Assets for services rendered in connection with performance of the duties of the Litigation and Distribution Trustee, as set forth above.

Compensation and expense reimbursement of any agents, consultants, employees, and/or professionals engaged or retained by the Litigation and Distribution Trust and the Litigation and Distribution Trustee, such compensation shall be in an amount and on such terms as may be agreed to by the Litigation and Distribution Trustee and such agents, consultants, employees, and/or professionals. The Litigation and Distribution Trustee may retain, compensate, employ and pay, including on a contingency basis, any and all professionals and employees (including attorneys) without need for notice or any order of this Court, on such terms and condition as the Litigation and Distribution Trustee deems appropriate.

4.11   **Reimbursements.** The Litigation and Distribution Trustee and any agents or consultants employed pursuant to this Agreement shall be reimbursed as a priority form the Litigation and Distribution Trust Assets for all reasonable out-of-pocket expenses incurred in performance of their duties hereunder in addition to any compensation received.

4.12 **Indemnification.** The Litigation and Distribution Trustee shall be and hereby is indemnified by, held harmless and receive reimbursement from Litigation and Distribution Trust Assets for any and all claims, actions, demands, losses, damages, expenses, and liabilities, including, without limitation, court costs, attorneys' fees and accountants' fees incurred to the maximum extent permitted by law, as set forth above.

4.13 **Current Taxation of Earnings.** All earnings of the Litigation and Distribution Trust, including those retained in a Distribution Reserve established pursuant to section 5.1 below, shall be taxed on a cash basis for the calendar in which such earnings are recognized.

4.14 **Rights of Oversight Committee Paramount.** The rights and powers of the Oversight Committee to direct the Litigation and Distribution Trustee shall govern and be paramount, notwithstanding anything to the contrary herein.

4.15 **Power to Enter Into Agreements.** The Oversight Committee and the Litigation and Distribution Trustee may enter into one or more written agreements from time to time to effectuate and implement the provisions of this Agreement and the Plan, including, without limitation, to further indemnify the Litigation and Distribution Trustee, to provide for indemnity for members of the Oversight Committee, to state with specificity the standard of care with which members of the Oversight Committee shall act, and for any further or other matters not specifically set forth in this Agreement, the Plan or the Confirmation Order.

## ARTICLE V

### Distributions And Treatment of Disputed Claims

5.1 **Establishment of Reserves.** The Litigation and Distribution Trustee shall establish the Distribution Reserve from the Litigation and Distribution Trust Assets as the Litigation and Distribution Trustee determines may be appropriate. Thereafter, as Litigation and Distribution Trust Assets are liquidated and reduced to Cash, the Litigation and Distribution Trustee shall fund the Distribution Reserve with such Cash as practicable.

5.2 **Disbursing Agent.** The Litigation and Distribution Trustee, or an agent employed by the Litigation and Distribution Trustee, shall serve as a "disbursing agent" and shall make all Distributions to the beneficiaries of the Litigation and Distribution Trust derived from Litigation and Distribution Assets as provided for under the Plan.

5.3 **Distributions.** As of the Effective Date, to the extent there exist Disputed Claims in any Class, the Litigation and Distribution Trustee shall reserve from any Distributions, an amount equal to the Pro Rata portion of such Distribution to which such Disputed Claim would be entitled if allowed in the amount asserted by the Holder of such Disputed Claim. If a Disputed Claim is allowed, in part or in full, then the Litigation and Distribution Trustee shall distribute to the Holder of any such Claim an amount equal to such Holder's Pro Rata share, based on such Allowed Claim, of all Distributions previously made to Holders of Allowed Claims in the Class of Claims at issue.

5.4 **Rounding.** Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as unclaimed property under the Plan.

5.5 **Payment or Distribution Upon Resolution of Disputed Claims.** Except as the Litigation and Distribution Trustee may otherwise agree with respect to any Disputed Claim, no payments or distributions shall be made with respect to any portion of a Disputed Claim unless and until (a) all objections to such Disputed Claim have been resolved or determined by a Final Order of the Bankruptcy Court, or (b) the Bankruptcy Court shall have entered an order treating any portion of a Disputed Claim as an Allowed Claim. Payments and distributions to each holder of a Disputed Claim to the extent that it ultimately becomes an Allowed Claim shall be made in accordance with the provisions of this Plan with respect to the Class of Claims to which such Allowed Claim belongs. A Disputed Claim that is estimated for purposes of allowance and distribution pursuant to section 502(c) of the Bankruptcy Code and which is estimated and Allowed at a fixed amount by Final Order of the Bankruptcy Court shall thereupon be an Allowed Claim for all purposes in the amount so estimated and Allowed.

5.6 **Unclaimed Property.** The Litigation and Distribution Trustee will make all reasonable efforts to locate holders of Allowed Claims in Class 2: however, if any Distributions remain unclaimed six (6) months after the original date of Distribution of such Claims, the unclaimed Distributions will be redistributed on a Pro Rata basis to all known and locatable holders of Allowed Claims in Class 2 if such a Distribution, after expenses of Distribution, would produce an aggregate minimum dividend of $50,000. If such Distribution would produce an aggregate dividend of less than $50,000, the Litigation and Distribution Trustee may donate any remaining Cash allocable to any unclaimed Distributions to a charitable institution. After such donation, the Litigation and Distribution Trustee, and his agents and Professionals will be fully discharged and released from any claims related to the unclaimed Distributions.

5.7    **Setoff.** The Litigation and Distribution Trustee may, but shall not be required to, setoff against any Claim (and the distributions to be made pursuant to this Plan with respect to such Claim), claims of any nature whatsoever that the Debtor, its Estate, the Committee, or the Litigation and Distribution Trust may have against the holder of such Claim.  Notwithstanding the foregoing, the failure to effect such a setoff will not constitute a waiver or release by the Litigation and Distribution Trust of any such claim against such holder.

## ARTICLE VI

### Beneficiaries and Subordinated Beneficiaries

6.1    **Interest Beneficial Only.**  The ownership of a beneficial interest in the Litigation and Distribution Trust shall not entitle any Beneficiary or Subordinated Beneficiary to any title in or to the Litigation and Distribution Trust Assets or to any right to call for a partition or division of such assets or to require an accounting except as may be specifically provided herein, in the Plan or the Confirmation Order.

6.2    **Ownership of Beneficial Interests Hereunder**. Each Beneficiary and Subordinated Beneficiary shall have a beneficial interest in the Litigation and Distribution Trust solely to the extent that such Beneficiary or Subordinated Beneficiary is entitled to a distribution from the Litigation and Distribution Trust pursuant to the Plan or the Confirmation Order. Each Beneficiary and Subordinated Beneficiary shall cease to own a beneficial interest in the Litigation and Distribution Trust and cease to be a Beneficiary or Subordinated Beneficiary hereunder for all purposes immediately upon completion of the Distribution by the Litigation and Distribution Trustee to such Beneficiary or Subordinated Beneficiary, as applicable, as required by this Litigation and Distribution Trust Agreement, the Plan and the Confirmation Order.

6.3    **Standing**.   No Beneficiary or Subordinated Beneficiary shall have standing to direct the Litigation and Distribution Trustee to do or not to do any act other than as described herein.

