UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 17-11213 |
| First NBC Bank Holding Company, | Section A |
| Debtor | Chapter 11 |
| | Honorable John W. Kolwe |

## RULING ON THE UNITED STATES' OBJECTION TO PLAN CONFIRMATION

On March 10, 2020, the Court held a confirmation hearing on the Second Amended Plan (ECF #621) filed by the Debtor, First NBC Bank Holding Company ("FNBC"), and the Official Committee of Unsecured Creditors (together, the "Plan Proponents"). By the time of the hearing, the only remaining Objection to Confirmation was by the United States of America on behalf of the Department of the Treasury ("Treasury") (ECF #669). Under the Plan, Treasury's Series D Preferred Equity shares in FNBC will be left unaltered. According to Treasury, this means that its preferred shares must be redeemed at a cost of at least $37,935,000.00 under the terms of the governing documents between Treasury and the Debtor. Since the Debtor cannot show it can pay the redemption price upon confirmation, Treasury contends the Plan is not feasible. It also claims the Plan violates the absolute priority rule. Because the Court concludes that the redemption obligation has not been triggered and that Treasury's rights and obligations are not impaired by the Plan, the Court will overrule Treasury's Objection and confirm the Plan.

### Relevant Facts and Issues Presented

The relevant facts are undisputed. The Debtor is or was a bank holding company that had a single bank subsidiary, First NBC Bank (the "Bank"). It is undisputed that the Bank was closed on April 28, 2017 by the Louisiana Office of Financial Institutions and, on the same date, the Federal Deposit Insurance Corporation was named as Receiver for the Bank. The question before the Court is

whether the Bank's closure, which arguably resulted in the termination of the Debtor's status as a bank holding company, triggered a contractual obligation to redeem shares held by Treasury. The Debtor has not redeemed the shares, and the Plan put forward by the Plan Proponents does not propose to do so. Because it is effectively impossible for the Debtor to pay that redemption price at present, if Treasury is correct, it is necessarily impaired, its consent would be required to confirm the Plan, and its Objection must be sustained.

The Plan Proponents claim that because Treasury is not entitled to redemption, the Plan does not alter Treasury's rights and obligations, which means (a) Treasury is deemed to accept the Plan under § 1126(f); (b) the feasibility requirement of § 1129(a)(11) is satisfied; and (c) the Plan does not violate the absolute priority rule under § 1129(b)(2).

This dispute ultimately concerns the interpretation of a Securities Purchase Agreement ("Purchase Agreement"), which was executed by the Debtor and Treasury and effective August 4, 2011, in connection with the issuance of 37,935 shares of Series D Preferred Equity in the Debtor. The shares are worth a minimum "Liquidation Amount per share" of $1,000.00, or $37,935,000.00 total. The Purchase Agreement itself is a single page that states: "This Agreement consists of the following attached parts, all of which together constitute the entire agreement of Treasury and the Company (the *'Parties'*) with respect to the subject matter hereof...." (ECF #669-2). The Purchase Agreement lists 11 Annexes included in the "entire agreement," most relevantly Annex C ("General Terms and Conditions") and Annex F ("Form of Certificate of Designation"). Any reference to sections of the Purchase Agreement below is found in Annex C unless otherwise specified.

Treasury claims that, pursuant to § 3.1(e) of the Purchase Agreement, "the Series D Preferred Equity must be redeemed by the Debtor if the Debtor is no longer a bank holding company" (ECF #669, p. 2). Under the Purchase Agreement, that means a company registered as such with the Federal Reserve under 12 U.S.C. § 1842 and related regulations, i.e., a company that "has direct or indirect control of a bank." 12 C.F.R. § 225.2(c).