## ARTICLE VII

### Objections to Claims

Following the Effective Date, the Litigation and Distribution Trustee shall be authorized to object, or to succeed or otherwise join any objection filed by the Debtor prior to the Effective Date, to Claims in Classes 2, 3A, 3B, 3C, 4 and 5, as well as any other Claims asserted to be entitled to priority pursuant to Sections 503 or 507 of the Bankruptcy Code (except for Claims of Professionals employed by the Debtor or the

Committee) so as to have the Bankruptcy Court determine the amounts to be allowed, if any, of such Claims and thus paid pursuant to the Plan. The Litigation and Distribution shall have no right to object to any Equity Interests nor to Claims of Professionals employed by the Debtor or the Committee. Objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of such Claims as set forth in the Plan; provided, however, that any deadline may be extended by the Bankruptcy Court upon the entry of an order by the Bankruptcy Court extending such deadline. An objection to the allowance of a Claim by the Litigation and Distribution Trustee must be filed with the Bankruptcy Court and served upon the holder of the Claim and all parties who have requested notice, unless such objection was filed prior to the Effective Date by the Debtor or Committee, in which event the Litigation and Distribution Trustee shall be substituted for the Debtor or Committee, as applicable, as the objecting party without the need for the filing by the Litigation and Distribution Trustee of a separate objection.

Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of claim for pre-petition debts of the Debtor filed after the Bar Dates shall be disallowed as a late-filed claim, without any action by the Debtor or Litigation and Distribution Trustee, unless and until the party filing such Claim obtains (i) the written consent of the Litigation and Distribution Trustee to file such Claim late or (ii) approval from the Bankruptcy Court upon notice to the Debtor and Litigation and Distribution Trustee that permits the late filing of the Claim, in which event, the Litigation and Distribution Trustee shall have 120 days from the date of such written consent or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Debtor.

From and after the Effective Date, the Litigation and Distribution Trustee shall litigate to judgment, propose settlements of, or withdraw objections to all Disputed Claims.

## ARTICLE VIII

### Appointment, Removal and Resignation of Litigation and Distribution Trustee

8.1    **Appointment of Litigation and Distribution Trustee; Acceptance of Appointment.** Stephen B. Darr is hereby appointed to serve as the initial Litigation and Distribution Trustee hereunder and pursuant to the Plan. Stephen B. Darr is willing to, and does hereby, accept the appointment to serve as the initial Litigation and Distribution Trustee, and to hold and administer the Litigation and Distribution Trust Assets pursuant to the terms of the Plan and this Agreement.

8.2    **Removal of the Litigation and Distribution Trustee.** A Litigation and Distribution Trustee appointed pursuant to this Agreement may be removed with

cause by order of the Bankruptcy Court after notice and opportunity for a hearing For purposes of this Agreement, the term "cause" shall mean: (a) the Litigation and Distribution Trustee's gross negligence or willful failure to perform his duties under this Agreement; (b) the Litigation and Distribution Trustee's misappropriation or embezzlement of any Litigation and Distribution Trust Assets or the proceeds thereof; or (c) the Litigation and Distribution Trustee's continued or repeated negligence or failure to perform his duties hereunder. If a Litigation and Distribution Trustee is removed, or is unwilling or unable to serve (1) by virtue of his inability to perform his duties under this Agreement due to death, illness or other physical or mental disability, (2) following the liquidation of all or substantially all of the Litigation and Distribution Trust Assets, or (3) for any other reason whatsoever, such Litigation and Distribution Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Litigation and Distribution Trustee.

8.3 **Resignation of Litigation and Distribution Trustee.** A Litigation and Distribution Trustee may resign upon motion to the Bankruptcy Court, which resignation shall become effective at the time specified by the Court, contemporaneous with the appointment of a successor Litigation and Distribution Trustee. If a Litigation and Distribution Trustee resigns from his or her position hereunder, subject to a final accounting and the approval of the Bankruptcy Court, such Litigation and Distribution Trustee shall be entitled to all accrued unpaid fees, reimbursement, and other compensation to the extent incurred or arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Litigation and Distribution Trustee.

8.4 **Successor Litigation and Distribution Trustee.** In the event that a Litigation and Distribution Trustee is removed, resigns, or otherwise ceases to serve as Litigation and Distribution Trustee, a successor Litigation and Distribution Trustee shall be appointed by the Oversight Committee.

## ARTICLE IX

### Effect of Agreement on Third Parties

9.1 **Effect of Agreement on Third Parties.** There is no obligation on the part of any purchaser or purchasers from the Litigation and Distribution Trustee or any agent of the Litigation and Distribution Trustee, or on the part of any other person dealing with the Litigation and Distribution Trustee or any agent of the Litigation and Distribution Trustee, to see to the application of the purchase money or other consideration paid or delivered to the Litigation and Distribution Trustee, or any

agent of the Litigation and Distribution Trustee, or to inquire in to the validity, expediency, or propriety of any such transaction, or the authority of the Litigation and Distribution Trustee, or any agent of the Litigation and Distribution Trustee, to enter into or consummate the same upon such terms as the Litigation and Distribution Trustee may deem advisable.

## ARTICLE X

### Waiver

10.1    **Waiver.**  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

## ARTICLE XI

### Termination of the Agreement; Amendment of the Agreement

11.1    **Termination of the Agreement.**  This Agreement will terminate only upon authorization of the Bankruptcy Court.  The duties, responsibilities and powers of the Litigation and Distribution Trustee shall terminate after (i) all Causes of Action transferred and assigned to the Litigation and Distribution Trust or involving the Litigation and Distribution Trustee on behalf of the Litigation and Distribution Trust, including but not limited to the Avoidance Actions, are fully resolved, and (ii) the Litigation and Distribution Trust Assets have been distributed on the final Distribution Date in accordance with the Plan and Litigation and Distribution Trust Agreement.  Notwithstanding the foregoing, this Agreement and the Litigation and Distribution Trust shall terminate on the later of the fifth (5th) year from the date hereof or such extended finite period(s) as approved by the Bankruptcy Court within six (6) months of the beginning of any such extended term(s),

11.2    **Amendment of Agreement.**  Except as otherwise set forth herein, any provisions of the Agreement may, consist with the terms of the Plan, be amended, modified, terminated, revoked or altered only upon Bankruptcy Court approval.

## ARTICLE XII

### Miscellaneous

12.1    **Severability.**  If any one or more of the provisions herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect, and of the remaining provisions, shall not be in any

way impaired or affected. In such event, there shall be added as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable. The effective date of the added provision shall be the date upon which the prior provision was held to be invalid, illegal or unenforceable.

12.2 **Entire Agreement.** This Agreement, the Plan and the Confirmation Order constitute the entire agreement of the parties and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. In the event of any inconsistency between this Agreement and the Plan, the Plan shall govern. Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

12.3 **Waiver of Jury Trial.** Each party to this Agreement hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this agreement or the transactions contemplated hereby.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the day and year first above written to evidence their counsel and agreement with the terms and provisions of this Agreement.

| FIRST NBC BANK HOLDING COMPANY | LITIGATION AND DISTRIBUTION TRUSTEE |
|---|---|
| By: | |
| Its: | Stephen B. Darr |

## **EXHIBIT C**

- FNBC Employment Agreement with Govindan
- FNBC Employment Agreement with Nash

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**") is made and entered into on the date set forth on the signature page hereto (the "**Effective Date**"), by and between First NBC Bank Holding Company (the "**Company**") and the employee set forth on the signature page hereto ("**Employee**").