Though Treasury repeatedly states in its briefing that § 3.1(e) of the Purchase Agreement requires redemption once the Debtor loses bank holding company status, that is not the precise language of the provision. Section 3.1(e) provides in full:

> (e) <u>Bank and Thrift Holding Company Status.</u> If the Company [Debtor] is a Bank Holding Company or a Savings and Loan Holding Company on the Signing Date, then the Company shall maintain its status as a Bank Holding Company or Savings and Loan Holding Company, as the case may be, for as long as Treasury owns any Preferred Shares. **The Company shall redeem all Preferred Shares held by Treasury prior to terminating its status as a Bank Holding Company or Savings and Loan Holding Company, as applicable.**

Purchase Agreement (ECF #669-2) (emphasis added). If the condition set out in § 3.1(e) is satisfied, the Debtor must redeem Treasury's shares at a minimum redemption price of the $1,000.00 per share Liquidation Amount, plus any unpaid dividends for the then-current quarter. For simplicity, the Court will round this minimum redemption price to $38 million.

On August 1, 2011, the Debtor amended its Articles of Incorporation, as required by § 1.3(d) of the Purchase Agreement (ECF #669-2), which included the form of the required Articles of Amendment in Annex F ("Form of Certificate of Designation"). The Articles of Amendment provide for redemption of the Series D Preferred Equity only by the Issuer (the Debtor) and state that holders of the Series D Preferred Equity "will have no right to require redemption or repurchase." *See* Articles of Amendment to Articles of Incorporation § 5(b) (ECF #669-2). The parties dispute whether the terms of the Purchase Agreement, including § 3.1(e), continued to apply at all following the Articles of Amendment.

To determine the merits of Treasury's Objection, the Court must answer two questions. First, did the terms of the Purchase Agreement remain in effect following the issuance of the Series D Preferred Equity shares? If not, then Treasury cannot rely on § 3.1(e) or any other provision of the Purchase Agreement to seek the $38 million payment. Second, if the terms of the Purchase Agreement continue to apply,

does § 3.1(e) require the Debtor to redeem the shares based on its involuntary loss of bank holding company status in April 2017?

### Applicable Bankruptcy Law

A bankruptcy court may only confirm a Plan under 11 U.S.C. § 1129 if a number of requirements are met. The only two requirements at issue in Treasury's Objection are feasibility under § 1129(a)(11) and the absolute priority rule under § 1129(b)(2). The Plan Proponents' briefs also address the rule concerning unimpaired classes under § 1126(f).

Section 1129(a)(11) requires the Court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *Id.* Under this standard, the debtor (or plan proponent) must "show by a preponderance of the evidence that the plan is feasible." *In re Save Our Springs (SOS) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011). Here, Treasury argues that because the Plan does not provide for payment of an approximately $38 million stock redemption it claims it is presently owed under the parties' agreement, and because the Debtor cannot possibly afford to pay that amount upon confirmation, the Plan is not feasible.

The absolute priority rule is set out in § 1129(b)(2). It "'requires that certain classes of claimants be paid in full before any member of a subordinate class is paid. Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated.'" *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 (5th Cir. 2009) (quoting *In re Geneva Steel*, 281 F.3d at 1180 n. 4 (10th Cir. 2002)). *See also In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009). Specifically, with respect to Treasury's equity interest, § 1129(b)(2)(C) provides:

> (C) With respect to a class of interests--
>
> > (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed

> amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
>
> **(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

*Id.* Under the absolute priority rule, if Treasury is presently entitled to the approximately $38 million redemption payment under the terms of the parties' contract, it must be paid prior to any junior class under the Plan receiving anything. Because the Plan does not provide for the redemption payment to Treasury but does provide for potential payments to at least one junior class, Treasury argues the Plan violates the absolute priority rule.

Finally, under 11 U.S.C. § 1126(f), "a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required." Under 11 U.S.C. § 1124(1), a Plan is not impaired if it "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." The Plan Proponents argue that the Plan will leave Treasury's rights unaltered and that Treasury is not now and has never been entitled to the $38 million redemption payment based on the language of the relevant documents and the undisputed facts.