1.      **Recitals**.  This Agreement is entered into with the intention of continuing a long-term relationship for the mutual benefit of the parties.  The Company desires to have an enforceable agreement with Employee, giving the Company exclusive rights to his services and expertise, and Employee wishes to provide his services and expertise in exchange for the compensation described in this Agreement.  Employee agrees and acknowledges that Employee has been and will be employed in an employee and/or managerial capacity and that Employee will be a key employee who will have access to valuable trade secrets and other confidential information belonging to the Company. In consideration of these rights and opportunities, Employee agrees it is reasonable and appropriate for Employee to enter into the various restrictive agreements contained in this Agreement in order to preserve the value of the Company's trade secrets and to protect the Company against unfair competition or interference with its business by Employee both during and after the term of this Agreement.  Furthermore, Employee agrees and acknowledges that the various restrictive agreements contained herein will not impose any unreasonable or undue restriction on his future activities.

2.      **Employment**.  On the terms and conditions set forth in this Agreement, the Company hereby employs Employee to serve in the position set forth on Exhibit A hereto and to perform such other duties as the Company may from time to time assign to Employee.  Employee hereby accepts such employment.  Employee will report to the Board of Directors of the Company (the "**Board**") or to such other individual or committee as designated by the Board.

3.      **Duties.**  Employee will devote Employee's full time and efforts to performing such duties and discharging such responsibilities as shall be assigned to Employee from time to time by the Company.  All duties assigned to Employee shall be performed to the satisfaction of the Company and in accordance with all applicable laws, professional and ethical standards and accreditation, licensing, and other regulatory requirements applicable to the Company.

4.      **At-Will Employment**.  This Agreement does not create a contract of employment for any specific duration.  At any time during Employee's employment, notwithstanding anything to the contrary, Employee has the right to terminate Employee's employment, with or without cause, with the Company.  At any time during Employee's employment, the Company may, and has the right to, terminate Employee's employment with or without cause and, without penalty, regardless of any other documents or oral or written statements by any representative of the Company.

5.      **Return of Property**.  Upon the Company's request or termination of employment of Employee hereunder, regardless of the reason for such termination, Employee shall immediately return to the Company any and all property of the Company in his possession, including any hard copies, electronic copies, and other records of or containing any Confidential Information (as

defined below). The Company may offset the value of any Company property not returned against any amounts due to Employee.

6. **Compensation**. As compensation for the services to be rendered by Employee during the term of his employment and in consideration of Employee's covenants contained herein, the Company agrees to pay Employee the amounts set forth in Exhibit A attached hereto (the "**Base Salary**").

7. **Benefits**. During the term of Employee's employment with the Company:

(a) Employee shall be eligible for reimbursement of all reasonable out-of-pocket travel and other business expenses incurred by Employee on behalf of the Company. The Company may impose such reasonable requirements on Employee as are imposed on other similar employees with respect to prior authorization, documentation, record keeping and other justification for reimbursable expenses in accordance with applicable tax laws, accounting procedures and internal policies of the Company as in effect from time to time. Employee shall immediately deliver to the Company upon termination of employment an accounting for any business expenses or other expenses for which Employee claims reimbursement.

(c) The Company may establish standard benefits for all employees as from time to time are feasible. Such benefits will be made available to Employee to the extent that they are made available to any other employees of the Company.

8. **Loyalty to the Company**. During the term of Employee's employment with the Company, Employee shall use his best efforts to advance the business of the Company. Employee will not during the term of his employment have any business interests or activities that are adverse to the interests of the Company. Employee represents and warrants that Employee is free to enter into this Agreement and to perform the duties required during the term of his employment, and that there are no employment contracts, restrictive covenants or other restrictions preventing, restricting, or affecting the performance of Employee's duties hereunder.

9. **Confidential Information/Confidentiality.**

(a) Employee recognizes that his employment as a key employee of the Company involves managerial duties, development responsibilities and access to the Company's valuable Confidential Information (as defined below). Employee acknowledges that all Confidential Information, including Confidential Information developed by Employee during the term of his employment (as more specifically set forth in Section 9(e) below), is the sole and exclusive property of the Company or of third parties whose rights the Company wishes to protect. Employee covenants and agrees that Employee will not at any time, either during Employee's employment with the Company or after such employment terminates for any reason, directly or indirectly, use or make known, divulge, disclose, or communicate to any person, firm, company, partnership, corporation or similar entity, in any manner whatsoever any Confidential Information acquired during the term of the employment with the Company or with respect to any member, shareholder, officer, director or manager of the Company (including personal financial information with respect to any such person) without the prior written consent of the Company or the person

2

to whom the information relates. Employee will be vigilant in protecting all Confidential Information from disclosure to unauthorized persons and will comply with all rules and instructions of the Company concerning the physical and electronic security of the Company's premises, property and records.

(b)     For purposes of this Agreement, the term "**Confidential Information**" shall include, without limitation, all trade secrets, procedures, business plans, concepts, methods, policies, practices, records, data, discoveries, inventions, ideas, concepts, designs, devices, know-how, techniques, improvements and other matters and information, customer or vendor lists, price lists, technical information and/or requirements, product information, sales information, sources of supply, financial data, computer software and programs (including object code and source code), computer software and database technologies, systems and structures, and any other information, however documented, that is related thereto. The term "Confidential Information" is intended to be interpreted broadly to encompass all items described in this Section 9(b) regardless of whether each item satisfies the legal concept of a trade secret. Confidential Information does not include information that is (i) freely available to the public or independently developed by parties outside of the Company; (ii) furnished to Employee by a third party that does not involve a breach of the third party's obligations to any third party; (iii) information properly in possession of Employee prior to his receipt of disclosure from the Company; (iv) information that Employee is required, by law, regulation or court order to disclose; and (v) general information available to the public without restriction.

(c)     Employee acknowledges that Employee is an employee of the Company and that such status as an employee does not confer any proprietary or ownership interest in the Company; that the customers, suppliers, and relationships developed by Employee on behalf of the Company during the term hereof shall be the customers and relationships of the Company; and that upon termination of his employment, Employee shall have no interest in, nor will Employee interfere with the business of the Company, including its relationships with all customers or suppliers, or potential customers or suppliers whom Employee dealt with or became aware of while employed by the Company.

(d)     All books, records, files, forms, reports, memoranda, papers, customer and supplier lists and identities, drawings, designs and models concerning the Company's customers, documents concerning products or processes, and all other documents, writings and similar materials used by Employee in his job, together with any copies or other reproductions thereof made by or in Employee's possession or control, whether prepared or paid for by Employee or anyone else, shall be the exclusive property of the Company and shall be returned immediately to the Company upon termination of employment or upon the Company's request at any time.

(e)     In the course of Employee's employment, Employee may develop or participate in the development of Confidential Information useful in or relating to the Company's business. All trade secrets, procedures, concepts, methods, policies, practices, records, data, discoveries, inventions, ideas, concepts, designs, devices, know-how, techniques, improvements and other matters and information, however documented, which are developed by Employee during the course of his employment, developed in connection with or using in whole or in part any personnel or resources of the Company, or otherwise developed during the term of this

3

Agreement and related in any way to the business of the Company shall be presumed to be Confidential Information whether or not copyrighted or otherwise legally protected. All such Confidential Information, whether developed in whole or in part by Employee, shall be the exclusive property of the Company. Confidential Information specifically includes calendars, address books, appointment records, and other information maintained by Employee individually during the course of his employment hereunder, and all such records whether in hard copy, electronic form, or other form are Confidential Information which constitutes property of the Company and will be returned to the Company upon termination of employment. All original works of authorship relating to the Company or the Restricted Business and which are made or developed by Employee in whole or in part (individually or in conjunction with others) during the term of Employee's employment are within the scope of Employee's employment, as provided within Employee's job description with Employer or by this Agreement, and constitute "works made for hire." Employee agrees to take any action requested by the Company during the term hereof or at any time after termination of Employee's employment (regardless of the reason for such termination) for the purpose of protecting and/or evidencing the Company's rights to any Confidential Information including executing any patent applications, patent assignments, trademark reservations, copyrights, or other legal indicia of the Company's exclusive property rights in any of such Confidential Information.