Because the question of impairment is a threshold issue, the Court wishes to clarify a key point. This dispute concerns whether Treasury is entitled to a $38 million redemption payment under the relevant documents, all of which predate the Debtor's bankruptcy. Although Treasury argues in its briefing that the *Plan* impairs its rights, that is only the case if Treasury's interpretation of the documents is correct. The Plan specifically purports to leave Treasury's rights unchanged, with § 3.3.10 of the Plan providing: "Holders of Class 8 Interests [i.e., Series D Preferred Equity] in the Debtor shall have left unaltered the legal, equitable, and contractual rights, all

as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interests." (ECF #621).

If the pre-bankruptcy documents did not trigger the redemption obligation at issue, as the Plan Proponents contend, then the Plan could not impair Treasury's rights by failing to include something it never had to begin with. On the other hand, if the pre-bankruptcy documents did trigger the redemption obligation, as Treasury argues, then it will still have that right under the Plan, and Treasury's Objection must be sustained because the plan is not feasible and violates the absolute priority rule for failure to provide for the $38 million redemption payment. The key is that the outcome does not turn on the Plan language but on the interpretation of pre-bankruptcy documents.

## Analysis

### The Terms of the Purchase Agreement Continue to Apply Through the Stock Certificate.

Because § 3.3.10 of the Second Amended Plan provides that Treasury shall maintain all of its "legal, equitable, and contractual rights, all as set forth in the Articles of Amendment to the Articles of Incorporation of First NBC Bank Holding Company dated July 27, 2011, to which each such Holder is entitled on account of such Interests," the Court must first decide whether those rights include any rights under the Purchase Agreement, specifically § 3.1(e).

Treasury's original July 31, 2019 Objection focused only on the Purchase Agreement, not the Articles of Amendment or the stock certificate. (ECF #669). The Plan Proponents' initial response argued that the Purchase Agreement was merely an agreement to purchase stock that "does not equate to a stock certificate for the Series D Preferred [shares] nor is it incorporated into the Debtor's articles of incorporation or bylaws . . . ." The Plan Proponents further point out that the Articles of Amendment specifically state that the holders of the Series D Preferred Equity shares shall "have no right to require redemption or repurchase of any" of those shares (ECF #679). Thus, the Plan Proponents' initial position was that the

6

provisions of the Purchase Agreement were not incorporated into the Series D Preferred Equity shares at all, whether through the Articles of Amendment or the stock certificate issued for those shares.

Treasury's August 19, 2019 Supplemental Brief (ECF #691) noted that at an earlier hearing, Treasury could not state whether the stock certificate "recited or referenced" § 3.1(e) but after the hearing it was able to locate the document, and neither party disputes its authenticity. The stock certificate includes language (discussed below) purporting to incorporate provisions of the Purchase Agreement by reference, but the parties disagree on the scope of that incorporation. Treasury argues that the stock certificate broadly incorporates provisions of the Purchase Agreement, including § 3.1(e), and that the incorporation of § 3.1(e)'s provision requiring redemption upon the fulfillment of a condition does not conflict with the Articles of Amendment's prohibition against Treasury demanding redemption.

The Plan Proponents' Memorandum (ECF #702), filed the same day as Treasury's Supplemental Brief, argues that any covenants the stock certificate purports to incorporate from the Purchase Agreement nevertheless are not binding on third parties because they only apply while Treasury holds the shares, and any rights and obligations under the Purchase Agreement are not assignable absent the mutual consent of the Debtor and Treasury. Whether or not that is true—and the Court takes no position—it is irrelevant to Treasury's Objection because it is undisputed that Treasury still holds the shares. The Plan Proponents also argue that neither the Purchase Agreement nor the Articles of Amendment grant Treasury the right to demand redemption, an argument that assumes that even if the Purchase Agreement was incorporated, § 3.1(e)'s redemption obligation was not triggered. The Plan Proponents' Memorandum fails to address whether the Articles of Amendment or stock certificate incorporated the relevant provisions of the Purchase Agreement with respect to *Treasury* for as long as Treasury held the shares.