(f)     Nothing in this Agreement shall preclude, restrict or interfere with any rights of Employee that cannot be waived under applicable law. No provision of this Agreement is intended to discourage or interfere with any party's good faith disclosure of a suspected violation of the law to any governmental entity. Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret and/or Confidential Information that is made: (i) in confidence and good faith to a federal, state, or local government official either directly or indirectly, or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, as long as such filing is made under seal. Employer will not retaliate against Employee for such disclosures of trade secret and/or Confidential Information made in accordance with the federal Defend Trade Secrets Act. If such disclosure is made, and Employer files a lawsuit for retaliation against Employee for reporting a suspected violation of law, Employee may disclose the relevant trade secret and/or Confidential Information to his attorney and may use the trade secret and/or Confidential Information in that court proceeding, only if: (i) Employee ensures that any court filing including the trade secret and/or Confidential Information is made under seal; and (ii) Employee does not otherwise disclose the trade secret and/or Confidential Information, except as required by court order.

10.     **Protective Covenants**.

(a)     The restrictions contained throughout this Section 10 are applicable for so long as Employee is employed by the Company or its affiliates, successors and assigns and shall continue in effect for ninety (90) days following termination of Employee's employment for any reason, (the "**Covenant Period**"). During the Covenant Period, Employee agrees that Employee will not do any of the following:

4

(1)     Interfere in any way with any contractual or other business relationship of the Company with clients, suppliers, contractors or other third parties who have engaged in or considered engaging in business with the Company (collectively, the "**Contracting Parties**");

(2)     Solicit or hire the employees or independent contractors hereafter employed by or otherwise retained by the Company or their successors and assigns;

(3)     Disclose to any third party or utilize in any way adverse to the Company any of the proprietary information utilized by the Company.  The provisions of this Section 10(a)(4) are in addition to, and not substitution of, the provisions of Section 9 above; and

(4)     Directly or indirectly disparage, criticize or otherwise adversely affect the reputation of the Company or its respective agents, employees, officers, directors, managers, shareholders, members, successors and assigns or any of the Company's business, products or services or take any other action that adversely affects the Company.

11.     **Enforcement**.

(a)     Employee acknowledges that the terms of this Agreement are essential for the protection of the Company.  Accordingly, the parties agree that, in addition to any other remedy to which the Company may be entitled pursuant to the terms of this Agreement, in the event that Employee breaches or threatens to breach any term of this Agreement, the Company may suspend and/or offset against all payments, of any kind, due to Employee under the terms of this Agreement or any agreements related thereto. In the event that the Company shall commence and prevail in any action or proceeding (including any arbitration proceeding) that arises out of the provisions hereof, or to recover damages as the result of the alleged breach of any of the provisions hereof, the Company shall be entitled to recover all costs incurred in connection therewith, including reasonable attorneys' fees.

(b)     Employee acknowledges that the provisions of Sections 8, 9 and 10 of this Agreement are essential for the protection of the Company and of its confidential information, including its trade secrets and the Confidential Information, from disclosure to or use by its competitors, and that any breach or threatened breach of such Sections would cause immediate and irreparable damage to the Company, for which monetary relief would be inadequate and difficult to ascertain.  Accordingly, the parties hereto agree that, in addition to any other remedy to which the Company may be entitled at law or in equity, the Company may obtain a temporary restraining order, preliminary injunction or other appropriate form of equitable relief from any court of competent jurisdiction (without the posting of any bond or any other security and without proof of actual damages) to prevent breaches or threatened breaches of Sections 8, 9 or 10 of this Agreement and/or to compel specific performance of such Sections, and Employee expressly waives the defense that a remedy in damages would be adequate.

(c)     Employee acknowledges that the provisions of Sections 8, 9 and 10 of this Agreement are given in connection with the receipt of Equity and in connection with Employee's position as an executive, manager and key employee.  Employee acknowledges and agrees that the

5

territorial and time limitations set forth in Section 10 are reasonable and properly required for the adequate protection of the Company's business and its confidential and proprietary information, including its trade secrets and the Confidential Information, developed during the term of Employee's employment with the Company.   Employee represents and warrants that his experience and capabilities are such that Employee can obtain employment notwithstanding the restrictions contained in Section 10.

(d)     It is specifically agreed that the respective time periods set forth in Section 10 shall be computed by subtracting from such computation any time during which Employee is in violation of such provision of Section 10 and any time during which there is pending in any court, arbitration, authority, or other adjudicative or mediation body (including any appeal from any judgment) brought by any entity or person, in which action the Company seeks to enforce any of the covenants of Employee pursuant to Section 10 or in which any entity or person contests the validity of such covenants or their enforceability or seeks to avoid their performance or enforcement.

12.    **Termination of Employment**.

(a)     <u>General</u>.  Employee's employment with the Company may be terminated by Employee or the Company at any time, with or without notice, for any or no reason and without penalty by either party hereto.

(b)     <u>Compensation after Termination</u>.   Upon termination for any reason, Employee shall be entitled to receive accrued wages, any other accrued and unpaid commission or bonus as of the date of termination, and any outstanding travel, lodging and business expenses, and nothing else.  It being understood that commission and bonus will not be deemed accrued unless, in the case of commission, amounts on which commission is due are collected prior to date of Employee's termination, and in the case of bonus, the bonus is declared and all conditions to the bonus are satisfied prior to the date of Employee's termination.

(c)     <u>Other Agreements</u>.  Employee specifically acknowledges and agrees that termination of Employee's employment with the Company may trigger certain rights and obligations of the Company and Employee contained in agreements between the Company and Employee, including under the Operating Agreement.

13.    **Successors**.  This Agreement and all provisions hereof shall bind and inure to the benefit of the Company, Employee and each of their respective personal representatives, heirs, successors and assigns.  The Company shall have the right to assign its rights and obligations hereunder to any other entity in the Company or to successor organization of the Company (including any purchaser of all or any significant portion of the Company's business, operations or assets) but Employee's employment obligations and covenants are personal in nature and may not be assigned or delegated by Employee.