The Plan Proponents' November 5, 2019 Supplemental Memorandum (ECF #775), filed more than a month later, raised a few new arguments,[1] but only one addressing whether or not the provisions of the Purchase Agreement, including § 3.1(e), remained viable following execution of the Articles of Amendment and issuance of the Series D Preferred Equity shares. The Plan Proponents concede that the stock certificate, through the language quoted above, incorporated at least some provisions of the Purchase Agreement into the shares, but they argue that it did not incorporate § 3.1(e).

Both parties agree that the applicable statute is La. R.S. § 10:8-202, governing the responsibility and defenses of an issuer of a security. Most relevantly, § 10:8-202(a) provides:

> (a) Even against a purchaser for value and without notice, **the terms of a certificated security include terms stated on the certificate and terms made part of the security by reference on the certificate to another instrument**, indenture, or document or to a constitution, statute, ordinance, rule, regulation, order, or the like, to the extent the terms referred to do not conflict with terms stated on the certificate. . . .

*Id.* (emphasis added). The stock certificate issued for the Series D Preferred Equity on August 4, 2011 contains, among other things, the following paragraph:

> THIS INSTRUMENT IS ISSUED SUBJECT TO THE RESTRICTIONS ON TRANSFER **AND OTHER PROVISIONS** OF A SECURITIES PURCHASE AGREEMENT BETWEEN THE ISSUER OF THESE SECURITIES AND THE SECRETARY OF THE TREASURY. THE SECURITIES REPRESENTED BY

---

[1] For instance, the Plan Proponents contended that even if the redemption obligation had been triggered, it would have been a pre-bankruptcy claim that would be disallowed due to Treasury's failure to file a proof of claim in the bankruptcy proceeding. Because the Court holds that the redemption obligation was not triggered, Treasury could not have waived any right by failing to file a proof of claim. The Plan Proponents also raise an alternative argument in the final paragraph of their earlier August 19, 2019 Memorandum (ECF #702), suggesting that the Purchase Agreement "*may* have been an executory contract" (emphasis added) that was rejected when the Debtor, on a properly noticed motion, obtained an order rejecting all executory contracts. Because the Plan Proponents do not even definitively assert that the Purchase Agreement *was* an executory contract, and neither party briefed that issue, the Court takes no position on the rejection argument.

> THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.

(ECF #691-2) (emphasis added).

Treasury argues that this language incorporates the full Purchase Agreement, including § 3.1(e), by reference, while the Plan Proponents contend that the stock certificate only incorporates provisions of the Purchase Agreement concerning transfers of securities. The Plan Proponents argue that the language on the stock certificate comes from § 4.2(a) of the Purchase Agreement, which concerns only the transfer and registration of the Series D Preferred Equity shares, and that it simply restates that limited scope.

The Plan Proponents' argument is without merit. First, the plain language of the stock certificate does not limit the incorporated provisions to transfer restrictions. To the contrary, the stock certificate specifically expands the incorporated provisions *beyond* transfer restrictions by incorporating the Purchase Agreement's "restrictions on transfer **and other provisions**" (emphasis added). The Plan Proponents' interpretation, which would strictly limit the stock certificate's language to transfer provisions in the Purchase Agreement, fails to give any effect to the phrase "and other provisions." The language of the stock certificate suggests that the full Purchase Agreement was incorporated by reference, with special—but not exclusive—emphasis placed on the transfer restrictions. That special emphasis makes sense considering a hypothetical third-party purchaser of the Series D Preferred Equity shares would be most interested in transfer restrictions, but the language also fairly puts third parties on notice of "other provisions" of the Purchase Agreement also incorporated by reference.

Second, the Plan Proponents argue that the stock certificate limits the incorporation of the Purchase Agreement to transfer provisions because the stock certificate's language comes from § 4.2(a) of the Purchase Agreement, which itself focuses on transfer provisions. The Court cannot make any sense of this argument

9

because § 4.2(a) simply sets out the "legend" to include on the stock certificate, including the precise language at issue incorporating by reference the Purchase Agreement's "restrictions on transfer and other provisions." The Plan Proponents effectively overlook the phrase "and other provisions" in the stock certificate, then try to bolster their argument by overlooking the phrase in § 4.2(a) as well. Citing to § 4.2(a) adds nothing.