14.    **Arbitration**.  All disputes among the parties arising under or which are related to this Agreement, including but not limited to any dispute relating to the Company's employment of Employee or any breach of this Agreement (except for disputes arising from or in connection

6

with any allegation of a breach of Sections 8, 9 or 10, which at the discretion of the Company may be resolved in accordance with Section 11), whether arising before or after termination, upon which an amicable resolution by good faith negotiations cannot be reached within forty-five (45) days after notice of any such dispute has been provided by one party to the other party, shall be submitted to binding arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association as then in effect. Except as set forth in Section 11 above, the procedures of the American Arbitration Association shall be the sole and exclusive procedures for the resolution of any disputes among the parties arising out of or relating to this Agreement. The parties shall continue to participate in good faith in the arbitration procedures specified herein regardless of whether the Company has separately resorted to a remedy set forth in Section 11 above. All applicable statutes of limitation shall be tolled while preliminary injunctive relief actions are pending, and the parties agree to take all such action as shall be reasonably required to effectuate such tolling. Any arbitration hereunder shall take place in the State of Colorado. The parties agree to arbitrate hereunder within sixty (60) days following the appointment of an arbitrator(s) hereunder. The parties shall be entitled to conduct reasonable discovery of information and documentation in accordance with the Rules of Civil Procedure of Colorado, and they shall be entitled to move the arbitrator(s) to compel production of such discovery information. All documentary production will be made available to the other parties no less than fourteen (14) days prior to the date of arbitration. The parties agree to require that the arbitrator(s) issue a written decision, and further agree that such written decision of a majority of the arbitrators (if more than one) shall be final and binding upon the parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction. The arbitration provisions of this Section 14 may be modified, at the election of the parties, by a unanimous written agreement of all parties engaged in any arbitration procedure to provide, for example, for the use of an arbitration association other than the American Arbitration Association.

15. **Miscellaneous**.

(a) Any matter to be determined or decided by the Company shall be determined or decided within the sole and absolute discretion of the Board (or such other individual or committee as designated by the Board).

(b) This Agreement is entered into in the state of Colorado and shall be governed in all respects by the laws of such state.

(c) This Agreement is intended to be enforceable in accordance with the terms hereof, and shall be interpreted accordingly. In the event that any court or other authority of competent jurisdiction finds any provision of this Agreement to be illegal or unenforceable, such provision shall be stricken, severed or modified to the extent necessary to cause it to be enforceable, and as so stricken, severed or modified, the remainder of this Agreement shall remain in full force and effect.

(d) This Agreement and Exhibits attached hereto shall set forth the entire agreement of the parties hereto and shall replace and supersede all prior discussions, agreements and arrangements, written or oral, relating to Employee's employment with the Company. This

4811-5332-4723.4

Agreement may be amended or modified only by written agreement subscribed to by both of the parties hereto.

(e)     The waiver by either party of a breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach of the same provision or any other provision of this Agreement.

(f)     The remedies provided in this Agreement are cumulative, not alternative, and the exercise of one shall not preclude the exercise of any other remedy at law or in equity for the same event or any other event.

(g)     Any notices required or permitted to be given hereunder shall be sufficient if in writing, and if delivered by hand or sent by certified mail to the addresses set forth below on the signature page to this Agreement or such other address as either party may from time to time designate in writing to the other party, and shall be deemed given as of the date of the delivery or mailing.

(h)     Wherever the context requires, the gender of all words used in this Agreement shall include the masculine, feminine, and neuter, and the number of all words shall include the singular and the plural.

(g)     <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, OR (ii) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY AGREES THAT ANY PARTY MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF EACH PARTY IRREVOCABLY TO WAIVE THEIR RIGHTS TO TRIAL BY JURY, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER AMONG THE PARTIES SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

*[Signatures on following page.]*

4811-5332-4723.4

IN WITNESS WHEREOF, the parties have entered into this Employment Agreement effective as of as of January 1, 2020.

**COMPANY**:

**First NBC Bank Holding Company**

By:_____

    L. Blakes Jones, Chief Restructuring Officer

**EMPLOYEE:**

_____

Andrew Nash

Address: _____

           _____

           _____

4811-5332-4723.4

## EXHIBIT A

1. **Employment**.

   (a)   <u>Employee Name</u>:   Andrew Nash

   (b)   <u>Position</u>:   Chief Financial Officer

2.   **Base Salary.**   The Base Salary payable to Employee shall be equal to $12,000 per month to be paid in accordance with the payroll policies of the Company and may be modified by the Company from time to time upon 30 days prior notice to the Employee; provided, however, that no Base Salary shall be payable until after the occurrence of the effective date of the Joint Chapter 11 Plan of Reorganization for the Company.

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**") is made and entered into on the date set forth on the signature page hereto (the "**Effective Date**"), by and between First NBC Bank Holding Company (the "**Company**") and the employee set forth on the signature page hereto ("**Employee**").

1.     **Recitals**. This Agreement is entered into with the intention of continuing a long-term relationship for the mutual benefit of the parties. The Company desires to have an enforceable agreement with Employee, giving the Company exclusive rights to his services and expertise, and Employee wishes to provide his services and expertise in exchange for the compensation described in this Agreement. Employee agrees and acknowledges that Employee has been and will be employed in an employee and/or managerial capacity and that Employee will be a key employee who will have access to valuable trade secrets and other confidential information belonging to the Company. In consideration of these rights and opportunities, Employee agrees it is reasonable and appropriate for Employee to enter into the various restrictive agreements contained in this Agreement in order to preserve the value of the Company's trade secrets and to protect the Company against unfair competition or interference with its business by Employee both during and after the term of this Agreement. Furthermore, Employee agrees and acknowledges that the various restrictive agreements contained herein will not impose any unreasonable or undue restriction on his future activities.

2.     **Employment**. On the terms and conditions set forth in this Agreement, the Company hereby employs Employee to serve in the position set forth on Exhibit A hereto and to perform such other duties as the Company may from time to time assign to Employee. Employee hereby accepts such employment. Employee will report to the Board of Directors of the Company (the "**Board**") or to such other individual or committee as designated by the Board.

3.     **Duties.** Employee will devote Employee's sufficient time and effort to performing such duties and discharging such responsibilities as shall be assigned to Employee from time to time by the Company. All duties assigned to Employee shall be performed to the satisfaction of the Company and in accordance with all applicable laws, professional and ethical standards and accreditation, licensing, and other regulatory requirements applicable to the Company.

4.     **At-Will Employment**. This Agreement does not create a contract of employment for any specific duration. At any time during Employee's employment, notwithstanding anything to the contrary, Employee has the right to terminate Employee's employment, with or without cause, with the Company. At any time during Employee's employment, the Company may, and has the right to, terminate Employee's employment with or without cause and, without penalty, regardless of any other documents or oral or written statements by any representative of the Company.

5.     **Return of Property**. Upon the Company's request or termination of employment of Employee hereunder, regardless of the reason for such termination, Employee shall immediately return to the Company any and all property of the Company in his possession, including any hard copies, electronic copies, and other records of or containing any Confidential Information (as

4846-7686-7763.6

defined below). The Company may offset the value of any Company property not returned against any amounts due to Employee.

6.     **Compensation**.  As compensation for the services to be rendered by Employee during the term of his employment and in consideration of Employee's covenants contained herein, the Company agrees to pay Employee the amounts set forth in <u>Exhibit A</u> attached hereto (the "**Base Salary**").

7.     **Benefits**.  During the term of Employee's employment with the Company:

(a)     Employee shall be eligible for reimbursement of all reasonable out-of-pocket travel and other business expenses incurred by Employee on behalf of the Company.  The Company may impose such reasonable requirements on Employee as are imposed on other similar employees with respect to prior authorization, documentation, record keeping and other justification for reimbursable expenses in accordance with applicable tax laws, accounting procedures and internal policies of the Company as in effect from time to time.  Employee shall immediately deliver to the Company upon termination of employment an accounting for any business expenses or other expenses for which Employee claims reimbursement.