Third, although the Plan Proponents do not squarely address this point, the Court notes that the Purchase Agreement states that all of the Annexes, including Annex C (which contains § 3.1(e)'s redemption provision and § 4.2(a)'s required stock certificate language) and Annex F (which sets out the form for the Articles of Amendment), "together constitute the entire agreement of Treasury and the Company." (ECF #669-2). The Court finds no conflict among the provisions of the Purchase Agreement, the Articles of Amendment, and the stock certificate, which makes sense because they were all part of the same agreement. Furthermore, because Treasury and the Debtor were the only parties to the Purchase Agreement, and Treasury remains the only holder of Series D Preferred Equity shares, this case does not pose the more difficult question of whether and to what extent the rights and obligations contained in the Purchase Agreement might apply to a third party purchaser of the Series D Preferred Equity shares.

The Court therefore concludes that the Series D Preferred Equity shares were made subject to the Purchase Agreement from the time the shares were issued in 2011 based on the plain language on the stock certificate, which was issued pursuant to the Articles of Amendment and which includes the required language from the Purchase Agreement incorporating the Purchase Agreement's provisions by reference. Furthermore, the Purchase Agreement required both the execution of the Articles of Amendment and the stock certificate's incorporation of the Purchase Agreement by reference. Because the Plan provides that the holder of Series D Preferred Equity shares, i.e., Treasury, shall maintain all of its "legal, equitable, and contractual rights, all as set forth in the Articles of Amendment" under the Plan, the

Court concludes that Treasury may look to § 3.1(e) of the Purchase Agreement to determine whether the redemption obligation was triggered.

<u>Section 3.1(e) of the Purchase Agreement Does Not Allow Redemption under These Circumstances.</u>

Because the Plan purports to leave Treasury's rights unaltered, and Treasury's rights include any relevant provisions under the Purchase Agreement, the Court may now turn to the heart of Treasury's Objection: whether the redemption obligation under § 3.1(e) was triggered. The outcome depends on the interpretation of the Purchase Agreement.

The Purchase Agreement is to be "enforced, governed, and construed in all respects (whether in contract or tort) in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. . . ." Purchase Agreement § 5.5 (ECF #669-2). "Under [New York state law's] longstanding rules of contract interpretation, '[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.'" *Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082, 128 N.E.3d 674, 675 (N.Y. 2019) (quoting *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244, 997 N.Y.S.2d 339, 21 N.E.3d 1000 (N.Y. 2014)).

> The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.
>
> Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide. A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of

> the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion. Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569–70, 780 N.E.2d 166, 170–71 (N.Y. 2002). These are essentially the same rules of contract interpretation applied in jurisdictions throughout the country.

Both parties argue that the meaning of § 3.1(e) of the Purchase Agreement is clear on its face, and neither party cites to nor relies on extrinsic evidence. The Court agrees that the provision is clear on its face. Again, § 3.1 provides:

> (e) <u>Bank and Thrift Holding Company Status.</u> If the Company [Debtor] is a Bank Holding Company or a Savings and Loan Holding Company on the Signing Date, then the Company shall maintain its status as a Bank Holding Company or Savings and Loan Holding Company, as the case may be, for as long as Treasury owns any Preferred Shares. **The Company shall redeem all Preferred Shares held by Treasury prior to terminating its status as a Bank Holding Company or Savings and Loan Holding Company, as applicable.**

Stock Purchase Agreement (ECF #669-2) (emphasis added).

Treasury argues that this provision means that the Debtor's redemption obligation is triggered whenever the Debtor loses bank holding company status, no matter how that occurs. The Plan Proponents argue that the provision means that the redemption obligation is only triggered when the Debtor itself chooses to terminate its bank holding company status but is not triggered by the Debtor involuntarily losing that status, as it did on April 28, 2017, when the Louisiana Office of Financial Institutions closed the Debtor's sole subsidiary bank.