(c)     The Company may establish standard benefits for all employees as from time to time are feasible.  Such benefits will be made available to Employee to the extent that they are made available to any other employees of the Company.

8.     **Loyalty to the Company**.  During the term of Employee's employment with the Company, Employee shall use his best efforts to advance the business of the Company.  Employee represents and warrants that Employee is free to enter into this Agreement and to perform the duties required during the term of his employment, and that there are no employment contracts, restrictive covenants or other restrictions preventing, restricting, or affecting the performance of Employee's duties hereunder.  The Company acknowledges that Employee has other business interests, including management roles, which may require time and effort.

9.     **Confidential Information/Confidentiality.**

(a)     Employee recognizes that his employment as a key employee of the Company involves managerial duties, development responsibilities and access to the Company's valuable Confidential Information (as defined below).  Employee acknowledges that all Confidential Information, including Confidential Information developed by Employee during the term of his employment (as more specifically set forth in Section 9(e) below), is the sole and exclusive property of the Company or of third parties whose rights the Company wishes to protect. Employee covenants and agrees that Employee will not at any time, either during Employee's employment with the Company or after such employment terminates for any reason, directly or indirectly, use or make known, divulge, disclose, or communicate to any person, firm, company, partnership, corporation or similar entity, in any manner whatsoever any Confidential Information acquired during the term of the employment with the Company or with respect to any member, shareholder, officer, director or manager of the Company (including personal financial information with respect to any such person) without the prior written consent of the Company or the person

2

to whom the information relates. Employee will be vigilant in protecting all Confidential Information from disclosure to unauthorized persons and will comply with all rules and instructions of the Company concerning the physical and electronic security of the Company's premises, property and records.

(b)     For purposes of this Agreement, the term "**Confidential Information**" shall include, without limitation, all trade secrets, procedures, business plans, concepts, methods, policies, practices, records, data, discoveries, inventions, ideas, concepts, designs, devices, know-how, techniques, improvements and other matters and information, customer or vendor lists, price lists, technical information and/or requirements, product information, sales information, sources of supply, financial data, computer software and programs (including object code and source code), computer software and database technologies, systems and structures, and any other information, however documented, that is related thereto. The term "Confidential Information" is intended to be interpreted broadly to encompass all items described in this Section 9(b) regardless of whether each item satisfies the legal concept of a trade secret. Confidential Information does not include information that is (i) freely available to the public or independently developed by parties outside of the Company; (ii) furnished to Employee by a third party that does not involve a breach of the third party's obligations to any third party; (iii) information properly in possession of Employee prior to his receipt of disclosure from the Company; (iv) information that Employee is required, by law, regulation or court order to disclose; and (v) general information available to the public without restriction.

(c)     Employee acknowledges that Employee is an employee of the Company and that such status as an employee does not confer any proprietary or ownership interest in the Company; that the customers, suppliers, and relationships developed by Employee on behalf of the Company during the term hereof shall be the customers and relationships of the Company; and that upon termination of his employment, Employee shall have no interest in, nor will Employee interfere with the business of the Company, including its relationships with all customers or suppliers, or potential customers or suppliers whom Employee dealt with or became aware of while employed by the Company.

(d)     All books, records, files, forms, reports, memoranda, papers, customer and supplier lists and identities, drawings, designs and models concerning the Company's customers, documents concerning products or processes, and all other documents, writings and similar materials used by Employee in his job, together with any copies or other reproductions thereof made by or in Employee's possession or control, whether prepared or paid for by Employee or anyone else, shall be the exclusive property of the Company and shall be returned immediately to the Company upon termination of employment or upon the Company's request at any time.

(e)     In the course of Employee's employment, Employee may develop or participate in the development of Confidential Information useful in or relating to the Company's business. All trade secrets, procedures, concepts, methods, policies, practices, records, data, discoveries, inventions, ideas, concepts, designs, devices, know-how, techniques, improvements and other matters and information, however documented, which are developed by Employee during the course of his employment, developed in connection with or using in whole or in part any personnel or resources of the Company, or otherwise developed during the term of this

3

Agreement and related in any way to the business of the Company shall be presumed to be Confidential Information whether or not copyrighted or otherwise legally protected. All such Confidential Information, whether developed in whole or in part by Employee, shall be the exclusive property of the Company. Confidential Information specifically includes calendars, address books, appointment records, and other information maintained by Employee individually during the course of his employment hereunder, and all such records whether in hard copy, electronic form, or other form are Confidential Information which constitutes property of the Company and will be returned to the Company upon termination of employment. All original works of authorship directly relating to the business of the Company and which are made or developed by Employee in whole or in part (individually or in conjunction with others) utilizing resources of the Company during the term of Employee's employment are within the scope of Employee's employment, as provided within Employee's job description with Employer or by this Agreement, and constitute "works made for hire." Notwithstanding the foregoing, the Company acknowledges that Employee has other business interests, including management roles, for which Employee may also develop similar works of authorship. Employee agrees to take any action requested by the Company during the term hereof or at any time after termination of Employee's employment (regardless of the reason for such termination) for the purpose of protecting and/or evidencing the Company's rights to any Confidential Information including executing any patent applications, patent assignments, trademark reservations, copyrights, or other legal indicia of the Company's exclusive property rights in any of such Confidential Information.

(f) Nothing in this Agreement shall preclude, restrict or interfere with any rights of Employee that cannot be waived under applicable law. No provision of this Agreement is intended to discourage or interfere with any party's good faith disclosure of a suspected violation of the law to any governmental entity. Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret and/or Confidential Information that is made: (i) in confidence and good faith to a federal, state, or local government official either directly or indirectly, or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, as long as such filing is made under seal. Employer will not retaliate against Employee for such disclosures of trade secret and/or Confidential Information made in accordance with the federal Defend Trade Secrets Act. If such disclosure is made, and Employer files a lawsuit for retaliation against Employee for reporting a suspected violation of law, Employee may disclose the relevant trade secret and/or Confidential Information to his attorney and may use the trade secret and/or Confidential Information in that court proceeding, only if: (i) Employee ensures that any court filing including the trade secret and/or Confidential Information is made under seal; and (ii) Employee does not otherwise disclose the trade secret and/or Confidential Information, except as required by court order.

10. **Protective Covenants**.

(a) The restrictions contained throughout this Section 10 are applicable for so long as Employee is employed by the Company or its affiliates, successors and assigns and shall continue in effect for ninety (90) days following termination of Employee's employment for any reason, (the "**Covenant Period**"). During the Covenant Period, Employee agrees that Employee will not do any of the following:

4

(1)     Interfere in any way with any contractual or other business relationship of the Company with clients, suppliers, contractors or other third parties who have engaged in or considered engaging in business with the Company (collectively, the "**Contracting Parties**");

(2)     Solicit or hire the employees or independent contractors hereafter employed by or otherwise retained by the Company or their successors and assigns;

(3)     Disclose to any third party or utilize in any way adverse to the Company any of the proprietary information utilized by the Company.  The provisions of this Section 10(a)(4) are in addition to, and not substitution of, the provisions of Section 9 above; and

(4)     Directly or indirectly disparage, criticize or otherwise adversely affect the reputation of the Company or its respective agents, employees, officers, directors, managers, shareholders, members, successors and assigns or any of the Company's business, products or services or take any other action that adversely affects the Company.

11.     **Enforcement**.