The Court shares the Plan Proponents' interpretation. While the first sentence of § 3.1(e) states that the Debtor "shall maintain its status as a Bank Holding Company," the second sentence provides that the Debtor "shall redeem" the shares "prior to terminating its status as a Bank Holding Company," which implies a

conscious decision by the Debtor. The second sentence easily could have tied the redemption obligation to simply losing bank holding company status, which would have plainly covered even involuntary loss of status (as in this case), but it does not say that.[2] Instead, the obligation is triggered by the Debtor "terminating its status," and the Debtor is required to redeem Treasury's shares before doing so.

The plain language of the second sentence of § 3.1(e) only makes sense for voluntary, not involuntary, status terminations. First, in an involuntary termination, it is not "the Company" that terminates its status but a regulatory authority. That alone is sufficient to conclude that § 3.1(e)'s redemption obligation only applies to voluntary and not involuntary status terminations. Second, because the provision requires redemption prior to terminating the status, § 3.1(e) anticipates a *decision* by "the Company" to either maintain its status and keep Treasury's investment or redeem the shares to gain freedom to terminate its bank holding company status. There is no such decision in an involuntary status termination. Indeed, it is hard to imagine a scenario in which an imperiled bank holding company would have the financial ability to satisfy § 3.1(e)'s redemption obligation on the eve of involuntarily losing the very bank that makes it a bank holding company.

In sum, the fact that the redemption obligation is triggered *prior* to losing bank holding company status strongly implies that § 3.1(e) was intended to apply to voluntary status terminations, and the fact that the provision is explicitly written to apply only to "[t]he Company...terminating its status" precludes any ambiguity. The

---

[2] In connection with its August 18, 2019 Supplemental Brief (ECF #691), Treasury submitted the Second Declaration of John McGrail, Senior Counsel for Treasury (ECF #691-1), in which he stated that "[l]imited redemption rights were among the features needed to allow the investment to qualify as tier 1 capital. If the Series D Preferred Equity were not designed to serve as tier 1 capital for bank holding companies, the United States would have sought better protections as the investor, including broader redemption rights." *Id.* at ¶ 8. This statement is telling because it acknowledges that the redemption right under the Purchase Agreement and associated Articles of Amendment are *not* broad and were specifically intended to be limited. Under the plain language of the Purchase Agreement, the redemption right, or more accurately the redemption obligation, is limited to the condition set out in § 3.1(e). Unless that condition was triggered by the Debtor choosing to change its bank holding company status, Treasury has no right to demand redemption under the plain terms of the Articles of Amendment.

Court therefore concludes that § 3.1(e) applies only to voluntary terminations of bank holding status by the Debtor, not to involuntary status terminations.

In this case, it is undisputed that the Debtor did not terminate its status on April 28, 2017; that was done by the Louisiana Office of Financial Institutions. That termination could not trigger the redemption obligation under the plain language of § 3.1(e), so Treasury is not entitled to the approximately $38 million payment. Because this payment is not due, the Plan is feasible, as the Debtor will have the funds on hand to carry out its obligations under the Plan. Moreover, there is no violation of the absolute priority rule because Treasury's "legal, equitable, and contractual rights" are left unaltered. § 1124(1). There is no impairment, and the Plan should be confirmed.

## Conclusion

Treasury's entire Objection to plan confirmation is based on the approximately $38 million redemption payment it claims is due to it under § 3.1(e) of the Purchase Agreement. Because no such redemption payment is owed, it poses no threat to the feasibility of the Plan under § 1129(a)(11). Because Treasury retains all of its prepetition rights and is not losing any right to payment under the Plan, the Plan does not violate the absolute priority rule under § 1129(b)(2). Finally, because Treasury is not impaired under the Plan, Treasury is indeed deemed to accept under § 1126(f). The Court will therefore overrule Treasury's Objection and confirm the Plan. The Plan Proponents shall submit a proposed Order in conformity with this Ruling within ten days of it being entered.

Lafayette, Louisiana, this 1st day of May, 2020.

_____
Chief Judge John W. Kolwe
U.S. Bankruptcy Court