(a)     Employee acknowledges that the terms of this Agreement are essential for the protection of the Company.  Accordingly, the parties agree that, in addition to any other remedy to which the Company may be entitled pursuant to the terms of this Agreement, in the event that Employee breaches or threatens to breach any term of this Agreement, the Company may suspend and/or offset against all payments, of any kind, due to Employee under the terms of this Agreement or any agreements related thereto. In the event that the Company shall commence and prevail in any action or proceeding (including any arbitration proceeding) that arises out of the provisions hereof, or to recover damages as the result of the alleged breach of any of the provisions hereof, the Company shall be entitled to recover all costs incurred in connection therewith, including reasonable attorneys' fees.

(b)     Employee acknowledges that the provisions of Sections 8, 9 and 10 of this Agreement are essential for the protection of the Company and of its confidential information, including its trade secrets and the Confidential Information, from disclosure to or use by its competitors, and that any breach or threatened breach of such Sections would cause immediate and irreparable damage to the Company, for which monetary relief would be inadequate and difficult to ascertain.  Accordingly, the parties hereto agree that, in addition to any other remedy to which the Company may be entitled at law or in equity, the Company may obtain a temporary restraining order, preliminary injunction or other appropriate form of equitable relief from any court of competent jurisdiction (without the posting of any bond or any other security and without proof of actual damages) to prevent breaches or threatened breaches of Sections 8, 9 or 10 of this Agreement and/or to compel specific performance of such Sections, and Employee expressly waives the defense that a remedy in damages would be adequate.

(c)     Employee acknowledges that the provisions of Sections 8, 9 and 10 of this Agreement are given in connection with the receipt of Equity and in connection with Employee's

4846-7686-7763.6

position as an executive, manager and key employee. Employee acknowledges and agrees that the territorial and time limitations set forth in Section 10 are reasonable and properly required for the adequate protection of the Company's business and its confidential and proprietary information, including its trade secrets and the Confidential Information, developed during the term of Employee's employment with the Company. Employee represents and warrants that his experience and capabilities are such that Employee can obtain employment notwithstanding the restrictions contained in Section 10.

(d)     It is specifically agreed that the respective time periods set forth in Section 10 shall be computed by subtracting from such computation any time during which Employee is in violation of such provision of Section 10 and any time during which there is pending in any court, arbitration, authority, or other adjudicative or mediation body (including any appeal from any judgment) brought by any entity or person, in which action the Company seeks to enforce any of the covenants of Employee pursuant to Section 10 or in which any entity or person contests the validity of such covenants or their enforceability or seeks to avoid their performance or enforcement.

12.     **Termination of Employment**.

(a)     General. Employee's employment with the Company may be terminated by Employee or the Company at any time, with or without notice, for any or no reason and without penalty by either party hereto.

(b)     Compensation after Termination. Upon termination for any reason, Employee shall be entitled to receive accrued wages, any other accrued and unpaid commission or bonus as of the date of termination, and any outstanding travel, lodging and business expenses, and nothing else. It being understood that commission and bonus will not be deemed accrued unless, in the case of commission, amounts on which commission is due are collected prior to date of Employee's termination, and in the case of bonus, the bonus is declared and all conditions to the bonus are satisfied prior to the date of Employee's termination.

(c)     Other Agreements. Employee specifically acknowledges and agrees that termination of Employee's employment with the Company may trigger certain rights and obligations of the Company and Employee contained in agreements between the Company and Employee, including under the Operating Agreement.

13.     **Successors**. This Agreement and all provisions hereof shall bind and inure to the benefit of the Company, Employee and each of their respective personal representatives, heirs, successors and assigns. The Company shall have the right to assign its rights and obligations hereunder to any other entity in the Company or to successor organization of the Company (including any purchaser of all or any significant portion of the Company's business, operations or assets) but Employee's employment obligations and covenants are personal in nature and may not be assigned or delegated by Employee.

14.     **Arbitration**. All disputes among the parties arising under or which are related to this Agreement, including but not limited to any dispute relating to the Company's employment

6

of Employee or any breach of this Agreement (except for disputes arising from or in connection with any allegation of a breach of Sections 8, 9 or 10, which at the discretion of the Company may be resolved in accordance with Section 11), whether arising before or after termination, upon which an amicable resolution by good faith negotiations cannot be reached within forty-five (45) days after notice of any such dispute has been provided by one party to the other party, shall be submitted to binding arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association as then in effect.  Except as set forth in Section 11 above, the procedures of the American Arbitration Association shall be the sole and exclusive procedures for the resolution of any disputes among the parties arising out of or relating to this Agreement.  The parties shall continue to participate in good faith in the arbitration procedures specified herein regardless of whether the Company has separately resorted to a remedy set forth in Section 11 above.  All applicable statutes of limitation shall be tolled while preliminary injunctive relief actions are pending, and the parties agree to take all such action as shall be reasonably required to effectuate such tolling.  Any arbitration hereunder shall take place in the State of Colorado.  The parties agree to arbitrate hereunder within sixty (60) days following the appointment of an arbitrator(s) hereunder.  The parties shall be entitled to conduct reasonable discovery of information and documentation in accordance with the Rules of Civil Procedure of Colorado, and they shall be entitled to move the arbitrator(s) to compel production of such discovery information.  All documentary production will be made available to the other parties no less than fourteen (14) days prior to the date of arbitration.  The parties agree to require that the arbitrator(s) issue a written decision, and further agree that such written decision of a majority of the arbitrators (if more than one) shall be final and binding upon the parties.  Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction.  The arbitration provisions of this Section 14 may be modified, at the election of the parties, by a unanimous written agreement of all parties engaged in any arbitration procedure to provide, for example, for the use of an arbitration association other than the American Arbitration Association.

15.   **Miscellaneous**.

(a)   Any matter to be determined or decided by the Company shall be determined or decided within the sole and absolute discretion of the Board (or such other individual or committee as designated by the Board).

(b)   This Agreement is entered into in the state of Colorado and shall be governed in all respects by the laws of such state.

(c)   This Agreement is intended to be enforceable in accordance with the terms hereof, and shall be interpreted accordingly.  In the event that any court or other authority of competent jurisdiction finds any provision of this Agreement to be illegal or unenforceable, such provision shall be stricken, severed or modified to the extent necessary to cause it to be enforceable, and as so stricken, severed or modified, the remainder of this Agreement shall remain in full force and effect.

(d)   This Agreement and Exhibits attached hereto shall set forth the entire agreement of the parties hereto and shall replace and supersede all prior discussions, agreements and arrangements, written or oral, relating to Employee's employment with the Company.  This

4846-7686-7763.6

Agreement may be amended or modified only by written agreement subscribed to by both of the parties hereto.

(e)     The waiver by either party of a breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach of the same provision or any other provision of this Agreement.

(f)     The remedies provided in this Agreement are cumulative, not alternative, and the exercise of one shall not preclude the exercise of any other remedy at law or in equity for the same event or any other event.

(g)     Any notices required or permitted to be given hereunder shall be sufficient if in writing, and if delivered by hand or sent by certified mail to the addresses set forth below on the signature page to this Agreement or such other address as either party may from time to time designate in writing to the other party, and shall be deemed given as of the date of the delivery or mailing.

(h)     Wherever the context requires, the gender of all words used in this Agreement shall include the masculine, feminine, and neuter, and the number of all words shall include the singular and the plural.

(g)     <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, OR (ii) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY AGREES THAT ANY PARTY MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF EACH PARTY IRREVOCABLY TO WAIVE THEIR RIGHTS TO TRIAL BY JURY, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER AMONG THE PARTIES SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

*[Signatures on following page.]*

4846-7686-7763.6

IN WITNESS WHEREOF, the parties have entered into this Employment Agreement effective as of as of January 1, 2020.

**COMPANY**:

**First NBC Bank Holding Company**

By:_____
      L. Blakes Jones, Chief Restructuring
      Officer

**EMPLOYEE:**

_____
Shivan Govindan

Address: _____
           _____
           _____

9

## EXHIBIT A

1.    **Employment**.

    (a)    <u>Employee Name</u>:   Shivan Govindan

    (b)    <u>Position</u>:  Chief Executive Officer

2.    **Base Salary**.  The Base Salary payable to Employee shall be equal to $12,000 per month to be paid in accordance with the payroll policies of the Company and may be modified by the Company from time to time upon 30 days prior notice to the Employee; provided, however, that no Base Salary shall be payable until such time as the Company has closed on transactions which result in revenue to the Company of $1.0 million or more as reasonably determined by the board. In addition, no Base Salary shall be payable until after the occurrence of the effective date of the Joint Chapter 11 Plan of Reorganization for the Company.

# **EXHIBIT D**

Business Plan Summary

**First NBC Bank Holding Co.**

**Business Plan**

**February 2020**

Shivan Govindan, CEO, and Andrew Nash, CFO (cumulatively, the "Management Team"), and the Board of Directors ("Board") have been continuously working on a plan for First NBC Bank Holding Co. (the "Company") to emerge from Chapter 11 since May of 2017 while developing a plan and engaging in negotiations to evolve into new operations.

The Company has been successfully raising $6 million in a common stock offering to finance its emergence from bankruptcy. Those funds will settle creditor claims and finance its ongoing operations.

Each member of the Management Team has executed employment contracts with the Company that will be effective once the Company emerges from Chapter 11 and the reorganization plan becomes effective.

There is substantial continuity at the Company. CEO Shiv Govindan has been a Director of the company since 2006, Chairman since 2017, and CEO since 2018. Mr. Nash was Senior Vice President of the Company's subsidiary since 2011, and CFO since 2017. The Board includes members whose tenure extends back to the formation of the Company in 2006

FNBC Bank Holding Co.'s former chief subsidiary's primary business was lending. CFO Andrew Nash has extensive experience in accounting and finance functions at financial institutions. Several of management and board have experience in managing publicly traded and private credit investments. CEO Shiv Govindan has extensive experience managing private equity investments and operating businesses that make such investments. The Company's investors have experience investing in public and private equity and debt instruments, and other financial instruments.

The Company continues to leverage its experience as a lender, and the experience, expertise, and contacts of its Management Team, Board, and investors to continue developing asset management operations investing both for its own account and on behalf of other investors.

The categories of investments contemplated include:

- Credit: The Company intends to continue its 13+ year history in lending, leveraging its experience and market knowledge to identify attractive lending opportunities. These opportunities include direct lending (i.e., providing funds directly to borrowers) as well as purchasing credit exposure on the secondary market.
- Private Equity: Mr. Govindan has substantial experience in venture capital and private equity investing.  The Company has been leveraging his experience, and that of the board and investors, to raise capital and identify and negotiate investment opportunities.
- Structured Finance: Mr. Govindan has substantial experience with structured finance investments, and substantial contacts with industry participants. The Company has been

leveraging his experience, and that of the board and investors, to identify partners, negotiate with investors and seek investment opportunities.

The characteristics of the investments contemplated include:

- Regulated businesses. The Company and its Management, Board, and investors have extensive experience investing in and operating within regulated industries.
- Large scale potential: The Company seeks to make investments in industries and particular companies that evidence the potential for accommodating additional capital if the Company can successfully scale its operations, such companies operating in the franchise-franchisee construct.
- Structural sophistication: Mr. Govindan and others have extensive experience with highly structured financial transactions, including over the counter derivatives and structured finance. The Company intends to use that expertise to broaden the scope of its potential investments, as well as to employ sophisticated structuring to maximize the Company's benefit of those investments.

The Company believes these categories and characteristics represent examples of investments in which the Company enjoys a competitive advantage.

The Company will seek creative methods for financing and identifying exposure to the desired investments. As such, the Company may seek to enter into joint ventures or other contractual agreements with fund managers or others that have beneficial interests in such assets. The Company has been working with an adviser to help source and structure these transactions.

# **EXHIBIT E**

## Officer and Director Disclosures

After confirmation of the Plan ("Confirmation") and the occurrence of the Effective Date, the board of directors of the Debtor (the "Board") shall consist of seven (7) persons, including Shivan Govindan, Blake Jones, Lee Foley, Lee Giorgio, and Navid Abghari; and, within three (3) months of the first Board meeting after entry of the Confirmation Order, FNBC shall cause Tim Babich and one other individual, designated by Nexxus Holdings, Inc., (or any other individual as may be designated by First Phoenix SPV, LLC from time to time, not to exceed two individuals at any point in time) (each a "Phoenix Director" and together, the "Phoenix Directors") to be appointed to the Board. Mr. Govindan, Mr. Jones, Mr. Foley, Mr. Giorgio each currently serve as directors and have served since the filing of the Chapter 11 case. Mr. Abghari is a member of the Committee. Nexxus Holdings, Inc. will be the largest investor in First Phoenix SPV, LLC, the entity that will provide funding for implementation of the Plan.

After Confirmation and the occurrence of the Effective Date, Shivan Govindan shall serve as the Chief Executive Officer of the Debtor to be compensated as set forth in the Employment Agreement attached as Exhibit C and Andrew Nash shall serve as the Chief Financial Officer of the Debtor to be compensated as set for the in the Employment Agreement attached as Exhibit C.

## **EXHIBIT F**

Stock Option and Warrant Disclosures

After Confirmation and the occurrence of the Effective Date, the Debtor contemplates issuance of the following compensatory awards to officers of FNBC: (i) 400,000 options exercisable at $0.50 per share (380,000 of which have vested) to Blake Jones, Chief Restructuring Officer; (ii) 400,000 options exercisable at $0.50 per share (380,000 of which have vested) to Shivan Govindan, Chief Executive Officer; (iii) 400,000 options exercisable at $0.50 per share (380,000 of which have vested) to Andrew Nash, Chief Financial Officer; (iv) 50,000 options exercisable at $0.50 (47,500 of which have vested) to Matt Elsom, Senior Financial Analyst; (v) 50,000 options exercisable at $0.50 (47,500 of which have vested) to Mark Haden, Business Development Officer. In addition, after confirmation and the occurrence of the Effective Date, the Debtor contemplates payment of (A) approved cash incentives of $75,000 to each of Matt Elsom and Mark Haden, and $100,000 to Andrew Nash and (B) intends to approve equity incentive awards (in the form of either stock options or stock appreciation rights) representing up to 1,100,000 shares or share equivalents to members of the executive management of FNBC. In addition, after Confirmation and the occurrence of the Effective Date, the Debtor contemplates issuance of warrants, exercisable for a period of five (5) years from the Effective Date, to purchase 600,0000 shares of common stock exercisable at $0.3896 per share to Nexxus Holdings, Inc. (or an affiliate of Nexxus Holdings, Inc.), the largest First Round Investor.